IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WHARF, INC.<br>t/a THE WHARF,<br><br>BRW, INC.<br>t/a CAPTAIN WHITE SEAFOOD CITY,<br><br>and<br><br>SALT WATER SEAFOOD, INC.<br>t/a SALT WATER<br><br>Plaintiffs,<br><br>v.<br><br>THE DISTRICT OF COLUMBIA,<br><br>HOFFMAN-MADISON<br>WATERFRONT, LLC,<br><br>and<br><br>THE WHARF HORIZONTAL<br>REIT LEASEHOLDER, LLC,<br><br>Defendants. | Case No: |

## **COMPLAINT**

Plaintiffs, The Wharf, Inc., t/a The Wharf, ("The Wharf"), BRW, Inc., t/a Captain White

Seafood City ("Captain White"), and Salt Water Seafood, Inc., t/a Salt Water ("Salt Water")

(collectively, "Plaintiffs"), who are tenants and operators of open air fish markets and a seafood

deli located on the Southwest Waterfront in the District of Columbia, bring this Complaint and

allege as follows:

## SUMMARY OF THE ACTION

1.     This is an action to protect Plaintiffs, tenants of 1100 Maine Avenue, S.W., Washington, D.C. 20024 (the "Municipal Fish Market"), against the destruction of their businesses by the District of Columbia (the "District"); Hoffman-Madison Waterfront, LLC ("HMW"), the developer with whom the District has partnered in the $2 billion redevelopment of the District's Southwest Waterfront; and Wharf Horizontal REIT Leaseholder LLC ("WHRL"),  HMW's affiliated entity and alter ego to which the District assigned its rights as Plaintiffs' landlord.

2.     The District's Municipal Fish Market is the country's oldest open air fish market, which first opened in 1805.  Plaintiffs run three of the seafood businesses at the District's Municipal Fish Market and have long term leases there.  Plaintiffs' original landlord was the District, but in 2014 the District assigned its rights to HMW/WHRL.

3.     Plaintiffs' rights under the leases conflicted with the District's and with HMW/WHRL's development plans.  As a result, the Defendants entered into a conspiracy to run the Plaintiffs' out of the fish market by destroying Plaintiffs' businesses.  Indeed, in a recent article in the Washington Business Journal, HMW President Monty Hoffman stated that HMW, through the Redevelopment Project, had "annexed" Plaintiffs' leased property and described the various actions Defendants planned to take under the Redevelopment Project.  The proposed actions constitute breaches of Plaintiffs' leases.

4.     Defendants' conspiracy encompasses a pattern of egregious acts including harassment, governmental overreach, continuous material breaches of Plaintiffs' leases, and unjust attempts to oust Plaintiffs from their leased property.  On information and belief, this conspiracy was in effect at all times relevant to this Complaint.

5.      The abuses began in 2011 when, over the objections of several neighborhood residents, the District passed a law closing Water Street for the benefit of HMW's development plan and to the detriment of Plaintiffs.

6.      Water Street is the primary access road to Plaintiffs' leased property.  The District's action eventually led to the actual removal of the primary access point for customers and vendors, and eliminated a large amount of customer parking causing monetary damage and irreparable harm to Plaintiffs.

7.      In 2012, at the request of the District, and to the benefit of the Redevelopment Project, a nearly 100-year-old federal law was changed.  The law, which previously required that Plaintiffs' leased property and the surrounding area be used exclusively as a fish market, was changed to permit Plaintiffs' leased property to operate for any uses as the Mayor of the District may determine.

8.      In April 2014, the District, possibly in an attempt to avoid the clear violation of the Fifth Amendment's Takings Clause that would flow from the steps necessary to destroy the Plaintiffs' businesses, assigned its rights as landlord to WHRL—the alter ego of HMW.  HMW represented to Plaintiffs that it controls WHRL to its benefit, and HMW has effectively acted as Plaintiffs' landlord.[1]

9.      Almost immediately after the assignment, HMW began encroaching onto Plaintiffs' leased property, damaging the leased property, blocking various access points to, and exits from, Plaintiffs' leased property, and otherwise interfering with Plaintiffs' businesses.

---

[1] Collectively HMW and WHRL are referred to herein as "HMW" or the "Landlord." Discovery will show whether HMW and WHRL conspired to commit the illegal acts set for this Complaint, or whether HMW and WHRL are simply one and the same, such that no conspiracy between these two entities was necessary.  For the purpose of this Complaint, and based on the representations of HMW to the Plaintiffs, HMW and WHRL are treated as alter egos.

10.     When Plaintiffs voiced their objections to HMW's actions, HMW escalated its harassment of Plaintiffs.  HMW repeatedly closed the customer parking lot, impermissibly constructed permanent structures on the "Common Area" designated under the leases for Plaintiffs' use, and attempted on multiple occasions to have Plaintiffs' commercial and private vehicles ticketed and towed from the Common Area parking lot.

11.     HMW now plans to construct multiple additional structures on the Common Area without Plaintiffs' required consent and to Plaintiffs' detriment.

12.     Further, HMW is now attempting to terminate two of Plaintiffs' leases for pretextual reasons.  Specifically, HMW is attempting to force The Wharf and Salt Water to vacate the premises by July 31, 2015.  In one case, HMW claims that a valid lease does not exist because HMW cannot find signed copies of the leases it assumed from the District.  In another case, HMW relies on alleged, but immaterial, breaches by one of Plaintiffs' business.  As will be discussed in more detail below, the locations of the Wharf and Salt Water would interfere most with HMW's planned redevelopment removing all doubt as to why the Defendants want those Plaintiffs gone.

13.     The actions of the District and HMW have deterred Plaintiffs' customers from frequenting the Municipal Fish Market, threatened the financial viability of Plaintiffs' businesses, and harmed Plaintiffs' reputation in the community.

14.     The District's accommodations to HMW and abandonment of its commitments to Plaintiffs is particularly ironic here because of its storied history of failed urban development in this very area, which displaced local businesses with historic ties to the community.

