**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE WHARF, INC.**<br>**t/a THE WHARF,**<br><br>**BRW, INC.**<br>**t/a CAPTAIN WHITE SEAFOOD CITY,**<br><br>**And**<br><br>**SALTWATER SEAFOOD, INC.**<br>**t/a SALT WATER,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE DISTRICT OF COLUMBIA,**<br><br>**HOFFMAN-MADISON WATERFRONT LLC,**<br><br>**And**<br><br>**WHARF HORIZONTAL REIT LEASEHOLDER LLC,**<br><br>**Defendants.** | **Civil Action No. 15-cv-1198** |

**DEFENDANTS HOFFMAN-MADISON WATERFRONT LLC AND**
**WHARF HORIZONTAL REIT LEASEHOLDER LLC'S**
**BRIEF IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

***Page***

I. INTRODUCTION .... 1

II. FACTS .... 3

A. The Wharf Developer is implementing the District of Columbia's long-term plan to transform the Southwest Waterfront.... 3

B. Captain White cannot establish that he has valid leases. .... 4

C. Assuming the leases are valid, Captain White is in material breach of them.... 6

D. Captain White never had a leasehold interest in the Common Areas. .... 7

E. Captain White offers no evidence that the Wharf Developer interfered with his access to the Common Areas. .... 7

1. Captain White does not allege that the Wharf Developer encroached on his alleged leasehold interest: the barges. .... 7

2. Captain White complains about activities that were on wholly separate property—not on the Fish Market at all.... 8

3. The Wharf Developer is entitled to do all of the work it is doing in the Common Areas, and none of that work is interfering with Captain White's businesses.... 9

F. The Fish Market is open during construction and the other tenants support the project.... 11

G. Captain White only filed this lawsuit because he is being evicted. .... 11

H. The Wharf Developer is implementing plans that will greatly improve the Fish Market. .... 12

I. The Wharf Developer will suffer harm if the preliminary injunction is wrongfully granted. .... 13

III. LEGAL STANDARD.... 14

IV. ARGUMENT.... 15

A. Captain White cannot show that he will suffer irreparable harm without a preliminary injunction. .... 15

1. The legal standard of irreparable harm is difficult to establish. ............... 15

2. This Court has already determined that losing space at this particular Fish Market is not irreparable harm. ....................................... 16

3. Captain White does not show that his alleged injuries threaten the very existence of his businesses.............................................................. 17

4. Captain White's authorities are distinguishable. ..................................... 18

B. Captain White's lawsuit is baseless. ..................................................................... 19

1. Either Captain White's leases terminated or Captain White is in material breach of the leases—those are the only two options. ................ 19

2. The Wharf Developer did not violate any of the three lease provisions that Captain White claims. ..................................................... 20

3. The Wharf Developer's planned future work in the Common Areas will not violate the leases either. .............................................................. 23

C. The balance of equities weighs in the Wharf Developer's favor. ......................... 24

D. The public interest will be served by permitting the Wharf Developer to continue the construction work. .............................................................................. 25

E. Captain White's proposed injunction would violate Rule 65 and is impermissibly vague. ............................................................................................. 26

V. CAPTAIN WHITE MUST POST A BOND ................................................................... 27

VI. CONCLUSION ............................................................................................................... 28

# TABLE OF AUTHORITIES

***Page***

**Cases**

*1010 Potomac Assocs. v. Grocery Mfgs. of Am., Inc.*,
485 A.2d 199 (D.C. 1984) .......... 25

*Amoco Production Co. v. Gambell*,
480 U.S. 531 (2008) .......... 25

*Barletta Heavy Division, Inc. v. Erie Interstate Contractors, Inc.*,
620 F. Supp. 2d 158 (D. Mass. 2009) .......... 21

*Barton v. District of Columbia*,
131 F. Supp. 2d 236 (D.D.C. 2001) .......... passim

*Brown v. Artery Org., Inc.*,
691 F. Supp. 1459 (D.D.C. 1987) .......... 19

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) .......... 15

*Coalition for Common Sense in Government Procurement v. United States,*
576 F. Supp. 2d 162 (D.D.C. 2008) .......... 16

*Columbia Hosp. for Women Found. v. Bank of Tokyo–Mitsubishi, Ltd.,*
15 F. Supp. 2d 1 (D.D.C. 1997) .......... 14

*Common Cause v. Nuclear Regulatory Comm'n*,
674 F.2d 921 (D.C. Cir. 1982) .......... 29

*ConverDyn v. Moniz*,
68 F. Supp. 3d 34 (D.D.C. 2014) .......... 18

*Davis v. PBGC*,
571 F.3d 1288 (D.C .Cir. 2009) .......... 15

*Jack's Canoes & Kayaks, LLC v. National Park Serv.*,
933 F. Supp. 2d 58 (D.D.C. 2013) .......... 15, 16, 26

*Julian v. Christopher*,
575 A.2d 735 (Md. 1990) .......... 25

*Kingman Park Civic Assoc. v. Gray*,
956 F. Supp. 2d 230 (D.D.C. 2013) .......... 27

*Mylan Pharm., Inc. v. Sebelius*,
856 F. Supp. 2d 196 (D.D.C. 2012) .......... 18

*Nat'l Kidney Patients Assoc. v. Sullivan*,
958 F.2d 1127 (D.C. Cir. 1992) ........ 30

*Nat'l Mining Assoc. v. Jackson*,
768 F. Supp. 2d 34 (D.D.C. 2011) ........ 18

*RadioShack Corp. v. Ruffin*,
No. 12-2014-JTM, 2012 WL 589283, *1 (D. Kan. Feb. 22, 2012) ........ 19

*Schmidt v. Lessard*,
414 U.S. 473 (1974) ........ 29

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........ 15, 27

*Sierra Club v. United States Army Corps of Engineers*,
990 F. Supp. 2d 9 (D.D.C. 2013) ........ 16

*The Cuneo Law Group, P.C. v. Joseph*,
669 F. Supp. 2d 99 (D.D.C. 2009), *aff'd*
428 F. App'x 6 (D.C. Cir. 2011) ........ 21

*Trudeau v. FTC*,
384 F. Supp. 2d 281 (D.D.C. 2005), *aff'd*,
456 F.3d 178 (D.C. Cir. 2006) ........ 16

*United States v. Phillip Morris USA, Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ........ 28

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........ 27

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 14, 15, 25, 27

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........ 16, 19

**Rules and Regulations**

Fed. R. Civ. P. 65 ........ 27, 28

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (3d ed. 2015).... 27

14 Williston on Contracts (4th ed. 2013) ........ 20

## I. INTRODUCTION

Captain White[1] seeks a preliminary injunction to stop construction that has been underway for more than a year, and that Captain White was told about a year before that. If Captain White really wanted to stop the construction, he would have done so a long time ago. He filed this lawsuit and this motion when he did because he was about to be evicted. Captain White cannot establish any element of a motion for a preliminary injunction. The Court should deny the motion.

