IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE WHARF, INC. | ) | |
| t/a THE WHARF, | ) | |
| | ) | |
| BRW, INC. | ) | |
| t/a CAPTAIN WHITE SEAFOOD CITY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SALT WATER SEAFOOD, INC. | ) | |
| t/a SALT WATER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No: 1:15-cv-01198-CKK |
| THE DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| HOFFMAN-MADISON | ) | |
| WATERFRONT, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE WHARF HORIZONTAL | ) | |
| REIT LEASEHOLDER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS DEFENDANT WHARF HORIZONTAL REIT LEASEHOLDER
LLC'S FIRST AMENDED COUNTERCLAIM**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT.........................................................................................................................4

A. Legal Standard ...............................................................................................................5

B. Counts  I & II – Unjust Enrichment and Quantum Meruit ........................................................5

    1. Plaintiffs' Leases Have not Expired or Been Terminated and no Quasi-Contract
    Claims can be Asserted Where a Valid Contract Exists....................................................7
        a.               Provision 38.E in Plaintiffs' Leases did not Cause Them to Expire Three
                      Years After Execution. ................................................................................7
        b.               The Mayor did not Exceed his Authority by Entering into Plaintiffs'
                      Leases, so the Leases Were not Void Ab Initio. .........................................9
        c.               The Developer Could not have Terminated Plaintiffs' Leases for the
                      Alleged Breaches Because the Actions it Alleges are not Breaches or not
                      Supported by Sufficient Factual Content.................................................10

    2. The Developer's Unjust Enrichment and Quantum Meruit Claims that are Based on
    the Plaintiffs' Continued Presence at the Fish Market are Time-Barred.........................24

    3. Certain Express Provisions of the Plaintiffs' Leases Survive and Govern Holdover
    Conduct, so no Quasi-Contract Claims can be Maintained Against Plaintiffs. ...............25

    4. Any Quasi-Contract Claim Based on the Developer's Alleged Improvement and
    Maintenance Cannot Be Maintained Because the Developer did not Engage in
    Those Activities for the Fish Market or with the Expectation of Payment from the
    Fish Market Tenants. ....................................................................................................26

C. Counts III & IV – Claims for Ejectment ...........................................................................27

CONCLUSION....................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,*
  485 A.2d 199 (D.C. 1984) .................................................................................................21

*4934, Inc. v. D.C. Dep't of Emp. Servs.,*
  605 A.2d 50 (D.C. 1992) ...................................................................................................7

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................. 5, 11, 22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...........................................................................................................5

*Bingham v. Goldberg. Marchesano. Kohlman. Inc.,*
  637 A.2d 81 (D.C. 1994) ...................................................................................................6

*Chamber of Commerce v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) .........................................................................................10

*City of Harper Woods Employees' Ret. Sys. v. Olver,*
  589 F.3d 1292 (D.C. Cir. 2009) .........................................................................................5

*Embassy of Fed. Republic of Nigeria v. Ugwuonye,*
  901 F. Supp. 2d 136 (D.D.C. 2012) ...................................................................................5

*Grimes v. Newsome,*
  780 A.2d 1119 (D.C. 2001) ..............................................................................................25

*Hazen v. Am. Sec. & Trust Co.,*
  265 F. 447 (D.C. 1920)........................................................................................................8

*In re Conservatorship for Rich,*
  337 A.2d 764 (D.C. 1975) ..................................................................................................6

*Jordan Keys & Jessamy LLP v. St. Paul Fire and Marine Ins. Co.,*
  870 A.2d 58 (D.C. 2005) ................................................................................................6, 7

*Julian v. Christopher,*
  575 A.2d 735 (Md. 1990) .................................................................................................21

*News World Commc'ns, Inc. v. Thompsen,*
  878 A.2d 1218 (D.C. 2005) ................................................................................... 6, 24, 25

*Peart v. D.C. Housing Auth.*,
   972 A.2d 810 (D.C. 2009) ........................................................................6

*Rosenkoff v. Finkelstein*,
   195 F.2d 203 (D.C. Cir. 1952) ...............................................................26

*Sarete, Inc. v. 1344 U St. Ltd. P'ship*,
   871 A.2d 480 (D.C. 2005) ......................................................................27

*Second Realty Corp. v. Krogmann*,
   235 F.2d 510 (D.C. 1956) .........................................................................8

*Shapiro v. Tauber*,
   575 A.2d 297 (D.C. 1990) ......................................................................28

*Tsintolas Realty Co. v. Mendez*,
   984 A.2d 181 (D.C. 2009) ......................................................................28

*TVL Assoc. v. A&M Const. Corp.*,
   474 A.2d 156 (D.C. 1984) .........................................................................6

*Waco Scaffold & Shoring, Co. v. 425 Eye St. Assocs.*,
   355 A.2d 780 (D.C. 1976) ......................................................................26

*Wolff v. Westwood Mgmt., LLC*,
   558 F.3d 517 (D.C. Cir. 2009) ...............................................................25

STATUTES

D.C. Code § 12-301(7) (2009)...........................................................................25

D.C. Code § 42-3210 (2001) .............................................................................27

Pub. L. No. 62-435, 37 Stat. 941 (1913) ...........................................................15

Pub. L. No. 105-277, 112 Stat. 2681 (1998) ........................................................9

Pub. L. No. 106-522 § 162(a), 114 Stat. 2440 (2000) .....................................9, 10

OTHER AUTHORITIES

DCRA, *Business License Verification*, http://pivs.dcra.dc.gov/BBLV/Default.aspx. .................16

77 Fed. Reg. 10270(B)(3)(a) (Feb. 21, 2012)......................................................11

DCRA, *5 Basic Steps to Obtaining a Business License*, at
   http://dcra.dc.gov/node/1151081 ..............................................................16

Food & Drug Administration, *Retail Store Eligibility USDA Supplemental Nutrition Assistance Program*, http://www.fns.usda.gov/snap/retail-store-eligibility-usda-supplemental-nutrition-assistance-program.................................................................18

*Food Establishment Inspection Report: Jimmy's Grill*, *at* http://dc.healthinspections.us/webadmin/dhd_431/lib/mod/inspection/paper/_paper_food_inspection_report.cfm?inspectionID=404387&wguid=1367 ..........................................18

H.R. Rep. No. 105-670 (1998) ..............................................................................................9

USACE, *Public Notices Overview*, *at* http://www.nab.usace.army.mil/Missions/Regulatory/PublicNotices/tabid/10471/Article/492646/spn-12-32-reissuance-of-nationwide-permits.aspx................................................12

USACE, *2012 Nationwide Permits Summary*, *at* http://www.usace.army.mil/Portals/2/docs/civilworks/nwp/2012/NWP2012_sumtable_15feb2012.pdf. ...........................................................................................................12

Webster's Third New International Dictionary (1993) ..............................................................17

## PRELIMINARY STATEMENT

Defendant Wharf Horizontal REIT Leaseholder LLC's (the "Developer") amendments to its counterclaims fail to save its claims from dismissal because they still do not state a claim as a matter of law. The Developer's claims against Plaintiffs fall into two categories: (1) quasi-contractual claims seeking restitution for services allegedly rendered, and (2) equitable claims seeking eviction of the Plaintiffs.