15.     This action is to save Plaintiffs' businesses, to require that Defendants abide by the terms of the leases, to return to the status quo under the leases, and to compensate Plaintiffs for Defendants' bad acts.

## THE PARTIES

16.     Plaintiff The Wharf is a corporation organized and existing under the laws of the District and transacting business in the District as an open air fish market and deli serving cooked seafood at the Municipal Fish Market.

17.     Plaintiff Captain White is a corporation organized and existing under the laws of the District and transacting business in the District as an open air fish market selling raw seafood located at the Municipal Fish Market.

18.     Plaintiff Salt Water is a corporation organized and existing under the laws of the Commonwealth of Virginia and transacting business in the District as an open air fish market selling raw seafood located at the Municipal Fish Market.

19.     Defendant HMW is a joint venture between PN Hoffman & Associates and Madison-Marquette existing under the laws of the District and transacting business in the District as the developer selected for the Southwest Waterfront Redevelopment Project ("Redevelopment Project").

20.     Defendant WHRL is a limited liability company existing under the laws of Delaware and transacting business in the District as the landlord of the Municipal Fish Market tenants.

21.     Based on the representations and actions of HMW, WHRL and HMW are alter egos each acting for the benefit of the other.

22.     All of WHRL's actions relating to Plaintiffs' leases are attributable to HMW and vice versa.

23.     Defendant District of Columbia is a municipal corporation, which is the city government of Washington, D.C.  On information and belief, at all times relevant to the Complaint, the District was conspiring with HMW and WHRL.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a) because the events all occur based on the same events related to the land-use of the Municipal Fish Market, the surrounding property, and the adjacent Redevelopment Project.

25.     This Court has personal jurisdiction over all Defendants as all are located in the District.

26.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because all Defendants' principal places of business are located in the District, a substantial part of the events giving rise to this action occurred in the District, and the properties that are the subject of this action are located in the District.

## STATEMENT OF FACTS

27.     Plaintiffs re-allege and incorporate by reference the allegations contained in the Paragraphs 1-26 of this Complaint.

28.     The Municipal Fish Market, which has been in operation since 1805, is the oldest operating retail fish market in the United States.

29.     Starting in 1913, the United States mandated that the Municipal Fish Market, defined as the water frontage on the Potomac River lying south of Water Street between 11th and 12th Streets, be used as a fish market and be the exclusive location for the landing of fish and oysters in the District.

30.     Despite the historic significance of the Municipal Fish Market, the District has a noted history of harassment against the Municipal Fish Market tenants.  Indeed, in 1988 and 1994, the District was enjoined from harassing the tenants.

31.     Congress mandated the District enter into 30-year leases with the leaseholders on the Municipal Fish Market.

32.     Plaintiffs' have operated businesses at the Municipal Fish Market for nearly 45 years.

    A.  Plaintiffs' Leases

33.     Plaintiffs' businesses are owned and operated by members of the White family.

34.     The Wharf entered into a 30-year commercial lease agreement with the District, acting on behalf of the United States of America, dated July 12, 2000.  The lease grants The Wharf exclusive use of certain delineated water frontages, Lots 16, 17, 18, and 19 of the Municipal Fish Market to run its businesses, as well as the right to access and use certain common areas designated for the general use, convenience, and benefit of the commercial tenants in the area and their customers on the Municipal Fish Market (e.g. restrooms, parking areas, driveways, walkways, loading and unloading areas for deliveries) (the "Common Area").  See The Wharf Lease attached hereto as Exhibit A.

35.     Captain White entered into a 30-year commercial lease agreement with the District, acting on behalf of the United States of America, dated July 12, 2000.  The lease grants Captain White exclusive use of certain delineated water frontages, Lots 7, 8, and 9 of the Municipal Fish Market to run its businesses, as well as the right to access and use the Common Area.  See Captain White Lease attached hereto as Exhibit B.

36.     The Wharf and Captain White leases were renewals of leases with the District that had been in place for over 40 years.

37.     On March 20, 2014, Salt Water acquired the assets and assumed the lease of Pruitt's

Seafood, Inc., a business nearby The Wharf and Captain White on the Municipal Fish Market,

for over $1 million.  The District was the landlord at that time and consented to the assignment

of the Pruitt lease to Salt Water.  The Salt Water lease grants Salt Water exclusive use of certain

delineated water frontages, Lots 1, 2, 3, and 4 of the Municipal Fish Market to run its businesses,

as well as the right to access and use the Common Area.  The Salt Water lease expires in 2044.

See Salt Water Lease and Assignment attached hereto as Exhibit C.

38.     Other adjacent fish markets, all of which are associated with the businesses Jessie Taylor

Seafood or Virgo Fish Market, operate on lots at the Municipal Fish Market and share access to

the Common Area with Plaintiffs.

39.     Until April 23, 2014, the District was the Plaintiffs' landlord under the above-described

leases.  On that date, the District assigned the leases to HMW acting through WHRL.

   B.   The Redevelopment Project

40.     In 2006, HMW, then doing business as Hoffman-Struever Waterfront, was selected by

the District as the primary developer for the District's $2 billion Southwest Waterfront

Redevelopment Project.  As part of the land disposition agreement facilitating the development,

the District of Columbia sold a large stretch of land along the Southwest Waterfront to HMW.

41.     Under the Redevelopment Project, HMW plans to construct numerous retail shops,

residential and office buildings, hotels, and parks along the approximately 27 acres of land

between the Municipal Fish Market and Fort McNair.

42.     As described above, on April 23, 2014, the District assigned the various Municipal Fish

Market leases, including Plaintiffs' leases, to HMW, acting through WHRL, to facilitate the

Redevelopment Project.

43.     Plaintiffs were not notified of these lease assignments, and only discovered the assignments when a dispute arose between Plaintiffs and HMW over construction that blocked access to the Municipal Fish Market.

C.   Water Street Closure

44.     For the entire time Plaintiffs and the other Municipal Fish Market tenants have operated their businesses prior to the assignment of their leases from the District to HMW, Water Street has been open to the public and was a critical access point for customers and vendors.