First, Captain White cannot show that he will suffer irreparable harm. Indeed, this Court ruled in *Barton v. District of Columbia*, 131 F. Supp. 2d 236 (D.D.C. 2001), that the alleged loss of leasehold space at the Washington Municipal Fish Market does not constitute irreparable harm and therefore denied a preliminary injunction. Like the *Barton* plaintiffs, Captain White has "failed to demonstrate that [his] business could not survive, or even thrive, somewhere else . . . ." *Id.* at 247. Captain White offers precious little evidence that his business is being affected at all by the construction and *no evidence* that he is being run out of business altogether. He accordingly has not shown that he will suffer irreparable harm if the Court does not grant a preliminary injunction and the Court should therefore deny his motion.

Captain White also cannot establish a substantial likelihood of prevailing on the merits, for many reasons, starting with the fact that there are no valid lease agreements in force – something the Wharf Developer[2] pointed out in its motion to dismiss (ECF Nos. 20, 21). The

---

[1] This brief will refer to all three plaintiffs simply as "Captain White" because they are all controlled by the White family, which refers to its business by that name.

[2] This brief will refer to defendants Hoffman-Madison Waterfront LLC and Wharf Horizontal REIT Leaseholder LLC collectively as "the Wharf Developer," the trade name for the transformative and iconic $2 billion waterfront redevelopment project. For purposes of this brief, there is no meaningful distinction between the two defendants, but if this litigation continues, there will be.

evidence submitted with this brief establishes that even if Captain White's claimed leases were valid, he would be in material breach of them by not paying rent to the Wharf Developer, impermissibly operating a wholesale seafood business out of the Common Areas, and performing construction on the barges without permits and without Landlord consent. Furthermore, the evidence submitted with this brief shows that the Wharf Developer is innocent of the breaches that Captain White accuses it of. Most of the activity that Captain White complains about did not even take place in the Common Areas at the Fish Market—a fact established with aerial photographs. Some of the activities that took place in the Common Areas at the Fish Market were by others—not the Wharf Developer. The Wharf Developer was well within its right to do the two things it actually did on the Common Areas. First, it enforced the rules and regulations attached to the leases by ensuring that parking was available to customers. That meant having Captain White's vehicles ticketed and towed, but the leases say that he should not have parked there anyway. Second, the Wharf Developer installed bollards to prevent cars and trucks from parking on piers that two engineering studies had warned were not structurally sound. In sum, Captain White cannot show any likelihood of prevailing on the merits—much less a "substantial" likelihood.

The other two elements that must be established to show that a preliminary injunction is warranted—the balance of equities and consideration of the public interest—tilt heavily toward the Wharf Developer and against Captain White. The Wharf Developer is implementing the District of Columbia's long-desired plan to transform the Southwest Waterfront and is under contract with the District to do all of the work that Captain White wants the Court to enjoin, including major upgrades to the Fish Market that also have the support of the other Fish Market tenants. The proposed injunctions would force the Wharf Developer to breach its agreement

with the District and would stop the transformation that the District has worked to implement for more than a decade.

Even if Captain White could show irreparable harm, his proposed injunction violates Rule 65 of the Federal Rules of Civil Procedure by referring to another document. His proposed injunction is also overly broad and impermissibly vague. It is unclear exactly what conduct Captain White wants the Court to enjoin. Rule 65 and the case law require injunctions to clearly state what action they proscribe without referring to other documents. Captain White asks the Court to violate Rule 65 by enjoining "further violations of the lease agreement."

Finally, Captain White must post a bond before any injunction takes effect. If the Court decides to issue a preliminary injunction, it should order Captain White to post a bond equal to $1 million for each month the injunction is anticipated to remain in effect.

But the Court should not issue an injunction because Captain White's motion fails on every single element he must establish. The Court should therefore deny his motion.

## II. FACTS

### A. <u>The Wharf Developer is implementing the District of Columbia's long-term plan to transform the Southwest Waterfront.</u>

The Wharf Developer's project is the culmination of years of planning by the District of Columbia. Back in 2001, the District of Columbia's vision for the Southwest Waterfront included such initiatives as constructing a "Market Square plaza at the fish market," "770 new residential units[,] 233,000 s.f. of new retail space[,] 180,000 s.f. of new cultural space[,] and 215,000 s.f. of new hotel." *See* Ex. A (Decl. of M. Steenhoek) ¶ 5, Att. 1.

After a competitive bidding process, the District of Columbia selected the Wharf Developer to implement this vision. *See* Ex. A (Decl. of M. Steenhoek) ¶ 7, Att. 3. The Wharf Developer entered into multiple agreements with the District of Columbia, most of which have

nothing to do with the Fish Market, but some of which do. *See* Ex. A (Decl. of M. Steenhoek) ¶ 11. Those agreements obligate the Wharf Developer, at its "sole cost and expense," to perform certain improvements to the Fish Market. *See* Ex. A (Decl. of M. Steenhoek) ¶ 12, Att. 5.

The District Zoning Commission approved the plan, finding that "the following benefits and amenities will be created" as a result of the Planned Unit Development ("PUD") and cited the upgrades that the Wharf Developer has agreed to perform:

> The proposed PUD will also include several exceptional benefits of particular value to the Southwest community and the District of Columbia as a whole. . . . Second, the Applicant will perform significant upgrades to the municipal Fish Market immediately adjacent to the PUD site. The improvements will include extensive sitework, hardscape and landscaping improvements; relocation of existing overhead utilities to underground conduits; replacement and/or renovation of the 1,300 squarefoot structure known as the "Fish Cleaning Building;" furnishings to accommodate outdoor dining and seating; as well as several other enhancements. Third, in coordination with the U.S. National Park Service, the Applicant will seek approvals to construct temporary pedestrian connections from the L'Enfant Promenade and Banneker Overlook to the Waterfront. The new links would include a staircase from the 10th Street Overlook to the Fish Market, surface pedestrian connections from the north side of Maine Avenue to the Fish Market, and new signage and street furniture, where appropriate. Fourth, the Applicant will provide below-grade accessory parking for the benefit of such uses as the Fish Market and the public marinas.

Ex. A (Decl. of M. Steenhoek) ¶¶ 8–9, Att. 4; *see id.* ¶ 50, Att. 12 (Pictures of Current Condition of Fish Cleaning Building).

**B. <u>Captain White cannot establish that he has valid leases.</u>**

As explained in the Wharf Developer's motion to dismiss (ECF No. 21), all three of Captain White's leases automatically terminated more than ten years ago. The leases include a "perpetuities savings clause" to prevent them from lasting forever in the event that the "Landlord's Work"—improvements to the Common Areas, the completion of which trigger the start of the 30-year lease term—was not finished three years after the leases were signed. All parties agree that the Landlord's Work was not completed in three years, so the perpetuities

savings clause was triggered and the leases terminated automatically. The other Fish Market tenants, Jessie Taylor Seafood and Virgo Fish House, support the redevelopment project and are in the process of negotiating new leases with the Wharf Developer. *See* Ex. C (Decl. of R. Rubenkonig) ¶ 20.]