The quasi-contractual claims rely on the assertion that the Plaintiffs' leases are no longer in effect. The Developer points to three times at which the leases allegedly expired or were terminated: (1) in 2003 and 2004 because the previous landlord Defendant District of Columbia (the "District") breached the leases by not completing certain work required under Plaintiffs' leases; (2) at the outset of the leases because the Mayor did not have the authority to enter into Plaintiffs' leases; or (3) in July 2015 and March 2016 when the Developer terminated the Plaintiffs' leases for breach.

The Developer's contentions misapprehend Plaintiffs' leases and the law. The Developer first claims that the leases expired in 2003 or 2004 due to a lease clause it claims was triggered because the District opted to breach Plaintiffs' leases by not "us[ing] all reasonable commercial efforts to complete the Landlord's Work by June 30, 2001" to do work that it committed to Plaintiffs and Congress that it would complete. The Developer contends that the clause was included to prevent the leases from lasting forever. But the provision the Developer relies upon states its "sole purpose"—to foreclose any possible interpretation that the leases violated the rule against perpetuities or other laws against restraints on alienation. The Developer has not alleged that the leases violate the rule against perpetuities or other laws against restraints on alienation, nor could it. The rule against perpetuities applies only to *unvested* interests, and the leases unconditionally vested at the time of signing according to their own terms. Therefore, this

provision did not operate to terminate Plaintiffs' leases.  In addition, this purported expiration plainly does not apply to Plaintiff Saltwater because the District agreed to set a new expiration date when Saltwater acquired its predecessor's lease.

The Developer's argument that the leases were void *ab initio* fails as well.  The Developer arrives at the conclusion that the Mayor lacked authority to enter into the current Fish Market leases by summarizing only a portion of the relevant Congressional enactments that allowed the Mayor to execute Plaintiffs' leases.  After years of negotiation and after two of the Plaintiffs had already signed their leases, Congress passed legislation to allow the Mayor to execute the leases that had already been offered.  Although the Developer omits the relevant language, Congress allowed the Mayor to "approve and execute leases of the . . . Washington Municipal Fish Wharf with the existing lessees thereof for an initial term of 30 years, together with such other terms and conditions (including renewal options) as the Mayor deems appropriate."  This Congressional enactment gave the Mayor broad discretion as to the form of the Fish Market leases, provided the leases ran for at least 30 years, and clearly contemplated that the leases could run for more than 30 years.  And, at the time of signing, the District's Corporation Counsel approved the leases for legal sufficiency.  It is simply not plausible that the leases were void *ab initio* based on the language of Congress's appropriation bill, the District's legal review, and the Mayor's actions.

The Developer also claims that even if the Plaintiffs' leases did not expire over a decade ago or at the outset, it terminated two of the Plaintiffs' leases in July 2015 for operating a dining barge and building a small equipment shed behind one of their barges without the proper permits. The Developer also states that it has alerted Plaintiffs to the other breaches contained in this counterclaim in a March 18, 2016 letter ("Default Letter").  With respect to the alleged July 2015

termination, the Developer could not have terminated the leases because operating a dining barge is not a breach, and Plaintiff obtained permits for the construction of the small equipment shed, although it was unlikely that any permits were required.  The remainder of the breaches alleged by the Developer are not supported by factual content as is required under applicable pleading standards, so they can be ignored, and are not breaches at all when compared with the relevant lease requirements.

Because the Plaintiffs' leases remain valid under any of the Developer's theories, its quasi-contract claims—unjust enrichment and *quantum meruit*—must be dismissed.  As is clear under District of Columbia law, where an express contract exists, quasi-contract claims cannot, and certain lease terms would survive the Developer's aspirational expiration and govern post-expiration conduct.  Moreover, all of the improvements and maintenance that the Developer alleges to have undertaken were the result of its redevelopment contract with the District that the Plaintiffs had no part of negotiating.  The unrequested and unwanted changes that the Developer has made at the Fish Market were never undertaken for the Fish Market tenants with the expectation of restitution from such tenants.  The Plaintiffs cannot be required to pay the costs of the obligations the Developer took on in a contract with the District that the Plaintiffs were not present for, a party to, nor wanted.  The Developer's pleading that it would perform the maintenance and improvements at the Fish Market at its "sole cost and expense" is fatal to its claims for quasi-contractual relief.  Indeed, the commitments the Developer made to the District constitute breaches of Plaintiffs' leases for which they have sought relief in this Court.  And to the extent that the Developer's quasi-contractual claims are based on the leases expiring over a decade ago, they are barred by the statute of limitations.

Finally, under District of Columbia law, the District has set forth a series of specific procedures that must be used in eviction actions. These procedures specify that only Superior Court has jurisdiction to hear eviction actions, so this Court may not. But even assessing the merits of the Developer's claims, it cannot obtain eviction. Eviction for breach is considered to be a harsh and disfavored remedy. It can be imposed here only if the breach is material, the Plaintiffs demonstrated bad faith in breaching the leases, and no other remedies short of eviction are available. The Developer has made no attempt to establish that its alleged breaches, which include that the Plaintiffs have sold carbonated beverages, Saltwater installed a sign with its own name on it, and Plaintiffs placed sandwich board advertisements in the Common Area that were later removed, have caused it *any* harm, let alone materially breached the leases sufficient to support an eviction. Thus, even if the Court finds that some of the Plaintiffs' actions are technical breaches—which they are not—remedies short of eviction are obviously available. As such, the Developer would not be entitled to possession for breach under any circumstances.

## ARGUMENT

Although presented in a somewhat scattershot manner, the Developer's counterclaims generally fall into two categories: (1) money damages for the Plaintiffs' continued operations at the Fish Market after—the Developer contends—the leases expired, and (2) eviction for various claimed breaches of the leases. *The Wharf, Inc. v. District of Columbia*, Def. Wharf Horizontal REIT Leaseholder LLC's First Am. Countercl., ¶¶ 230-53 (filed on May 9, 2016) [hereinafter "Am. Countercl."].

But these counterclaims fail to state a claim as a matter of law because they (1) misconstrue the Plaintiffs' leases and the law to erroneously conclude that the leases expired; (2) fail to provide sufficient factual basis to meet the pleading standards set forth by the Supreme Court; (3) allege actions that, even if true, would not constitute breaches under the leases or were

remedied by Plaintiffs; (4) are time-barred; and (5) ask for a relief that cannot be granted under District of Columbia law.