45.     Prior to the assignment of Plaintiffs' leases from the District to HMW, the Municipal Fish Market could be easily accessed by vehicular and pedestrian foot traffic via Water Street.

46.     Customers arriving at the Municipal Fish Market by car (or other vehicle) could park along Water Street while shopping at the Municipal Fish Market.

47.     Vendors, particularly those driving large delivery trucks, used Water Street to make deliveries because a roundabout at the end of the street allowed the large trucks to turn around easily.

48.     In short, Water Street was critical to Plaintiffs' businesses.

49.     In addition to the Water Street access point, Plaintiffs' leases include a parking lot in front of the businesses and overflow parking was available on weekends along eastbound Maine Avenue to the north of Water Street.

50.     Plaintiffs entered into their long-term leases with the District with the expectation of reasonable access by pedestrians and vehicular traffic.

51.     Even in light of Water Street's importance to Plaintiffs' businesses, on January 28, 2011, the Council of the District of Columbia began consideration of Bill 19-69, entitled the "Closing of Water Street, S.O. 10-15906 Act of 2011."

52.     On April 19, 2011, the Council of the District of Columbia Committee of the Whole stated the Water Street closure was for the benefit of HMW and would assist HMW to "facilitate necessary financing." The Committee relied on testimony from Lamont Hoffman, Chief Executive Officer of PN Hoffman, Inc.,  that the Water Street closure would "eliminate as many contingent liabilities as possible as early in the process" which would help "to obtain commitments from institutional investors and lenders."

53.     On June 7, 2011, the Council of the District of Columbia, over the objections of several community members, passed Bill 19-69.

54.     The Committee Report contemplates reasonable access for several nearby properties, but it does not discuss similar access for the Municipal Fish Market.

55.     In passing the bill, the Council of the District of Columbia stated that it deemed the closure of Water Street to be "required for the redevelopment of the Southwest Waterfront, pursuant to the Amended and Restated Land Disposition Agreement Between Hoffman-Struever Waterfront L.L.C. and the District of Columbia . . . ."

56.     The Mayor of the District signed Bill 19-69 on June 28, 2011 (at which point it became Act 19-90), and the Congressional review period ended on August 17, 2011 (at which point it became D.C. Law 19-19).

57.     Water Street remained in public use, however, and Plaintiffs and their customers and vendors continued to use Water Street, until May 2014 while the District finished closing its Land Disposition Agreement with HMW.

58.     From May 2014 through November 2014, HMW periodically closed Water Street, without notice to Plaintiffs, to carry out construction activities related to the Redevelopment Project, severely restricting access to Plaintiffs' leased property.

59.    In or around November 2014, HMW dug an enormous hole where Water Street used to be.

60.    In late 2014, HMW closed Water Street completely.  By closing Water Street, the primary entrance to the Municipal Fish Market was eliminated.

61.    Once Water Street was closed, the only point of access for vehicular traffic from the north and east was eliminated and the only route vehicular traffic could take to reach the Municipal Fish Market was eastbound on Maine Avenue.  Vehicles travelling westbound on Maine Avenue now had to take a complex, unmarked detour of approximately 1.2 miles.

62.    In connection with the closure of Water Street and the related construction, the sidewalk along the south side of Maine Avenue was closed, which has impeded pedestrian access to the Municipal Fish Market from the north and east.

63.    In addition, the Water Street closure eliminated the parking along eastbound Maine Avenue.

64.    Currently, Plaintiffs' customers have limited access to the Municipal Fish Market using a route that crosses the Redevelopment Project property, but Plaintiffs have no guarantee HMW will continue to allow this access point to be used for the Municipal Fish Market. Based on HMW's actions to date, it is likely that HMW will soon eliminate this access point.

65.    Because of the closure of Water Street, several vendors have refused to deliver necessary inventory and supplies to Plaintiffs, and common carriers have refused to deliver packages, citing difficulty in reaching the property.

66.    Many of Plaintiffs' customers have expressed that they go to Plaintiffs' businesses less frequently or not at all because of the difficulty in accessing the Municipal Fish Market.

67.     The closure of Water Street and accompanying construction has caused foot traffic on the Municipal Fish Market and Plaintiffs' revenues to diminish significantly such that Plaintiffs may have to close their businesses if such losses continue.

68.     Plaintiffs are unable to put their leased property to beneficial commercial use because the street closure and construction facilitated by the street closure prevents customers from seeing or entering the Municipal Fish Market and prevents suppliers from delivering necessary products.

69.     In contrast to the great harm caused to Plaintiffs, HMW was able to use the closure of Water Street to secure financing for the Redevelopment Project to reap large profits and further the District's goal of redeveloping the waterfront.

    D.   Plaintiffs' Rights Under Their Leases

70.     Under the terms of each lease, Plaintiffs are entitled to exclusive use of certain water frontages to operate open air fish markets and a seafood deli.  Plaintiffs, along with various other nearby businesses, also have the right to access and use the Common Area.  See Exhibits A, B, and C at § 9.A.

71.     Under the terms of each lease, the Landlord's right to locate structures on the Common Area does not vest until completing certain work specified therein.

72.     Even after the right vests, the Landlord may not locate any structures on the Common Area without the approval of the Municipal Fish Market Tenants' Committee ("Tenants' Committee") and any structures may not materially interfere with access to the Common Area.

73.     The Tenants' Committee consists of Plaintiffs, two other open air fish markets operated as Jessie Taylor Seafood, and a fish cleaning house operated as Virgo Fish Market.

74.     Plaintiffs' leases provide that members of the Tenants' Committee have voting power in proportion to the total amount of linear footage each controls at the Municipal Fish Market. Decision are reached by majority vote.  See Exhibits A, B, and C at § 1.M & 1.N.

75.     Plaintiffs have a combined 52.81% voting power in the Tenants' Committee.  By virtue of the linear footage controlled by Plaintiffs, The Wharf has 14.81% of the Tenants' Committee voting power, Captain White has 16.97%, and Salt Water has 21.03%.  The remaining votes are spread between Jessie Taylor Seafood and Virgo Fish Market.