Two of Captain White's leases have additional material flaws. Salt Water Seafood, one of the Captain White plaintiffs, has no claim whatsoever to any lease. It alleges that it is the tenant of barges 1–4. *See* First Am. Compl. ¶ 40, ECF No. 17. The documents that Captain White filed say that the current tenant of those barges is W.D. Inc. *See* Pls.' Mem. of Mot. for Prelim. Inj. ("Pls.' Mem.") at Ex. G, ECF No. 18-8, p. 2 of 60. Salt Water Seafood claims that Captain White's family bought out the previous tenant and changed its name from W.D. Inc. to Salt Water Seafood. *See id.* at Ex. A (Decl. of P. White) ¶ 5, ECF No. 18-2, p. 3 of 198. That is demonstrably false. The company currently named Salt Water Seafood, Inc. was incorporated on June 20, 2014—after the Wharf Developer took over as Landlord—and its previous name was White & Dize, Inc., not W.D. Inc. *See* Ex. B (Virginia Secretary of State records). Accordingly, Salt Water Seafood, Inc. has not shown that it has any leasehold interest in barges 1–4.

The other flawed lease is for barges 16–19. The District of Columbia assigned an *unsigned* lease for those barges to the Wharf Developer. *See* Pls.' Mem. at Ex. A (Decl. of P. White), Ex. D, ECF No. 18-5, p. 6 of 6; *see also* Ex. C (Decl. of R. Rubenkonig) ¶ 5, Att. 1. More than a year ago, the Wharf Developer repeatedly asked for the allegedly signed lease, but Captain White never produced it. *See* Ex. C (Decl. of R. Rubenkonig) ¶ 7. Then miraculously, Captain White filed a signed lease for barges 16–19 as an attachment to his First Amended Complaint. *See* Pls.' First Am. Compl. at Ex. D, ECF No. 17-4. That was the first time that the Wharf Developer saw any signed lease for those barges and, because it was not assigned to the

Wharf Developer by the District of Columbia, the District has no record of this signed lease. And that lease is slightly different from the lease that the Wharf Developer assumed.

**C. Assuming the leases are valid, Captain White is in material breach of them.**

The leases required each of the three Captain White tenants to pay "Minimum Rent" of $16,400 (The Wharf), $32,000 (Salt Water Seafood), and $27,000 (Captain White) annually, plus adjustments for inflation, for the first five years of the 30-year lease term, "without demand," meaning without waiting for the Landlord to ask for it. *See, e.g.*, Pls.' Mem. at Ex. E, §§ 1.E, 5.A, ECF No. 18-6, pp. 4–5, 10 of 58; *id.* at Ex. F, §§ 1.F, 5.A, ECF No. 18-7, pp. 4, 9 of 32; *id.* at Ex. G, §§ 1.F, 5.A, ECF No. 18-8, pp. 14, 18 of 60. Starting in Lease Year 6, the tenants must pay a percentage of their sales in addition to the Minimum Rent. *See, e.g.*, *id.* §§ 1.E, 1.G, 7.A, ECF No. 18-6, pp. 4–6, 11–12 of 58. Captain White has never paid the Minimum Rent to the Wharf Developer. *See, e.g.*, Ex. A (Decl. of M. Steenhoek) ¶ 52. Since the Wharf Developer assumed the leases, Captain White has paid nothing—not a penny—to the Wharf Developer. *See, e.g.*, Ex. A (Decl. of M. Steenhoek) ¶ 51.

Captain White has materially breached the leases in other ways. He is operating a dining area on a barge, which is not permitted under the leases. *See* Ex. A (Decl. of M. Steenhoek) ¶ 53, Att. 15. And, he is using the Common Areas to stage his wholesale seafood business. *See* Ex. A (Decl. of M. Steenhoek) ¶¶ 31, 54, Atts. 10, 16. Section 1.I of the leases is called "Permitted Uses," and it allows only "the retail sale of seafood" and related food, and even that can only be sold on a "takeout" basis. *See* Pls.' Mem. at Ex. E, § 1.I, ECF No. 18-6, p. 6 of 58. Captain White also performed construction on his barges without permits and without the Landlord's written consent, in violation of the leases' terms. *See, e.g.*, Pls.' Mem. at Ex. E, § 13, ECF No. 18-6, pp. 15, 58 of 58; Ex. A (Decl. of M. Steenhoek) ¶¶ 55–56, Att. 17; Ex. C (Decl. of R. Rubenkonig) ¶¶ 17–18.

### D. Captain White never had a leasehold interest in the Common Areas.

Even assuming that the leases were valid and Captain White had not materially breached them, the "Premises" would only be the barges that each lease covers. *See, e.g.*, Pls.' Mem. at Ex. E, § 1.J, ECF No. 18-6, p. 6 of 58. The "Common Areas" are defined as "all areas within the Project that Landlord makes available to tenants and their customers for their general use, convenience and benefit, including restrooms, parking areas, driveways, walkways, landscaped or planted areas, lighting facilities, service areas and loading and unloading areas, as depicted in Exhibit B hereto." *See, e.g.*, *id.* § 1.C, ECF No. 18-6, p. 4 of 58 (emphasis in original).

Section 9.A of the leases governs those Common Areas. *Id.* § 9.A, ECF No. 18-6, p. 13 of 58. Three points from this section are relevant here. First, the tenants do not have a leasehold interest in the Common Areas; under Section 9.A, they just have a license. Second, the leases impose no restrictions on the Landlord related to the Common Areas until after the Landlord's Work is complete. Third, even after the Landlord's Work is finished, the Landlord needs consent from the Tenant Committee only to change the size, location, or nature of the Common Areas and to locate new structures there.

### E. Captain White offers no evidence that the Wharf Developer interfered with his access to the Common Areas.

#### 1. Captain White does not allege that the Wharf Developer encroached on his alleged leasehold interest: the barges.

Captain White behaves as if he has a leasehold interest in the entire Fish Market, including the Common Areas. His actual leasehold interest—again, assuming the leases are valid—would be in a few barges, and he does not allege that the Wharf Developer interfered with that leasehold interest.

### 2. Captain White complains about activities that were on wholly separate property—not on the Fish Market at all.

Most of the activities that Captain White complains about were entirely outside the Common Areas of the Fish Market. The aerial photos included as attachments to the Declaration of Matthew Steenhoek show the boundaries of the Fish Market Common Areas and also show the approximate locations where Captain White's photos were taken and the property that those photos show. *See* Ex. A (Decl. of M. Steenhoek) ¶ 32, Att. 11. These aerial photos prove that the majority of the various activities that Captain White complains about happened outside of the Common Areas.

Captain White's biggest complaint is the closing of Water Street. Water Street was a public right-of-way. It was never part of the Fish Market or the Common Areas. It was closed pursuant to a statute and deeded to the Wharf Developer. *See* Ex. D, D.C. Law 19-90 (June 28, 2011). But, as part of the Wharf Developer's arrangement with the District, the Wharf Developer agreed to build a new intersection to create access to the Fish Market from Maine Avenue. *See* Ex. A (Decl. of M. Steenhoek) ¶¶ 16–19. Before the closure of Water Street and while the new intersection was being completed, the Wharf Developer created a temporary access point from Water Street to the Fish Market. *See* Ex. A (Decl. of M. Steenhoek) ¶ 16, Att. 6. In fact, before closing Water Street, the Wharf Developer built a new, signalized intersection, complete with signalized crosswalks, to provide safe and convenient access to the Fish Market for vehicles and pedestrians. *See id.* ¶ 18, Att. 6. There was never a time when access to the Fish Market was entirely barred. *See id.* ¶ 19.