    A.  <u>Legal Standard</u>

When a defendant files a counterclaim, the plaintiff—now counter-defendant—"may file a motion to dismiss to test the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 139 (D.D.C. 2012) (internal quotations omitted). To survive a motion to dismiss, the counterclaim must "plead sufficient facts that, taken as true, provide 'plausible grounds' that discovery will reveal evidence to support the counter-plaintiffs['] allegations." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [counter-]plaintiff pleads factual content that allows the court to draw the reasonable inference that the [counter-]defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Moreover, "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' Nor does a [counterclaim] suffice if it tenders 'naked assertion[s]' devoid of `further factual enhancement.'" *Id.* at 678 (citation omitted). Although, for the purposes of the motion, the Court must accept all factual allegations in the counterclaim as true, "it need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations." *City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

    B.  <u>Counts I & II – Unjust Enrichment and *Quantum Meruit*</u>

Counts I and II allege quasi-contract causes of action: unjust enrichment and *quantum meruit*. Am. Countercl. ¶¶ 230-41. These causes of action are similar and are designed to remedy situations in which a party has received a benefit under circumstances that warrant

restitution.  "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  *Peart v. D.C. Housing Auth.*, 972 A.2d 810, 813 (D.C. 2009) (quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005)).[1] Similarly, "[t]he essential elements for recovery under *quantum meruit* are: (1) valuable services being rendered; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, used and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, expected to be paid by him or her."  *In re Conservatorship for Rich*, 337 A.2d 764, 766 (D.C. 1975).  The cause of action for these quasi-contractual claims accrues at the time there is "a wrongful act giving rise to a duty of restitution."  *News World Commc'ns*, 878 A.2d at 1225 (citation omitted).  Yet, neither cause of action may be maintained where an express contract is in effect.  *Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*, 870 A.2d 58, 64 (D.C. 2005); *Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 94 n.30 (D.C. 1994).

Here, both quasi-contract claims fail because Plaintiffs' leases are still in effect; the claims are time-barred; and the benefits the Developer alleges to have provided were unrequested and unwanted, not done for the Fish Market tenants, and not done with any expectation of restitution.

---

[1] "Unjust enrichment is quasi-contractual in nature (based on a contract implied in law), and recovery will be had in restitution."  *Peart*, 972 A.2d at 813-14 (citing *TVL Assoc. v. A&M Const. Corp.*, 474 A.2d 156, 159 (D.C. 1984)).

    1.  *Plaintiffs' Leases Have not Expired or Been Terminated and no Quasi-Contract Claims can be Asserted Where a Valid Contract Exists.*

The Developer alleges three possible times that the Plaintiffs' leases either expired or were terminated: (1) in 2003 or 2004 when Provision 38.E terminated the contracts; (2) at the outset because the leases were void *ab initio*; or (3) in July 2015 when the Developer terminated two of Plaintiffs' leases for breach.[2]  Am. Countercl. ¶¶ 22, 24, 32.  But, the leases did not expire due to Provision 38.E nor were they void *ab initio*.  And the Developer has not sufficiently plead that Plaintiffs breached their leases.

District of Columbia courts have described quasi-contract claims as a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is *no contract* . . . ."  *4934, Inc. v. D.C. Dep't of Emp. Servs.*, 605 A.2d 50, 55 (D.C. 1992) (emphasis added).  Where express contractual terms govern, however, there can be no unjust enrichment.  *Jordan Keys & Jessamy*, 870 A.2d at 64.  Simply put, "[o]ne who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement."  *Id.*  Because the leases did not expire or terminate and quasi-contract claims cannot be maintained where an express contract exists, the Developer's unjust enrichment and *quantum meruit* claims should be dismissed due to the continued validity of the leases.

Thus, as demonstrated below, Plaintiffs' leases remain valid, so no quasi-contract claims can be maintained against them.

    a.  *Provision 38.E in Plaintiffs' Leases did not Cause Them to Expire Three Years After Execution.*

As has been stated repeatedly in this case, Provision 38.E provides:

---

[2] The Developer does not contend that it terminated BRW's lease in July 2015.  Nonetheless, the Developer also claims to have raised additional defaults in its Default Letter, including some related to BRW.

Notwithstanding any provision in this Lease to the contrary, if the Lease Term has not commenced within three (3) years after the date of this Lease, this Lease shall automatically terminate on the third (3rd) anniversary hereof.  The sole purpose of this provision is to avoid any interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation.

Contrary to the expressly stated purpose of this provision—to "avoid any interpretation that the Lease violates the Rule Against Perpetuities or other law[s] against restraints on alienation"—the Developer contends that the purpose was to prevent the lease from lasting forever.  Am. Countercl. ¶ 20. But, the Rule Against Perpetuities does not prohibit perpetual leases.  *Hazen v. Am. Sec. & Trust Co.*, 265 F. 447, 449 (D.C. 1920) ("[A]n interest is not obnoxious to the rule against perpetuities if it begins within the prescribed period, although it may extend beyond that limit.").  It requires only that a property interest vests, if at all, within the statutorily-prescribed period.  *Id.*  Each of Plaintiffs' leases vested on the date of execution according to their own terms.  Exhibits A-C § 1.O (defining "Term" as beginning on the Commencement Date") [hereinafter "Leases"].  Similarly, District of Columbia law does not prohibit leases that could last forever.  *Second Realty Corp. v. Krogmann*, 235 F.2d 510, 511 (D.C. 1956) (upholding lease that was renewable forever).[3]

The leases did not violate the Rule Against Perpetuities or any other law against restraint of alienation, and the Developer has not alleged otherwise.  As avoiding such laws was the "sole purpose" of the provision, Provision 38.E did not terminate the leases in 2003 or 2004, and the leases remain valid.[4]

---

[3] Specifically for Saltwater, even if Provision 38.E caused its lease to expire, the District renewed the lease in 2014 when it set the lease's expiration as of March 2044.

[4] The Plaintiffs also reassert that the Lease Term began on the day the leases were signed under the plain language of the lease, so Provision 38.E could not have terminated the leases.

Since the leases did not expire under Provision 38.E, no action in quasi-contract (or for ejectment) can be maintained.

> b. *The Mayor did not Exceed his Authority by Entering into Plaintiffs' Leases, so the Leases Were not Void Ab Initio.*

Similarly, the Plaintiffs' leases were not void *ab initio*. The Plaintiffs' current leases are a result of years of negotiation between the District and the Fish Market tenants, three Congressional acts, and one federal lawsuit. The Developer now contends that even in light of all of this, Plaintiffs'—and presumably all other Fish Market tenants'—leases were void *ab initio* because the Mayor exceeded his authority in signing them. Given the history of the negotiation, this claim is implausible.