76.     With over half of the voting power in the Tenants' Committee, at least one of the Plaintiffs would have to vote in favor of building structures on the Common Area for such an act to be valid under the leases.

77.     The Landlord's work specified in the leases has not been completed and the Tenants' Committee has not approved the location of any structures on the Common Area, therefore the Landlord's right to place structures on the Common Area has not vested.

78.     Each of Plaintiffs' leases also provide, "[a]s long as [Plaintiff] is not in default under this Lease, [Plaintiff] may peaceably and quietly enjoy the Premises for the Term without hindrance, ejection or molestation by Landlord or anyone claiming or acting by or through Landlord."  See Exhibits A, B, and C at § 29.

    E.   Actual and Planned Breaches of Plaintiffs' Leases

        i.   HMW Moved a Fence to Block Access to the Municipal Fish Market

79.     Notwithstanding Plaintiffs' rights under their leases, HMW has repeatedly encroached onto the Common Area, located structures thereon, materially interfered with Plaintiffs' access to the Common Area, and otherwise interfered with Plaintiffs' right to quiet enjoyment guaranteed under the lease.

80.     The first of these breaches happened in May 2014—shortly after HMW assumed the

Municipal Fish Market leases from the District—when HMW constructed a fence on the

Common Area, which blocked an entrance/exit to/from the Municipal Fish Market necessary for

Plaintiffs' businesses.

81.     Plaintiffs moved the fence to unblock the entrance/exit.

82.     HMW moved the fence back.

83.     Eventually the fence was removed again to unblock access, possibly by customers

desiring access to the Municipal Fish Market.

84.     After this incident, HMW requested a meeting to discuss accommodation of the

Redevelopment Project.

　　　　ii.　　<u>First Meeting to Discuss Breach of Leases and Construction Plans</u>

85.     On or about May 15, 2014, Plaintiffs, the other members of the Tenants' Committee,

HMW, and the District met to discuss the Redevelopment Project and the plans for construction.

86.     During the meeting, HMW presented plans for the Redevelopment Project, which the

District supported.

87.     These plans, which were dated September 27, 2013, included drawings for at least three

large buildings to be located on Plaintiffs' designated Common Area.

88.     Plaintiffs, as well as each of the other members of the Tenants' Committee objected to

the large-scale encroachment onto the Common Area, which would violate their respective

leases.

89.     HMW agreed to consider changing construction plans to reduce the encroachment on the

Common Area and to address the parking and access issues. HMW also agreed to work with

Plaintiffs to determine the most convenient times for certain construction activities that would

14

impact the Municipal Fish Market and proposed revising Plaintiffs' leases given the

Redevelopment Project.

90.      Despite the assurances, HMW never formally proposed lease revisions and continued to

encroach Plaintiffs' Common Area including periodically closing Water Street without notice to

Plaintiffs.

     iii.   <u>Second Meeting to Discuss Breach of Lease and Construction Plans</u>

91.      On August 5, 2014, a second meeting was held to discuss construction plans and the

continuing impact on the Municipal Fish Market.

92.      At this meeting, HMW presented revised plans, which still showed proposed buildings to

be constructed in the Common Area.

93.      Once again, Plaintiffs and the other Tenants' Committee members objected to the plans

because the planned location of the buildings would violate their leases and encroach onto the

Common Area.

94.      At this meeting, HMW again proposed to send modifications to Plaintiffs' leases to

accommodate the construction.  HMW never proposed these lease modifications, however.

     iv.   <u>Third Meeting to Discuss Breach of Lease and Construction Plans</u>

95.      On September 5, 2014, Plaintiffs, other Tenants' Committee members, and HMW met

again to discuss HMW's construction plans and the impact to access to the Municipal Fish

Market.  At the meeting, HMW presented further revised construction plans.

96.      Phase I of these plans—which had apparently already commenced—showed that HMW

planned to remove the roundabout at the end of Water Street, but that Water Street would remain

open with one lane in each direction until September 2014.  Phase 1 called for expanded

customer parking for the Municipal Fish Market, but such parking never materialized.

97.     Phase II of the plans, which was to run until November 2014, showed that HMW would move Water Street to the south of its location on the Phase I drawings, but would provide even more parking than proposed in Phase I.  As with Phase I, the expanded parking never materialized and no new Water Street was ever created.

98.     Phase III, which was to start in November 2014 and be the configuration of the Municipal Fish Market until HMW completed construction in 2017, showed a greatly expanded parking lot, and ample access from Maine Avenue.

99.      As with Phases I and II, the benefits to the Municipal Fish Market never materialized, and Plaintiffs have been left with reduced parking and significantly impaired access.

100.    HMW also informed Plaintiffs and other Tenants' Committee members that it planned to dig a large hole in the Common Area that would impede the flow of traffic on the Municipal Fish Market.

101.    HMW represented that the hole would remain in place for approximately a week.

102.    Plaintiffs and other Tenants' Committee members objected to HMW's plans to dig the hole on the Common Area.

103.    The revised plans still showed proposed buildings to be constructed in the Common Area. Once again, Plaintiffs and the other Tenants' Committee members objected to the plans because the planned location of the buildings would violate their leases and encroach onto the Common Area.

104.    Despite HMW's knowledge that the Tenants' Committee objected to encroachments onto the Common Area, HMW continued to willfully breach Plaintiffs' leases.

F.   Continued Breaches and Harassment

105.   In the months following the third meeting, HMW deterred access to the Municipal Fish

Market by repeatedly changing vehicular traffic patterns and blocking pedestrian foot traffic with

fences.

106.   The fences also gave the appearance that the Municipal Fish Market was not open, which

further deterred customers.

107.   On December 8, 2014, HMW blocked a large portion of the Municipal Fish Market

parking lot.

108.   Shortly thereafter, some of Plaintiffs' vendors began refusing to deliver product to the

Municipal Fish Market citing difficulty in reaching the storefronts.  Because of the perishable

nature of seafood, consistent deliveries are extremely important to the viability of Plaintiffs'

businesses.