**3. The Wharf Developer is entitled to do all of the work it is doing in the Common Areas, and none of that work is interfering with Captain White's businesses.**

There are only two things that the Wharf Developer has actually done in the Common Areas, and it is well within its rights to do both. First, the Wharf Developer has taken steps to ensure that parking in the Common Areas is both safe and available for Fish Market customers. The Common Areas at the Fish Market have limited parking, so the "Rules and Regulations" attached to the leases reserve parking for customers and prohibit the tenants from parking there. *See* Pls.' Mem. at Ex. E, § 32, ECF No. 18-6, p. 23, 58 of 58. Captain White breached the leases by allowing his employees and wholesale business trucks to park in the Common Areas on a routine basis. *See* Ex. A (Decl. of M. Steenhoek) ¶ 57, Att. 18 (time-lapse photographs of Common Areas). So, the Wharf Developer put up signs reserving Common Area parking spots for Fish Market customers and asked the police to ticket and tow violators. *See* Ex. C (Decl. of R. Rubenkonig) ¶ 16.

The Wharf Developer also had to eliminate some of the parking spots for safety reasons. Two independent engineering reports had questioned the structural integrity of two piers that were used for parking. *See* Ex. A (Decl. of M. Steenhoek) ¶¶ 24–28, Att. 7 (Inspection Report of Waterfront Facilities by U.S. Army Corps of Engineers), Att. 8 (Report by Moffat & Nichol). One report recommended that no vehicles weighing over three tons be parked on the piers. *See id.*, Att. 7 at 3–18. Cars and trucks were routinely parking on both piers, creating a risk to human health and safety. *See* Ex. A (Decl. of M. Steenhoek) ¶ 31, Att. 18 (time-lapse photographs of Common Areas). Accordingly, the Wharf Developer installed bollards to prevent parking there. *See* Ex. A (Decl. of M. Steenhoek) ¶¶ 30–31, Att. 9; Ex. C (Decl. of R. Rubenkonig) ¶¶ 10–14, Att. 2 (July 19–23, 2015 correspondence between the Wharf Developer and Captain White regarding notice of bollard installation).

The Wharf Developer did not remove any parking spaces on Common Areas other than those on the structurally questionable piers. *See* Ex. A (Decl. of M. Steenhoek) ¶ 44. But it did add parking nearby and reserved it for Fish Market customers, despite having no obligation to do so. *See* Ex. A (Decl. of M. Steenhoek) ¶ 46, Att. 14. The Wharf Developer also reserved an entire level in a nearby parking structure for Fish Market customers to use during installation of the utilities and installation of the new parking area, and paid Colonial Parking to administer it. *See* Ex. A (Decl. of M. Steenhoek) ¶ 47. During this time, the Wharf Developer provided parking in another lot exclusively for Captain White and the other Fish Market tenants as a courtesy for their employee and commercial vehicle parking. *See id.*

Second, the Wharf Developer fenced in a small portion of the Common Areas in order to rebuild a deteriorated seawall. *See* Ex. A (Decl. of M. Steenhoek) ¶ 29, Att. 9, 11. Neither Captain White nor any other Fish Market tenant was using that part of the Common Areas for a productive commercial use or to serve the public. *See id.* Further, it appeared that homeless people had turned a portion of it into a small encampment and various trash and other rubbish were being stockpiled in the area. *See id.* The seawall is now rebuilt but the surface of the newly graded ground is not yet finished, so the area remains fenced off for safety purposes. *See id.* The fencing does not block access to any Fish Market customers. *See* Ex. A (Decl. of M. Steenhoek) ¶ 29, Atts. 9, 11.

Captain White accuses the Wharf Developer of digging a hole in the Common Areas, but the hole was dug by Washington Gas to fix a leak—it was not dug by the Wharf Developer or anyone working for the Wharf Developer. Captain White also shows photographs of trucks parked in the Common Areas and accuses the Wharf Developer of letting its construction workers park there. *See* Pls.' Mem. at Ex. A, ¶ 39, ECF No. 18-2, p. 6 of 198; *id.* at Ex. 10, ECF

No. 18-2, p. 190 of 198. But the trucks in the photo are not the Wharf Developer's construction workers'; they apparently belong to Fish Market customers or to other contractors working at the Fish Market not hired by the Wharf Developer. Ex. A (Decl. of M. Steenhoek) ¶ 49.

### F. **The Fish Market is open during construction and the other tenants support the project.**

The other Fish Market tenants support the Wharf Developer's work. *See* Ex. E (Decl. of C. Evans) ¶ 13; Ex. F (Decl. of D. Jones) ¶ 12. Jessie Taylor Seafood is suffering from an incremental drop in business, but not one that threatens its existence. *See* Ex. E (Decl. of C. Evans) ¶ 14. And they look forward to completion of the work, because the project will ultimately drive a significant increase in business. *See id.* ¶ 13; Ex. F (Decl. of D. Jones) ¶¶ 11–13. The owner of the Virgo Fish House also supports the project. *See* Ex. F (Decl. of D. Jones) ¶ 12, 13. Construction is always disruptive, but the Wharf Development will be a boon to Fish Market tenants.

Notably, the other Fish Market tenants testify that the Tenant Committee contemplated by the leases was never formed. *See* Ex. E (Decl. of C. Evans) ¶ 4; Ex. F (Decl. of D. Jones) ¶ 5.

### G. **Captain White only filed this lawsuit because he is being evicted.**

Captain White acknowledged that he has known about the Wharf Developer's plans for over a year and that construction has been ongoing for most of that time. *See* Pls.' Mem. 5–9, ECF No. 18-1. So why did he wait until July 2015 to file this lawsuit? The answer is simple: The Wharf Developer had given him a "Notice to Quit" the premises by July 31. *See* Ex. C (Decl. of R. Rubenkonig), ¶ 19, Att. 3. The Wharf Developer told Captain White that it planned to file an eviction lawsuit. Captain White's accusation of procedural game playing is rather hypocritical. If he were really being run out of business by construction and the closing of Water Street, he would have filed for a preliminary injunction long ago.

### H. <u>The Wharf Developer is implementing plans that will greatly improve the Fish Market.</u>

In accordance with the District of Columbia's approved Master Plan for the Fish Market, the Wharf Developer is in the process of completing the design for the landside redevelopment of the Fish Market. *See* Ex. A (Decl. of M. Steenhoek) ¶¶ 3, 33–42, Atts. 5, 12. This plan has evolved since the Concept Master Plan was completed for the Fish Market in 2011. After hearing concerns from Captain White about elements of the Concept Master Plan when it was reviewed with him, the Wharf Developer completed a series of design revisions to the Master Plan. *See, e.g.*, *id.* ¶ 37. These modifications to the plan are designed to increase visibility of the existing pier and barges, create more porosity in the site, provide a variety of architectural languages and scales, create increased opportunities for public access and enjoyment including outdoor seating and dining opportunities, improve circulation, access, and loading, improve wayfinding from the Mall and Tidal Basin, enhance site placemaking elements, improve utility services to site, enhance the bathroom and trash facilities, and increase public safety. *See id.* ¶¶ 33–42.