By the late-1990s, the Fish Market had fallen into a state of disrepair due to the District's policy of keeping the Fish Market tenants on month-to-month leases. H.R. Rep. No. 105-670, at 23 (1998). The tenants' uncertain future made them unable to obtain financing and unwilling to make capital improvements even if they could. In 1998, Congress allocated $3 million to the District under two conditions: (1) it provide the tenants with 30 year leases, and (2) it use the $3 million for certain Fish Market improvements. Pub. L. No. 105-277, 112 Stat. 2681 (1998). Two of the Plaintiffs (and the third Plaintiffs' predecessor) began negotiating the leases soon after the 1998 legislation. By mid-2000, the parties had agreed on a draft lease, which two of Plaintiffs signed. Ex. A at 25-26; Ex. B at 23. Saltwater's predecessor signed its lease shortly thereafter. Ex. C. at 37. After two of Plaintiffs had signed the leases, but before the District had signed, Congress passed a third law related to the leases. Pub. L. No. 106-522 § 162(a), 114 Stat. 2440 (2000). That law provided the Mayor with the power to "approve and execute leases of the . . . Washington Municipal Fish Wharf with the existing lessees thereof for an initial term of 30 years, together with such other terms and conditions (including renewal options) as the

Mayor deems appropriate." *Id.*   This act gave the Mayor power to sign the leases already offered, and it vested the Mayor with broad discretion with respect to lease terms, provided the leases ran for at least 30 years.   Moreover, the plain language of the act indicates that it contemplated that the leases could run for more than 30 years.   Using the authority granted to him by Congress, the Mayor signed the Plaintiffs' leases in early 2001.   The leases were approved for legal sufficiency by the District's Assistant Corporation Counsel.

Now, after nearly 15 years of performance under the leases, the Developer claims that the leases were void *ab initio*.   This claim is counter to the Congressional legislation permitting the Mayor to sign the leases that the District had offered (and were already signed by Plaintiffs), and which specifically contemplated that the leases could run for more than 30 years.   As such, the leases were not void *ab initio*.[5]   And no claims can be maintained on the basis that they were so void.

      c.   *The Developer Could not have Terminated Plaintiffs' Leases for the Alleged Breaches Because the Actions it Alleges are not Breaches or not Supported by Sufficient Factual Content.*

For many of Developer's alleged breaches, under the plain terms of the Plaintiffs' leases, the actions alleged do not constitute breaches at all.   For other alleged breaches, it relies entirely on bare assertions that the Plaintiffs breached their leases, and fails to provide critical factual content such as the dates of the alleged breaches, the circumstances surrounding the alleged breach, the identity of the Plaintiff that committed the alleged breach.   Under the pleading standards established by the Supreme Court, "pleadings [that] are no more than conclusions [ ]

---

[5] Even if, despite having Congress's clear approval, the Mayor exceeded his authority by allowing the leases to run for more than 30 years—and he did not—the remedy would not be to consider the leases void.  The remedy would be to reform the leases to comply with the Mayor's authority—in this case, to limit the leases to 30 year terms.  *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.").

are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  And a counterclaim must be dismissed "if it tenders naked assertions devoid of further factual enhancement."  *Id.* at 678 (internal quotations omitted).  Accordingly, many breaches alleged by the Developer can be ignored for purposes of determining whether the lease is terminated.

    1. *Saltwater did not Breach its Lease by Performing Construction Work Because it was not Required to Obtain Permits for the Construction.*

  The Developer first contends that Saltwater breached its lease because it failed to obtain appropriate permits for a small equipment shed that it added to the back of one of its barges. Am. Countercl. ¶¶ 47-67.  The Developer acknowledges that Saltwater received a building permit, but now contends that it was not the right permit.  *Id.* ¶ 62.  Saltwater provided the building permit to the Developer.  *Id.*  In an effort to build evidence for its breach claim, the Developer has reported the construction to the District on numerous occasions.  Despite these reports to the District, including copying the Deputy Mayor's Office on the April 20, 2015 default letter, no action has been taken by the District to indicate that the construction was illegal.  Moreover, the Department of Consumer and Regulatory Affairs ("DCRA") has not asserted jurisdiction over construction on the Plaintiffs' barges in the many years Plaintiffs have been in business, and accordingly, no permits were required.

  The Developer also claims that Saltwater was required to obtain a permit from the U.S. Army Corps of Engineers ("USACE") under the Rivers and Harbors Act of 1899.  Counterclaim ¶ 45.  But Saltwater was also not required to obtain a permit from the USACE because it qualified for Nationwide Permit 3, which is a general license allowing in-kind replacement, since it was replacing the equipment that was operated by its predecessor.  *See* 77 Fed. Reg.

10270(B)(3)(a) (Feb. 21, 2012).[6]  Under Nationwide Permit 3, applicants are not required to file any pre-construction notice with the USACE.  USACE, *2012 Nationwide Permits Summary*, *at* http://www.usace.army.mil/Portals/2/docs/civilworks/nwp/2012/NWP2012_sumtable_15feb201 2.pdf.  Accordingly, Saltwater was not required to obtain a permit from the USACE prior to beginning construction.

Because Saltwater was not required to obtain any permits, it was not required to seek the landlord's consent.

### 2. *Plaintiffs have Carried the Proper Insurance and Provided it to the Developer.*

Contrary to the Developer's claims, Plaintiffs have long maintained the required insurance.  *See* Am. Countercl. ¶¶ 68-74.  The Plaintiffs were first notified about the Developer's concerns that it did not maintain the proper insurance for the Fish Market in its Default Letter. As the Developer pleads, the Plaintiffs provided certificates of their currently-effective insurance policies to the Developer.  Am. Countercl. ¶ 156.  However, in its fishing expedition to manufacture breaches, the Developer asserts that this proof was unacceptable.

First, the Developer claims that the certificates sent by the Plaintiffs to show that they carry the requisite insurance are not "proof."  Am. Countercl. ¶¶ 156-58.  However, nothing in Section 17.B of the Leases requires Plaintiffs to provide any particular type of "proof" of insurance.  And, indeed, Section 17.B expressly states that certificates of insurance are acceptable deliverables.

Second, the Developer complains that the Plaintiffs do not have an "all-risk" policy covering their business property.  Am. Countercl. ¶ 159.  However, the policies plainly show that

---

[6] The USACE also confirms that the Nationwide Permits are not suspended in the District of Columbia.  USACE, *Public Notices Overview*, *at* http://www.nab.usace.army.mil/Missions/Regulatory/PublicNotices/tabid/10471/Article/492646/ spn-12-32-reissuance-of-nationwide-permits.aspx.

the Plaintiffs maintain over $2.3 million in insurance to cover their business property in compliance with their leases.

Third, the Developer claims that the Plaintiffs did not provide a certificate of insurance for The Wharf.  Am. Countercl. ¶ 160.  That is plainly untrue.  The Wharf is covered on the same certificate as BRW, Inc., which the Developer itself points out in the immediately following paragraph.  *Id.* ¶ 161.

Fourth, the Developer claims that the certificate covering BRW, Inc. and The Wharf, Inc. have policy limits that are only sufficient to cover one entity.  But that is all that the leases require.  Under The Wharf's and BRW's leases, they are required to maintain insurance "with limits of at least One Million Dollars [ ] per occurrence and Two Million Dollars [ ] *aggregate combined for all locations in which Tenant operates its business (Nos. 7, 8, 9 16, 17, 18, and 19) . . . ."*  Ex. A § 17.B; Ex. B § 17.B (emphasis added).  All of the lots listed are those leased by BRW and The Wharf, so they are only required under their leases to maintain the insurance of one tenant.