109.   In February 2015, HMW extended a formerly public sidewalk that ran along the south

side of Maine Avenue so that it encroached on the designated Common Area without consent

from Plaintiffs' or the Tenants' Committee.

110.   This resulted in the Municipal Fish Market parking spaces being moved farther onto the

Common Area, leaving less Common Area space for other business activities.

111.   In April 2015, without notice to Plaintiffs or approval from the Tenants' Committee,

HMW dug the large hole on the Common Area that Plaintiffs had previously objected to.  This

restricted the flow of traffic at the Municipal Fish Market, caused extreme traffic congestion, and

significantly reduced the number of customers that frequented Plaintiffs' businesses.

112.   Upon information and belief, in May 2015, HMW listed on Google Maps that the

Municipal Fish Market was "permanently closed" as a result of the Redevelopment Project.  The

listing has resulted in numerous calls to Plaintiffs inquiring about the continued operation of the Municipal Fish Market and undoubtedly caused Plaintiffs to lose customers.

113.    In June 2015, HMW sent notice that it planned to install permanent bollards on the Common Area in front of Plaintiffs' leased water frontages.  Plaintiffs objected to the installation.

114.    Once again, neither Plaintiffs nor the Tenants' Committee approved this plan.

115.    Nonetheless, HMW installed the bollards on the Common Area in front of Plaintiffs' businesses.

116.    In and around June 2015, HMW installed signs stating Municipal Fish Market customers had only 60 minutes to park before being towed.  This is in clear contravention of Plaintiffs' leases, which give the Tenants' Committee the authority to regulate Municipal Fish Market parking.  See Exhibits A, B, and C at § 9.B.  Plaintiffs did not adopt any rules regarding length of time customers could park in the Municipal Fish Market parking lot.

117.    On June 25, 2015 and July 7, 2015, HMW's construction workers used numerous of the already reduced number of customer parking spaces at the Municipal Fish Market to park while they worked at the Redevelopment Project.  This left fewer parking spaces for Municipal Fish Market customers.

118.    Also on July 7, 2015, Bob Rubenkonig, a project manager of the Redevelopment Project, instructed the police to ticket and tow Plaintiffs' commercial and private use vehicles from the Municipal Fish Market parking lot because HMW was the "owner" of the Municipal Fish Market, and Plaintiffs' vehicles were parked on private property without permission.

119.    Rubenkonig's attempted control over the Municipal Fish Market parking lot is in clear breach of Plaintiffs' leases, which give the Tenants' Committee the authority to regulate the Municipal Fish Market parking lot.

120.    All of these breaches of Plaintiffs' right to quiet enjoyment guaranteed under the leases and incidences of harassment have caused irreparable harm and continued losses will force them out of business.

   G.   HMW's Attempted Lease Terminations and Notices to Vacate

121.    Notwithstanding the litany of breaches described above, HMW, without any basis, is attempting to invalidate two of Plaintiffs' leases and force Plaintiffs' to vacate the Municipal Fish Market.

122.    On March 25, 2015, Mark Dorigan of HMW sent Salt Water a letter questioning the construction of a small shed housing boilers used to power the cookers on one of Salt Water's barges.

123.    Dorigan alleged that Salt Water was performing construction on one of its barges for which it had not obtained required permits or landlord's approval.

124.    The Salt Water barge at issue replaced a similar barge operated by Salt Water's predecessor Pruitt's.  The replacement of the barge and related construction was addressed in Salt Water's purchase agreement, which was approved by then landlord, the District, in connection with the assignment of the lease from Pruitt's to Salt Water.

125.    The new Salt Water barge contained the same equipment, including cookers and boilers, that Salt Water's predecessor had operated, and will be operated in the same manner.

126.    Further, Salt Water had received all required permits relating to construction and installation of the cookers and other equipment on the barge.  Because the boilers were a

necessary component to operate the cookers, Salt Water reasonably believed that no additional permits were required for the small shed housing the boilers.

127.    Dorigan also wrongly asserted that the Salt Water lease was breached because the construction extended into Space 1 of the Municipal Fish Market, and any construction extending into that site required approval.

128.    Salt Water's construction, however, was more than 28 feet from the Space 1 property line, so it did not violate the lease.

129.    Salt Water responded to Dorigan explaining that the construction did not violate the lease and that it complies with all applicable federal and building codes.

130.    On April 20, 2015, HMW's counsel sent a Lease Default Notice to Salt Water for alleged violations of the lease for failure to obtain necessary construction permits.

131.    The notice explained that the alleged breach must be cured—by obtaining appropriate construction permits and getting HMW's consent—within 30 days or HMW could terminate the lease.

132.    Salt Water did not believe that it was in default of its lease.  However, on May 14, 2015, in an effort to avoid further harassment by HMW, Salt Water responded through its counsel requesting approval for the construction and enclosing a construction permit application.

133.    In the alternative, Salt Water requested HMW forbear from taking further actions in order to resolve the situation.

134.    HMW did not respond to this letter thus waiving any rights regarding this alleged minor breach.

135.    While awaiting response and out of an abundance of caution, Salt Water obtained a construction permit for the shed from the District.  Salt Water, through its counsel, sent HMW's counsel a copy of the approved construction permit.

136.    Notwithstanding receipt of the construction permit, HMW sent Salt Water a termination letter instructing it to vacate by July 31, 2015.

137.    Even if Salt Water was in technical breach of its lease, which it was not, the breach was immaterial such that it cannot be the basis for termination.  The alleged minor breach caused no harm to HMW or the Municipal Fish Market; Salt Water attempted to cured any alleged breach by obtaining the construction permit from the District and requested consent from HMW; HMW waived its rights by not responding; and termination of the lease for such a minor issue would be tantamount to a forfeiture.

138.    HMW also sent a notice to vacate to The Wharf apparently based on the fact that HMW alleges it has not seen a signed copy of the lease.