These additions to the Fish Market are designed to increase the patronage and visibility of both new and existing Fish Market tenants and will not prevent access to Captain White's businesses—the number of entrances and exits to the Fish Market site will remain unchanged from the current condition, which includes the new dedicated intersection on Maine Avenue that the Wharf Developer built to facilitate access to the Fish Market from northwest bound Maine Avenue traffic. *See id.* ¶¶ 16–18, 33–42. The buildings and uses in the Fish Market redevelopment are designed to increase the diversity and scale of the fresh and prepared food offerings available at the Fish Market, which will appeal to a wider bandwidth of potential customers and increase patronage of all Fish Market tenants. *See id.* ¶¶ 33–42.

Further, in addition to the surface convenience parking spaces that will be provided at the Fish Market and at the Wharf Development, a dedicated elevator has been planned for the nearest building on the Wharf Development that will provide direct access to more than 675 public parking spaces that will be available to Fish Market patrons—an increase in available patron parking of more than twelvefold.

**I. The Wharf Developer will suffer harm if the preliminary injunction is wrongfully granted.**

If Captain White's request for a preliminary injunction is granted, it will prevent the Wharf Developer from accessing the Common Areas at the Fish Market and using the new signalized Maine Avenue intersection, which is located outside of the Common Areas on public right-of-way and private property. Access to the Common Areas and this intersection is essential for the Wharf Developer to proceed with construction of the planned Fish Market improvements and the work required under its agreements with the District. *See* Ex. A (Decl. of M. Steenhoek) ¶ 63. If the Wharf Developer cannot access the Fish Market Common Areas or the Maine Avenue intersection, it will not be able to continue with construction of the improvements to the Fish Market, will experience delays in completing portions of construction of the Wharf Development, and will suffer substantial and extensive monetary damages. *See id.* ¶¶ 59–63. The Wharf Developer estimates that it will incur damages between $30,000 and $50,000 for each day that it cannot proceed with construction in the current manner and as planned at the Fish Market and the Wharf Development due to restricted access to the new Maine Avenue intersection. *See id.* ¶ 59. This equates to an estimated $1 million per month in damages. *See id.*

First, if the Wharf Developer is restricted from accessing the Fish Market Common Areas or the Maine Avenue intersection, the impacts on the Wharf Developer's construction of

improvements to the Fish Market will be "severe and immediate." Ex. A (Decl. of M. Steenhoek) ¶ 60. As explained in the Declaration of Matthew L. Steenhoek, attached hereto as Exhibit A, the Wharf Developer has three general contractors and six specialty subcontractors, with over 200 tradesmen, who are onsite every day performing construction work at the Wharf Development. *See id*. Prohibiting the Wharf Developer from accessing the Wharf Development from the Maine Avenue intersection will mean that none of those contractors can perform their work in the current or planned manner, and the Wharf Developer will experience delays and suffer significant cost impacts. *See id*.

Second, if the Wharf Developer cannot access the Common Areas, and thus cannot continue with the improvements to the Fish Market, the Wharf Developer may violate its agreements with the District of Columbia. *See* Ex. A (Decl. of M. Steenhoek) ¶¶ 62–63.

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). "When a party seeks an injunction to reverse policies that are already in place, 'the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction.'" *Barton*, 131 F. Supp. 2d at 241 n.5 (quoting *Columbia Hosp. for Women Found. v. Bank of Tokyo–Mitsubishi, Ltd.,* 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (citation omitted), *aff'd,* 159 F.3d 636 (D.C. Cir. 1998)).

A party seeking a preliminary injunction must prove "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Jack's Canoes & Kayaks, LLC v. National*

*Park Serv.*, 933 F. Supp. 2d 58, 76 (D.D.C. 2013) (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995) (citation omitted)); *see also Winter*, 555 U.S. at 20. The "sliding scale" framework that Captain White points to—where a stronger showing on one factor could make up for a weaker showing on another—was called into doubt by *Sherley v. Sebelius*, where the United States Court of Appeals for the District of Columbia Circuit suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction. *See Jack's Canoes & Kayaks*, 933 F. Supp. 2d at 76 (citing *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011); *Davis v. PBGC*, 571 F.3d 1288, 1292 (D.C .Cir. 2009)). In light of this "unresolved issue," this Court has acknowledged that "[i]f a plaintiff cannot meet the less demanding 'sliding scale' standard, then it certainly could not satisfy the more stringent standard alluded to by the Court of Appeals." *Id.*

## IV. ARGUMENT

### A. <u>Captain White cannot show that he will suffer irreparable harm without a preliminary injunction.</u>

#### 1. The legal standard of irreparable harm is difficult to establish.

The requirement of irreparable harm "erects a very high bar for a movant." *Coalition for Common Sense in Government Procurement v. United States,* 576 F. Supp. 2d 162, 168 (D.D.C. 2008). Specifically, a party seeking injunctive relief must show that the claimed injury is "both certain and great" and that the alleged harm is "actual and not theoretical." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Because "the court must decide whether the harm will *in fact* occur," a party seeking injunctive relief must "substantiate the claim [of] irreparable injury" and "show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.* (emphasis in original). "The injury complained of [must be] of

such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Wisconsin Gas. Co.*, 758 F.2d at 674 (internal quotations omitted) (emphasis in original). "'A showing of irreparable harm is the *sine qua non* of the preliminary injunction inquiry.'" *Jack's Canoes & Kayaks*, 933 F. Supp. 2d at 81 (quoting *Trudeau v. FTC*, 384 F. Supp. 2d 281, 296 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006)). Captain White is unable to establish a "great, actual, and imminent" injury; thus, he is not entitled to a preliminary injunction.

**2. This Court has already determined that losing space at this particular Fish Market is not irreparable harm.**

This Court dealt with this same Fish Market in the same context of injunctive relief, and found no irreparable harm in *Barton v. District of Columbia*. *See Barton*, 131 F. Supp. 2d at 247-48. In *Barton*—a scenario eerily similar to today's case—a tenant of another space in the Fish Market argued that its pending eviction proceedings constituted irreparable harm because "their business will be destroyed" by an eviction. *Id.* at 247. Noting as a preliminary matter that "[n]othing can happen to [plaintiff] or his leasehold interest while his eviction case is pending," the court then asked a question that rings as true in 2015 as it did in 2001: "why couldn't [plaintiff] relocate their seafood store to another area?" *Id.* In Judge Urbina's words,

> [T]he plaintiffs have failed to demonstrate that their business could not survive, or even thrive, somewhere else in the District. In fact, the plaintiffs do not even address this point in either their motion or in their two reply briefs. In the worst-case scenario, the plaintiffs might face a transition or modification of their business. This, however, does not amount to a *destruction* of their business. In fact, even assuming the plaintiffs had to move their store to another, less profitable venue, this move would constitute merely an economic loss for the plaintiffs. And by the plaintiffs' own admission, economic loss alone does not rise to the level required to show irreparable harm.