Fifth, the Developer complains about an additional insurance policy that the Plaintiffs maintain for insurable events that may occur on the Common Area—the policy written to cover the Municipal Fish Wharf.  Am. Countercl. ¶ 162.  While this policy is not specified in their leases, Plaintiffs are not prohibited from maintaining additional insurance.

Sixth, the Developer asserts that Plaintiffs' leases do not contain the necessary terms. However, Plaintiffs have long maintained insurance policies containing these terms.

Seventh, the Developer is incorrect that Plaintiffs have been required to increase the coverage amounts.  Am. Countercl. ¶ 165.  The leases require that insurance coverage limits be raised every five <u>Lease Years</u>.  Leases § 17.B.  Under the leases, Lease Years are defined to

begin on the New Rent Commencement Day (Leases § 1.D), which does not occur until the Landlord's Work is complete.  Leases § 1.F.  As all parties have acknowledged, the Landlord's Work was never completed, so the Lease Years have not begun to run.  Accordingly, Plaintiffs are only responsible for maintaining insurance coverage with the limits specified in the leases.

Finally, the Developer claims that the Plaintiffs have not provided certificates of insurance for policies that were in place but have now expired.  However, in the Default Letter, the Developer asked only for proof of insurance—not information pertaining to expired policies. The Plaintiffs provided certificates for the policies that were then in effect.  The Developer did not ask for expired policies, so the Plaintiffs did not provide those.

The Plaintiffs have maintained the proper insurance and provided it to the Developer, so this claim should be dismissed.

### 3. *The Developer Provides No Factual Basis to Show Plaintiffs have Permitted its Employees to Park in the Parking Lot.*

The Developer has provided no information about when the Plaintiffs allegedly permitted their employees to park in the parking lot, which Plaintiff gave such permission, or how such information was communicated, among other missing relevant facts.  Am. Countercl. ¶¶ 75-78.

The Developer also alleges that the Plaintiffs allowed contractors and dumpsters to use parking spaces and that this violates the prohibition on permitting "employees" from using the parking lot.  *Id.* ¶ 78.  The Developer's allegation with respect to these entities is similarly devoid of facts.  Additionally, neither dumpsters nor contractors are employees, so their occupation of a parking spot would not violate the lease even if true.  Therefore, the Developer has failed to properly plead breach, so this claim should be dismissed.

4.  *The Plaintiffs' Leases Allow Wholesaling Because that was Permissible Under the 1913 Act.*

The Plaintiffs' leases allow wholesaling because such activity was permissible under the 1913 legislation.  The Developer, by selectively lifting portions of the leases, asserts that the Plaintiffs may only use the premises for "retail sales."  Am. Countercl. ¶ 79.   But the full provision allows retail sales plus any other activities consistent with the 1913 legislation related to the Fish Market.  Leases § 1.I.  In that legislation, Congress made the Fish Market the exclusive landing for fish and oysters in the District.  Pub. L. No. 62-435, 37 Stat. 941 (1913), Ex. D.  By definition, there were wholesale businesses at the Fish Market at the time of the 1913 legislation because fish and oysters had to be delivered to the Fish Market and could not be delivered elsewhere.  If any merchants or restaurants purchased seafood, it had to be through the Fish Market (or from a third party who purchased at wholesale from the Fish Market).  In fact, the inclusion of "retail sales" in the Section 1.I of each lease indicates that other types of business, like wholesaling, was already conducted at the Fish Market in 1913.  The Defendants attempt to dodge the 1913 legislation by stating the potentially accurate, but irrelevant, fact that boats may have been the primary delivery vehicles for the Fish Market.  Am. Countercl. ¶ 186.  But the important inquiry is not how the seafood may have been transported to the Fish Market in 1913.  The important inquiry is what happened with it after it arrived.  On that point, it is clear that wholesaling was permitted.

Thus, any wholesale business operated by Plaintiffs is permissible under the leases, and the Developer's claim should be dismissed.

     5.   *The Wharf's Lease Allows it to Operate a Dining Barge, so its Lease Cannot be Terminated for that Reason.*

The Developer claims that the Plaintiffs' operation of a dining barge constitutes a breach. Am. Countercl. ¶¶ 89-95. The Developer arrives at the conclusion, once again, by selectively omitting portions of the relevant provision so that it appears to support its position.

The Wharf is only prohibited from maintaining <u>serviced</u> tables in the Common Area or on their barges unless the landlord allows such use. Ex. A § 1.I(iii). The Developer claims that The Wharf maintains serviced tables now because it daily clears trash and cleans the barge. Am. Countercl. at ¶ 90. Occasionally cleaning the barge and removing debris does not transform the tables thereon into "serviced" tables within the meaning of the lease. Under The Wharf's lease, serviced tables mean that they are serviced by a server, as in a restaurant. This is demonstrated by the lease's requirement that if The Wharf chooses to start maintaining serviced tables, it must obtain a restaurant permit to do so.

The Developer further alleges that even if the dining barge does not exceed the permitted uses of Lot 17, it violates the law because it does not have a certificate of occupancy. Am. Countercl. ¶ 93. However, The Wharf has a business license,[7] and under the DCRA rules, a business license will not issue unless any applicable certificate of occupancy requirements are met. DCRA, *5 Basic Steps to Obtaining a Business License, at* http://dcra.dc.gov/node/1151081 (showing that meeting Certificate of Occupancy requirements is a step in obtaining a business license). Further, although the District has been aware of the dining barge for its entire existence, it has never been cited as illegal or even unwanted.

In addition, the Developer pleads that the existence of a dining barge subjects it to "liability for injury and damage to people and property." Am. Countercl. ¶ 95. But the

---

[7] *See, e.g.* Business License 53001518. DCRA, *Business License Verification,* http://pivs.dcra.dc.gov/BBLV/Default.aspx.

Developer provides no facts to support that claim.  Moreover, the remedy for such occurrence is set forth in Provision 11.C—Plaintiffs are to pay the increase in insurance costs.  Simply put, the Developer could not terminate Plaintiffs' leases on this basis.

Accordingly, the Developer has not shown that the operation of a dining barge breaches The Wharf's lease, and its claim should be dismissed.

6. *The Plaintiffs' Sale of Carbonated Beverages and Fried Chicken Are Consistent with Their Leases.*

The Plaintiffs' sale of carbonated beverages and fried chicken are permissible under their leases as both are "accessory items."  *See* Am. Countercl. ¶¶ 98-102.  Under their leases, Plaintiffs can sell fresh and prepared seafood, fresh produce, and "accessory items such as cole slaw, french fries, and the like."  Leases § 1.I.

With respect to carbonated beverages, Section 1.P of the leases provides the only restriction on beverage sales: Plaintiffs may not sell non-alcoholic beverages from vending machines while Virgo Fish House is in operation.  Leases § 1.P.  If the District intended to limit Plaintiffs' ability to sell carbonated beverages, it knew how to do so, yet it chose to adopt a narrower and explicit restriction.