139.    The Wharf notice to vacate was sent even in light of Plaintiffs' presence on the Municipal Fish Market for over 44 years, timely rent payments under the current leases for nearly 15 years, and HMW accepting an assignment of all the Municipal Fish Market tenant leases from the District.

140.    The notices to vacate also unconscionably attempt to sensationalize an incident of a child falling off one of Plaintiffs' barges into the water to prove that Plaintiffs' barges are unsafe.  However, based on news reports, this incident did not occur at one of Plaintiffs' barges but at one of the Jessie Taylor Seafood businesses, and also involved the child falling into the water from the land, not off of a barge.

141.    Due to the baseless attempts to oust Plaintiffs from the Municipal Fish Market, Plaintiffs have suffered reputational harm, and financial loss and irreparable harm in their businesses.

142.    If HMW is allowed to continue its eviction process, Plaintiffs will be irreparably harmed because their businesses will have to close.

## COUNT I
## FIFTH AMENDMENT TAKING
## (AGAINST DEFENDANT DISTRICT OF COLUMBIA)

143.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-142 of this Complaint.

144.    D.C. Law 19-19 entitled the Closing of Water Street, S.O. 10-15906 Act of 2011 is unconstitutional because it violates the Takings Clause of the Fifth Amendment of the United States Constitution by impairing access to Plaintiffs' leased property for public use without providing just compensation to Plaintiffs.

145.    The permanent closing of Water Street in early 2015 has impaired direct vehicular access to the Municipal Fish Market, impeded vendor deliveries, eliminated customer parking, and caused some common carrier packages to go undelivered.

146.    Because of these difficulties, Plaintiffs are unable to put their leased property to beneficial commercial use causing irreparable harm to Plaintiffs' businesses.

147.    The Water Street closure also interferes with Plaintiffs' well-known investment-backed expectations.

148.    For example, the District—fully aware of the use and necessity of Water Street to the Plaintiffs' businesses—entered into 30-year leases for two of the properties in the year 2000 with Plaintiffs.  Plaintiffs also invested in improvements to the properties on the expectation of continued reasonable customer and vendor access to the Municipal Fish Market.  And, Plaintiffs

assumed the lease of a third business on the Municipal Fish Market for over $1 million based on the same expectation.

149.   Despite the impairment of access to the property, Plaintiffs have not received or been offered compensation or any other remedial measures by the District.

150.    Any state remedies for this taking are unavailable, inadequate or futile.

**COUNT II**
**DECLARATORY JUDGMENT**
**(AGAINST HMW)**

151.   Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-150 of this Complaint.

152.   Plaintiffs' leases unequivocally prohibit HMW from locating any structures on the Municipal Fish Market before they have completed the required renovations and obtained consent from the Tenants' Committee.

153.   Neither Plaintiffs nor the Tenants' Committee have consented to any of HMW's construction that has taken place on the Municipal Fish Market, nor has HMW completed the required renovations to trigger the right for the landlord to request that the Tenants' Committee agree to its Common Area construction.

154.   HMW continues to carry out construction on the Common Area in order to benefit the Redevelopment Project.

155.   HMW's unauthorized Municipal Fish Market construction and other encroachments have interfered with Plaintiffs' businesses and quiet enjoyment of the leased Municipal Fish Market property.

156.   In addition, HMW has asserted that one of Plaintiffs' leases does not exist and that another of Plaintiffs' leases is in default.

157.    As such, justiciable controversies between the parties exists as to whether HMW can
ignore the Plaintiffs' lease provisions to conduct unauthorized construction and otherwise
encroach on the Municipal Fish Market, whether HMW can eliminate reasonable access to the
Municipal Fish Market, whether the Salt Water lease is in default, and whether The Wharf lease
is valid and enforceable.

158.    Plaintiffs ask the Court to declare that:

   (1)  HMW is required to carry out its obligations under its leases, including but not
        limited to, getting approval from the Tenants' Committee and performing certain
        renovation work before locating any structures on the Municipal Fish Market
        Common Area;

   (2)  HMW violated Plaintiffs' quiet enjoyment of the Municipal Fish Market when it
        located structures on the Common Area without Tenants' Committee approval and
        before renovation work was completed;

   (3)  HMW violated Plaintiffs' right to quiet enjoyment of the leases when it took
        repeated actions to interfere with Plaintiffs' businesses and harass Plaintiffs;

   (4)  HMW's planned future construction on the Municipal Fish Market will violate
        Plaintiffs' leases;

   (5)  The Wharf's lease is valid and enforceable;

   (6)  Salt Water has not materially breached its lease and may open the business located
        on the barge in Lot 2; and

   (7)  Plaintiffs are entitled to reasonable access for customers, vendors, and employees to
        the Municipal Fish Market.

**COUNT III**
**SPECIFIC PERFORMANCE & INJUNCTIVE RELIEF**
**(AGAINST HMW)**

159.    Plaintiffs re-allege and incorporate by reference the allegations contained in the

Paragraphs 1- 158 of this Complaint.

160.    Plaintiffs and the District entered into valid and enforceable lease agreements for certain

property on the Municipal Fish Market.

161.    Plaintiffs' leases remain valid, and the earliest any of Plaintiffs' leases expires is 2030.

162.    The District assigned the leases to HMW, acting through WHRL, on April 23, 2014.

HMW represented to Plaintiffs that HMW was Plaintiffs' Landlord.

163.    The leases guarantee Plaintiffs the right to quiet enjoyment of the demised premises on

the Municipal Fish Market and prohibit the Landlord from locating any structures on the

Common Area without consent from the Tenants' Committee after completing its required

renovations.

164.    HMW has breached these lease terms by making repeated and disruptive encroachments

onto the Common Area for the benefit the Redevelopment Project and engaging in a pattern of

harassment against Plaintiffs in violation of their leases.

165.    If HMW continues with its redevelopment plans, it will violate Plaintiffs' lease terms by

constructing permanent structures on the Municipal Fish Market, blocking customers' foot and

vehicular traffic to Plaintiffs' businesses, impeding access by vendors, and causing continued

financial harm to Plaintiffs.