*Id.* Captain White is identically situated to the *Barton* plaintiff. *See id.* at 237 n.2. Accordingly, Captain White cannot show irreparable harm from the pending eviction proceedings.

**3. Captain White does not show that his alleged injuries threaten the very existence of his businesses.**

Even if the *Barton* case did not settle this issue, Captain White's evidence cannot get him over the high bar to show irreparable harm. He claims that the Wharf Developer's alleged breaches will force him out of business. *See* Pls.' Mem. 25, ECF No. 18-1. But Captain White offers precious little factual support to show that he has lost any customers and he offers nothing to suggest that he is running out of business. *See ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 47–49 (D.D.C. 2014) (denying preliminary injunction despite specific evidence of lost profits and decreased sales).

At most, Captain White's allegations demonstrate some lost revenue from three customers, and that one of Captain White's vendors no longer delivers. He does not even make a conclusory claim that he "will" have to close without a preliminary injunction. Instead, he said that he "*may* have to close." Pls.' Mem. at Ex. A (Decl. of P. White) ¶ 45, ECF No. 18-2, p. 6 of 198 (emphasis added).

This evidence falls woefully short of the standard that this Court requires. *See, e.g.*, *Mylan Pharm., Inc. v. Sebelius*, 856 F. Supp. 2d 196, 215–16 (D.D.C. 2012) (finding no irreparable harm where president of pharmaceutical company "ma[de] no attempt at quantification" of economic injury and instead claimed that company "may" suffer serious loss); *Nat'l Mining Assoc. v. Jackson*, 768 F. Supp. 2d 34, 51 (D.D.C. 2011) (finding no irreparable harm where declarant predicted that his business "will be out of business within eighteen months," because that declaration failed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, or explain with any specificity how he arrived at the conclusion that he would be forced out of business in eighteen months").

Captain White offers only speculation and anecdotes; he makes no attempt to show that *imminent* harm *in fact* threatens the existence of his businesses. *See Wisconsin Gas. Co.*, 758 F.2d at 674 ("Bare allegations of what is likely to occur are of no value."). Accordingly, the Court should deny Captain White's motion for preliminary injunction.

**4. Captain White's authorities are distinguishable.**

Captain White relies on *Brown v. Artery Org., Inc.*, to argue that "[w]rongful eviction, as a matter of law, constitutes irreparable injury." 691 F. Supp. 1459, 1461 (D.D.C. 1987). This is only true if the eviction is *actually wrongful*. In *Brown*, the landlord attempted a wrongful self-help eviction—not a judicial eviction like the Wharf Developer is pursuing here. *See id.* at 1461. The Wharf Developer is pursuing two eviction cases against Captain White in the Landlord and Tenant Branch of the D.C. Superior Court, where proceedings are specifically designed to give due process to both landlords and tenants. These evictions will be rightful by definition because they will result from the fair proceedings in Superior Court.

Furthermore, Captain White cites no cases involving the eviction of a wholly commercial tenant. Unlike a residential tenancy, where an individual plaintiff could actually be "evicted into the street," *see* Pls.' Mem. 29, ECF No. 18-1, a commercial tenant has a greater ability to relocate its business. *See, e.g.*, *RadioShack Corp. v. Ruffin*, No. 12-2014-JTM, 2012 WL 589283, *7 (D. Kan. Feb. 22, 2012) ("RadioShack's losses, if it is evicted from its current location, will be primarily economic and can be compensated by monetary damages. In fact, loss of sales can only be compensated with money. Further, to the extent RadioShack stands to lose customers or goodwill, that also can be compensated with money . . . ."); *see also Barton*, 131 F. Supp. 2d at 247.

Here, Captain White asks this Court to enjoin a different court that is specially situated to give due process to landlords and tenants in disputes like this. This Court should defer to the

District of Columbia Superior Court's Landlord-Tenant Branch, and allow those cases to go forward.

**B. Captain White's lawsuit is baseless.**

**1. Either Captain White's leases terminated or Captain White is in material breach of the leases—those are the only two options.**

Before he filed this lawsuit, the Wharf Developer asked Captain White to "pick his poison." Either the leases automatically terminated years ago (because the 30-year Lease Term did not start within three years of execution) or he was in material breach for not paying rent (because the 30-year Lease Term did start 15 years ago). Captain White ignored the question and, facing eviction, filed this lawsuit. The Wharf Developer put the former "poison" before the Court in the form of its motion to dismiss.

Again, if the Court grants that motion, Captain White's motion will be moot. Captain White now wants the other "poison." He argues in opposition to that motion that the 30-year Lease Term started 15 years ago.

If that is right, Captain White's lawsuit would still fail because he would be in material breach of the leases in three ways. First, he has not paid rent. Captain White owed $16,400, $27,000, and $32,000 annually for the first five years of the 30-year Lease Term, and after that he owed escalation of that amount plus a portion of his revenue in addition. *See, e.g.*, Pls.' Mem. at Ex. E, § 1.E, ECF No. 18-6, pp. 4–5 of 58. But he has paid nothing—not a penny—to the Wharf Developer. *See* Section II.C, *supra*. Second, Captain White is operating a wholesale seafood business at the Fish Market in violation of the leases. *See* Sections II.C and II.E.3, *supra*. He is also operating a dining barge, which likewise is not allowed. *See* Section II.C, *supra*. Third, Captain White performed construction on his barges without permits and without the Landlord's permission, which violates the leases' terms. *See* Section II.C, *supra*.

Captain White is in material breach of the leases; thus, he cannot establish a substantial likelihood of success on the merits of his underlying breach of contract claim. *See, e.g.*, *The Cuneo Law Group, P.C. v. Joseph*, 669 F. Supp. 2d 99, 125 (D.D.C. 2009), *aff'd* 428 F. App'x 6 (D.C. Cir. 2011) ("A party's material breach of a settlement agreement generally excuses the other party's obligation to perform its end of the bargain under the agreement."); *Barletta Heavy Division, Inc. v. Erie Interstate Contractors, Inc.*, 620 F. Supp. 2d 158, 162 (D. Mass. 2009) (concluding that the defendants have not shown a likelihood of success on the merits of their counterclaims for breach of contract where the evidence indicates that the defendants breached the contract, and denying the defendants' motion for a preliminary injunction); 14 Williston on Contracts § 43:5 (4th ed. 2013) ("[T]he party first in default under a bilateral contract cannot recover for the subsequent failure of the other party to perform."). . Without a substantial likelihood of success on the merits, Captain White's motion for a preliminary injunction must be denied.

**2. The Wharf Developer did not violate any of the three lease provisions that Captain White claims.**

Even if there were valid leases and Captain White were not in breach of them, the Wharf Developer is not guilty of Captain White's accusations.

a. <u>Captain White has a right to quiet enjoyment only of his barges—not of the Common Areas.</u>

First, Captain White alleges that the Wharf Developer violated § 29 of the leases, which gives him the right to quiet enjoyment of the "Premises" as long as he is not in breach of the leases. *See* Pls.' Mem. at Ex. E, § 29, ECF No. 18-6, p. 22 of 58. But "Premises" is defined to cover only the barges that Captain White purportedly leased—nothing more. *Id.* § 1.J, ECF No. 18-6, p. 6 of 58. Captain White does not argue that the Wharf Developer encroached on his actual barges.

b. Until the 30-year Lease Term starts, the leases put no restrictions on what the Landlord can do in the Common Areas.