Moreover, both carbonated beverages and fried chicken are accessory items to seafood. The dictionary definition of "accessory" is "supplementary or secondary to something of greater or primary importance. . . ."  Webster's Third New International Dictionary, at 11 (1993).  The Developer did not plead that carbonated beverages and fried chicken do not meet this definition. Plainly, carbonated beverages and fried chicken meet this definition because they represent a small portion of Plaintiffs' overall prepared seafood sales, and those items are intended to

supplement Plaintiffs' seafood offering.[8]   Fried chicken, in particular, appeals to those patrons

that are allergic or averse to seafood, and it is considered an accessory item by other Fish Market

tenants.[9]   D.C. Dep't of Health, *Food Establishment Inspection Report: Jimmy's Grill*, *at*

http://dc.healthinspections.us/webadmin/dhd_431/lib/mod/inspection/paper/_paper_food_inspect

ion_report.cfm?inspectionID=404387&wguid=1367&wgunm=sysact&wgdmn=431      (showing

holding temperature of fried chicken of an entity operated by another Fish Market tenant).

   Accordingly, Plaintiffs' alleged sale of carbonated beverages and fried chicken does not

breach their leases, and the Developer's claim should be dismissed.

   7.   *The Developer Provides No Information Related to Its Allegation that*
        *Plaintiffs Violated District of Columbia Regulations.*

   In full, the Developer alleges: "[t]he [Plaintiffs] have not properly protected their barges

from the entry of animals, which is a violation of Title 25 of the D.C. Municipal Regulations and

of the purported leases."   Am. Countercl. ¶ 104.   Yet the Developer provides no information

---

[8] The FDA explicitly defines "soda" as an "accessory food".  *See* Food & Drug Administration,
*Retail Store Eligibility USDA Supplemental Nutrition Assistance Program*,
http://www.fns.usda.gov/snap/retail-store-eligibility-usda-supplemental-nutrition-assistance-
program.

[9] Many restaurants in the District that hold themselves out as seafood restaurants also sell
chicken, and as far as Plaintiffs are aware, all of them sell soda.  *See, e.g.*, Hank's Oyster Bar,
*Capitol Hill Dinner Menu*, *at* http://hanksoysterbar.com/wp-content/uploads/HOTH-DINNER-
3.21.2016.pdf?50284f (Chesapeake fried chicken); Legal Seafoods, *Dinner Menu*, *at*
http://www.legalseafoods.com/index.cfm/pk/download/id/45206 (marinated chicken); Oceanaire
Seafood Room, *Dinner Menu*,
http://www.theoceanaire.com/pdf/menus/washington/DC_Dinner_Menu.pdf (roasted chicken
chop); Fish in the Hood, *Menu*, *at* http://fishinthehooddc.blogspot.com/ (fried chicken wings,
among other chicken items); Pops SeaBar, *at* http://popsseabar.com/ (Boardwalk fried chicken).
Indeed, perhaps nowhere in the country are seafood and fried chicken more closely
intertwined—it is *de rigueur* for crab houses in the Chesapeake-area to sell fried chicken. *See,*
*e.g.* Jimmy Cantler's Riverside Inn, *2015 Winter Menu*, *at*
http://www.cantlers.com/menu/2015wintermenuback/; Captain James Landing, *Crab House*
*Menu*, *at* http://captainjameslanding.com/menus/Crab%20House%20Menu.pdf; Fat Boys Crab
Shack, *Menu*, *at* http://www.fatboyscrabshack.com/regular-menu; Riptide by the Bay, *Kid's*
*Menu*, *at* http://riptidebythebay.net/menu/kids-menu/.

about the shortcomings of the Plaintiffs' animal defenses, any instances of animal encroachments, or generally applicable standards to prevent animal entry. Simply put, the lack of factual basis for this alleged breach requires the Developer's claims to be dismissed.

> 8. *The Additional Walkways that the Developer now Claims as a Breach Were Given to the Plaintiffs by the Developer's Employees or Affiliates, and Plaintiffs Have Offered to Return the Walkways.*

The Developer next claims that some additional floating walkways that are behind Plaintiffs' barges also breach the lease. Am. Countercl. ¶¶ 103-04. Although Plaintiffs explained in their April 18 letter that one of the Developer's employees or affiliates provided the walkways to the Plaintiffs and that they would gladly give the walkways back, the Developer now disclaims it provided the walkways to Plaintiffs. Regardless of who provided the walkways, Plaintiffs have not refused to remove them—quite the opposite, the Plaintiffs have expressed that they do not want them and that they could be removed. The only reason Plaintiffs did not remove the walkways on their own immediately is that, given the Developer's watchful eye over all of Plaintiffs' activities, they did not want to be charged with theft or invite legal consequences. Accordingly, Plaintiffs have promised to cure this alleged breach, and will do so if the Developer is now disclaiming ownership over the walkways, so the Developer's claim should be dismissed.

> 9. *The Developer has not Pled Facts to Show that the Plaintiffs Expanded the Horizontal Space of Their Barges.*

The Developer next claims that certain of Plaintiffs' barges (Spaces 2 and 17) and floating docks (Space 16) are larger than are described in Plaintiffs' leases, and as such required the Developer's consent for such expansion under Section 13 of each lease. Am. Countercl. ¶¶ 105-114. But the Developer has failed to plead that any of these barges or floating docks were,

at any time, smaller and then expanded.  Moreover, for Barge 2, its lease expressly consents to its horizontal expansion into Space 1.

With respect to the barges in Lots 2 and 3, Saltwater agreed with the District to replace the dilapidated barges in those Lots that were maintained by Saltwater's predecessors.  The space taken up by the replacement barges was smaller than the barges they were replacing.  Under Section 13 of its and other Plaintiffs' leases, Saltwater only must obtain consent where it is expanding the size of its barges.  Ex. C § 13.  Because Saltwater lessened the horizontal space as compared to its predecessor's barges, no consent was required.  And the Developer has pled no facts about any alleged expansion.  Even ignoring that fact, Saltwater's lease expressly gives consent to Saltwater to expand the barge in Space 2 into Space 1.  *Id.* § 1.J ("Tenant shall have the right, at any time during the Term, to expand its existing Barge 2, or to install a new barge, in the area comprising Space No. 1 . . . .")  Thus, while Saltwater did not expand the horizontal space of the barges previously operated by its predecessor, it could do so under the lease if it so desired.

Similarly, the barge that is currently in Space 2 was formerly in Space 16 prior to Saltwater's assumption of its lease.  As the Developer alleges, the barge currently in Space 2 is bigger than the floating docks that are currently in Space 16.  Once again, the replacement *lessened* the horizontal space taken up in Space 16, so no consent was necessary.

The barge in Space 17 has been in its current location since the onset of The Wharf's lease.  As such, the horizontal space was never expanded such that consent was required, and the Developer has pointed to no expansion by The Wharf.

Accordingly, the Developer has not pled that Plaintiffs have improperly expanded their barges, and any of the Developer's claims premised on this breach should be dismissed.