166.    The steps HMW has taken to carry out its Redevelopment Project in contravention of the

leases has caused Plaintiffs' severe financial impact and irreparable harm.  It has also harmed the

goodwill, reputation, and existing customer base that Plaintiffs have developed in the community

over several decades.  If Defendants' overreaches continue, the Municipal Fish Market, which

has been in operation in the District since 1805, will be decimated along with Plaintiffs'

businesses and their valuable property rights.

167.    Because no adequate remedy at law exists to address HMW's breaches and its continued

attempts to carry out its plans for the Redevelopment Project in violation of Plaintiffs' leases,

Plaintiffs respectfully ask the Court to require HMW to specifically perform its requirements

under Plaintiffs' leases to provide Plaintiffs with quiet enjoyment of the Municipal Fish Market

and permanently enjoin HMW, while Plaintiffs' leases are in effect, from taking any steps to

carry out the Redevelopment Project to the extent that such actions:

    a. Infringe on Plaintiffs' rights under the leases without approval of the Tenants'
       Committee;

    b. Alter, modify, or block any entrances to or exits from the Municipal Fish Market;

    c. Alter, modify, or block any pedestrian or vehicular traffic to the Municipal Fish Market
       and Plaintiffs' leased lots; and

    d. Alter, modify, or block any customer or employee parking locations.

168.    In addition, no adequate remedy at law exists which could address HMW's eviction of

Plaintiffs.  Thus, Plaintiffs respectfully ask the Court to enjoin HMW's attempts to evict

Plaintiffs from their leases.

169.    No adequate remedy at law exists which could address HMW's elimination of access to

the Municipal Fish Market.  Thus, Plaintiffs respectfully request the Court to grant it an

easement or other form of permanent access for its customers, vendors, employees, or other

persons desiring to visit the Municipal Fish Market.

170.    The equities and public interest overwhelmingly favor the issuance of this injunction as District law strongly favors upholding a person's valuable property rights as well as enforcing contractual obligations.  The original parties to the lease agreements were a municipality and commercial entities that negotiated the leases at arm's length and with full knowledge of the terms thereof.  In such situations involving sophisticated parties, the courts have an even greater interest in enforcing provisions agreed to between the parties.  Consequently, by issuing the injunction, the Court will be ensuring that HMW will continue to honor the contractual obligations it voluntarily assumed from the District.

171.    To allow otherwise would be giving permission to HMW to willfully and intentionally breach their contractual obligations, trample over Plaintiffs' valuable property rights, and destroy Plaintiffs' businesses at the Municipal Fish Market so HMW can reap windfall profits at the expense of Plaintiffs and its customers.

172.    Finally, by issuing the injunction, the Court will not be indefinitely precluding HMW from constructing their redevelopment.  Instead, it will simply be requiring HMW to abide by the terms of the leases it voluntarily assumed until the term of the leases expires or until such time as it receives consent from the Tenants' Committee.

**COUNT IV**
**BREACH OF LEASE—DAMAGES**
**(AGAINST HMW)**

173.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-172 of this Complaint.

174.    Plaintiffs and the District entered into valid and enforceable lease agreements for certain property on the Municipal Fish Market.

175.    Plaintiffs' leases remain valid, and the earliest any of Plaintiffs' leases expires is 2030.

176.    The District assigned the leases to HMW, acting through WHRL, on April 23, 2014.

177.    HMW's repeated unauthorized encroachments onto the Municipal Fish Market have breached the clear lease terms contained in Plaintiffs' leases.

178.    All of HMW's breaches occurring after May 2014 were intentional as Plaintiffs made HMW explicitly aware that they objected to encroachments onto the Common Area and their designated lots.

179.    As a result of these breaches, Plaintiffs have suffered and will continue to suffer direct damages in an amount to be proven at trial.

180.    In addition to direct damages, the goodwill, reputation, and existing customer base that Plaintiffs have developed in the community over the last several decades have been damaged and will continue to be damaged by HMW's willful misconduct, and Plaintiffs' businesses have suffered and will continue to suffer immense financial harm in an amount to be proven at trial.

**COUNT V**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(AGAINST HMW)**

181.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-180 of this Complaint.

182.    Plaintiffs' leases, like all contracts, imply a covenant of good faith and fair dealing.

183.    By repeatedly encroaching on the Municipal Fish Market over Plaintiffs' objections, engaging in a pattern of harassment of Plaintiffs, and willfully breaching the express lease terms, HMW has failed to comply with the substance of the obligations imposed and implied by the leases, including the implied covenant of good faith and fair dealing.

184.    HMW, by engaging in this conduct, has evaded the spirit of the leases, willfully rendered imperfect performance, and interfered with the Plaintiffs' performance.

185.     All of HMW's breaches of the implied covenant of good faith and fair dealing occurring after May 2014 were intentional as Plaintiffs made HMW explicitly aware that it objected to encroachments onto the Common Area and its designated lots and objected to being subject to harassment in running their businesses.

186.     As a result of the breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered and will continue to suffer direct damages in an amount to be proven at trial.

187.     In addition to direct damages, the goodwill, reputation, and existing customer base that Plaintiffs have developed in the community over the last several decades have been damaged and will continue to be destroyed by HMW's willful breaches of the implied covenant of good faith and fair dealing, and Plaintiffs' businesses have suffered and will continue to suffer immense financial harm in an amount to be proven at trial.

**COUNT VI**
**TRESPASS AND CONVERSION**
**(AGAINST HMW)**

188.     Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-187 of this Complaint.

189.     Plaintiffs have a possessory interest in their respective designated leased lots and the Common Area on the Municipal Fish Market.

190.     HMW has made repeated and disruptive encroachments onto the Municipal Fish Market to perform construction activities and harass Plaintiffs for the benefit the Redevelopment Project in violation of Plaintiffs' possessory interest of the Municipal Fish Market.