Second, Captain White alleges that the Wharf Developer violated § 9.A of the leases, which addresses the Common Areas. *See* Pls.' Mem. 10–12, 21–23, ECF No. 18-1. That section only gave Captain White a license to use the Common Areas—not a leasehold interest. *See* Pls.' Mem. at Ex. E, § 9, ECF No. 18-6, p. 13 of 58. And it clarifies that "Landlord shall have exclusive control and management of the Common Areas and Landlord may establish and enforce rules therefor." *Id.*

Captain White ignores those sentences and argues that § 9 bars the Wharf Developer "from engaging in any construction of the Common Areas unless certain conditions precedent are met." Pls.' Mem. 16, ECF No. 18-1, p. 21 of 32 (emphasis in original). But the sentence he relies on actually reads as follows:

> After the completion of Landlord's Work, and with the approval of the Tenant Committee, Landlord may change the size, location, or nature of the Common Areas, and may locate on the Common Areas structures of any type; provided, no such structures would materially interfere with access to the premises across the Common Areas and to and from Maine Avenue.

Pls.' Mem. at Ex. E, § 9, ECF No. 18-6, p. 13 of 58 (emphasis in original). The trigger for this sentence is the completion of the Landlord's Work. Until that is done—an event which starts the 30-year lease term—this sentence puts no restrictions on the Landlord. And for good reason. The tenants pay only a nominal rent until the Landlord's Work is done. The tenants do not get consent rights for work in the Common Areas without paying for them. Once the 30-year Lease Term starts, and the tenants start paying rent, they get consent rights.[3] Again, Captain White can pick his poison. If the Landlord's Work is not finished, he has no consent rights. If the Landlord's Work is done and the

[3] And, as noted above, the Tenant Committee was never formed. *See* Section II.F, *supra*.

30-year Lease Term has started, then he is in material breach for not paying rent. Either way, he loses.

Moreover, even if the Landlord's Work had been finished, that sentence would not require consent for "any construction" in the Common Areas—just for locating structures on the Common Areas. The Wharf Developer has not located any structures on the Common Areas, so there has been no violation of the leases. *See* Section II.E, *supra*. Furthermore, Captain White argues as if the Tenant Committee has been formed, but it was never created. *See* Section II.F, *supra*.

Captain White loses this point for the additional reason that the majority of the activities he complains about happened outside of the Fish Market Common Areas entirely. The Wharf Developer only did two things on the Common Areas. First, it fenced off an unused portion of the Common Areas so it could repair the seawall. *See* Section II.E.2, *supra*. That is not "chang[ing] the size, location or nature of the Common Areas" and it is not "locat[ing] on the Common Areas structures of any kind" either. Second, it installed bollards to prevent the risk to human health and welfare that resulted when cars and trucks were parked on structurally deficient piers. *See* Section II.E.3, *supra*. Neither of those activities violates § 9 of the leases.

c. The Wharf Developer has facilitated customer parking at the Fish Market—not impeded it.

Third, Captain White argues that the Wharf Developer violated § 9.B of the leases, which governs parking. *See* Pls.' Mem. 11, 22–23, ECF No. 18-1. Ironically, Captain White argues that the Wharf Developer is driving him out of business by ensuring that there is parking available to Fish Market customers. This simply does not make sense. And the Wharf Developer was merely enforcing the rules and regulations attached to the leases, which Captain White was violating. Those rules reserve parking in the Common Areas for customers. *See* Pls.'

Mem. at Ex. E, § 32, ECF No. 18-6, p. 23 of 58. Captain White complains that the Wharf Developer enforced those rules by towing Captain White's "private and commercial vehicles." Pls.' Mem. 24, ECF No. 18-1. Neither type of vehicle should have been there. The rules say, "no part of the Common Area may be used for parking by employees of Tenant or other Tenants of the Project." *See* Pls.' Mem. at Ex. E, ECF No. 18-6, p. 58 of 58; *see also* Pls.' Mem. at Ex. E, § 9.B, ECF No. 18-6, p. 13 of 58. Captain White was doing just that by parking his wholesale delivery trucks in the Common Areas and around the clock. *See* Sections II.C and II.E.3, *supra*. So were his employees, by parking their cars in the Common Areas all day long. *See* Sections II.C and II.E.3, *supra*.

**3. The Wharf Developer's planned future work in the Common Areas will not violate the leases either.**

Captain White also has no right to stop the Common Areas work that the Wharf Developer plans in the future. Even if the leases were in effect, Captain White had paid his rent and was not otherwise in breach of the leases, the Landlord's work had been done, and the Tenant Committee had been formed, the Tenant Committee could only withhold consent to the Wharf Developer's current plans if they would "materially interfere with access to the [barges] across the Common Areas to and from Maine Avenue." *See, e.g.*, Pls.' Mem. at Ex. E, § 9.A, ECF No. 18-6, p. 13 of 58.

The plans preserve that access, so the Tenant Committee would have to give its consent. *See 1010 Potomac Assocs. v. Grocery Mfgs. of Am., Inc.*, 485 A.2d 199, 210 (D.C. 1984) (where a party will receive all benefits bargained for in the lease, it is unreasonable to withhold consent); *see also Julian v. Christopher*, 575 A.2d 735, 738–39 (Md. 1990) (right to consent cannot be exercised arbitrarily or capriciously).

### C. <u>The balance of equities weighs in the Wharf Developer's favor.</u>

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter*, 555 U.S. at 24. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* (citing *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (2008)). The balance of equities and consideration of the public interest "are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Id.* at 32 (citing *Amoco Production Co.*, 480 U.S. at 546 n.12). A plaintiff seeking a preliminary injunction must demonstrate that the balance of equities tips in its favor. *See Jack's Canoes & Kayaks*, 933 F. Supp. 2d at 81.

Here, the balance of equities clearly tips in favor of the Wharf Developer. If the Court grants Captain White's motion for a preliminary injunction, the Wharf Developer will be forced to breach its agreements with the District of Columbia, subjecting the Wharf Developer to potential litigation and financial harm. *See* Section II.I, *supra*;; *Barton*, 131 F. Supp. 2d at 248 (finding that preventing the defendants from implementing improvements that Congress intended is a harm that tips the balance of equities in defendants' favor). In addition, granting a preliminary injunction will cause the Wharf Developer to suffer extensive monetary damages because it will be unable to proceed with the planned construction. *See* Section II.I, *supra*. Further, the Wharf Developer is currently suffering economic harm because Captain White is occupying the Leased Property without paying rent, thereby depriving the Wharf Developer of rental income and economically beneficial use of that space. *See* Section II.C, *supra*; Pls.' Mem. at Ex. E, § 1.E, ECF No. 18-6, pp. 4–5 of 58 (defining the Minimum Rent payments under the leases); *Barton*, 131 F. Supp. 2d at 248 (finding that depriving the defendants of rent payments is a harm that tips the balance of equities in defendants' favor). As such, the Wharf Developer will suffer substantial harm if the Court grants a preliminary injunction.