10. *The Sign Installed by Saltwater Showing its Name did not Breach its Lease.*

Continuing its litany of nitpicking nakedly aimed at ousting Plaintiffs, the Developer claims that Saltwater is in breach because it did not obtain the Developer's consent to put up a sign showing the name of its business rather than some other business. Am. Countercl. ¶¶ 115-20.

But the Leases require Plaintiffs, including Saltwater, to replace signs when needed and may do so without any consent. Leases § 12.B (showing no consent necessary for replacement signs). Replacing a sign that shows the name of a different business is plainly needed, as failure to do so could subject Plaintiffs to trademark or other liability.

Moreover, as the Developer has set forth in this case, under District of Columbia law, consent may not be withheld where the consenting party "will receive all benefits bargained for in the lease," and consent may not be withheld "arbitrarily or capriciously." Defs.' Br. in Opp'n to Pls.' Mot. for Prelim. Inj. at 23 (filed Sept. 3, 2015) (citing *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 210 (D.C. 1984); *see also Julian v. Christopher*, 575 A.2d 735, 738–39 (Md. 1990)).

Here, Saltwater's sign would not deprive the Developer of anything it bargained for under the leases, and requiring Saltwater to display a sign for a different business, which would potentially subject it to trademark and other liability, would be arbitrary and capricious. Accordingly, there is no breach for Saltwater's installation of a sign to show its name, and the Developer's claim of breach should be dismissed.

11. *The Developer has Provided Inadequate Factual Basis to Support Its Allegations of Insufficient Cleanliness.*

The Developer alleges that the Plaintiffs "have repeatedly left conditions that are dirty and full of rubbish throughout the Premises and Common Area, since at least April 23, 2014."

Am.Countercl. ¶ 122.  However, it provides no information regarding these instances, what dirt or rubbish the Developer claims constitutes breaches, or any other information that could provide the Plaintiff with notice of the Developer's claims.  Such inadequate pleading cannot meet the pleading standards described in *Iqbal*.

Further, Section 15.A does not even apply to conditions of the Common Area.  Rather, by its own terms, it is limited to the "Premises" (defined as the water surface) and the Plaintiffs' barges.  Leases § 15.A.  The Developer's attempt to impute Section 15.A to the Common Area must fail.

12. *The Developer Failed to Provide Sufficient Factual Basis for its Claim the Plaintiff has Stored Objects in the Common Area.*

The Developer claims that Plaintiffs' storage of objects in the Common Area constitutes a breach of their leases sufficient to justify termination.  Am. Countercl. ¶¶ 127-30.  However, it has provided no information about dates or specific instances of objects placed in the Common Area as would be required under *Iqbal*.

Thus, the Developer has failed to allege facts sufficient to support a breach for storing objects in the Common Area, and this claim should be dismissed.

13. *Plaintiffs Have Not Failed to Conduct Business in the Premises Because the Premises are Defined Collectively, not Individually, and Developers do not Plead that Plaintiffs Have Failed to do Business in all Spaces Under any Lease.*

The Developer alleges that Plaintiffs' failure to do business in Spaces 1, 2, 3, 16, and 17 for a period of more than 15 days constitutes a breach of Section 21 of each lease.[10]  Am. Countercl. ¶¶ 124-26.  But this reading misconstrues defined terms in the leases.  Section 21 of each Plaintiffs' lease states that the Plaintiff leaseholder shall be in default if it "abandons the

---

[10] Of note, only Plaintiffs The Wharf and Saltwater operate businesses in these spaces.  The Developer does not allege any breaches by BRW for failing to conduct business.

Premises or fails to conduct business therein for a period of fifteen (15) or more consecutive days . . . ."  The Premises are defined in the Plaintiffs' respective leases as collective spaces, not as individual spaces.  Leases § 1.J.  Accordingly, the provision that requires Plaintiffs conduct business in the Premises does not require Tenant to conduct business in <u>each</u> of the spaces constituting the applicable Premises.

For instance, Saltwater's lease defines the Premises as Spaces 1-4, collectively.  Ex. C § 1.J.  As the Developer's pleading implicitly admits, Saltwater is doing business in Space 4, which means that it is doing business in the Premises.  Similarly, the Developer does not plead that Plaintiffs failed to do business in Spaces 18 and 19, which means that they have conducted business in the Premises that contain Spaces 16 and 17.

As such, this claim should be dismissed.

14. *The Developer Failed to Provide Sufficient Factual Basis for its Claim the Plaintiffs Have Displayed Advertising Signs that Breach Their Leases.*

The Developer next alleges that the Plaintiffs' use of sandwich board advertisements breaches their leases.  Am. Countercl. ¶¶131-33.  The Developer admits that the Plaintiffs have removed the sandwich board advertisements to cure the breach.  *Id.* ¶¶ 222-23.  However, the Developer now rests on unidentified "other types of signs and displays" that it contends breach Plaintiffs leases.  Allegations that are devoid of factual content, such as these, should be dismissed.

15. *The Plaintiffs Trucks do not Breach the Advertising Bar in Plaintiffs' Leases.*

The final breach alleged by the Developer is that certain of the Plaintiffs' delivery trucks that are parked in the Common Area constitute semi-permanent advertisements.  Am. Countercl. ¶¶ 134-39.  Under Exhibit E to each lease, Plaintiffs cannot display advertising in the Common Area for their retail businesses.  Leases at Ex. E.  The Developer does not allege that the trucks

are promoting any of the Plaintiffs' retail businesses. Indeed, the advertisements that the Developer alleges as breaches, as shown in the Default Letter, do not even reference Captain White or any other business at the Fish Market. Nor does the contact information shown on the truck relate to any of the Fish Market businesses (indeed, the only phone number on it has an entirely different area code).

The information on the trucks does not constitute breaches because it is clearly designed only to promote purchasing power to offsite crabbers, fishermen, and other seafood dealers.

Further, although appearing in the "Tenant Advertising" section, the Developer also claims that Plaintiffs' delivery trucks interfere with the use of the Common Area. Am. Countercl. ¶ 138-39. Yet, the Developer has made no attempt to describe any situation in which the delivery trucks have caused any interference with the use of the Common Area.

Accordingly, the Developer's allegations related to the Plaintiffs' delivery trucks cannot form the basis of a lease termination.

*                    *                    *

For the reasons stated above, the Plaintiffs' leases did not expire in 2003 or 2004, or at the outset of the leases. Further, the actions the Developer alleges as breaches are not breaches at all and do not constitute defaults under the leases that would allow the Developer to terminate Plaintiffs' leases.

2. *The Developer's Unjust Enrichment and Quantum Meruit Claims that are Based on the Plaintiffs' Continued Presence at the Fish Market are Time-Barred.*

The limitations period has long expired for the Developer's quasi-contract claims based on Plaintiffs' continued presence at the Fish Market. Under District of Columbia law, the statute of limitations for an quasi-contractual claims begins to run "when the enrichment actually becomes unlawful." *News World Commc'ns*, 878 A.2d at 1225 (internal quotations omitted). In

24

a contract for discrete services with later recognized benefits, this can be as late as the date of the last rendition of services, but the true test for when the limitations period begins to run is when "there has been a 'wrongful act giving rise to a duty of restitution.'" *Id.* (citation omitted).