191.     For example, HMW has:

a.   Moved a fence onto the Common Area, blocking an entrance to and exit from the Municipal Fish Market;

b.   Repeatedly blocked or altered pedestrian foot traffic routes;

c.   Entered the Municipal Fish Market parking lot to "cone off" sections for itself;

d.   Impeded Plaintiffs' vendor deliveries by constantly changing the routes for vehicular traffic and blocked such routes entirely;

e.   Moved a public sidewalk onto the Common area and moved a parking lot abutting the sidewalk farther onto the Municipal Fish Market;

f.   Dug a large hole on the Common Area blocking foot and vehicular traffic;

g.   Constructed bollards blocking the walkways in front of Plaintiffs' businesses;

h.   Used numerous of the Municipal Fish Market customer parking spaces for construction worker parking; and

i.   Attempted to have the police ticket and tow Plaintiffs' private and commercial vehicles from the Municipal Fish Market parking lot.

192.   These encroachments resulted in HMW wrongfully exercising ownership, dominion, and control over portions of the Municipal Fish Market.

193.   In addition, HMW has threatened to terminate Plaintiffs' leases and to enter the Municipal Fish Market to repossess the property.

194.   The damage for these trespasses and conversions will be in an amount to be proven at trial.

195.   In addition, because HMW's conduct has been outrageous and malicious, wanton, reckless, or in willful disregard for Plaintiffs' rights in trespassing on and converting Plaintiffs'

leased property, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, and attorneys' fees.

## COUNT VII
## NUISANCE
## (AGAINST HMW)

196.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-195 of this Complaint.

197.    In addition to the physical encroachments of the Municipal Fish Market and the activities that took place on such premises, HMW has conducted off-site, but nearby, activities that have interfered with Plaintiffs' private use and enjoyment of their leased property.

198.    In particular, HMW has closed reasonable to access to the Municipal Fish Market by repeatedly closing Water Street during the summer of 2014 without notice to Plaintiffs and closing it permanently in 2015.

199.    HMW's closure of Water Street interferes with Plaintiffs' quiet enjoyment of the Municipal Fish Market and its ability to operate its businesses.

200.    Plaintiffs are entitled to damages caused by HMW's nuisance in an amount to be proven at trial.

201.    In addition, because HMW's conduct has been outrageous and malicious, wanton, reckless, or in willful disregard for Plaintiffs' rights in creating nuisances interfering with Plaintiffs' use of their leased property, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, and attorneys' fees.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**
**(AGAINST HMW)**

202.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs

1-201 of this Complaint.

203.    For many years, Plaintiffs have operated open air fish markets on the Municipal Fish

Market and have had a large amount of customers due to Plaintiffs' high-quality products for

sale, easy customer and vendor access to the Municipal Fish Market, and convenient parking

nearby the Municipal Fish Market.

204.    Plaintiffs expect that these customers will return to shop at Plaintiffs' storefronts on the

Municipal Fish Market if these features remain available.

205.    HMW, as Plaintiffs' Landlord and neighbor, is aware that Plaintiffs rely on pedestrian

and vehicular traffic on the Municipal Fish Market.

206.    HMW's intentional actions in encroaching onto the property, breaching Plaintiffs' leases,

blocking customer access and parking,  harassing Plaintiffs and their prospective customers, and

attempting to evict two Plaintiffs have interfered with Plaintiffs' expectation of a business

relationship with future customers.

207.    HMW's actions have caused customers to stop coming to the Municipal Fish Market and

have damaged Plaintiffs' businesses.

208.    Plaintiffs are entitled to damages caused by HMW's tortious interference with Plaintiffs'

prospective customer relationships in an amount to be proved at trial.

209.    In addition, because HMW's conduct has been outrageous and malicious, wanton,

reckless, or in willful disregard for Plaintiffs' rights in tortiously interfering with Plaintiffs'

potential customers, Plaintiffs are entitled to punitive damages in an amount to be proven at trial and attorneys' fees.

### COUNT IX
### UNJUST ENRICHMENT
### (AGAINST HMW)

210.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-209 of this Complaint.

211.    HMW received and will continue to receive an undeserved benefit to the Redevelopment Project through their repeated and planned encroachments and construction on the Municipal Fish Market.

212.    The encroachments and construction are in contravention of the lease terms, diminish Plaintiffs' property rights, and damage Plaintiffs' businesses.

213.    It is inequitable to allow HMW to take Plaintiffs' property rights and violate the lease terms to obtain benefits for themselves, without compensating Plaintiffs for such benefits.

214.    By encroaching onto the Municipal Fish Market, HMW is moving forward with their development project in direct contravention to Plaintiffs' leases.

215.    HMW stands to gain enormous windfall profits as a result of their breaches of Plaintiffs' leases.

216.    As such, Plaintiffs are entitled to recover damages tied to HMW's taking of its valuable property rights in an amount to be proved at trial.

217.    In addition, because HMW's conduct has been outrageous and malicious, wanton, reckless, or in willful disregard for Plaintiffs' rights in obtaining unjust enrichment, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court: (1) order the District to pay just compensation to Plaintiffs for the closure of Water Street or reopen Water Street or other equivalent access point to the Municipal Fish Market as requested in Count I; (2) order the declaratory relief sought in Count II; (3) award the injunctive relief sought in Count III; and (4) award damages to Plaintiffs as requested in Counts IV through IX, along with prejudgment and post-judgment interest and attorneys' fees.  Plaintiffs also respectfully request any other relief which the Court deems is proper and just.

JURY DEMAND

Plaintiffs respectfully request a jury trial for the appropriate claims for which a jury is permissible, including all claims seeking monetary relief.


Dated: July 23, 2015                                Respectfully submitted,

                                                     __/s/Wendell L. Taylor_____
                                                     Wendell L. Taylor, DC Bar No. 973873
                                                     Jonathan Lasken, DC Bar No. 997251
                                                     HUNTON & WILLIAMS LLP
                                                     2200 Pennsylvania Ave., NW
                                                     Washington, DC  20037
                                                     Tel: (202) 955-1627
                                                     Fax: (202) 857-3898
                                                     wtaylor@hunton.com
                                                     jlasken@hunton.com

                                                     *Counsel for Plaintiffs*