Conversely, if the Court denies Captain White's motion for a preliminary injunction, Captain White will suffer only minimal harm (which he has failed to prove), if any. First, Captain White has provided no evidence to demonstrate the specific damages that he would suffer absent an injunction. *See* Sections II.B and II.E, *supra*; *see also Sherley*, 644 F.3d at 398 (finding that the balance of equities tilted against granting a preliminary injunction because the harm to plaintiffs if no injunction issued was uncertain, but the hardship a preliminary injunction would impose upon the defendants would be certain and substantial). As described in greater detail above, the Wharf Developer's continuing construction does not impede Captain White's use of the Leased Property. *See* Sections II.E, II.F, II.H, *supra*. This Court should therefore deny Captain White's motion for a preliminary injunction.

**D. <u>The public interest will be served by permitting the Wharf Developer to continue the construction work.</u>**

"'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). A plaintiff seeking a preliminary injunction must establish that an injunction would be in the public interest. *See Kingman Park Civic Assoc. v. Gray*, 956 F. Supp. 2d 230, 258 (D.D.C. 2013) (citing *Winter*, 555 U.S. at 20).

Here, the public interest will be best served by permitting the Wharf Developer to continue the construction work to improve, renovate, upgrade, and restore the Southwest Waterfront, as envisioned by the District of Columbia and various other government agencies.

Captain White points to a petition to "Preserve the Southwest Waterfront Municipal Fish Wharf" that Captain White contends 2,200 members of the public have signed. *See, e.g.*, Pls.' Mem. 26, ECF No. 18-1; *id.*, Ex. Y, ECF No. 18-26. In particular, the petition asks the District

of Columbia to: "(i) evaluate the impact of the development of the Southwest Waterfront on the Municipal Fish Wharf (the 'Wharf'), the businesses located at the Wharf and the patrons of the Wharf, (ii) [] provide sufficient public means of access to the Wharf by public roadways, and (iii) [] provide reasonable options for parking." Pls.' Mem. at Ex. Y at 1, ECF No. 18-26. The District of Columbia already did all that and determined that the Wharf Developer's plan would result in a variety of benefits and improvements. *See generally, e.g.*, Ex. A (Decl. of M. Steenhoek), Att. 4 (Stage 1 PUD approved by the District Zoning Commission); Section II.A, *supra*. The public interest, therefore, is best served by permitting the Wharf Developer to complete the ongoing construction work, and this Court should deny Captain White's motion for a preliminary injunction.

### E. Captain White's proposed injunction would violate Rule 65 and is impermissibly vague.

Captain White's proposed injunction lacks the specificity required by Federal Rule of Civil Procedure 65, which says: "Every order granting an injunction . . . must: . . . (B) state its terms specifically; and (C) describe in reasonable detail—*and not by referring to the complaint or other document*—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(B), (C) (emphasis added). "Because an injunction 'prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.'" *United States v. Phillip Morris USA, Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). An injunction under Rule 65 must also be clear on its face so "that an ordinary person reading the court's order should be able to ascertain *from the document itself* what conduct is proscribed." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2955 (3d ed. 2015) (emphasis added); *see also Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 926 (D.C. Cir. 1982)

(reversing district court's grant of injunction that was "susceptible to more than one interpretation").

Captain White's proposed injunction is impermissibly vague and violates the plain language of Rule 65 because it refers to another document, the leases, for virtually all of its terms. The very first provision in Captain White's proposed injunction is an order that the Wharf Developer "CEASE and DESIST from any further violations of the lease agreement." Pls.' Mem. at Ex. BB at 6, ECF No. 18-29. It then lists activities that Captain White wants the Court to enjoin, but those also reference the leases, starting with this one: "Entering the Plaintiffs' leased property, including the Common Areas, as defined by their leases, to locate any temporary or permanent structures or to conduct construction activities of any kind without the express, written consent of a majority of the Tenant Committee and in advance of completing the improvements required in the lease agreements . . . ." *Id.* at 6–7. The leases do not define the Common Areas as "leased property." The leases do not bar "construction activities of any kind," either. And how could the Landlord "complete the improvements required by the lease agreements" if it is not allowed on the Common Areas? Captain White also wants the Court to enjoin "any further action that interferes with Plaintiffs [sic] rights to quiet enjoyment of the property under the lease agreements . . . ." *Id.*

This is not "explicit notice of precisely what conduct is outlawed" and it requires referral to another document. An ordinary person reading just the proposed injunction would not know what conduct was proscribed. Accordingly, Captain White's proposed injunction would violate Rule 65 and the Court should not enter it.

## V. CAPTAIN WHITE MUST POST A BOND

If the Court decides to grant injunctive relief in Captain White's favor, then the Court must require Captain White to post an appropriate bond in the event that this Court or another

court later determines that the injunction was wrongfully issued. Federal Rule of Civil Procedure 65(c) states that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see also Nat'l Kidney Patients Assoc. v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992) (noting the bond requirement's "important goal, that of forcing the plaintiff to consider the injury to be inflicted on its adversary in deciding whether to press ahead in its quest for a preliminary injunction. The deterrence of flimsy claims depends on this."). If the Court grants Captain White's motion, it will substantially delay construction of a portion of the Wharf Development. The Wharf Developer would suffer costs increases of $30,000 to $50,000 per day, and an estimated total of $1 million per month. *See* Section II.I, *infra*. Accordingly, in the event that the Court grants Captain White's motion, the Wharf Developer respectfully requests that the Court require Captain White to post a bond of $1 million per month that the preliminary injunction is slated to remain in effect. If, for example, the Court intends to issue a case schedule that would allow for discovery followed by an expedited trial in six months, that would mean that the bond amount should be $6 million.

## VI. CONCLUSION

For the reasons set forth above, the Wharf Developer respectfully requests that this Court deny Captain White's motion for preliminary injunction.

Dated: September 3, 2015

Respectfully submitted,

Michael McNamara

____________________________________

PILLSBURY WINTHROP SHAW PITTMAN LLP
Michael S. McNamara, D.C. Bar No. 493773
1200 Seventeenth Street, N.W.
Washington, D.C. 20036
michael.mcnamara@pillsburylaw.com
*Attorney for Defendants Hoffman-Madison Waterfront, LLC and The Wharf Horizontal REIT Leaseholder, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2015, I caused a copy of the foregoing to be served via email on the following counsel:

Wendell L. Taylor, D.C. Bar No. 973873
Jonathan Lasken, D.C. Bar No. 997251
Hunton & Williams LLP
2200 Pennsylvania Ave, N.W.
Washington, D.C. 20037
Tel: (202) 955-1627
Fax: (202) 857-3898
wtaylor@hunton.com
jlasken@hunton.com

Respectfully submitted,

Michael McNamara

PILLSBURY WINTHROP SHAW PITTMAN LLP
Michael S. McNamara, D.C. Bar No. 493773
1200 Seventeenth Street, N.W.
Washington, D.C. 20036
michael.mcnamara@pillsburylaw.com
*Attorney for Defendants Hoffman-Madison Waterfront, LLC and The Wharf Horizontal REIT Leaseholder, LLC*