The Developer's theory is that the Plaintiffs' leases expired in 2003 or 2004 (or earlier), and they have been holdover tenants since that time.  Because of their status as holdover tenants, the Developer contends, Plaintiffs owe "fair and reasonable rent," and their failure to pay that amount can support its claims for unjust enrichment and *quantum meruit*.  But the Developer's claims, if true, would have been as accurate on the date the leases purportedly expired as it is today.  Therefore, the "wrongful act giving rise to [Plaintiffs'] duty of restitution" arose in 2003 or 2004 at the latest, and the Developer's unjust enrichment claim accrued at that time.

The limitations period for unjust enrichment and *quantum meruit* claims is three years.  D.C. Code § 12-301(7) (2009); *News World Commc'ns*, 878 A.2d at 1221.  Thus, the limitations period for any quasi-contract claims based on the Plaintiffs' supposed statuses as holdover tenants expired in or 2006 or 2007.  The Developer's quasi-contract claims are time-barred.

   3.  *Certain Express Provisions of the Plaintiffs' Leases Survive and Govern Holdover Conduct, so no Quasi-Contract Claims can be Maintained Against Plaintiffs.*

The Developer's quasi-contract claims should also be dismissed because Plaintiffs' contracts govern the rent due in the event of a holdover, and quasi-contract claims cannot lie where an express contract term governs.

Here, express contract terms govern any post-expiration duties under Plaintiffs' leases.  Section 25 of each Plaintiffs' lease provides that in the event that the respective tenant becomes a holdover, it owes 50% more than the rent it was paying post-termination.  Because this provision cannot be operative unless the leases expire, it would continue to be in effect today under the

Developer's theory.  *See, e.g., Grimes v. Newsome,* 780 A.2d 1119, 1120 n.1 (D.C. 2001); *Wolff*

*v. Westwood Mgmt., LLC*, 558 F.3d 517, 520 (D.C. Cir. 2009).

Section 25 of Plaintiffs' leases governs the relationship between the parties in a holdover

situation.  Because that term sets forth the Developer's remedies in the event of a holdover, it

cannot bring a claim for unjust enrichment or *quantum meruit* against the Plaintiffs.

> 4. *Any Quasi-Contract Claim Based on the Developer's Alleged Improvement and Maintenance Cannot Be Maintained Because the Developer did not Engage in Those Activities for the Fish Market or with the Expectation of Payment from the Fish Market Tenants.*

Although containing slightly different elements, the basic thrust of unjust enrichment and

*quantum meruit* is that a person who renders valuable services to another without a contract

should be compensated under certain circumstances.  These circumstances include that the

service was rendered for the benefit of the defendant and the defendant was on notice that the

plaintiff expected payment.  *See, e.g., Waco Scaffold & Shoring, Co. v. 425 Eye St. Assocs.*, 355

A.2d 780, 783 (D.C. 1976); *Rosenkoff v. Finkelstein*, 195 F.2d 203, 204 (D.C. Cir. 1952).

Here, as the Developer pleads, it entered into its Land Disposition Agreement ("LDA")

with the District to redevelop the Southwest Waterfront.  In the LDA, the District conferred

immense benefits on the Developer, including development rights and other lease rights.  With

respect to the Fish Market, under the LDA, the Developer pleads that it committed to improving

and maintaining the Fish Market at its "sole cost and expense."  Am. Countercl. ¶ 11.  The

Developer does not plead, because it cannot, that the Plaintiffs had any part of the Developer's

negotiations with the District on the LDA.  Indeed, the Developer, until its initial counterclaim

has never asked for compensation from the Fish Market tenants for the commitments it agreed to

take on.   Moreover, Plaintiffs have not requested, and have repeatedly objected to, the

Developer's activities, which constitute breaches of the Plaintiffs' leases.

The Developer's claim that it agreed to take on various improvements and maintenance at its "sole cost and expense" is fatal to its claim that it ever expected payment from the Fish Market.   And the Plaintiffs' absence from the bargaining table and outright objections to the Developer's work defeats these quasi-contract claims, and they should be dismissed.

C.   <u>Counts III & IV – Claims for Ejectment</u>

  1.   *District of Columbia Law Requires Eviction Actions to be Filed in Superior Court.*

District of Columbia law is clear that the exclusive method for regaining possession of property through an eviction action is through the statutes and regulations that the District has put into place.   *Sarete, Inc. v. 1344 U St. Ltd. P'ship*, 871 A.2d 480, 496 (D.C. 2005).   And under this method, the only court that that has jurisdiction to hear an eviction action is the District of Columbia Superior Court.   D.C. Code § 42-3210 (2001).   Indeed, it does not appear that any federal court in District of Columbia has heard an eviction action in the first instance.

Because the District has delineated the exclusive rights of landlords to gain possession of property from tenants by statute, such process must be followed.   As such, this Court cannot exercise jurisdiction over an eviction matter in the first instance.

  2.   *Even if the Court Hears the Eviction Action, it Cannot Provide the Relief the Developer Requests.*

As provided at length above, the Plaintiffs' leases did not expire in 2003 or 2004 nor were they void *ab initio*.   And none of the actions the Developer claims are breaches are breaches at all, let alone material breaches that could support an eviction.   Thus, Plaintiffs are not in breach or considered to be tenants at sufferance.   But even if it could prove that some of the alleged actions were breaches and this Court exercises jurisdiction, the Developer would still not be entitled to terminate the leases and take possession under District of Columbia law.

District of Columbia law "abhors forfeitures." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 186 (D.C. 2009).  Specifically in actions for possession, courts consider eviction to be a "harsh and disfavored sanction." *Shapiro v. Tauber*, 575 A.2d 297, 300 (D.C. 1990) (citations omitted).  Before issuing an eviction order, courts must review various factors to determine the culpability of the tenant.  *Id.*  And "[m]ost important," courts must consider whether alternative remedies short of eviction are available and order such remedies where possible.  *Id.*

In this case, the Plaintiffs have not exhibited any bad faith that would warrant such a harsh outcome, and remedies short of an eviction are plainly available.  For example, the Court could award money damages to the extent any of the breaches harmed the Developer or could issue an injunction prohibiting the breaching action.  None of the breaches alleged, however, go to the core of the agreement, like failing to pay rent.

Because the Court could not award the remedy requested even if the Developer could prove a breach, its claims for ejectment should be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Dismiss the Developer's First Amended Counterclaim should be granted.

DATED: June 3, 2016                           Respectfully submitted,

    /s/Wendell L. Taylor
Wendell L. Taylor, DC Bar No. 973873
Brian C. Hauser, DC Bar No. 1024406
Hunton & Williams LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
Tel: (202) 955-1627
Fax: (202) 857-3898
wtaylor@hunton.com
bhauser@hunton.com

*Counsel for Plaintiffs*

28