IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE WHARF, INC.<br>t/a THE WHARF, | ) | |
| | ) | |
| BRW, INC.<br>t/a CAPTAIN WHITE SEAFOOD CITY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SALT WATER SEAFOOD, INC.<br>t/a SALT WATER | ) | |
| | ) | |
|      Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No: 1:15-cv-01198-CKK |
| THE DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| HOFFMAN-MADISON<br>WATERFRONT, LLC, | ) | |
| | ) | |
| WHARF DISTRICT GP JOINT VENTURE<br>LLC, | ) | |
| | ) | |
| WHARF HORIZONTAL REIT, LLC, | ) | |
| | ) | |
| HOFFMAN-STRUEVER WATERFRONT,<br>LLC, | ) | |
| | ) | |
| WHARF DISTRICT JOINT VENTURE,<br>LP, | ) | |
| | ) | |
|     Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE WHARF HORIZONTAL<br>REIT LEASEHOLDER, LLC, | ) | |
| | ) | |
| WHARF FISH MARKET REIT<br>LEASEHOLDER, LLC, | ) | |
| | ) | |
|     Defendants/Counter-Plaintiffs. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs, The Wharf, Inc., t/a The Wharf, ("The Wharf"), BRW, Inc., t/a Captain White

Seafood City ("Captain White"), and Salt Water Seafood, Inc., t/a Salt Water ("Salt Water")

(collectively, "Plaintiffs"), who are tenants and operators of open air fish markets and a seafood

deli located on the Southwest Waterfront in the District of Columbia, bring this Complaint and

allege as follows:

## SUMMARY OF THE ACTION

1.      This is an action to protect Plaintiffs, tenants of 1100 Maine Avenue, S.W., Washington,

D.C. 20024 (the "Municipal Fish Market"), against the destruction of their businesses by the

District of Columbia (the "District"); Hoffman-Madison Waterfront, LLC ("HMW"), the

developer with whom the District has partnered in the $2 billion redevelopment of the District's

Southwest Waterfront ("Redevelopment Project"); Wharf Horizontal REIT Leaseholder LLC

("WHRL"), HMW's affiliated entity and alter ego to which the District assigned its rights as

Plaintiffs' landlord; Wharf District GP Joint Venture LLC ("WDGPJV"), a general partner and

affiliated entity; Wharf Fish Market REIT Leaseholder LLC ("WFMRL"), an affiliated entity to

which WHRL transferred its interest in the Municipal Fish Market; Wharf Horizontal REIT LLC

("WHR"), an affiliated entity; Hoffman-Struever Waterfront LLC ("HSW"), an affiliated entity;

and Wharf District Joint Venture LP, an affiliated entity ("WDJV").[1]

---

[1] Collectively HMW,  WHRL, WDGPJV, WFMRL, WHR, HSW, and WDJV are referred to
herein as the  "Developer Defendants" or the "Landlord."  Discovery will show whether the
Developer Defendant entities conspired to commit the illegal acts set for this Complaint, or
whether these entities are simply one and the same, such that no conspiracy between them was
necessary.  For the purpose of this Complaint, and based on the representations by Developer
Defendants to the Plaintiffs, the entities are treated as alter egos.

2.     The District's Municipal Fish Market is the country's oldest open air fish market, which first opened in 1805.  Plaintiffs run three of the seafood businesses at the Municipal Fish Market and have long-term leases there.  The District was Plaintiffs' original landlord, but in 2014 the District assigned its rights to the Developer Defendants through WHRL.  WHRL subsequently transferred its rights as landlord to WFMRL.

3.     Plaintiffs' rights under the leases conflicted with the District's and with Developer Defendants' development plans.  As a result, the Defendants entered into a conspiracy to run the Plaintiffs out of the Municipal Fish Market by destroying Plaintiffs' businesses.  Indeed, in a 2015 article in the Washington Business Journal, HMW President Monty Hoffman stated that HMW, through the Redevelopment Project, had "annexed" Plaintiffs' leased property and described the various actions Defendants planned to take in constructing the Redevelopment Project.  These proposed actions constitute breaches of Plaintiffs' leases.

4.     Defendants' conspiracy encompasses a pattern of egregious acts including harassment, governmental overreach, continuous material breaches of Plaintiffs' leases, and unjust attempts to oust Plaintiffs from their leased property.  On information and belief, this conspiracy was in effect at all times relevant to this Complaint.

5.     The abuses began in 2011 when, over the objections of several neighborhood residents, the District passed a law closing Water Street for the benefit of Developer Defendants' development plan and to the detriment of Plaintiffs.

6.     Water Street was the primary access road to Plaintiffs' leased property.  The District's action eventually led to the actual removal of the primary access point for customers and vendors, and eliminated a large number of customer parking spaces causing damage to Plaintiffs.

7.      In 2012, at the request of the District, and to the benefit of the Redevelopment Project, a nearly 100-year-old federal law was changed.  The law, which previously required that Plaintiffs' leased property and the surrounding area be used <u>exclusively</u> as a fish market, was changed to permit Plaintiffs' leased property to operate for <u>any</u> uses as the Mayor of the District may determine.

8.      In April 2014, the District, possibly in a failed attempt to avoid liability for the clear violation of the Fifth Amendment's Takings Clause, assigned its rights as landlord to WHRL— the alter ego of HMW.

9.      Almost immediately after the assignment, Developer Defendants began encroaching onto Plaintiffs' leased property, damaging the leased property, blocking various access points to, and exits from, Plaintiffs' leased property, and otherwise interfering with Plaintiffs' businesses.

10.      When Plaintiffs voiced their objections to Developer Defendants' actions, Developer Defendants escalated their harassment of Plaintiffs.  Developer Defendants repeatedly closed the customer parking lot, impermissibly constructed permanent structures on the "Common Area" designated under the leases for Plaintiffs' use, and attempted on multiple occasions to have Plaintiffs' commercial and private vehicles ticketed and towed from the Common Area parking lot.

11.      Developer Defendants' transparent animus toward Plaintiffs is evident in their wrongful attempt to evict Plaintiffs for actions that do not violate their leases and that have been occurring for decades at the Fish Market without complaint or comment from the District.  And, Developer Defendants turn a blind eye toward other Fish Market tenants who operate under nearly identical leases and engage in the very same conduct as Plaintiffs only without the threat of eviction,

merely because those tenants have acquiesced to the Developer Defendants' construction and plans.

12.     Since the time of Plaintiffs' Amended Complaint, Developer Defendants continue to harass Plaintiffs, including hiring District of Columbia Metropolitan Police Department officers to patrol the Municipal Fish Market and disrupt Plaintiffs' businesses.  One officer's actions in harassing Plaintiffs' owners have been so extreme that an Internal Affairs investigation concluded that he had engaged in misconduct, yet the Developer Defendants continue to permit him to patrol the Fish Market.

13.     Developer Defendants have also harmed Plaintiffs' businesses by transferring the Fish Market utility bills to the Developer Defendants' account and then failing to pay those bills. These utilities would have been shut off had Plaintiff not stepped in and paid the bills for the entire Fish Market, including for other tenants.

14.     Developer Defendants are in the process of constructing multiple additional structures on the Common Area without Plaintiffs' required consent and to Plaintiffs' detriment.

15.     To facilitate this construction, the Developer Defendants have eliminated all customer parking on the Common Area.  And, they have instructed the Metropolitan Police Department to block Plaintiffs' delivery trucks from loading or unloading on the Common Area or a temporary adjacent lot.  This forces Plaintiffs to park their delivery vehicles on Maine Avenue and then drive forklifts in and against traffic simply to obtain the products they are required to sell under their leases.  Not only does this congest traffic on Maine Avenue, but the Developer Defendants' actions make it nearly impossible for Plaintiffs and other Municipal Fish Market tenants to safely obtain products necessary to run their businesses.

16.     The actions of the District and Developer Defendants have deterred Plaintiffs' customers from frequenting the Municipal Fish Market, threatened the financial viability of Plaintiffs' businesses, and harmed Plaintiffs' reputation in the community and with business partners.

17.     The District's accommodations to Developer Defendants and abandonment of its commitments to Plaintiffs is particularly egregious here because of its storied history of failed urban development in this very area and industry, which displaced local businesses with historic ties to the community.

18.     This lawsuit is to save Plaintiffs' businesses, to require that Defendants abide by the terms of the leases, to return to the status quo under the leases, and to compensate Plaintiffs for the harm they endured due to Defendants' bad acts.

## THE PARTIES

19.     Plaintiff The Wharf is a corporation organized and existing under the laws of the District and transacting business in the District as an open air fish market selling raw seafood and deli serving cooked seafood at the Municipal Fish Market.

20.     Plaintiff Captain White is a corporation organized and existing under the laws of the District and transacting business in the District as an open air fish market selling raw seafood and deli serving cooked seafood at the Municipal Fish Market.

21.     Plaintiff Salt Water is a corporation organized and existing under the laws of the Commonwealth of Virginia and transacting business in the District as an open air fish market selling raw seafood and deli serving cooked seafood at the Municipal Fish Market.

22.     Salt Water was formerly known as W.D., Inc., but changed its name in June 2014.  Salt Water and W.D., Inc. are the same entity.

23.     Defendant HMW is a joint venture between PN Hoffman & Associates and Madison-Marquette existing under the laws of the District and transacting business in the District as the developer selected for the Redevelopment Project and is affiliated with the other Developer Defendants.

24.     Defendant WDGPJV is a limited liability company existing under the laws of Delaware and transacting business in the District and is affiliated with the other Developer Defendants.

25.     Defendant WHRL is a limited liability company existing under the laws of Delaware and transacting business in the District and is affiliated with the other Developer Defendants.  It was formerly the landlord of the Municipal Fish Market tenants.

26.     Defendant WFMRL is a limited liability company existing under the laws of Delaware and transacting business in the District as the landlord of the Municipal Fish Market tenants. WFMRL is affiliated with the other Developer Defendants.

27.     Defendant WHR is a limited liability company existing under the laws of Delaware and transacting business in the District and is affiliated with the other Developer Defendants.

28.     Defendant HSW is a limited liability company existing under the laws of the District and transacting business in the District and is affiliated with the other Developer Defendants.

29.     Defendant WDJV is a limited liability company existing under the laws of Delaware and transacting business in the District and is affiliated with the other Developer Defendants.

30.     Based on the representations and actions of the Developer Defendants, WHRL and HMW are alter egos each acting for the benefit of the other.  For example:

> a.  Lamont Hoffman is the Managing Member of HMW and the Co-President of WHRL;

7

      b.   Upon information and belief, HMW and WHRL have overlapping corporate officers;

      c.   HMW employees have represented that HMW and WHRL are one in the same;

      d.   HMW has held itself out as Plaintiffs' landlord during several meetings with Plaintiffs and other Municipal Fish Market tenants;

      e.   WHRL, when corresponding with Plaintiffs about their leases, uses HMW letterhead;

      f.   HMW and WHRL share corporate offices at 690 Water Street in the District;

      g.   Upon information and belief, HMW and WHRL share a phone number; and

      h.   Upon information and belief, WHRL shares a website with HMW.

31.    Upon information and belief, WFMRL stepped into the shoes of WHRL when WFMRL was created to hold the Municipal Fish Market leases.

32.    All of WHRL's and WFMRL's actions relating to Plaintiffs' leases are attributable to HMW and the other Developer Defendants and vice versa.

33.    Defendant District of Columbia is a municipal corporation, which is the city government of Washington, D.C.  On information and belief, at all times relevant to the Complaint, the District was conspiring with Developer Defendants to the detriment of Plaintiffs.

## JURISDICTION AND VENUE

34.    This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a) because the events all occur based on the same events related to the land-use of the Municipal Fish Market, the surrounding property, and the adjacent Redevelopment Project.

35.    This Court has personal jurisdiction over all Defendants as all are located in the District.

36.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because all Defendants' principal places

of business are located in the District, a substantial part of the events giving rise to this action

occurred in the District, and the properties that are the subject of this action are located in the

District.

## STATEMENT OF FACTS

37.     Plaintiffs re-allege and incorporate by reference the allegations contained in the

Paragraphs 1-36 of this Complaint.

38.     The Municipal Fish Market, which has been in operation since 1805, is the oldest

operating retail fish market in the United States.

39.     Starting in 1913, the United States mandated that the Municipal Fish Market, defined as

the water frontage on the Potomac River lying south of Water Street between 11th and 12th

Streets, be used as a fish market and be the exclusive location for the landing of fish and oysters

in the District.

40.     Plaintiffs' owners have operated businesses at the Municipal Fish Market for nearly 45

years.

41.     Despite the historic significance of the Municipal Fish Market, the District has a noted

history of harassment against the Municipal Fish Market tenants.  Indeed, in 1988 and 1994, the

District was enjoined from harassing the tenants.

42.     To improve the Municipal Fish Market and end the serial litigation concerning the

property and tenants, Congress mandated the District enter into 30-year leases with the

leaseholders on the Municipal Fish Market.  *See* Pub. L. No. 105-277, 112 Stat. 2681, 124-125

(1998), Pub. L. No. 106-113 § 164(b), 113 Stat. 1501, at 1529 (1999), and Pub. L. No. 106-522 §

162(a), 114 Stat. 2484, at 2848 (2000).

9

A. Plaintiffs' Leases

43.    Plaintiffs' businesses are owned and operated by members of the White family.

44.    Plaintiff The Wharf signed the above-noted 30-year commercial lease agreement with the District, acting on behalf of the United States of America, on July 12, 2000. The District signed this lease on February 21, 2001. The lease grants The Wharf exclusive use of certain delineated water frontages, Lots 16, 17, 18, and 19 of the Municipal Fish Market, to run its businesses, as well as the right to access and use certain common areas designated for the general use, convenience, and benefit of the commercial tenants in the area and their customers on the Municipal Fish Market (e.g. restrooms, parking areas, driveways, walkways, loading and unloading areas for deliveries) (the "Common Area"). The Wharf Lease is attached hereto as Exhibit A.

45.    All parties to this lease agreement understood that it was to run for a minimum term of 30 years. The parties made explicit statements to each other stating their intent that the lease term would be at least 30 years; Congress's initial instruction to the District required a term of 30 years, Pub. L. 105-277, 112 Stat. 2681–124-125 & H.R. 105-670 (attached hereto as Exhibit B); and after The Wharf signed the lease agreement, Congress gave express authority to the Mayor of the District of Columbia to execute the lease. *See* Pub. L. No. 106-522, § 162(a), 114 Stat. 2484, at 2484–85 (2000). A proper reading of the lease confirms that the term is at least 30 years. To the extent the lease is understood to have a different term, that would reflect a mutual mistake.

46.    Plaintiff Captain White signed a 30-year commercial lease agreement with the District, acting on behalf of the United States of America, on July 12, 2000. The District signed this lease on February 21, 2001. The lease grants Captain White exclusive use of certain delineated water

10

frontages, Lots 7, 8, and 9, of the Municipal Fish Market to run its businesses, as well as the right

to access and use the Common Area. The Captain White Lease is attached hereto as Exhibit C.

47.    All parties to this lease agreement understood that it was to run for a minimum term of 30

years. The parties made explicit statements to each other stating their intent that the lease term

would be at least 30 years; Congress's initial instruction to the District required a term of 30

years, Ex. B; and after Captain White signed the lease agreement, Congress gave express

authority to the Mayor of the District of Columbia to execute the lease. *See* Pub. L. No. 106-

522, § 162(a), 114 Stat. 2484, at 2484–85 (2000). A proper reading of the lease confirms that

the term is at least 30 years. To the extent the lease is understood to have a different term, that

would reflect a mutual mistake.

48.    Plaintiff Salt Water holds a 30-year commercial lease agreement, which the District

signed, acting on behalf of the United States of America, that is in substantially similar form as

The Wharf's and Captain White's respective leases.

49.    The original tenant in the lease that Salt Water now holds, Pruitt's Seafood, Inc.

("Pruitt's"), signed the lease on March 14, 2001. The District signed this lease on October 2,

2001. The lease grants Pruitt's (and now Salt Water) exclusive use of certain delineated water

frontages, Lots 1, 2, 3, and 4 of the Municipal Fish Market, to run its businesses, as well as the

right to access and use the Common Area. The Pruitt's lease is attached hereto as Exhibit D.

50.    Upon information and belief, all parties to this lease agreement understood that it was to

run for a minimum term of 30 years. Upon information and belief, the parties made explicit

statements to each other stating their intent that the lease term would be at least 30 years;

Congress's initial instruction to the District required a term of 30 years, Ex. B; and Congress

gave express authority to the Mayor of the District of Columbia to execute the lease. *See* Pub. L.

11

No. 106-522, § 162(a), 114 Stat. 2484, at 2484–85 (2000).    A proper reading of the lease confirms that the term is at least 30 years.  To the extent the lease is understood to have a different term that would reflect a mutual mistake.

51.     Pruitt's assigned its lease to DNM Seafood, Inc. ("DNM") on June 30, 2005—a transaction that was approved by the District.

52.     On March 20, 2014, Salt Water (then doing business as W.D., Inc.) acquired the assets and assumed the lease of Pruitt's from DNM for over $1 million.  The District was the landlord at that time and consented to the assignment of the DNM lease to Salt Water.  The Salt Water lease grants Salt Water exclusive use of certain delineated water frontages, Lots 1, 2, 3, and 4 of the Municipal Fish Market to run its businesses, as well as the right to access and use the Common Area.  The Salt Water Lease and Assignment is attached hereto as Exhibit D.

53.     When Salt Water (then doing business as W.D., Inc.) acquired the Pruitt's lease from DNM, a specific provision of the lease assignment provided that "the expiration date of the Lease is March 15, 2044."  This provision can be found at paragraph 10 of the Assignment in Exhibit D.

54.     At the time of the 2014 DNM assignment, the District did not inform Plaintiffs that it had any intent to assign the Municipal Fish Market leases to the Developer Defendants or that the Developer Defendants intended do any of the construction the Developer Defendants have undertaken on the Common Area—including the Developer Defendants' decision to move the location of the Fish Market dumpsters directly in front of Salt Water's business, to its detriment.

55.     Other adjacent seafood businesses, all of which are associated with the businesses Jessie Taylor Seafood or Virgo Fish House, operate on lots at the Municipal Fish Market and share access to the Common Area with Plaintiffs.

56.     Upon information and belief, in 2001, these other Fish Market tenants finalized leases in substantially similar form to The Wharf's, Captain White's, and Pruitt's respective leases.

57.     The Wharf, Captain White, Pruitt's, and other Municipal Fish Market tenants' leases were the result of years of joint negotiations with the District, Congress, and other tenants of neighboring property.

58.     Until April 23, 2014, the District was the Plaintiffs' landlord under the above-described leases.  On that date, the District assigned Plaintiffs' leases to Developer Defendants acting through WHRL.  WHRL subsequently assigned the leases to WFMRL.

59.     At no time from the inception of the leases until the assignment to WHRL did the District claim to Plaintiffs that their leases were not valid or that the leases expired on their own terms. During the time when the District was Plaintiffs' landlord each party performed their basic obligations under the lease and Plaintiffs paid rent and occupied the property without issue or objection from the District.

60.     Also during the period from 2001-April 23, 2014, Plaintiffs made several improvements to the Municipal Fish Market property, including the removal of the old fish cleaning house, and paid for the property's upkeep and maintenance.

  B.  The Redevelopment Project

61.     In 2006, HMW, then doing business as Hoffman-Struever Waterfront, was selected by the District as the primary developer for the District's $2 billion Redevelopment Project.  As part of the Land Disposition Agreement ("LDA") facilitating the development, the District sold or otherwise transferred its interest in a large stretch of land along the Southwest Waterfront to HMW.

62.     Under the Redevelopment Project, Developer Defendants plan to construct numerous retail shops, residential and office buildings, hotels, and parks along the approximately 27 acres of land between the Municipal Fish Market and Fort McNair.

63.     In 2009, Hoffman-Struever Waterfront entered into a LDA with the District relating to the Redevelopment Project.

64.     The LDA authorizes or requires the Developer Defendants to engage in construction on the Municipal Fish Market, but Plaintiffs were not invited to participate in, or even informed of, the negotiation of the LDA despite their leases granting them a property interest in the Municipal Fish Market.

65.     The District took numerous additional steps that were necessary for the Municipal Fish Market construction to proceed, including entering into a Ground Lease Agreement for the Municipal Fish Market, even though Plaintiffs' leases grant them, along with other Municipal Fish Market tenants, the right to approve or disapprove of construction on the Municipal Fish Market.

66.     Once again, Plaintiffs were not given a chance to participate in the process of leasing the Municipal Fish Market to the Developer Defendants even though such actions would directly impact their businesses and their rights under the leases that the District had provided to them years earlier.

67.     As described above, on April 23, 2014, the District assigned the various Municipal Fish Market leases, including Plaintiffs' leases, to Developer Defendants, acting through WHRL, to facilitate the Redevelopment Project.  Plaintiffs were not informed of, or given a chance to contest, this assignment.

14

68.    When Developer Defendants accepted the assignment, the lease agreements that they assumed were listed in appendix A to the assignment contract.  The D.C. Landlord Assignment is attached hereto as Exhibit E.  On information and belief, Developer Defendants had the opportunity to review the leases that they agreed to assume before they accepted the assignment of the leases.

69.    Upon accepting assignment of the leases, Developer Defendants did not notify any Plaintiff that they believed their leases were invalid or had expired on their own terms.

70.    In fact, Plaintiffs first learned of the assignments when a dispute arose between Plaintiffs and Developer Defendants over construction that blocked access to the Municipal Fish Market.

71.    By assigning the leases, the District evinced a belief that the leases were valid and had not expired.  Developer Defendants also did not indicate any belief that the leases were expired or invalid.  Ex. E.

72.    Upon accepting the assignment of the leases no party informed Plaintiffs that they should cease paying rent because the leases were expired.  Instead, Plaintiffs' rent payments were accepted as they always had been.

73.    Subsequent to the assignment and prior to this litigation, Developer Defendants acted as if the leases were valid.  Developer Defendants made efforts to secure approval of the Municipal Fish Market Tenant Committee ("Tenant Committee") for various of its construction plans (but when they failed to secure such approval, they breached the leases as described below).

74.    Developer Defendants sent two Plaintiffs notices of alleged breaches as well—but the notices did not contend that the allegedly breached leases were expired.

C.  Water Street Closure

75.    For the entire time Plaintiffs and the other Municipal Fish Market tenants have operated

their businesses prior to the assignment of their leases from the District to Developer Defendants,

Water Street has been open to the public and was a critical access point for customers and

vendors.

76.    Water Street was even mentioned in the 1913 Act designating the Municipal Fish Market

the sole market of its kind in the District of Columbia.  *See* 37 Stat. 941 (Mar. 4, 1913).

77.    Prior to the assignment of Plaintiffs' leases from the District to Developer Defendants,

the Municipal Fish Market could be easily accessed by vehicular and pedestrian foot traffic via

Water Street.

78.    Customers arriving at the Municipal Fish Market by car (or other vehicle) could park

along Water Street while shopping at the Municipal Fish Market.

79.    Vendors, particularly those driving large delivery trucks, used Water Street to make

deliveries because a roundabout at the end of the street allowed the large trucks to turn around

easily.

80.    In short, Water Street was critical to Plaintiffs' businesses.

81.    The District was aware of the decades of use by Plaintiffs' customers and vendors and its

importance to Plaintiffs' businesses.

82.    In addition to the Water Street access point, Plaintiffs' leases include a parking lot in

front of the businesses.  And overflow parking was available on weekends along eastbound

Maine Avenue to the north of Water Street.

83.    Plaintiffs entered into their long-term leases with the District with the expectation of

reasonable access by pedestrians and vehicular traffic.

16

84.     Even in light of Water Street's importance to Plaintiffs' businesses, on January 28, 2011, the Council of the District of Columbia began consideration of Bill 19-69, entitled the "Closing of Water Street, S.O. 10-15906 Act of 2011."

85.     On April 19, 2011, the Council of the District of Columbia Committee of the Whole stated the Water Street closure was for the benefit of Developer Defendants and would assist Developer Defendants to "facilitate necessary financing."  The Committee relied on testimony from Lamont Hoffman, Chief Executive Officer of PN Hoffman, Inc., that the Water Street closure would "eliminate as many contingent liabilities as possible as early in the process" which would help "to obtain commitments from institutional investors and lenders."

86.     On June 7, 2011, the Council of the District of Columbia, over the objections of several community members, passed Bill 19-69.

87.     The Committee Report contemplates reasonable access for several nearby properties, but it does not discuss similar access for the Municipal Fish Market.

88.     In passing the bill, the Council of the District of Columbia stated that it deemed the closure of Water Street to be "required for the redevelopment of the Southwest Waterfront, pursuant to the Amended and Restated Land Disposition Agreement Between Hoffman-Struever Waterfront L.L.C. and the District of Columbia . . . ."

89.     The Mayor of the District signed Bill 19-69 on June 28, 2011 (at which point it became Act 19-90), and the Congressional review period ended on August 17, 2011 (at which point it became D.C. Law 19-19).

90.     Water Street remained in public use, however, and Plaintiffs and their customers and vendors continued to use Water Street, until May 2014 while the District finished closing its Land Disposition Agreement with Developer Defendants.

91.    From May 2014 through November 2014, Developer Defendants periodically closed Water Street, without notice to Plaintiffs, to carry out construction activities related to the Redevelopment Project, severely restricting access to Plaintiffs' leased property.

92.    In or around November 2014, Developer Defendants dug an enormous hole where Water Street used to be.

93.    By closing Water Street, the primary entrance to the Municipal Fish Market was eliminated.

94.    Once Water Street was closed, the only point of access for vehicular traffic from the north and east was eliminated and the only route vehicular traffic could take to reach the Municipal Fish Market was eastbound on Maine Avenue.  Vehicles travelling westbound on Maine Avenue had to take a complex, unmarked detour of approximately 1.2 miles.

95.    In addition, the Water Street closure eliminated parking along eastbound Maine Avenue.

96.    Although the Developer Defendants have since installed a signalized intersection to provide access to the Redevelopment Project and the Municipal Fish Market, that access point is insufficient to accommodate large delivery vehicles that would formerly use Water Street.

97.    Moreover, Developer Defendants have blocked all other entrances to the Municipal Fish Market, and the route from the signalized intersection that Plaintiffs' customers and vendors must use crosses the Redevelopment Project property.  Plaintiffs have no guarantee Developer Defendants will continue to allow this access point to be used for the Municipal Fish Market. Based on Developer Defendants' actions to date, Developer Defendants may restrict Plaintiffs' access using this entrance.

98.    Because of the closure of Water Street and ongoing construction, several vendors have refused to deliver necessary inventory and supplies to Plaintiffs, and common carriers have refused to deliver packages, citing difficulty in reaching the property.

99.    Many of Plaintiffs' customers have expressed that they go to Plaintiffs' businesses less frequently or not at all because of the difficulty in accessing the Municipal Fish Market.

100.    The closure of Water Street and accompanying construction has caused foot traffic on the Municipal Fish Market and Plaintiffs' revenues to diminish significantly such that Plaintiffs may have to close their businesses if such losses continue.

101.    Plaintiffs are unable to put their leased property to beneficial commercial use because the street closure and construction facilitated by the street closure prevents customers from seeing or entering the Municipal Fish Market and prevents suppliers from delivering necessary products.

102.    In contrast to the great harm caused to Plaintiffs, Developer Defendants were able to use the closure of Water Street to secure financing for the Redevelopment Project to reap large profits and further the District's goal of redeveloping the waterfront.

D.    Plaintiffs' Rights Under Their Leases

103.    Under the terms of each lease, Plaintiffs are entitled to exclusive use of certain water frontages to operate open air fish markets and a seafood deli.  Plaintiffs, along with various other nearby businesses, also have the right to access and use the Common Area. Exs. A at § 9.A, C at § 9.A, D at § 9.A.

104.    Under the terms of each lease, the Landlord's right to locate structures on the Common Area does not vest until completing certain work specified therein.

19

105.    Even after the right vests, the Landlord may not locate any structures on the Common Area without the approval of the Tenant Committee and any structures may not materially interfere with access to the Common Area.

106.    The Tenant Committee consists of representatives of Plaintiffs, two other open air fish markets operated as Jessie Taylor Seafood, and a fish cleaning house operated as Virgo Fish House.

107.    Plaintiffs' leases provide that members of the Tenant Committee have voting power in proportion to the total amount of linear footage that each controls at the Municipal Fish Market. Decisions are reached by majority vote.  Exs. A at §§ 1.M, 1.N, C at §§ 1.M, 1.N, D at §§ 1.M, 1.N.

108.    Plaintiffs have a combined 52.81% voting power in the Tenant Committee.  By virtue of the linear footage controlled by Plaintiffs, The Wharf has 14.81% of the Tenant Committee voting power, Captain White has 16.97%, and Salt Water has 21.03%.  The remaining votes are spread between Jessie Taylor Seafood and Virgo Fish House.

109.    With over half of the voting power in the Tenant Committee, at least one of the Plaintiffs would have to vote in favor of building structures on the Common Area for such an act to be valid under the leases.

110.    The Landlord's Work specified in the leases has not been completed and the Tenant Committee has not approved the location of any structures on the Common Area, therefore the Landlord cannot place structures on the Common Area.

111.    The leases also specify that the Tenant Committee has the power to regulate parking at the Municipal Fish Market.  Exs. A at § 9.B, C at § 9.B, D at § 9.B.

112.    Each of Plaintiffs' leases also provide, "[a]s long as [Plaintiff] is not in default under this Lease, [Plaintiff] may peaceably and quietly enjoy the Premises for the Term without hindrance, ejection or molestation by Landlord or anyone claiming or acting by or through Landlord."  Exs. A at § 29, C at § 29, D at § 29.

    E.    <u>Actual and Planned Breaches of Plaintiffs' Leases</u>

        i.    <u>Developer Defendants Moved a Fence to Block Access to the Municipal Fish Market</u>

113.    Notwithstanding Plaintiffs' rights under their leases, Developer Defendants have repeatedly encroached onto the Common Area, located structures thereon, materially interfered with Plaintiffs' access to the Common Area, and otherwise interfered with Plaintiffs' right to quiet enjoyment guaranteed under the lease.

114.    The first of these breaches happened in May 2014—shortly after Developer Defendants assumed the Municipal Fish Market leases from the District—when Developer Defendants constructed a fence on the Common Area, which blocked an entrance/exit to/from the Municipal Fish Market necessary for Plaintiffs' businesses.

115.    The fence was moved to unblock the entrance/exit.

116.    Developer Defendants moved the fence back.

117.    Eventually the fence was removed again to unblock access, possibly by customers desiring access to the Municipal Fish Market.

118.    After this incident, Developer Defendants requested a meeting to discuss accommodation of the Redevelopment Project.

ii.    First Meeting to Discuss Breach of Leases and Construction Plans

119.    On or about May 15, 2014, Plaintiffs, the other members of the Tenant Committee,

Developer Defendants, and the District met to discuss the Redevelopment Project, the plans for

construction, and how those plans affected Plaintiffs' leases.  Neither the District nor Developer

Defendants indicated at this meeting that they believed that Plaintiffs' leases were expired or

invalid.

120.    During the meeting, Developer Defendants presented plans for the Redevelopment

Project, which the District supported.

121.    These plans, which were dated September 27, 2013—long before Developer Defendants

became Plaintiffs' landlord—included drawings for at least three large buildings to be located on

Plaintiffs' designated Common Area.  At the same time, Developer Defendants turned over other

plans, dated January 6, 2011, showing sketches of encroaching buildings.

122.    Plaintiffs, as well as each of the other members of the Tenant Committee objected to the

large-scale encroachment onto the Common Area, which would violate their respective leases.

123.    Developer Defendants agreed to consider changing construction plans to reduce the

encroachment on the Common Area and to address the parking and access issues.  Developer

Defendants also agreed to work with Plaintiffs to determine the most convenient times for certain

construction activities that would impact the Municipal Fish Market and proposed revising

Plaintiffs' leases given the Redevelopment Project.

124.     Despite the assurances, Developer Defendants did not formally propose lease revisions

and continued to encroach Plaintiffs' Common Area including periodically closing Water Street

without notice to Plaintiffs.

### iii. Second Meeting to Discuss Breach of Lease and Construction Plans

125.    On August 5, 2014, a second meeting was held to discuss construction plans and the continuing impact on the Municipal Fish Market.

126.    At this meeting, Developer Defendants presented revised plans, which still showed proposed buildings to be constructed in the Common Area.

127.    Once again, Plaintiffs and the other Tenant Committee members objected to the plans because the planned location of the buildings would violate their leases and encroach onto the Common Area.

128.    At this meeting,  Developer Defendants again proposed to send modifications to Plaintiffs' leases to accommodate the construction.  Developer Defendants did not claim that they believed that Plaintiffs' leases were invalid or expired.  However, Developer Defendants did not propose the lease modifications.

### iv. Third Meeting to Discuss Breach of Lease and Construction Plans

129.    On September 5, 2014, Plaintiffs, other Tenant Committee members, and Developer Defendants met again to discuss Developer Defendants' construction plans and the impact to access to the Municipal Fish Market.  At the meeting, Developer Defendants presented further revised construction plans.  Developer Defendants did not claim that Plaintiffs' leases were invalid or expired at this meeting.

130.    Phase I of these plans—which had apparently already commenced—showed that Developer Defendants planned to remove the roundabout at the end of Water Street, but that Water Street would remain open with one lane in each direction until September 2014.  Phase I called for expanded customer parking for the Municipal Fish Market, but such parking never materialized.

131.    Phase II of the plans, which was to run until November 2014, showed that Developer Defendants would move Water Street to the south of its location on the Phase I drawings, but would provide even more parking than proposed in Phase I.  As with Phase I, the expanded parking never materialized and no new Water Street was ever created.

132.    Phase III, which was to start in November 2014 and be the configuration of the Municipal Fish Market until Developer Defendants completed construction in 2017, showed a greatly expanded parking lot, and ample access from Maine Avenue.

133.    As with Phases I and II, the benefits to the Municipal Fish Market never materialized, and Plaintiffs have been left with reduced parking and significantly impaired access.

134.    Developer Defendants also informed Plaintiffs and other Tenant Committee members that it planned to dig a large hole in the Common Area that would impede the flow of traffic on the Municipal Fish Market.

135.    Developer Defendants represented that the hole would remain in place for approximately a week.

136.    Plaintiffs and other Tenant Committee members objected to Developer Defendants' plans to dig the hole on the Common Area.

137.    The revised plans still showed proposed buildings to be constructed in the Common Area.

138.    Once again, Plaintiffs and the other Tenant Committee members objected to the plans because the planned location of the buildings would violate their leases and encroach onto the Common Area.  Developer Defendants did not respond to these concerns with any claim that the leases were invalid or expired.

139.    Despite Developer Defendants' knowledge that the Tenant Committee objected to encroachments onto the Common Area, Developer Defendants continued to willfully breach Plaintiffs' leases.

F.    Breaches and Harassment Leading to this Lawsuit

140.    In the months following the third meeting, Developer Defendants deterred access to the Municipal Fish Market by repeatedly changing vehicular traffic patterns and blocking pedestrian foot traffic with fences.

141.    The fences also gave the appearance that the Municipal Fish Market was not open, which further deterred customers.

142.    On December 8, 2014, Developer Defendants blocked a large portion of the Municipal Fish Market parking lot.

143.    Shortly thereafter, some of Plaintiffs' vendors began refusing to deliver product to the Municipal Fish Market citing difficulty in reaching the storefronts.  Because of the perishable nature of seafood, consistent deliveries are extremely important to the viability of Plaintiffs' businesses.

144.    In February 2015, Developer Defendants extended a formerly public sidewalk that ran along the south side of Maine Avenue so that it encroached on the designated Common Area without consent from Plaintiffs or the Tenant Committee.

145.    This resulted in the Municipal Fish Market parking spaces being moved farther onto the Common Area, leaving less Common Area space for other business activities.

146.    In April 2015, without notice to Plaintiffs or approval from the Tenant Committee, Developer Defendants or an entity operating for the benefit of the Developer Defendants dug the large hole on the Common Area that Plaintiffs had previously objected to.  This restricted the

25

flow of traffic at the Municipal Fish Market, caused extreme traffic congestion, and significantly reduced the number of customers that frequented Plaintiffs' businesses.

147.    Upon information and belief, in May 2015, Developer Defendants listed on Google Maps that the Municipal Fish Market was "permanently closed" as a result of the Redevelopment Project.  The listing has resulted in numerous calls to Plaintiffs inquiring about the continued operation of the Municipal Fish Market and undoubtedly caused Plaintiffs to lose customers.

148.    In June 2015, Developer Defendants sent notice that they planned to install permanent bollards on the Common Area in front of Plaintiffs' leased water frontages.  Plaintiffs objected to the installation.

149.    Once again, neither Plaintiffs nor the Tenant Committee approved this plan.

150.    Nonetheless, Developer Defendants installed the bollards on the Common Area in front of Plaintiffs' businesses.

151.    In and around June 2015, Developer Defendants installed signs stating Municipal Fish Market customers had only 60 minutes to park before being towed.  This is in clear contravention of Plaintiffs' leases, which give the Tenant Committee the authority to regulate Municipal Fish Market parking.  Exs. A at § 9.B, C at § 9.B , D at § 9.B.  Plaintiffs did not adopt any rules regarding length of time customers could park in the Municipal Fish Market parking lot.

152.    On June 25, 2015 and July 7, 2015, Developer Defendants' construction workers used numerous of the already reduced number of customer parking spaces at the Municipal Fish Market to park while they worked at the Redevelopment Project.  This left fewer parking spaces for Municipal Fish Market customers.

153.    Also on July 7, 2015, Bob Rubenkonig, a project manager of the Redevelopment Project, instructed the police to ticket and tow Plaintiffs' commercial and private use vehicles from the Municipal Fish Market parking lot because Developer Defendants were the "owner" of the Municipal Fish Market, and Plaintiffs' vehicles were parked on private property without permission.

154.    Rubenkonig's attempted control over the Municipal Fish Market parking lot is in clear breach of Plaintiffs' leases, which give the Tenant Committee the authority to regulate the Municipal Fish Market parking lot.

155.    All of these breaches of Plaintiffs' right to quiet enjoyment guaranteed under the leases and incidences of harassment have caused irreparable harm and continued losses will force them out of business.

   G.    Developer Defendants'  Attempted Lease Terminations and Notices to Vacate

156.    Notwithstanding the litany of breaches described above, Developer Defendants, without any basis, sent two letters purporting to evict Plaintiffs.  Neither letter claims that Plaintiffs' leases are expired.

157.    On March 25, 2015, Mark Dorigan of HMW sent Salt Water a letter questioning the construction of a small shed housing boilers used to power the cookers on one of Salt Water's barges.  The letter nowhere indicates that Salt Water's lease is expired.

158.    Dorigan alleged that Salt Water was performing construction on one of its barges for which it had not obtained required permits or landlord's approval.

159.    The Salt Water barge at issue replaced a similar barge operated by Salt Water's predecessors Pruitt's and DNM.  The replacement of the barge and related construction was

addressed in Salt Water's purchase agreement, which was approved by then landlord, the District, in connection with the assignment of the lease from DNM to Salt Water.

160.    The new Salt Water barge contained the same equipment, including cookers and boilers that Salt Water's predecessor operated and that Salt Water will operate in the same manner.

161.    Before construction, Salt Water consulted with a permitting expert who advised that no permits were required.  Because the boilers were a necessary component to operate the cookers, Salt Water reasonably believed that no additional permits were required for the small shed housing the boilers.

162.    When Developer Defendants indicated that they believed permits were required, Salt Walter secured such permits.

163.    Dorigan also wrongly asserted that the Salt Water lease was breached because the construction extended into Space 1 of the Municipal Fish Market, and any construction extending into that site required approval.

164.    Salt Water's construction, however, was more than 28 feet from the Space 1 property line, so it did not violate the lease.  Moreover, Salt Water's lease provides it with the right to expand the barge in Space 2 into Space 1.  *See* Exs. D § 1.J.

165.    Salt Water responded to Dorigan explaining that the construction did not violate the lease and that it complies with all applicable federal and building codes.

166.    On April 20, 2015, Developer Defendants' counsel sent a Lease Default Notice to Salt Water for alleged violations of the lease for failure to obtain necessary construction permits.

167.    The April 20, 2015 letter does not claim that the lease agreement is invalid or expired.

28

168.    Instead, the notice explained that the alleged breach must be cured—by obtaining appropriate construction permits and getting HMW's consent—within 30 days or HMW could terminate the lease.

169.    Salt Water was not in default of its lease.  However, on May 14, 2015, in an effort to avoid further harassment by Developer Defendants, Salt Water responded through its counsel requesting approval for the construction and enclosing a construction permit application.

170.    In the alternative, Salt Water requested Developer Defendants forbear from taking further actions in order to resolve the situation.

171.    Developer Defendants did not respond to this letter.  Developer Defendants did not indicate how this alleged breach caused it material harm and still has not explained how this alleged breach causes it material harm.  Developer Defendants' failure to demonstrate that the alleged breach was in any way material precludes it from terminating the lease based upon this alleged minor breach.

172.    Regardless, while awaiting response and out of an abundance of caution, Salt Water obtained a construction permit for the shed from the District.  Salt Water, through its counsel, sent Developer Defendants' counsel a copy of the approved construction permit.

173.    Notwithstanding receipt of the construction permit, Developer Defendants sent Salt Water a termination letter instructing it to vacate by July 31, 2015.  This letter also did not claim that Salt Water's lease was invalid or expired.

174.    Even if Salt Water was in technical breach of its lease, which it was not, the breach was immaterial such that it cannot be the basis for termination.  The alleged minor breach caused no harm to Developer Defendants or the Municipal Fish Market; Salt Water attempted to cure any alleged breach by obtaining the construction permit from the District and requested consent from

29

Developer Defendants; Developer Defendants waived their rights by not responding; and termination of the lease for such a minor issue would be tantamount to a forfeiture, which is "abhorred" under District of Columbia law.

175.    Developer Defendants also sent a notice to vacate to The Wharf apparently based on the fact that Developer Defendants allege they had not seen a signed copy of the lease.

176.    Developer Defendants advance this claim despite agreeing to assume this exact lease from the District only one year earlier.  Ex. E at Ex. A.

177.    In that notice, Developer Defendants did not inform Plaintiffs that they believed that The Wharf lease was expired.

178.    The Wharf notice to vacate was sent even in light of Plaintiffs' presence on the Municipal Fish Market for over 44 years, and their timely rent payments under the current leases for nearly 15 years.

   H.    Breaches and Harassment Occurring After Plaintiffs Filed this Lawsuit

179.    Although the breaches described above represented serious threats to Plaintiffs' businesses, Developer Defendants have engaged in conduct orders of magnitude worse since Plaintiffs filed this complaint.

180.    Despite Plaintiffs having arranged security at the Municipal Fish Market through the Metropolitan Police Department for many years, the Developer Defendants paid the Metropolitan Police Department higher wages to perform the same security, only with the additional direction to harass Plaintiffs and disrupt their businesses.

181.    For example, at the direction of the Developer Defendants, the Metropolitan Police Department frequently tickets and tows Plaintiffs' delivery vehicles while they are loading and unloading on the Common Area—even though loading and unloading is expressly contemplated

by Plaintiffs' leases—while permitting Plaintiffs' competitors to engage in that exact activity without objection.

182.    One officer's (Detective Joseph Gatling) actions in limiting Plaintiffs' access and verbal abuse of Plaintiffs' owners undertaken at the direction of the Developer Defendants were so extreme that Robert Adler, Commander of the Criminal Investigations Division at the Metropolitan Police Department, informed Plaintiffs that there were sufficient facts to corroborate that Detective Gatling engaged in misconduct.

183.    Furthermore, in October 2016, Developer Defendants fenced off the area surrounding Plaintiffs' electricity panels, blocking Plaintiffs from accessing their electricity and rendering them unable to shut off their electricity in the event of an emergency.

184.    In March 2017, as a result of Developer Defendants' construction, the water main line servicing the Municipal Fish Market was broken, cutting off water access to each of Plaintiffs' businesses and preventing them from operating boilers necessary to sell certain product.

185.    Also in March 2017, a fire alarm went off at one of Plaintiffs' businesses, but emergency vehicles were not able to access the site of the fire alarm due to the Common Area obstructions, including the bollards, that the Developer Defendants put in place.

186.    In April 2017, Developer Defendants again severed the water main line servicing Captain White, causing the business to lose water access for several hours, which prevented Captain White from selling products to customers.

187.    Developer Defendants recently started construction of several buildings on the Common Area, causing further interruptions to Plaintiffs' businesses.

188.    To facilitate the construction, Defendants have closed off all entrances to the Municipal Fish Market other than the one entrance that crosses the Redevelopment Project.

31

189.    Developer Defendants have installed a continuous fence along Maine Avenue that runs for more than a block from the I-395 bridge to 9th Street SW.

190.    The Developer Defendants have also installed a network of ever-changing fencing on the Common Area that restricts Plaintiffs' ability to bring product to their businesses, provides only narrow and difficult to traverse paths for customers, which do not comply with the Americans with Disabilities Act, and creates confusing and chaotic parking situations.  In addition, this restricted access prevents critical vendors from providing services to Plaintiffs.  For example, because of the impediments on the Common Area, the pump out truck cannot reach Plaintiffs' businesses to effectively provide its regularly scheduled services that are needed for the barges to stay afloat.  Similarly, the vendor that delivers oil needed to power Salt Water's boilers cannot reach Salt Water's barges.  The fences have also blocked access to the dumpsters used by the Municipal Fish Market tenants, creating a safety and health issue.

191.    For example, due to increased construction activity and related obstructions, Plaintiffs have been forced to load and unload product deliveries on Maine Avenue rather than on the Common Area.  Loading and unloading on Maine Avenue is dangerous to Plaintiffs' employees and others.

192.    Plaintiffs have continuously maintained that the Developer Defendants' construction on the Common Area and harassment breaches Plaintiffs' leases, and they have repeatedly objected to Developer Defendants about this conduct in an effort to stop the ongoing harm to their businesses.

193.    Nonetheless, Developer Defendants have proceeded with their plans.

194.    Due to Developer Defendants' baseless attempts to oust Plaintiffs from the Municipal Fish Market, constant harassment, and ongoing disruptive actions, Plaintiffs have suffered

32

reputational harm, financial loss, diminished business value, and irreparable harm in their businesses.

## COUNT I
## FIFTH AMENDMENT TAKING
## (AGAINST DEFENDANT DISTRICT OF COLUMBIA)

195.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-194 of this Complaint.

196.    D.C. Law 19-19 entitled the Closing of Water Street, S.O. 10-15906 Act of 2011 is unconstitutional because it violates the Takings Clause of the Fifth Amendment of the United States Constitution by impairing access to Plaintiffs' leased property for public use without providing just compensation to Plaintiffs.

197.    The permanent closing of Water Street in early 2015 has impaired direct vehicular access to the Municipal Fish Market, impeded vendor deliveries, eliminated customer parking, and caused some common carrier packages to go undelivered.

198.    Because of these difficulties, Plaintiffs are unable to put their leased property to beneficial commercial use causing irreparable harm to Plaintiffs' businesses.

199.    The Water Street closure also interferes with Plaintiffs' well-known investment-backed expectations.

200.    For example, the District—fully aware of the use and necessity of Water Street to the Plaintiffs' businesses—entered into 30-year leases for two of the properties in the year 2000 with Plaintiffs.  Plaintiffs also invested in improvements to the properties on the expectation of continued reasonable customer and vendor access to the Municipal Fish Market.  And, Plaintiffs assumed the lease of a third business on the Municipal Fish Market for over $1 million based on the same expectation.

201.    Despite the impairment of access to the property, Plaintiffs have not received or been offered compensation or any other remedial measures by the District.

202.    Any state remedies for this taking are unavailable, inadequate, or futile.

**COUNT II**
**FIFTH AMENDMENT TAKING**
**(AGAINST DEFENDANT DISTRICT OF COLUMBIA)**

203.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-202 of this Complaint.

204.    The District's authorization and/or requirement of Developer Defendants' construction on the Common Area violates the Takings Clause of the Fifth Amendment of the United States Constitution by impairing Plaintiffs' property interest in the Common Area and their leases without providing just compensation to Plaintiffs.

205.    The Common Area construction has impaired vehicular access to the Municipal Fish Market, impeded vendor deliveries, and impeded customer and employee access to the Municipal Fish Market.  Because the District authorized the construction without Plaintiffs' consent, Plaintiffs routinely encounter physical obstructions to their use of the Common Area, including the presence of construction vehicles and equipment, barricades, dumpsters, and construction-related waste, and other impediments caused by the construction of permanent structures on the Common Area to which Plaintiffs never agreed.  And once the construction is complete, Plaintiffs  will suffer an ongoing loss of their use of and access to large portions of the Common Area.

206.    The Common Area construction constitutes a permanent physical invasion of Plaintiffs' property.

207.    By authorizing or requiring Developer Defendants to undertake the Common Area construction without Plaintiffs' consent, the District has effectuated a per se physical taking of Plaintiffs' property, causing irreparable harm to Plaintiffs.

208.    Despite the impairment of access to the property, Plaintiffs have not received or been offered compensation or any other remedial measures by the District.

209.    Any state remedies for this taking are unavailable, inadequate, or futile.

**COUNT III**
**VIOLATION OF PROCEDURAL DUE PROCESS**
**(AGAINST DEFENDANT DISTRICT OF COLUMBIA)**

210.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-209 of this Complaint.

211.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the District from depriving any person of life, liberty, or property without due process of law.

212.    Plaintiffs have a protected property interest in their leases and in the Common Area.

213.    Under Plaintiffs' leases, no construction can be commenced on the Common Area without Plaintiffs' approval because they collectively control a majority vote of the Tenant Committee.

214.    The District approved of Developer Defendants' development plans for the Municipal Fish Market, and authorized—even required—Developer Defendants' construction on the Common Area without providing due process of law to Plaintiffs.  The District signed contracts authorizing the Developer Defendants' development plans to dramatically reshape the Common Area and the Municipal Fish Market as a whole without even seeking a vote of the Tenant Committee or providing any other opportunity to participate in or voice their concerns about the

proposed construction—the exact outcome Plaintiffs sought to avoid in securing such rights under their leases.

215.    By approving of Developer Defendants' plans without providing Plaintiffs with timely notice and an opportunity to be heard in a meaningful manner, the District deprived Plaintiffs of procedural due process of law.

216.    This deprivation was permanent and final, as the approved Municipal Fish Market construction is ongoing and will permanently reshape and interfere with Plaintiffs' use of the property in which they have a protected interest.

217.    As a result, the District violated the Due Process Clause of the Fifth Amendment. Plaintiffs are therefore entitled to declaratory, injunctive relief, including but not limited to a hearing for Plaintiffs to challenge any of Defendants' development agreements, and monetary damages.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(AGAINST ALL DEVELOPER DEFENDANTS)**

218.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-217 of this Complaint.

219.    Plaintiffs' leases unequivocally prohibit Developer Defendants from locating any structures on the Municipal Fish Market before they have completed the required renovations and obtained consent from the Tenant Committee, and even then, the construction cannot materially interfere with Plaintiffs' use of and access to the Common Area.

220.    Neither Plaintiffs nor the Tenant Committee have consented to any of Developer Defendants' construction that has taken place or is planned to take place on the Municipal Fish

Market, nor have Developer Defendants completed the required renovations to trigger the right for the landlord to request that the Tenant Committee agree to its Common Area construction.

221.    Developer Defendants continue to carry out construction on the Common Area in order to benefit the Redevelopment Project.

222.    Developer Defendants' unauthorized Municipal Fish Market construction and other encroachments have interfered with Plaintiffs' businesses and quiet enjoyment of the leased Municipal Fish Market property.

223.    Developer Defendants claim they are able to engage in all of this conduct because Plaintiffs' leases either expired or were terminated.

224.    As such, justiciable controversies between the parties exist as to whether Developer Defendants can ignore the Plaintiffs' lease provisions to conduct unauthorized construction and otherwise encroach on the Municipal Fish Market, whether Developer Defendants can eliminate reasonable access to the Municipal Fish Market, and whether the Plaintiffs' leases remain valid, among others.

225.    Plaintiffs ask the Court to declare that:

(1) Developer Defendants are required to carry out their obligations under Plaintiffs' leases, including but not limited to, obtaining approval from the Tenant Committee and performing renovation work or before erecting any structures on the Municipal Fish Market Common Area;

(2) Developer Defendants violated Plaintiffs' quiet enjoyment of the Municipal Fish Market when they located structures on the Common Area without Tenant Committee approval and before the Landlord's Work was completed;

(3)    Developer Defendants violated Plaintiffs' right to quiet enjoyment of the leases

when they took repeated actions to interfere with Plaintiffs' businesses and harass

Plaintiffs;

(4)    Developer Defendants violated Plaintiffs' leases by restricting access and parking.

(5)    Developer Defendants' planned future construction on the Municipal Fish Market

will violate Plaintiffs' leases;

(6)    Plaintiffs' leases are valid and enforceable; and

(7)    Plaintiffs are entitled to reasonable access for customers, vendors, and employees to

the Municipal Fish Market.

## COUNT V
## BREACH OF LEASE—SPECIFIC PERFORMANCE & INJUNCTIVE RELIEF
### (AGAINST ALL DEVELOPER DEFENDANTS)

226.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs

1- 225 of this Complaint.

227.    Plaintiffs and the District entered into valid and enforceable lease agreements for certain

property on the Municipal Fish Market.

228.    Plaintiffs' leases remain valid.

229.    The District assigned the leases to Developer Defendants, acting through WHRL, on

April 23, 2014.  HMW represented to Plaintiffs that HMW was Plaintiffs' Landlord.  WHRL

assigned its interest in Plaintiffs' leases to WFMRL.

230.    The leases guarantee Plaintiffs the right to quiet enjoyment of the demised premises on

the Municipal Fish Market and prohibit the Landlord from locating any structures on the

Common Area without consent from the Tenant Committee after completing its required

renovations.

231.    Developer Defendants have breached these lease terms by making repeated and
disruptive encroachments onto the Common Area for the benefit the Redevelopment Project and
engaging in a pattern of harassment against Plaintiffs in violation of their leases.

232.    If Developer Defendants continue with their redevelopment plans, they will violate
Plaintiffs' lease terms by constructing permanent structures on the Municipal Fish Market,
blocking customers' foot and vehicular traffic to Plaintiffs' businesses, impeding access by
vendors, and causing continued financial harm to Plaintiffs.

233.    The steps Developer Defendants have taken to carry out their Redevelopment Project in
contravention of the leases have caused Plaintiffs severe financial impact and irreparable harm.
They have also harmed the goodwill, reputation, and existing customer base that Plaintiffs have
developed in the community over several decades.  If Defendants' overreaches continue, the
Municipal Fish Market, which has been in operation in the District since 1805, will be decimated
along with Plaintiffs' businesses and their valuable property rights.

234.    Plaintiffs have a specific interest in the specific property at issue.  They have made
improvements to the property and the goodwill associated with their businesses is associated
with their location and property.  In addition, Plaintiffs' businesses use special and unique
equipment that was made to operate at this specific location.

235.    Because no adequate remedy at law exists to address Developer Defendants' breaches
and their continued attempts to carry out their plans for the Redevelopment Project in violation
of Plaintiffs' leases, Plaintiffs respectfully ask the Court to require Developer Defendants to
specifically perform their requirements under Plaintiffs' leases, including completing the
Landlord's Work, providing Plaintiffs with quiet enjoyment of the Municipal Fish Market, and

permanently enjoining Developer Defendants, while Plaintiffs' leases are in effect, from taking

any steps to carry out the Redevelopment Project to the extent that such actions:

    a. Infringe on Plaintiffs' rights under the leases without approval of the Tenant Committee;

    b. Alter, modify, or block any entrances to or exits from, or restrict access to the Municipal Fish Market;

    c. Alter, modify, or block any pedestrian or vehicular traffic to the Municipal Fish Market and Plaintiffs' leased lots; and

    d. Alter, modify, or block any customer or employee parking locations.

236.    For the same reasons, Plaintiffs request that this Court require Developer Defendants to remediate their breaching conduct, including but not limited to, razing buildings built on the Common Area and restoring the Common Area to the condition it was in prior to the construction.

237.    No adequate remedy at law exists which could address Developer Defendants' elimination of access to the Municipal Fish Market.  Thus, Plaintiffs respectfully request the Court to require Developer Defendants to install permanent access to the Municipal Fish Market that does not run over the property to the east of the Municipal Fish Market.

238.    The equities and public interest overwhelmingly favor the issuance of this injunction as District law strongly favors upholding a person's valuable property rights as well as enforcing contractual obligations.  The original parties to the lease agreements were a municipality and commercial entities that negotiated the leases at arm's length and with full knowledge of the terms thereof.  In such situations involving sophisticated parties, the courts have an even greater interest in enforcing provisions agreed to between the parties.  Consequently, by issuing the

injunction, the Court will be ensuring that Developer Defendants will continue to honor the contractual obligations they voluntarily assumed from the District.

239.    To allow otherwise would be giving permission to Developer Defendants to willfully and intentionally breach their contractual obligations, trample over Plaintiffs' valuable property rights, and destroy Plaintiffs' businesses at the Municipal Fish Market so Developer Defendants can reap windfall profits at the expense of Plaintiffs and its customers.

240.    Finally, by issuing the injunction, the Court will not be indefinitely precluding Developer Defendants from constructing their redevelopment.  Instead, it will simply be requiring Developer Defendants to abide by the terms of the leases they voluntarily assumed until the term of the leases expires or until such time as they receive consent from the Tenant Committee.

## COUNT VI
## BREACH OF LEASE—DAMAGES
## (AGAINST ALL DEVELOPER DEFENDANTS)

241.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-240 of this Complaint.

242.    Plaintiffs and the District entered into valid and enforceable lease agreements for certain property on the Municipal Fish Market.

243.    Plaintiffs' leases remain valid.

244.    The District assigned the leases to Developer Defendants, acting through WHRL, on April 23, 2014.

245.    Developer Defendants' repeated unauthorized encroachments onto the Municipal Fish Market have breached the clear lease terms contained in Plaintiffs' leases.

246.    All of Developer Defendants' breaches occurring after May 2014 were intentional as Plaintiffs made Developer Defendants explicitly aware that they objected to encroachments onto the Common Area and their designated lots.

247.    As a result of these breaches, Plaintiffs have suffered and will continue to suffer direct damages in an amount to be proven at trial.

248.    In addition to direct damages, the goodwill, reputation, and existing customer base that Plaintiffs have developed in the community over the last several decades have been damaged and will continue to be damaged by Developer Defendants' willful misconduct, and Plaintiffs' businesses have suffered and will continue to suffer immense financial harm in an amount to be proven at trial.

## COUNT VII
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (AGAINST ALL DEVELOPER DEFENDANTS)

249.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-248 of this Complaint.

250.    Plaintiffs' leases, like all contracts, imply a covenant of good faith and fair dealing.

251.    By repeatedly encroaching on the Municipal Fish Market over Plaintiffs' objections, engaging in a pattern of harassment of Plaintiffs, and willfully breaching the express lease terms, Developer Defendants have failed to comply with the substance of the obligations imposed and implied by the leases, including the implied covenant of good faith and fair dealing.

252.    Developer Defendants, by engaging in this conduct, have evaded the spirit of the leases, willfully rendered imperfect performance, and interfered with the Plaintiffs' performance.

253.    All of Developer Defendants' breaches of the implied covenant of good faith and fair dealing occurring after May 2014 were intentional as Plaintiffs made Developer Defendants

explicitly aware that it objected to encroachments onto the Common Area and its designated lots and objected to being subject to harassment in running their businesses.

254.    As a result of the breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered and will continue to suffer direct damages in an amount to be proven at trial.

255.    In addition to direct damages, the goodwill, reputation, and existing customer base that Plaintiffs have developed in the community over the last several decades have been damaged and will continue to be destroyed by Developer Defendants' willful breaches of the implied covenant of good faith and fair dealing, and Plaintiffs' businesses have suffered and will continue to suffer immense financial harm in an amount to be proven at trial.

## COUNT VIII
## TRESPASS AND CONVERSION
## (AGAINST ALL DEVELOPER DEFENDANTS)

256.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-255 of this Complaint.

257.    Plaintiffs have a possessory interest in their respective designated leased lots and the Common Area on the Municipal Fish Market.

258.    Developer Defendants have made repeated and disruptive encroachments onto the Municipal Fish Market to perform construction activities and harass Plaintiffs for the benefit the Redevelopment Project in violation of Plaintiffs' possessory interest of the Municipal Fish Market.

259.    For example, Developer Defendants have:

    a.  Moved a fence onto the Common Area, blocking an entrance to and exit from the Municipal Fish Market;

b.  Repeatedly blocked or altered pedestrian foot traffic routes;

c.  Entered the Municipal Fish Market parking lot to "cone off" sections for itself;

d.  Impeded Plaintiffs' vendor deliveries by constantly changing the routes for vehicular traffic and blocked such routes entirely;

e.  Moved a public sidewalk onto the Common area and moved a parking lot abutting the sidewalk farther onto the Municipal Fish Market;

f.  Dug a large hole on the Common Area blocking foot and vehicular traffic;

g.  Constructed bollards blocking the walkways in front of Plaintiffs' businesses;

h.  Used numerous of the Municipal Fish Market customer parking spaces for construction worker parking;

i.  Blocked access to Plaintiffs' electricity panel;

j.  Blocked all access to the Municipal Fish Market dumpsters, creating a health and safety issue;

k.  Installed an extensive network of fencing that removed all parking on the Common Area; and

l.  Directed the police ticket and tow Plaintiffs' private and commercial vehicles from the Municipal Fish Market parking lot.

260.  These encroachments resulted in Developer Defendants wrongfully exercising ownership, dominion, and control over portions of the Municipal Fish Market.

261.  In addition, Developer Defendants have threatened to terminate Plaintiffs' leases and to enter the Municipal Fish Market to repossess the property.

262.  The damage for these trespasses and conversions will be in an amount to be proven at trial.

263.    In addition, because Developer Defendants' conduct has been outrageous and malicious, wanton, reckless, or in willful disregard for Plaintiffs' rights in trespassing on and converting Plaintiffs' leased property, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, and attorneys' fees.

## COUNT IX
## NUISANCE
## (AGAINST ALL DEVELOPER DEFENDANTS)

264.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-263 of this Complaint.

265.    In addition to the physical encroachments of the Municipal Fish Market and the activities that took place on such premises, Developer Defendants have conducted off-site, but nearby, activities that have interfered with Plaintiffs' private use and enjoyment of their leased property.

266.    In particular, Developer Defendants have closed reasonable to access to the Municipal Fish Market by repeatedly closing Water Street during the summer of 2014 without notice to Plaintiffs and closing it permanently later in the year.

267.    Developer Defendants' closure of Water Street interferes with Plaintiffs' quiet enjoyment of the Municipal Fish Market and their ability to operate their businesses.

268.    In addition, Developer Defendants' ongoing construction work and forcing of the Municipal Fish Market tenants to park their delivery vehicles on Maine Avenue interferes with Plaintiffs' quiet enjoyment of the Municipal Fish Market and their ability to operate their businesses.

269.    Plaintiffs are entitled to damages caused by Developer Defendants' nuisance in an amount to be proven at trial.

270.    In addition, because Developer Defendants' conduct has been outrageous and malicious, wanton, reckless, or in willful disregard for Plaintiffs' rights in creating nuisances interfering with Plaintiffs' use of their leased property, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, and attorneys' fees.

### COUNT X
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
### (AGAINST ALL DEVELOPER DEFENDANTS)

271.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-270 of this Complaint.

272.    For many years, Plaintiffs have operated open air fish markets on the Municipal Fish Market and have had many customers due to Plaintiffs' high-quality products for sale, easy customer and vendor access to the Municipal Fish Market, and convenient parking.

273.    Plaintiffs expect that these customers will return to shop at Plaintiffs' storefronts on the Municipal Fish Market if these features remain available.

274.    Developer Defendants, as Plaintiffs' Landlord and neighbor, are aware that Plaintiffs rely on pedestrian and vehicular traffic on the Municipal Fish Market.

275.    Developer Defendants' intentional actions in encroaching onto the property, breaching Plaintiffs' leases, blocking customer access and parking, and harassing Plaintiffs and their prospective customers have interfered with Plaintiffs' expectation of a business relationship with future customers.

276.    In addition to breaching the lease agreements, these same actions, separate and apart from any rights under the lease agreements, have interfered with Plaintiffs' expectation of a business relationship with future customers and vendors.

277.    Developer Defendants' actions have caused customers to stop coming to the Municipal Fish Market, vendors to cease doing business with Plaintiffs, and have damaged Plaintiffs' businesses.

278.    Plaintiffs are entitled to damages caused by Developer Defendants' tortious interference with Plaintiffs' prospective customer and vendor relationships in an amount to be proved at trial.

279.    In addition, because Developer Defendants' conduct has been outrageous and malicious, wanton, reckless, or in willful disregard for Plaintiffs' rights in tortiously interfering with Plaintiffs' potential customers, Plaintiffs are entitled to punitive damages in an amount to be proven at trial and attorneys' fees.

**COUNT XI**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEVELOPER DEFENDANTS)**

280.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-279 of this Complaint.

281.    Developer Defendants received and will continue to receive an undeserved benefit to the Redevelopment Project through their repeated and planned encroachments and construction on the Municipal Fish Market.

282.    The encroachments and construction are in contravention of the lease terms, diminish Plaintiffs' property rights, and damage Plaintiffs' businesses.

283.    It is inequitable to allow Developer Defendants to take Plaintiffs' property rights and violate the lease terms to obtain benefits for themselves, without compensating Plaintiffs for such benefits.

284.    By encroaching onto the Municipal Fish Market, Developer Defendants are moving forward with their development project in direct contravention to Plaintiffs' leases.

285.    Developer Defendants stand to gain enormous windfall profits as a result of their breaches of Plaintiffs' leases.

286.    As such, Plaintiffs are entitled to recover damages tied to Developer Defendants' taking of its valuable property rights in an amount to be proved at trial.

287.    In addition, because Developer Defendants' conduct has been outrageous and malicious, wanton, reckless, or in willful disregard for Plaintiffs' rights in obtaining unjust enrichment, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court: (1) order the District to pay just compensation to Plaintiffs for the closure of Water Street and reopen Water Street or another equivalent access point to the Municipal Fish Market as requested in Count I; (2) order the District to pay just compensation to Plaintiffs for the District's authorizing or requiring the Developer Defendants to engage in construction on the Common Area as requested in Count II; (3) order the injunctive and monetary relief sought in Count III; (4) award the declaratory relief sought in Count IV; (5) award the injunctive relief sought in Count V; and (6) award damages to Plaintiffs as requested in Counts VI through XI, along with prejudgment and post-judgment interest and attorneys' fees.  Plaintiffs also respectfully request any other relief which the Court deems is proper and just.

## JURY DEMAND

Plaintiffs respectfully request a jury trial for the appropriate claims for which a jury is permissible.

Dated: April 14, 2017                    Respectfully submitted,

    /s/Wendell L. Taylor

Wendell L. Taylor, DC Bar No. 973873
Brian C. Hauser, DC Bar No. 1024406
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
Tel: (202) 955-1627
Fax: (202) 857-3898
wtaylor@hunton.com
bhauser@hunton.com

*Counsel for Plaintiffs*

# EXHIBIT A

# LEASE AGREEMENT

THE DISTRICT OF COLUMBIA,
acting on behalf of THE UNITED STATES OF AMERICA,

LANDLORD

and

THE WHARF, INC.
T/A THE WHARF

TENANT

for

Premises Nos. 16, 17, 18, and 19
Municipal Fish Wharf

## TABLE OF CONTENTS

Section Number and Caption                                                                 Page

1.  *Definitions* ...................................................................................................................... 1
2.  *Lease of the Premises; Tenant's Acceptance of Premises; Termination Right* ................ 5
3.  *Landlord's Work* ............................................................................................................. 5
4.  *Tenant's Work* ................................................................................................................. 6
5.  *Minimum Rent* ................................................................................................................. 7
6.  *Late Charges* ................................................................................................................... 8
7.  *Percentage Rent* .............................................................................................................. 8
8.  *Utilities* ........................................................................................................................... 9
9.  *Common Areas; Employee Parking* ............................................................................... 10
10. *Common Area Operating Cost* ....................................................................................... 10
11. *Use of Premises* ............................................................................................................... 11
12. *Signs* ................................................................................................................................ 12
13. *Alterations* ...................................................................................................................... 12
14. *Fixtures and Equipment* .................................................................................................. 12
15. *Tenant's Maintenance; Condition of the Premises* ........................................................ 12
16. *Landlord's Right of Entry* ............................................................................................... 13
17. *Tenant's Indemnity; Insurance* ....................................................................................... 13
18. *[Intentionally Omitted]* .................................................................................................. 14
19. *Assignment and Subletting* ............................................................................................. 14
20. *[Intentionally Omitted]* .................................................................................................. 15
21. *Tenant's Defaults* ........................................................................................................... 15
22. *Landlord's Remedies in Case of Tenant's Default* ......................................................... 16
23. *Landlord's Right to Cure Tenant's Default* .................................................................... 17
24. *[Intentionally Omitted]* .................................................................................................. 17
25. *Holding Over* .................................................................................................................. 17
26. *Surrender of Premises* .................................................................................................... 17
27. *Limitation on Landlord's Liability* ................................................................................. 18
28. *Notices* ............................................................................................................................ 18
29. *Quiet Enjoyment* ............................................................................................................. 19
30. *Security Deposit* .............................................................................................................. 19
31. *[Intentionally Omitted]* .................................................................................................. 19
32. *Rules and Regulations* .................................................................................................... 20
33. *Waiver of Jury Trial* ....................................................................................................... 20
34. *Covenant Against Contingent Fees* ................................................................................ 20
35. *Facilities Nondiscrimination* .......................................................................................... 20
36. *Nondiscrimination in Employment* ................................................................................. 21
37. *Environment Protection* .................................................................................................. 22
38. *Miscellaneous* ................................................................................................................. 22

Exhibit A - Outline of the Premises
Exhibit B - Site Plan of the Project
Exhibit C – Certificate of Acceptance
Exhibit D – Work Orders 4 & 5
Exhibit E – Rules and Regulations



## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made this *12th* day of *July*, 2000, by and between THE DISTRICT OF COLUMBIA, acting on behalf of THE UNITED STATES OF AMERICA, whose notice address is Director, District of Columbia Department of Housing and Community Development, 801 North Capitol Street, N.E., 8th Floor, Washington, D.C. 20002 ("Landlord"), and THE WHARF, INC., a District of Columbia corporation, t/a The Wharf, whose notice address is 1100 Maine Avenue, S.W., Washington, D.C. 20024 ("Tenant").

In consideration of the promises in the Lease, Landlord and Tenant agree as follows:

### 1.    *Definitions.*

Certain terms in this Lease are defined below:

A.    **Barges:**  The barges owned by Tenant on which Tenant operates its business. The Barges are, or will be, located on the Premises.

B.    **Commencement Date:** The date of this Lease.

C.    **Common Areas:** "Common Areas" mean all areas within the Project that Landlord makes available to tenants and their customers for their general use, convenience and benefit, including restrooms, parking areas, driveways, walkways, landscaped or planted areas, lighting facilities, service areas and loading and unloading areas, as depicted on Exhibit B hereto.

D.    **Lease Year:** The first "Lease Year" shall begin on the New Rent Commencement Date and shall end on December 31 of the year following the year in which the New Rent Commencement Date shall occur, in order that each subsequent Lease Year hereunder shall coincide with the calendar year. Each subsequent Lease Year shall commence on the day immediately following the last day of the preceding Lease Year, and shall continue for a period of twelve (12) full calendar months.

E.    **Minimum Rent:** The annual minimum rent payable during the Term, which shall be as follows:

| Before New Rent Commencement Date | | |
|---|---|---|
| **Time Period** | **Annual** | **Monthly** |
| Commencing on earlier of (1) date on which Tenant opens for business on any portion of the Premises; or (2) availability of utilities to the Premises, and continuing until the New Rent Commencement Date | $3,636.36 [or $303.03 per month during long first Lease Year] | $303.03 |



| After New Rent Commencement Date | | |
|---|---|---|
| Lease Years | Annual | Monthly |
| 1 – 5 | $16,400.00 [OR $1,366.66 PER MONTH IN LONG FIRST LEASE YEAR, SUBJECT TO CPI ADJUSTMENT UNDER SEC. 7 BELOW IN YEARS 2 THROUGH 5] | $1,366.66 [FOR LEASE YEAR ONE ONLY] |
| 6 – 10 | [MINIMUM RENT FOR LEASE YEAR 5, AS DETERMINED BY CPI ADJUSTMENTS UNDER SEC. 7 BELOW, PLUS 3%] | [N.B. – MINIMUM RENT FOR ALL YEARS AFTER YEAR 5 TO BE PRO-RATED IN ACCORDANCE WITH RELATIVE FRONTAGE IF TENANT EXERCISES 5TH YEAR PARTIAL TERMINATION RIGHT] |
| 11 – 15 | [MINIMUM RENT FOR LEASE YEAR 10 PLUS 3%] | |
| 16 – 20 | [MINIMUM RENT FOR LEASE YEAR 15 PLUS 3%] | |
| 21 – 25 | [MINIMUM RENT FOR LEASE YEAR 20 PLUS 3%] | |
| 26 – 30 | [MINIMUM RENT FOR LEASE YEAR 25 PLUS 3%] | |

F.    **New Rent Commencement Date:**  The date upon which "Landlord's Work" (as defined in Section 3) is substantially completed; i.e., upon receipt of a Certificate of Substantial Completion from the Corps of Engineers, and provided that all utilities to be delivered to the Premises are then in working order.

G.    **Percentage Rent:**  For each Lease Year commencing with the Sixth (6th) Lease Year:

(i)    with respect to all "Gross Non-Taxable Sales" (as defined in Section 7), an amount equal to 1/2 of one percent (0.5%) of the excess of (A) Tenant's Gross Non-Taxable Sales for the Premises during the Lease Year, over (B) the "Non-Taxable Base Amount," which means the amount of actual Gross Non-Taxable Sales for the Premises for the Fifth (5th) Lease Year; and

(ii)    with respect to all "Gross Taxable Sales" (as defined in Section 7), the following percentages, depending on the ratio for such Lease Year of "Gross Taxable Sales" to "Gross Sales":

(A)    zero, provided Gross Taxable Sales for such Lease Year total less than fifteen percent (15%) of Gross Sales for such Lease Year;

(B)    with respect to those Gross Taxable Sales that constitute greater than fifteen percent (15%) and less than fifty percent (50%) of total Gross Sales for such Lease Year, one-half of one percent (0.5%) of the excess of (A) such Gross Taxable Sales for the Premises during the Lease Year, over (B) the "Taxable Base Amount," which means the amount of actual Gross Taxable Sales for the Premises for the Fifth (5th) Lease Year; and

(C)    with respect to those Gross Taxable Sales that constitute greater than fifty percent (50%) of total Gross Sales for such Lease Year, one and one-half percent (1.5%) of the excess of (A) such Gross Taxable Sales for the Premises during the Lease Year, over (B) the Taxable Base Amount.

H.    **Consumer Price Index:**  The "Consumer Price Index" means the index for the Washington - Baltimore, DC – MD - VA – WV area, now known as the United States Bureau of Labor Statistics, consumer Price Index, for All Urban Consumers, all items (1996=100).

I.    **Permitted Uses:**  The retail sale of seafood (fresh and prepared) and of fresh produce, including accessory items such as cole slaw, french fries, and the like, or any other use consistent with and permitted by the 1913 Federal legislation creating the Project and appointing the District of Columbia as manager of the Project. Notwithstanding the foregoing, (i) prepared food shall be sold only on a "takeout" basis; and (iii) there shall be no serviced tables situated within the Premises or in the Common Area unless plans for same shall have been approved by Landlord and unless Landlord and Tenant shall have executed an amendment hereto providing for a change to restaurant use and, among other things, revising the Percentage Rent payable hereunder in respect of the portion of the Premises to be devoted to such restaurant use. As to clauses (i) and (ii) above, Landlord shall enforce parallel restrictions on all other tenants within the Project.

J.    **Premises:**  The spaces in the Project identified on Exhibit A as Nos. 16, 17, 18, and 19. The Premises consist of an area on the surface of the water sufficient to moor three Barges to the concrete pier [one in No. 16("Barge 16"), one in No. 17 ("Barge 17"), and one in Nos. 18 and 19 ("Barge 18")] . Barge 16 shall have no more than 27 linear feet, Barge 17 shall have no more than 48 linear feet, and Barge 18 shall have no more than 48 linear feet. None of the Barges shall have a depth from the pier greater than the barge currently occupying Space No. 8. Tenant shall have the right to connect the Barges that comprise the Premises under this Lease as well as the Barges that comprise the "Premises" under the Lease between Landlord and BRW, Inc., t/a Capt. White Seafood City by a floating walkway that shall not exceed six feet (6') width, as shown on Exhibit B-1 hereto.

K.    **Project:**  The Municipal Fish Wharf located between 11th and 12th Streets, south of Maine Avenue, S.W., Washington, D.C. The Project includes the portion of the Potomac River in which the tenants' barges are moored. A site plan of the Project is attached as Exhibit B. A certified survey of the Project, to include references to all Lots and Squares, or portions thereof, included within the Project, has been commissioned and will be delivered to the parties upon



completion, at which time a legal description of the Project shall be initialed and attached hereto as a substitute and replacement for the existing Exhibit B.

L.    **Security Deposit:** $1,366.66, which shall be due and payable within thirty (30) days after the effective date of this Lease.

M.    **Tenant Committee:** A committee representing the tenants of the Project and composed of one representative to be named by each such tenant. The Tenant Committee shall cooperate with the Management Agent to be retained for the Project, as provided herein, to carry out the operation, maintenance, and repair of the Common Areas of the Project. The Tenant Committee may, at its option, elect to operate by means of a limited liability company or other legal entity. All matters requiring decisions by the Tenant Committee shall be decided on the basis of a simple majority. Voting on all such matters by Tenant and the other tenants of the Project shall be based upon the "Proportionate Share" (hereinafter defined) of each.

N.    **Tenant's Proportionate Share:** 14.81%, which equals the percentage that the number of linear feet of frontage in the Premises bears to the number of linear feet of frontage in the Project. If the number of linear feet of frontage in the Project changes, Tenant's Proportionate Share will be adjusted accordingly.

O.    **Term:** The period that begins on the Commencement Date and ends thirty (30) Lease Years after the New Rent Commencement Date, unless sooner terminated pursuant to this Lease. Tenant acknowledges that it has no right hereunder to renew or extend the Term hereof, or to negotiate for a renewal of the Term hereof. However, Landlord acknowledges that nothing contained herein shall prevent Tenant hereafter from seeking to obtain any such rights.

P.    **Prohibited Use:** Anything herein to the contrary notwithstanding, Tenant covenants that during the term of this Lease, (1) it shall not engage in the business of fish cutting or oyster shucking, nor shall it offer non-alcoholic beverages from vending machines; provided, that the provisions of this Section 1.P shall be enforceable only during such times as Virgo Fish House, its successors or permitted assigns, shall engage in the activities described herein at other premises within the Project; and (2) it shall not engage in the sale of liquor for consumption off the Premises. It is understood and agreed that the foregoing prohibition on oyster shucking is intended to apply only to the shucking of oysters conducted as an independent business, and shall not apply to the shucking by Tenant of oysters sold by Tenant.

Q.    **Restrictions on Sales.** The following restrictions shall appear in all Leases of Barge Spaces within the Project. In the particular Lease or Leases to which any such restriction pertains, such provision shall act as a restriction imposed and enforceable by Landlord for its benefit, and imposed and enforceable by the other tenants of the Project for their benefit, and accepted by the tenant or tenants occupying the area to which such restriction directly pertains.

(i)    For a period of ten (10) years, expiring on the tenth (10) anniversary of this Lease, the sale of seafood of any type shall be prohibited throughout the rectangular area comprising the southernmost twenty-four feet (24') of Barge 6.

(ii)  For the entire Term of this Lease, the sale of crabs anywhere on Barge 6 or 16 shall be prohibited.

## 2.   *Lease of the Premises; Tenant's Acceptance of Premises; Termination Right.*

A.    Landlord leases to Tenant and Tenant leases from Landlord the Premises for the Term.  At the commencement of the Term hereunder, Tenant shall occupy the Premises in their "as is" condition, subject to Section 3, and subject to the removal by Landlord of the barge in Lease Space No. 17 and the boat in Lease Space No. 16, which shall be accomplished as quickly as practicable, given legal constraints.  Effective as of the Commencement Date, Tenant does hereby release, remise, discharge, and forever waive any and all claims, actions, or causes of action, whether known or unknown, arising from or relating to the Prior Lease that Tenant has or may have against landlord, or its affiliated entities, predecessors, successors, assigns, legal representatives, agents, employees, servants, attorneys, officers, or other representatives.

B.    Anything herein to the contrary notwithstanding, Tenant shall have the right, exercisable by written notice given to Landlord not later than ninety (90) days before the end of the 5th Lease Year, to terminate this Lease altogether, or to terminate it in part as to any one or more of the Barge spaces leased hereunder (collectively, the "Terminated Premises") effective upon the expiration of the 5th Lease Year.  Upon surrender of the Terminated Premises in the manner required hereby, the parties shall be released and relieved of any obligations accruing after the effective date of such termination with respect to the Terminated Premises.

C.    Anything herein to the contrary notwithstanding, Tenant shall have the right, exercisable by written notice given to Landlord not later than ninety (90) days after submission of the Annual Statement (as defined in Section 7 below), to terminate this Lease if the total of the Minimum Rent and the Percentage Rent (as defined in Sections 1.E, 1.G and 1.I above, as the case may be) for the Lease Year to which such Annual Statement pertains exceeds ONE HUNDRED TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($125,000.00).  This termination right is specifically limited to the first Lease Year in which Minimum Rent and Percentage Rent hereunder exceed such sum.  Such termination shall be effective for all purposes one (1) calendar year following the date of such notice.  Upon the expiration of such one (1) year period, and upon the surrender of the Premises in the manner required hereby upon the expiration or termination of this Lease, the parties shall be released and relieved of any obligations accruing in respect of the Premises after the expiration of such one (1) year period.

## 3.   *Landlord's Work.*

A.    Landlord has been allocated $3,000,000 from the federal government (the "Federal Appropriation") to make improvements to the Project and to the marina located next to the Project at 1300 Maine Avenue.  Landlord and Tenant have heretofore agreed upon the nature of the improvements to be made to the Project with the Federal Appropriation and such other source of funding as may be available to landlord, all as embodied in the Work Orders issued by the Corps of

Engineers and reviewed and approved by Landlord and Tenant, and attached hereto as <u>Exhibit D</u>. (The improvements to be made to the Project with the Federal Appropriation and such other sources of funding as may be available to Landlord are referred to hereafter as "Landlord's Work.") Landlord shall have no obligation to spend any funds to complete Landlord's Work in excess of the Federal Appropriation and such other sources of funding as may be available to Landlord.

B.      After Landlord's Work has been determined in accordance with subsection A above, Landlord will complete construction of Landlord's Work in a good and workmanlike manner and in accordance with requirements of governmental authorities. Tenant shall be consulted with regard to materials and structural details of Landlord's Work, but the final choice thereof shall be in Landlord's sole discretion. Except for Landlord's Work and except as provided in Section 9, Landlord shall not be required to make any repairs or improvements to the Project.

C.      Landlord shall use reasonable commercial efforts to complete Landlord's Work by June 30, 2001, but shall have no liability to Tenant if it is unable to complete Landlord's Work by that date or by any other date. Within five (5) days after the New Rent Commencement Date, Tenant shall execute and deliver to Landlord a Certificate of Acceptance, in the form attached hereto as <u>Exhibit C</u>.

D.      Landlord's Work shall comply with ADA requirements, as well as all other applicable Federal and local governmental requirements.

## 4.    *Tenant's Work.*

A.      Landlord hereby conveys to Tenant all of its right, title and interest in and to the portion of the Premises, and any rights of Landlord to items located in such portion of the Premises, occupied by Barge 18. (Landlord claims no right to any Barge or other thing floating in the water.) Landlord is conveying such portion of the Premises to Tenant in its existing "as is" condition, without warranty of any kind whatsoever, except that Landlord agrees to supply all utilities necessary to make the Barges operational as part of Landlord's Work.

B.      As soon as practicable after the Commencement Date, Tenant shall make all repairs and improvements to Premises Nos. 18 and 19 necessary for Tenant to operate its business thereon (collectively, "Tenant's Work"). Specifications for Tenant's Work shall be submitted to Landlord prior to commencement of Tenant's Work, and shall be subject to Landlord's approval, which shall not be unreasonably withheld. Tenant's Work shall be performed in a good and workmanlike manner in accordance with requirements of governmental authorities and all reasonable rules made by Landlord and its agents and without interference with or damage to work performed by Landlord or its agents as part of Landlord's Work. If Tenant causes any such interference or damage, Tenant shall be liable therefor.

C.      Tenant shall not permit any materialmen's or mechanic's lien to be filed against the Project in connection with any item of construction or repair performed by Tenant, including Tenant's Work. If any such lien is filed, Tenant shall, within thirty (30) days after notice, discharge the lien of record or, if Tenant elects to contest the lien by appropriate proceedings, bond off the lien and prosecute the proceedings. If Tenant fails to discharge or bond off the lien,

Landlord may do so, and any monies expended by Landlord in doing so, including attorneys' fees, shall be reimbursed by Tenant promptly.

D.  Within fifteen (15) days after the Commencement Date, if the District of Columbia shall then issue occupancy permits for improvements of the type subject to this Lease, Tenant shall apply for a permit from the District of Columbia to occupy and use the Premises (the "Occupancy Permit"). Tenant shall use its best efforts to obtain final approval of its application and issuance of the Occupancy Permit as soon as possible. Tenant shall send Landlord a copy of its Occupancy Permit within ten (10) days after Tenant receives it.

## 5.  *Minimum Rent.*

A.  During the Term, Tenant shall pay all rent, without demand and without setoff, counterclaim, recoupment or other reduction, to the "Management Agent" (defined below) for the Project, including Minimum Rent in monthly installments as set forth in Section 1.E. All monthly installments of Minimum Rent shall be payable in advance on the first day of each month, except that the first payment shall be due on the New Rent Commencement Date.  If the Commencement Date or the New Rent Commencement Date is not the first day of a month, the rent for the months in which those dates fall shall be prorated.

B.  On or before the New Rent Commencement Date, the Tenant Committee shall select, following consultation with, and with the approval of, the Landlord, a "Management Agent" that shall be charged with responsibility for the operation, maintenance, repair, and replacement of all elements of the Common Areas and the orderly operation of the Project. The Management Agent, throughout the term of its employment as such with respect to the Project: (1) shall maintain insurance that includes employee dishonesty or fidelity coverage in an amount at least as great as the amount of funds the Management Agent has access to at any time; and (2) shall covenant not to, and shall not, discriminate against any employee or applicant for employment because of race, creed, color, sexual orientation, physical disability, marital status, or national origin. Landlord, subject to the review and approval, not to be unreasonably conditioned, delayed, or withheld, of the Tenant Committee, shall negotiate and enter into a Management Agreement with the Management Agent.  The Management Agreement shall provide that, before payment to Landlord of any amounts due Landlord hereunder: (i) twenty-five percent (25%) of the Minimum Rent and all other Rent from this Lease and all other leases of premises within the Project shall be placed in an interest-bearing escrow account with the Management Agent as a reserve for future capital expenditures in respect of the Common Areas, of which as much as one-fifth (1/5) (or five percent (5%) of the Minimum Rent) may be used for advertising the Fish Wharf in local media and signage in Common Areas, although it is acknowledged by the parties that establishing reasonable reserves for capital needs shall have priority; (ii) all "Common Area Operating Costs" shall be paid to, and applied by, Management Agent, as provided in Section 10 below; and (iii) Management Agent shall deduct the sum of TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($25,000.00) (the "Accounting Reserve") from the Rent payable hereunder and shall deposit the same in a reserve account to remain available for purposes paying any accounting or auditing charges incurred by Landlord under Section 7.D below from time to time.  As and when funds in the Accounting Reserve are expended, Management Agent shall again deduct sufficient monies



from the Rent payable hereunder to replenish the Accounting Reserve to the level established above..

    C.  No payment by Tenant of a lesser amount than the monthly installment of rent or other charges herein stipulated shall be deemed to be other than on account of the earliest stipulated rent or other charges, nor shall any endorsement or statement on any check or letter accompanying any payment be deemed an accord and satisfaction. Landlord may accept any check for payment without prejudice to Landlord's right to recover the balance of the rent due or to pursue any other remedy available to Landlord.

### 6. *Late Charges.*

    Any rental or other payment due from Tenant hereunder which is not received when due shall be payable by Tenant to Landlord, without demand, with interest from the due date until paid at the rate of fifteen percent (15%) per annum (1-1/4% per month), but no less than One Hundred Dollars ($100.00), and Tenant shall reimburse Landlord for reasonable attorneys' fees, if any, incurred by Landlord by reason of Tenant's failure to make timely payment. In addition, Tenant shall pay Landlord a $100.00 fee for each check received by Landlord which is returned by Tenant's bank unpaid.

### 7. *Additional Rent: CPI Adjustment; Percentage Rent.*

    A.  Upon the first (1st) day of the second (2nd) Lease Year, and upon each anniversary thereof through the first day of the sixth (6th) Lease Year (each, an "Adjustment Date"), the Minimum Rent herein provided shall be adjusted to reflect increases in the Consumer Price Index (as defined in Section 1.H above). Such adjustment shall be accomplished by multiplying the Minimum Rent by a fraction, the numerator of which shall be the Consumer Price Index as of the most recent date prior to such Adjustment Date, and the denominator of which shall be the Consumer Price Index as of the most recent date prior to the New Rent Commencement Date; provided, however, that in no event shall the Minimum Rent be reduced as a result of such adjustment below the Minimum Rent for the immediately preceding year; and provided further that the increase in Minimum Rent as a result of any such annual adjustment shall be limited by the provisions of the immediately succeeding sentence. For purposes of the annual adjustment in Minimum Rent provided for herein, the Minimum Rent shall be divided into two parts, as follows: (i) an amount equal to seventy-five percent (75%) of the Minimum Rent for the immediately preceding year (the "Capped Portion"); and (ii) an amount equal to twenty-five percent (25%) of the Minimum Rent for the immediately preceding year (the "Uncapped Portion"). Anything herein to the contrary notwithstanding, the adjustment of the Capped Portion of the Minimum Rent on any individual Adjustment Date shall not result in an increase in the Capped Portion in excess of three percent (3%) over the amount of the Capped Portion for the immediately preceding year. The Uncapped Portion of the Minimum Rent shall be subject to no such limitation and shall be adjusted in accordance with the formula set forth in the second sentence of this Section 7. [As an example, to calculate the adjustment in Minimum Rent on the first day of the second (2nd) Lease Year, assuming that (x) the annual Minimum Rent is $16,400.00; (y) the CPI Index is at 175 at the time of the New Rent Commencement Date; and (z) the CPI Index is at 185 at the time of the first day of

the second (2nd) Lease Year, then the adjustment to Minimum Rent would be calculated as follows: (1) the Minimum Rent to be adjusted is $16,400, divided for this purpose into the Capped Portion of $12,300 and an Uncapped Portion of $4,100; (2) the Capped Portion is increased by 3% from $12,300 to $12,669, and the Uncapped Portion is increased by 5.7% from $4,100 to $4,333.70, producing a total increase in Minimum Rent of $602.70 (or a blended increase of 3.68%) from $16,400 to $17,002.70.] The increased Minimum Rent established pursuant to this Section 7 shall continue in effect as, and for all purposes of this Lease be defined as, the Minimum Rent until again increased as herein provided.

      B.    Within seventy-five (75) days after the end of each Lease Year beginning with the Sixth (6th) Lease Year, Tenant shall pay to Landlord, as additional rent, Percentage Rent calculated in accordance with Section 1.G. Tenant's annual payment of Percentage Rent shall be accompanied by a financial statement (the "Annual Statement"), signed by Tenant and reviewed by an independent certified public accountant, showing "Gross Sales" and "Gross Non-Taxable Sales" (as such terms are defined below) and the Percentage Rent for the Lease Year.

      C.    "Gross Sales" means the gross amount charged for all sales or services made upon or from the Premises, including any rent or other sum received by Tenant from licensees or concessionaires. "Gross Non-Taxable Sales" means the amount of Gross Sales, minus the amount of all sales and services that shall be subject to, and with respect to which Tenant shall pay, District of Columbia Sales and Use Tax. "Gross Taxable Sales" means the amount of Gross Sales minus the amount of Gross Non-Taxable Sales. Each sale shall be valued at the actual sales price charged the customer, even if the sale is a credit or installment sale, and reported in full in the month in which the sale occurs, even if full payment is not received at the time of the sale.

      D. Tenant shall furnish to Management Agent, simultaneously with the filing thereof with the District of Columbia, copies of the Sales and Use Tax Returns currently required to be filed by Tenant in respect of prepared foods and other taxable goods sold by Tenant within the Premises. In addition, Tenant shall prepare, file with the District of Columbia, and make simultaneously available to Landlord informational returns in respect of all raw foods and other non-taxable goods sold by Tenant within the Premises. Such records shall be open to inspection and audit by Landlord or its accountants. If any audit discloses a deficiency in payment of Percentage Rent, Tenant shall immediately pay Landlord the deficient amount, together with interest thereon at the rate of fifteen percent (15%) per annum from the date such Percentage Rent should have been paid. If a discrepancy of three percent (3%) or more in the reported amount of Gross Non-Taxable Sales is uncovered as a result of any audit, Tenant shall reimburse Landlord for the cost of the audit (including the cost of Landlord's accountant). Landlord shall bear the cost of any audit in which no discrepancy or a discrepancy of less than three percent (3%) shall be found (including the cost of Tenant's accountant). Except to the extent required by law or required to exercise its rights hereunder, Landlord shall maintain the confidentiality of all information furnished by Tenant pursuant to this Section 7.D or otherwise made available to Landlord in connection with the exercise of its rights under Section 7.B above.

    *8.*    ***Utilities.***



During the Term, Tenant shall pay directly to the supplier all charges for water, sewer, gas, electricity, telephone and other utilities used upon the Premises. Expenses for maintenance of utility meters shall be borne by Tenant, and if Landlord pays any such expenses, Tenant shall reimburse Landlord promptly upon demand. Landlord shall not be liable for any failure to furnish or for any interruption of utility services, unless caused by the gross negligence of Landlord or Landlord's agents. Upon Tenant's request, Landlord shall furnish a copy of the surety bond or indemnity agreement from any contractor performing work in the Project.

### 9.    *Common Areas; Employee Parking.*

**A.**    Landlord grants to Tenant the right, in common with other tenants in the Project, to use the Common Areas during the Term. Such right of use shall be deemed a license coupled with an interest, and shall subsist until the expiration or the earlier termination of the Term. After the completion of Landlord's Work, and with the approval of the Tenant Committee, Landlord may change the size, location or nature of the Common Areas, and may locate on the Common Areas structures of any type; provided no such structures would materially interfere with access to the Premises across the Common Areas and to and from Maine Avenue. Subject to the terms of the Management Agreement, Landlord shall have exclusive control and management of the Common Areas and Landlord may establish and enforce rules therefor.

**B.**    Parking, including, without limitation, employee parking, within the Project shall be regulated by the Tenant Committee, which shall promulgate parking regulations to be enforced by the Management Agent; provided, that no area within the Project shall be dedicated to parking for employees of Tenant or any other tenant of the Project; and provided, further, that no parking shall be permitted in any area designated for table space in the plans for Landlord's Work.

### 10.    *Common Area Operating Costs.*

**A.**    Commencing with the New Rent Commencement Date, Tenant shall pay to Management Agent (as agent for Landlord), as additional rent, Tenant's Proportionate Share of all "Common Area Operating Costs" (as hereafter defined). Common Area Operating Costs means the sum of the following costs and charges incurred by Landlord for each calendar year or part thereof during the Term: (i) "Common Area Costs" (as hereafter defined); (ii) repair and maintenance costs for the structure and exterior of the buildings in the Project, exclusive of improvements located on barges within the Project and exclusive of expenditures that under "generally accepted accounting principles," as that term is defined by the financial Accounting Standards Board, would be capitalized ("Capital Expenditures"); (iii) "Insurance Costs" (as hereafter defined); and (iv) the monthly fee due Management Agent under the Management Agreement. Common Area Costs mean all costs incurred by Landlord, excluding Capital Expenditures, to operate, maintain, replace and repair the Common Areas, including costs for the following: security services; gardening and landscaping; repairs; painting; striping and sweeping; lighting (including the cost of electricity and maintenance and replacement of exterior fixtures and bulbs); and other utility costs for the public restrooms and other facilities located within the Common Area; refuse removal, including dumpsters; ice and snow removal; equipment and supplies related to Common Area maintenance; water and maintenance charges for sprinklers and hydrants; any dues, fees or assessments paid by Landlord with respect to storm water management facilities that benefit the Project; and personnel

of Management Agent to operate, maintain and repair the Common Areas (including salaries, employment taxes and workmen's compensation insurance for such personnel). "Insurance Costs" mean all insurance premiums and other costs incurred by Landlord in connection with fire and extended coverage, public liability, business interruption, sign, and any other insurance maintained by Landlord relating to the Project.

B.    Landlord shall annually notify Tenant of Tenant's Proportionate Share of Common Area Operating Costs for each calendar year, and Tenant shall pay to Management Agent (as agent for Landlord) such amount in equal monthly installments in advance on the first day of each of the twelve (12) months after the date of such notice, the first such monthly installment to be due on the New Rent Commencement Date. If the New Rent Commencement Date is a date other than the first day of a month, Tenant's Proportionate Share of Common Area Operating Costs for that month shall be prorated. Landlord shall annually submit to Tenant a statement showing the actual Tenant's Proportionate Share of Common Area Operating Costs for the prior calendar year, the amount paid by Tenant, and the balance due or overpayment. The balance due shall be paid by Tenant to Management Agent (as agent for Landlord), or the overpayment shall be paid by Landlord to Tenant, without interest, within thirty (30) days after the date of the statement. Tenant may, upon reasonable notice, examine Project records at the office of Management Agent during ordinary business hours to verify the statement for the immediately preceding year, but such examination shall not excuse the timely payment of Tenant's Proportionate Share of Common Area Operating Costs.

C.    The Tenant Committee, in conjunction with the Management Agent, shall prepare an annual budget for operation of, and any contemplated repairs and replacements of, the Common Areas, which shall be made available for the review and reasonable approval of Landlord. As and when capital expenditures are required, the Tenant Committee, in conjunction with the Management Agent, shall prepare a scope of work and budget therefor, and shall submit same to Landlord for approval, which shall not be unreasonably withheld. Until the New Rent Commencement Date, Tenant, in conjunction with the other tenants of the Project, shall continue to be responsible for and pay operating costs of the Project in the same manner as has been the case before the date of this Lease, subject to adjustment for any changes being implemented currently in tenants' respective Proportionate Shares.

## 11.    *Use of Premises.*

A.    Tenant shall use the Premises exclusively for conduct of the business set forth in Section 1.I.

B.    Tenant shall keep the Premises open for business at least forty-five (45) hours per week, excluding any closures caused by fire, natural disasters, or other casualties, required by the Landlord's Work or by repair or renovation work by Tenant, or by dredging activity required by the terms of this Lease.

C.    Tenant shall comply with all laws, ordinances, rules and regulations pertaining to the use and occupancy of the Premises, including the Americans with Disabilities Act

and other laws relating to the use of the public areas of the Premises by individuals with disabilities. Tenant shall not permit any act upon the Premises which (i) disturbs tenants of the Project or injures the reputation of the Project, (ii) subjects Landlord to liability for injury or damage to persons or property, or (iii) invalidates, or increases the cost of, any insurance policy pertaining to the Project. Tenant shall pay to Landlord the amount of any increase in Landlord's insurance costs caused by Tenant's activities.

### 12.    Signs.

A.    Tenant, at its expense, shall install exterior signage on the Premises ("Tenant's Signage"), which shall be subject to Landlord's approval and shall comply with all applicable codes, regulations and laws. Any changes to Tenant's Signage shall be subject to Landlord's approval, which shall not be unreasonably withheld.

B.    Tenant shall maintain Tenant's Signage in good repair, and shall replace it when needed so that Tenant's Signage is in good condition at all times. If Tenant fails promptly to perform its obligations under this Section, Landlord may perform the repairs, replacements or removal, at Tenant's expense, and Tenant shall reimburse Landlord for the cost thereof promptly upon demand.

### 13.    Alterations.

Tenant may alter the Barges provided such alterations shall not harm the Project and must comply with all applicable Federal and local building codes, regulations and laws, and provided that any alteration that includes an expansion of the horizontal space covered by such Barges, or the amount or location of the frontage currently occupied by such Barges for purposes of effecting sales to the public, shall require the written consent of Landlord. Provisions identical to the foregoing provisions of this Section 13 shall appear in all Leases of Barge Space within the Project.

### 14.    Fixtures and Equipment.

All of Tenant's equipment, furniture, and moveable trade fixtures shall remain Tenant's property, and Tenant shall have sole responsibility therefor. Tenant may remove them at any time prior to expiration of the Term, provided that Tenant is not then in default under this Lease and provided further that Tenant repairs any damage to the Premises occasioned by removal.

### 15.    Tenant's Maintenance; Condition of the Premises.



A.      Tenant shall, at all times throughout the Term, at its cost, put, keep and maintain the Barges and Premises and every improvement located thereon in good order, condition and repair, except for reasonable wear and tear, condemnation and casualty loss. As used herein, "repairs" shall include replacements, restorations and/or renewals, when necessary or appropriate to keep the Barges and Premises in good order, condition and repair at all times throughout the Term. All repairs shall be made in a first class workmanlike manner. In addition, Tenant shall keep and maintain the Barges and Premises in a clean and orderly condition, free of dirt, rubbish, snow and ice. The necessity for and adequacy of repairs to the Barges and Premises shall be measured by the standard that is appropriate for a first class wharf and fish market.

B.      Tenant shall deposit its refuse in the compactor, dumpster or other trash receptacle supplied by Landlord for Tenant's use as of the Commencement Date. Throughout the Term, the Tenant Committee shall provide compactors or dumpsters and/or trash collection service, the cost of which shall be included among the Common Area Costs. Tenant shall not use the compactors, dumpsters or trash collection service for discarding "Hazardous Materials" (as such term is defined below). Tenant, at its expense, shall dispose of its Hazardous Materials in accordance with applicable federal, state and local laws and regulations. "Hazardous Materials" means all substances declared to be hazardous, toxic or infectious under any applicable law or regulation.

C.      Tenant shall cooperate with the other tenants of the Project, if given reasonable notice, in arranging for movement of the Barges as necessary to accommodate the maintenance, repair, and replacement of Barges and dredging of submerged areas within the Project. All dredging activities shall be carried out and concluded as quickly as is commercially reasonable in the circumstances. Provisions identical to the foregoing provisions of this Section 15.C shall appear in all leases of Barge Space within the Project. It is the intent of the parties that all tenants of the Project shall have the rights of third-party beneficiaries with respect to the provisions of this Section 15.C.

## 16.    Landlord's Right of Entry.

Landlord and its agents may enter the Premises at reasonable hours to inspect or exhibit them; to place and maintain a "FOR RENT" sign thereon at any time within six (6) months prior to termination of the Term; or to enter them after Tenant defaults hereunder, and alter, repair or otherwise prepare the Premises for reoccupancy.

## 17.    Tenant's Indemnity; Insurance.

A.      Landlord shall not be liable for, and Tenant shall protect, defend, indemnify and hold Landlord harmless from and against, any liability or claim (including attorneys' fees) in connection with any injury or loss to any person or property (i) arising within the Premises, unless caused by the gross negligence or willful misconduct of Landlord, or (ii) arising out of any act or omission of Tenant or its agents or contractors.

B.      Throughout the Term, Tenant shall maintain, with a company licensed to sell insurance in the District of Columbia, (i) commercial general liability insurance (the "Liability

Policy") with limits of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate combined for all locations in which Tenant operates its business (Nos. 7, 8, 9, 16, 17, 18, and 19), in a form providing occurrence basis coverage; and (ii) an all-risk policy of insurance covering the Barges and all trade fixtures, equipment and personal property kept at the Premises, in an amount not less than the full replacement value of said items. All such insurance policies shall (i) be written as primary coverage and not contributing with or in excess of any coverage that Landlord may carry; (ii) contain an express waiver of any right of subrogation by the insurer against Landlord; and (iii) provide that the insurance policy may not be cancelled unless Landlord has been given thirty (30) days' prior written notice. Notwithstanding the foregoing, the Liability Policy shall be increased at the end of each period of five (5) Lease Years during the Term by an amount equal to the increase in the Consumer Price Index during such period. In addition, Tenant's Liability Policy shall (i) list as additional insured Landlord and any other parties with an insurable interest in the Premises designated by Landlord, and (ii) be endorsed to require the insurance carrier to notify Landlord in writing of any losses charged against the policy. Before the Term commences, and before any such insurance policy expires, Tenant shall deliver to Landlord a certificate of insurance for each policy or renewal thereof that Tenant is required to maintain under this Section. If Tenant fails to maintain any insurance required by this Section, Landlord may obtain such insurance, and any premium paid by Landlord shall be immediately payable by Tenant to Landlord as additional rent.

        C.     Neither party shall be liable to the other or to any insurer (by way of subrogation or otherwise) for any loss or damage, even though such loss or damage may have been occasioned by the negligence of such party, if such loss was covered by an insurance policy containing an endorsement to the effect that any such release by the insured shall not adversely affect the insured's right to recover for such loss, and that the insurer waives its right of subrogation.

## 18.    *[Intentionally Omitted].*

## 19.    *Assignment and Subletting.*

        A.     Tenant shall not assign, transfer, mortgage or otherwise encumber this Lease or sublet or otherwise permit others to use all or any part of the Premises, whether voluntarily, by operation of law or otherwise (collectively, an "Assignment"), without the prior written consent of Landlord, which Landlord may withhold in its absolute discretion. However, Landlord shall not withhold its consent if such assignee, transferee, subtenant or occupant (collectively, the "Assignee") is financially capable of satisfying its obligations under this Lease, and shall have previously and successfully sold seafood at retail. Any attempted Assignment shall be void and confer no rights upon any third party. If an Assignment is effected in violation of the terms of this Lease, Landlord may collect rent from the Assignee and apply the net amount collected to the rent herein reserved, but no such Assignment or collection shall be deemed a waiver of this covenant, acceptance of the Assignee as tenant, or release of Tenant hereunder. In addition, if Landlord consents to an Assignment, Tenant shall pay Landlord One Thousand and No/100 Dollars ($1,000.00) (the "Assignment Fee") as payment for legal fees and costs incurred in connection with the preparation of the documents to effectuate the Assignment. The Assignment Fee shall be paid to Landlord prior to the preparation of the Assignment documents. The following events shall also

constitute an Assignment:  (a) if Tenant is a corporation, the transfer of more than fifty percent (50%) of the voting stock of Tenant, or (b) if Tenant is a partnership, the transfer of more than fifty percent (50%) of the partnership interests of Tenant or the transfer of any general partnership interest of Tenant.  This clause shall not be interpreted to preclude an Assignment to siblings and direct descendants of individuals owning, as of the Commencement Date, a majority of the voting stock of Tenant, or a transfer to a new entity as a result of a reorganization that does not result in a change in beneficial ownership.

B.       If Landlord approves an assignment or subletting, Tenant shall pay to Landlord, as and when received by Tenant, an amount equal to 50% of the difference between (i) all sums paid to Tenant by or on behalf of such assignee or subtenant under the assignment or sublease, and (ii) the Rent paid by Tenant under this Lease and attributable to the portion of the Premises assigned or sublet.

C.       In addition to the foregoing, if Tenant notifies Landlord that Tenant desires to assign a portion of this Lease or sublet a portion of the Premises (the "Proposed Sublet Space"), Landlord shall have the option to regain possession of the Proposed Sublet Space and amend this Lease to exclude the Proposed Sublet Space and effect a proportionate reduction in Minimum Rent and Tenant's Proportionate Share based upon the relative size of the Premises as so reduced.  All other terms and conditions of this Lease shall remain in effect and applicable to the Premises as reduced, and Tenant shall execute documents to effect such amendment at Landlord's request. If Landlord does not exercise its right to regain possession of the Proposed Sublet Space, Tenant may seek an acceptable assignee or subtenant for a sublease term no longer than that set forth in Tenant's notice. If Tenant does not find an assignee or subtenant acceptable to Landlord within 120 days from the date of Tenant's most recent notice, Tenant may not enter into any assignment or sublease without first submitting a new notice to Landlord and affording Landlord an opportunity to amend or terminate this Lease as set forth above.

## 20.    *[Intentionally Omitted]*.

## 21.    *Tenant's Defaults.*

Tenant shall be in default under this Lease if Tenant (a) fails to pay any rent or other sum required hereunder within twelve (12) days after its due date; or (b) fails to maintain any insurance required hereunder; or (c) abandons the Premises or fails to conduct business therein for a period of fifteen (15) or more consecutive days, absent a casualty and then only after allowing a period of as much as six (6) months in which to replace the affected Barge, or (d) assigns this Lease or sublets all or any portion of the Premises in violation of Section 19; or (e) fails to open for business in the Premises within one (1) year after the New Rent Commencement Date; or (f) files for relief under the United States Bankruptcy Code (the "Bankruptcy Code") or under any other state or federal bankruptcy or insolvency law, or Tenant files an assignment for the benefit of creditors, or if an involuntary proceeding under the Bankruptcy Code or under any other federal or state bankruptcy or insolvency law is commenced against Tenant; or (g) defaults in any other obligation herein and such default is not remedied within thirty (30) days after written notice of the default from Landlord; provided, however, that Tenant's failure to perform any non-monetary obligation set forth in this Lease on its part to be performed three (3) or more times in any twelve

(12) month period shall effect an immediate default, and Landlord thereupon may exercise any remedy set forth in Section 22 below without affording Tenant any opportunity to cure such default.

## 22.    *Landlord's Remedies in Case of Tenant's Default.*

A.    At any time after Tenant's default under this Lease, Landlord may (i) terminate this Lease upon notice to Tenant or by any available judicial process; and/or (ii) re-enter the Premises (with or without terminating the Lease), remove all property, which may include towing the Barge or Barges and storing same, at Tenant's expense without being deemed guilty of trespass and without liability for any loss or damage, and/or relet or otherwise deal with the Premises in any manner which Landlord determines in its sole discretion.

B.    Should Landlord terminate this Lease after Tenant's default, Landlord may recover from Tenant all costs (including attorneys' fees) and other damages incurred by Landlord as a result of such default, and, without limiting the generality of the foregoing, (i) all rent to the time of such termination shall be paid by Tenant immediately, together with all expenses (including attorneys' fees) of retaking possession of the Premises, as shall the cost of preparing the Premises for reletting and the costs (including brokerage fees and advertising) of actually reletting same; (ii) Landlord may take all steps, including repair or alteration of the Premises, to prepare the Premises for reletting; (iii) Landlord may relet all or any part of the Premises for such term, at such rental, and upon such conditions as Landlord deems advisable; and (iv) Tenant shall pay to Landlord, as liquidated damages, for each month during the balance of the Term (but for termination of the Lease by Landlord), any deficiency between (a) all rent and additional rent herein reserved for each such month, and (b) the net rent for each such month collected upon any reletting. Alternatively, if Landlord terminates this Lease at any time after Tenant's default, Landlord may elect, in addition to the damages described in clauses (i) - (iii) of the preceding sentence, and the damages due under clause (iv) up to the time of said election, to recover from Tenant the value at the time of said election of the excess, if any, of all rent and additional rent due under this Lease for the remainder of the Term (but for termination of the Lease by Landlord) over the then reasonable rental value of the Premises for that period.

C.    If Landlord elects not to terminate this Lease after Tenant's default, Tenant shall continue to be liable for all rent and additional rent due hereunder, in addition to all costs (including attorneys' fees) and other damages arising from Tenant's default.

D.    If Tenant abandons the Premises, Landlord may re-enter the Premises without judicial process and relet them, and such re-entry or reletting shall not terminate this Lease, and Tenant shall continue to be liable for all rent and additional rent due under the Lease, in addition to all costs (including attorneys' fees) and other damages arising from Tenant's default.

## 23.    *Landlord's Right to Cure Tenant's Default.*

A.    If Tenant shall default in the keeping, observance or performance of any provision or obligation of this Lease, Landlord, without thereby waiving such default, may perform the same for the account and at the expense of Tenant, without notice in a case of emergency and in any other case if such default continues after thirty (30) days from the date of the giving by Landlord to Tenant a notice of intention so to do. Bills for any reasonable expense incurred by Landlord in connection with any such performance by Landlord for the account of Tenant, and bills for all reasonable costs, expenses and disbursements of every kind and nature whatsoever, including attorneys' fees, involved in collecting or endeavoring to collect any sums due hereunder or enforcing or endeavoring to enforce any rights against Tenant, under or in connection with this Lease, or pursuant to law, including any such reasonable cost, expense and disbursement involved in instituting and prosecuting any action or proceeding (including any summary dispossess proceeding), may be sent by Landlord to be due and payable in accordance with the terms of said bills, and if not paid when due, the amounts thereof shall immediately become due and payable as Additional Rent under this Lease.

B.    No entry in accordance with this Lease by Landlord or its employees, agents or representatives, or by any other party at the direction of Landlord, shall ever be construed or interpreted as an ouster of Tenant from possession or as a constructive eviction or to alter, diminish or abate Landlord's rights under this Lease.

## 24.    *[Intentionally Omitted].*

## 25.    *Holding Over.*

If Tenant lawfully remains in possession of the Premises after the expiration of the Term, Tenant shall be a tenant from month to month, upon all the terms hereof which are not inconsistent with such tenancy; provided, however, that Tenant covenants to pay to Landlord as Minimum Rent during such tenancy one hundred fifty percent (150%) of the Minimum Rent in effect immediately before expiration of the Term, in addition to all other rent and other charges due hereunder. Such tenancy may be terminated by Landlord or Tenant upon thirty (30) days notice.

## 26.    *Surrender of Premises.*

Upon termination of the Term for any reason, Tenant shall remove the Barges and any other property of Tenant, and surrender the Premises to Landlord in the same condition as they were in on the Commencement Date. If Tenant fails to remove the Barges or other property, it shall become Landlord's property or, at Landlord's option, shall be removed and stored at Tenant's expense, without Landlord being liable for trespass, conversion or negligence in respect of such property. If Tenant fails to surrender the Premises in the condition required by this Section, Landlord may restore the Premises to their condition as of the Commencement Date and Tenant shall reimburse Landlord for the cost of the restoration.



## 27. *Limitation on Landlord's Liability.*

A.    Notwithstanding anything to the contrary in this Lease, (i) Landlord shall not be liable to Tenant for any loss or damage to property which is either covered by insurance or which Tenant is required to insure under this Lease, and (ii) any liability of Landlord to Tenant under this Lease shall be limited to direct damages and shall not include indirect, consequential, incidental, or punitive damages, including any liability to Tenant for lost profits or interruption of business. Tenant shall look to its property damage or business interruption insurance policies, and not to Landlord, its agents or employees for any loss incurred as a result of damage to its property or interruption of its business.

B.    Except for damages resulting from the gross negligence or willful misconduct of Landlord, Landlord shall not be liable to Tenant, its employees, agents or other invitees for any damage, compensation, claim or expense arising from (i) damage or loss to the property of Tenant or others located anywhere in the Project), or (ii) death, accident or injury to persons occurring anywhere in the Project). Landlord shall have no liability to Tenant for any delay in completing Landlord's Work.

## 28. *Notices.*

All notices and other communications hereunder shall be in writing, and shall be hand delivered, delivered by a recognized overnight delivery service (e.g., Federal Express), or sent by certified or registered U.S. mail, postage prepaid, to Landlord or Tenant, as the case may be, at the address set forth below. All notices hereunder shall also be delivered to counsel for the party to receive such notice, at the address set forth below, in order to effectuate good and valid notice hereunder.

If to Landlord:

Director, District of Columbia Department of Housing
  and Community Development
801 North Capitol Street, N.E.
8th Floor
Washington, D.C. 20002

With a required copy to:

Andrew Ridley, Esquire
Assistant Corporation Counsel
801 North Capitol Street, N.E.
Room 734
Washington, D.C. 20002

If to Tenant:

THE WHARF, INC.
t/a The Wharf
1100 Maine Avenue, S.W.
Washington, D.C. 20024
Attn: Billy White

With a required copy to:

Richard L. Aguglia, Esquire
Hunton & Williams
1900 K Street, N.W., Suite 1200
Washington, D.C. 20006

Either party may designate in writing a change in its notice address, which shall be effective ten (10) days following receipt of such writing by the other party. Notices which are delivered in person shall be deemed given when received. Notices which are mailed shall be deemed given on the date they are mailed. Notices which are sent by overnight delivery service shall be deemed given on the date they are deposited with the delivery service.

### 29. *Quiet Enjoyment.*

As long as it is not in default under this Lease, Tenant may peaceably and quietly enjoy the Premises for the Term without hindrance, ejection or molestation by Landlord or anyone claiming or acting by or through Landlord.

### 30. *Security Deposit.*

Tenant has deposited with Landlord the sum set forth in Section 1.L (the "Security Deposit") as security for performance of Tenant's obligations hereunder. The Security Deposit shall be returned to Tenant, with interest, within forty-five (45) days after the expiration of the Term, provided that Tenant has discharged all such obligations. Landlord may apply the Security Deposit to cure any default of Tenant, and Tenant shall deposit with Landlord the amount applied within thirty (30) days after written demand.

### 31. *[Intentionally Omitted].*

### 32.    *Rules and Regulations.*

Tenant will comply with the Rules and Regulations set forth on <u>Exhibit E</u>, and with any other reasonable rules and regulations as Landlord adopts for the Premises. Such rules and regulations shall not unreasonably interfere with the conduct of Tenant's business. In particular instances, where in Landlord's reasonable judgment such rules and regulations may be infeasible, Landlord shall have the right to modify or waive such rules and regulations as they apply to particular other tenants. Any failure by Tenant to comply with any rule or regulation established pursuant to this Lease shall be a default under this Lease subject to Section 21. Landlord shall exercise its rights in respect of the promulgation, revision, and enforcement of Rules and Regulations in a non-discriminatory manner.

### 33.    *Waiver of Jury Trial.*

Landlord and Tenant hereby waive all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other pertaining to any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises.

### 34.    *Covenant Against Contingent Fees*

Tenant warrants that its has not employed any person to solicit or secure this Lease upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give Landlord the right to terminate this Lease, or, in its discretion, to add to the rental or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by Tenant upon contracts or sales secured or made through <u>bona</u> <u>fide</u> established commercial or selling agencies maintained by Tenant for the purposes of securing business, or to Tenant's attorneys' fees. Landlord shall pay any and all commissions and other compensation due to any broker, finder or other person with whom Landlord has dealt with regard to this Lease.

### 35.    *Facilities Nondiscrimination.*

A.    As used in this section, the term "facility" means the entire Premises.

B.    Tenant agrees that it will not discriminate by segregation or otherwise against any person or persons because of race, creed, color, sexual orientation, physical disability, marital status or national origin, in furnishing, or by refusing to furnish, to any person or persons the use of any facility, including any and all service, privileges, accommodations and activities provided thereby.

C.    It is agreed that Tenant's noncompliance with the provisions of this Article, as determined by a final, unappealable judgement by a court of competent jurisdiction, shall constitute material breach of this lease Agreement. In the event of such a determination of noncompliance, and Tenant's failure to cure such non-compliance within ten (10) days after such

determination becomes final, Landlord may take appropriate action to enforce compliance, and may pursue remedies as may be provided by law or in equity.

D.    Tenant agrees to include, or to require the inclusion of, the foregoing provisions of this section (with terms "The District" and "Tenant" appropriately modified) in every agreement or concession pursuant to which any person other than Tenant operates or has the right to operate the facility. Tenant also agrees that it will also comply with any final, unappealable court order directing Tenant to take any action with respect to any such agreement in order to enforce the processions of this section, including but not limited to termination of the agreement or concession in question; provided, however, that in the event the Tenant becomes involved in or is threatened with litigation with a person as a result thereof, Tenant may request Landlord to enter into such litigation to protect the interest of Landlord.

## 36. *Nondiscrimination in Employment.*

A.    In connection with the conduct of business on the Premises, Tenant agrees not to discriminate against any employee or applicant for employment because of race, creed, color, sexual orientation, physical disability, marital status, or national origin. Tenant will take affirmative action to ensure that applicants are employed and that employees are treated during employment without regard to their race, creed, color, sex orientation, physical disability, marital status or national origin. Such action shall include, but not limited to the following: employment, upgrading demotion or transfer, recruitment or recruitment advertising, layoff of termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship, as required by applicable law. Tenant agrees to post in conspicuous places available to employees and applicants for employment, notices to be provided by Landlord setting forth the provisions of this nondiscrimination clause.

B.    Tenant will, in all solicitations for advertisements for employees placed by or on behalf of the Tenant, state that qualified applicants will receive consideration for employment without regard to race, creed, color, sexual orientation, physical disability, marital status or national origin.

C.    Tenant will send to each union or representative of workers with which it has collective bargaining agreement(s) or other contracts of understandings a notice to be provided by Landlord in advising the said labor union or worker's representative of Tenant's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

D.    Tenant will permit Landlord access to their books, records, and accounts, or their agents, for purposes of investigation to ascertain compliance with such rules, regulations and orders, as provided by applicable law.

E.    In the event of any final, unappealable determination by any court or administrative body, of noncompliance of Tenant with the nondiscrimination clauses of this Lease Agreement, and Tenant's failure to cure such discrimination within ten (10) days after such determination becomes final, this Lease Agreement may be canceled in whole or in part and

Tenant may be declared ineligible for further leases with the District of Columbia.

F.    Tenant further agrees to insert the foregoing provisions of nondiscrimination in employment in all subcontracts hereunder, unless exempted by rules and regulations or orders of Landlord so that such provisions will be binding and regulations or orders of Landlord so that such provisions will be binding upon each subcontractor or vendor. Tenant will take such action with respect to any subcontract as required by any final, unappealable order of a court or governmental agency of competent jurisdiction in order to enforce such provisions, including sanctions for noncompliance; provided, however, that in the event the Tenant becomes involved in or is threatened with litigation with a subcontractor or vendor as a result thereof, Tenant may request Landlord to enter into such litigation to protect the interest of Landlord.

## 37.    *Environment Protection.*

A.    Tenant shall not pollute the air, ground or water in, on or under the premises. Tenant shall comply promptly with any laws, regulations, conditions or instructions applicable to the Tenant's business(es) at the Premises, if and when issued by the Environmental Protection Agency, or any Federal, state, or local governmental agency having jurisdiction to abate or prevent pollution. The disposal of any toxic or hazardous material within the Premises in violation or applicable laws or codes is specifically prohibited. Tenant shall require the owners/operators of boats moored at the Premises, including rental boats, to seal all sanitation facilities or such boats against any discharge into the Washington Channel. Services for waste disposal, including sewage pump-out of watercraft, shall be provided by the Tenant as reasonably appropriate. Tenant shall not discharge waste or effluent from the Premises, including Barges, in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

B.    If damage to the environment or natural resources is proximately caused by Tenant's activities at the premises, Tenant shall be liable to restore the damaged resources.

## 38.    *Miscellaneous.*

A.    **Entire Agreement; Joint and Several Liability; Successors and Assigns.** This Lease constitutes the entire agreement between the parties concerning the matters set forth herein. If Tenant shall include more than one person, the obligations hereunder of all such persons shall be joint and several. This Lease shall be binding upon and inure to the benefit of the parties and their respective successors, permitted assigns, heirs and legal representatives.

B.    **Interpretation.** The named Exhibits are part of this Lease. Section and subsection headings are for convenience only, and not for use in interpreting this Lease. If a court finds any provision of this Lease unenforceable, all other provisions remain enforceable.

C.    **Costs; Include; Shall; May.** Except as expressly provided otherwise in this Lease, the party obligated or permitted to perform an obligation is also obligated, as between Landlord and Tenant, to pay the cost of performance. "Include," "includes," and "including" mean

considered as part of a larger group, and not limited to the items recited. "Shall" means is obligated to. "May" means "is permitted to."

       D.     **Waiver**. No provision of this Lease is waived by Landlord or Tenant unless waived by them in writing. Landlord's acceptance of rent is not a waiver of any default of Tenant, regardless of Landlord's knowledge of a default when it accepts the rent. No waiver by Landlord or Tenant of any default is a waiver of any other default of the same or any other provision of this Lease.

       E.     **Rule Against Perpetuities**. Notwithstanding any provision in this Lease to the contrary, if the Lease Term has not commenced within three (3) years after the date of this Lease, this Lease shall automatically terminate on the third (3rd) anniversary of the date hereof. The sole purpose of this provision is to avoid any possible interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation.

       F.     **Remedies**. The rights and remedies mentioned in this Lease are in addition to, and do not deprive a party of any other rights at law or in equity.

       G.     **No Option**. The submission of this Lease for examination does not constitute a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery of it by Landlord.

       H.     **Additional Rent**. All sums owed by Tenant to Landlord in connection with this Lease which are not otherwise designated as rent shall be deemed to be additional rent.

       I.     **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the District of Columbia.

J.  **Waiver and Release of Claims.**  In consideration of the execution and delivery of this Lease by the parties hereto, each of such parties hereto (each, a "Releasing Party") hereby unconditionally releases, remises, acquits, and forever discharges the other party hereto (at such time as such other party shall have executed and delivered this Lease), as well as each of the other tenants of the Project (at such time as each such tenant shall have executed and delivered a Lease containing waiver and release provisions identical to the provisions of this Section 38.J, and provided such tenant shall not have instituted litigation against such Releasing Party after the date hereof and before the date of such Lease) (collectively, the "Released Parties"), from any and all claims, demands, liabilities, damages, losses, costs, expenses, causes of action, covenants, contracts, torts, controversies, agreements, promises, representations, breaches of contract or of obligations to perform, and any other type of conduct or misconduct, whether negligent, intentional or otherwise, whether at law or in equity, whether matured or unmatured, and whether known or unknown, that the Releasing Party, or any person or entity claiming by, through or under the Releasing Party, ever had, now has, or hereafter may have, against any of the Released Parties at any time from the beginning of the world to the date hereof related to, arising out of, or in any manner connected with: (1) the Project, the operations of the businesses within the Project, or the conduct of any of the Released Parties that relates in any manner to the Project; or (2) this Lease or other lease agreements entered into at any time before the date hereof or simultaneously herewith relating to the Project (collectively, the "Project Leases"), the procurement or negotiation of any of the Project Leases or the terms thereof, or the performance or non-performance by any party under any of such Project Leases.

[Signatures commence on following page]

7/10/00 6:30 PM

IN WITNESS WHEREOF, the District of Columbia has caused this Lease to be executed in its corporate name by **Anthony Williams**, its **Mayor**, and attested by **Beverly Rivers**, its **Secretary of D.C.**, and its seal to be hereunto affixed and does hereby constitute and appoint **Anthony Williams** its true and lawful Attorney-in Fact for it and in its name to acknowledge and deliver this Lease as its act and deed.

LANDLORD:

WITNESS:

THE DISTRICT OF COLUMBIA, as agent for
THE UNITED STATES OF AMERICA

By
Name: **Anthony A. Williams**
Title: **Mayor of the District of Columbia**

Approved for Legal Sufficiency:

Date: 2 - 21 - 01

Name: Andrew Onel Ridley
Title: Assistant Corporation Counsel

IN WITNESS WHEREOF, THE WHARF, INC., has caused this Lease to be executed in its corporate name by Billy R. White, its President, and attested by Penny R. White, its Secretary, and its seal to be hereunto affixed and does hereby constitute and appoint Billy R. White its true and lawful Attorney-in Fact for it and in its name to acknowledge and deliver this Lease as its act and deed.

TENANT:

ATTEST:

THE WHARF, INC., a District of Columbia corporation

By
Name: Billy Ray White
Title: Pres

(Seal)

DISTRICT OF COLUMBIA, SS.

I, _K. Gladys Herring_, a Notary Public in and for the District of Columbia, do hereby certify that **Anthony Williams** who is personally well known (or satisfactorily proven) to me to be the person named as ___Mayor___ of the District of Columbia, a municipal corporation, in the foregoing Lease, bearing date as of _July 12, 2000_, 2000, and hereto annexed, personally appeared before me in the said District of Columbia and acknowledged the same to be the act and deed of the District of Columbia, for the purposes therein contained.

WITNESS my hand and seal this _21st_ day of _February_, ~~2000~~ _2001._

_Gladys W. Herring_
Notary Public

My commission expires: _June 30, 2004_


DISTRICT OF COLUMBIA, SS.

I, _REGINA HOLMES_, a Notary Public in and for the District of Columbia, do hereby certify that _BILLY KAY WHITE_, who is personally well known (or satisfactorily proven) to me to be the person named as _PRESIDENT_ of THE WHARF, INC., a District of Columbia corporation, in the foregoing Lease, bearing date as of _July 12_, 2000, and hereto annexed, personally appeared before me in the said District of Columbia and acknowledged the same to be the act and deed of THE WHARF, INC.., for the purposes therein contained.

WITNESS my hand and seal this _12th_ day of _July_, 2000.

Notary Public

MY COMMISSION EXPIRES
SEPTEMBER 14, 2000

My commission expires: _____

# EXHIBIT A

[Outline of Premises -- to be initialed by the parties and attached upon completion of design and engineering for Landlord's Work.]

Exhibit A







## EXHIBIT B

[Site Plan of the Project]

Exhibit B-1



EKL B
CHANNEL
LEGEND:

------  / MAXIMUM
        / 6 Ft. WAIKWAY
          (floating) connecting
          BRW. to the WHARF

NOs. 7, 8 & 9. / BRW
NOs. 16, 17, 18 & 19 / WhARF

Lease Space No. LS-16
Frontage Linear Distance: 28.30
Lessor: Washington, DC
Page 1 of 1 pages

Fishwharf Lease Spaces
Southwest Waterfront, Northside Washington Channel
Washington, District of Columbia
15 June 2000  /  ghb

## LEASE FRONTAGE DESCRIPTION

A certain waterfront linear frontage strip situate in Washington, District of Columbia, in square 473 and being located along the top and easterly face of the east concrete pier within of the area commonly known as the Washington Municipal Fish Wharf located on the Washington, District of Columbia southwest waterfront between Maine Avenue, S.W and the Washington Channel, said frontage space designated as LS-16 as shown on a property location plat attached as Exhibit B and made a part hereof, and more particularly bounded and described as follows:

Commencing at a copper in the division line between Lot 846 in Square 473 and Lot 850 in Square 473, said copper in the top of the curb; thence from said copper running,

South 57°59'01" West 175.46 feet to a point on the top and easterly face of said east concrete pier and the True Point of Beginning of the herein described frontage strip: thence running along said top and westerly face of said concrete pier,

South 45°46'12" East 28.30 feet to the terminus point.

The bearings used herein are referenced to a plat of survey dated 26 August 1988 by the District of Columbia Government, Office of the Surveyor.

SQUARE 473,
LOT 850

SQUARE 473,
LOT 846

FACE OF SEA WALL

FACE OF SEA WALL

EAST CONCRETE PIER

WASHINGTON CHANNEL

WASHINGTON CHANNEL

WESTERLY FACE OF EAST CONC. PIER

EASTERLY FACE OF EAST CONC. PIER

SOUTHERLY FACE OF
EAST CONC. PIER

WASHINGTON CHANNEL

**EXHIBIT B**

SCALE IN FEET

30    15    0    30    60

**LEGEND**

FRONTAGE SPACE

TAX LOT BOUNDARY

LEASE SPACE NUMBER

US Army Corps
of Engineers

| SQUARE / LOT NO. :<br>473 / NOT<br>ACCESSED | PROPERTY LOCATION<br>PLAT | DISTRICT OF COLUMBIA<br>DEPARTMENT OF HOUSING<br>AND ECONOMIC DEVELOPMENT |
|---|---|---|
| ESTATE TYPE:<br>FRONTAGE LEASE | | **FISHWHARF** |
| LESSOR:<br>WASHINGTON, D.C. | | SOUTHWEST WATERFRONT<br>NORTHSIDE WASHINGTON CHANNEL |
| LINEAR FRONTAGE FEET: ACRES:<br>28.30    0.000 | | WASHINGTON, D.C. |
| JURISDICTION: WASHINGTON,<br>DISTRICT OF COLUMBIA | SCALE: AS SHOWN | TRACT NO. : |
| | DATE: 14 JUNE 2000 | LS-16 |
| DRAWN BY: GHB | CHECKED BY: SLM | CAD FILE: X |

Lease Space No. LS-17
Frontage Linear Distance: 46.56
Lessor: Washington, DC
Page 1 of 1 pages

Fishwharf Lease Spaces
Southwest Waterfront, Northside Washington Channel
Washington, District of Columbia
15 June 2000  / ghb

## LEASE FRONTAGE DESCRIPTION

A certain waterfront linear frontage strip situate in Washington, District of Columbia, in square 473 and being located along the top and southerly face of the east concrete pier within of the area commonly known as the Washington Municipal Fish Wharf located on the Washington, District of Columbia southwest waterfront between Maine Avenue, S.W and the Washington Channel, said frontage space designated as LS-17 as shown on a property location plat attached as Exhibit B and made a part hereof, and more particularly bounded and described as follows:

Commencing at a copper in the division line between Lot 846 in Square 473 and Lot 850 in Square 473, said copper in the top of the curb; thence from said copper running,

South 68°17'41" West 233.33 feet to a point on the top and southerly face of said east concrete pier and the True Point of Beginning of the herein described frontage strip: thence running along said top and westerly face of said concrete pier,

South 54°31'50" East 46.56 feet to the terminus point.

The bearings used herein are referenced to a plat of survey dated 26 August 1988 by the District of Columbia Government, Office of the Surveyor.

SQUARE 473,
LOT 850

SQUARE 473,
LOT 846

FACE OF SEA WALL

FACE OF SEA WALL

COPPER

WASHINGTON CHANNEL

EAST CONCRETE PIER

WASHINGTON CHANNEL

EASTERLY FACE OF EAST CONC. PIER

SOUTHERLY FACE OF
EAST CONC. PIER

46.56 feet

WASHINGTON CHANNEL

30    15    0         30         60

SCALE IN FEET

## EXHIBIT B

### LEGEND

FRONTAGE SPACE

TAX LOT BOUNDARY

LS-1    LEASE SPACE NUMBER

| SQUARE / LOT NO. : 473 / NOT ACCESSED | PROPERTY LOCATION PLAT | DISTRICT OF COLUMBIA DEPARTMENT OF HOUSING AND ECONOMIC DEVELOPMENT |
|---|---|---|
| ESTATE TYPE: FRONTAGE LEASE | | FISHWHARF |
| LESSOR: WASHINGTON, D.C. | | SOUTHWEST WATERFRONT NORTHSIDE WASHINGTON CHANNEL |
| LINEAR FRONTAGE FEET: 46.56 | ACRES: 0.000 | WASHINGTON, D.C. |
| JURISDICTION: WASHINGTON, DISTRICT OF COLUMBIA | SCALE: AS SHOWN | TRACT NO. : |
| DRAWN BY: GHB | CHECKED BY: SLM | DATE: 14 JUNE 2011 | CAD FILE: X | LS-17 |

Lease Space No. LS-18                                    Fishwharf Lease Spaces
Frontage Linear Distance: 65.82       Southwest Waterfront, Northside Washington Channel
Lessor: Washington, DC                               Washington, District of Columbia
Page 1 of 1 pages                                            15 June 2000  / ghb

## LEASE FRONTAGE DESCRIPTION

A certain waterfront linear frontage strip situate in Washington, District of Columbia, in square 473 and being located along the top and westerly face of the east concrete pier within of the area commonly known as the Washington Municipal Fish Wharf located on the Washington, District of Columbia southwest waterfront between Maine Avenue, S.W and the Washington Channel, said frontage space designated as LS-18 as shown on a property location plat attached as Exhibit B and made a part hereof, and more particularly bounded and described as follows:

Commencing at a copper in the division line between Lot 846 in Square 473 and Lot 850 in Square 473, said copper in the top of the curb; thence from said copper running,

South 79°18'20" West 174.66 feet to a point on the top and westerly face of said east concrete pier and the True Point of Beginning of the herein described frontage strip: thence running along said top and westerly face of said concrete pier,

South 45°23'42" West 65.82 feet to the terminus point.

The bearings used herein are referenced to a plat of survey dated 26 August 1988 by the District of Columbia Government, Office of the Surveyor.



**EXHIBIT B**

SCALE IN FEET

30  15  0  30  60

US Army Corps
of Engineers

**LEGEND**

━━━━  FRONTAGE SPACE

- - - -  TAX LOT BOUNDARY

(LS-1)  LEASE SPACE NUMBER

| SQUARE / LOT NO. : 473 / NOT ACCESSED | PROPERTY LOCATION PLAT | DISTRICT OF COLUMBIA DEPARTMENT OF HOUSING AND ECONOMIC DEVELOPMENT |
|---|---|---|
| ESTATE TYPE : FRONTAGE LEASE | | FISHWHARF |
| LESSOR : WASHINGTON, D.C. | | SOUTHWEST WATERFRONT |
| LINEAR FRONTAGE FEET : 65.82 | ACRES : 0.000 | NORTHSIDE WASHINGTON CHANNEL |
| JURISDICTION : WASHINGTON, DISTRICT OF COLUMBIA | | WASHINGTON, D.C. |
| | | SCALE : AS SHOWN |
| DRAWN BY : GHB | CHECKED BY : SLM | DATE : 14 JUNE 2000 |
| | CAD FILE : X | TRACT NO. : LS-18 |

# EXHIBIT C

[Certificate of Acceptance – establishing New Rent Commencement Date]

## EXHIBIT C

## CERTIFICATE OF ACCEPTANCE

The undersigned, having entered into a certain Lease Agreement dated _____

_____, 2000, by and between the undersigned, as Tenant, and THE DISTRICT OF

COLUMBIA, acting on behalf of THE UNITED STATES OF AMERICA, as Landlord,

DOES HEREBY CERTIFY to Landlord that:

    (1)    The Lease is in full force and effect without offset or defense;

    (2)    Tenant has taken possession of the Premises described in said Lease,

namely, _____, 1100 Maine Avenue, S. W., Washington, D.C. 20024;

    (3)    The Commencement Date is _____, 2000;

    (4)    The New Rent Commencement Date is _____, _____; and

    (5)    The condition of the Premises is satisfactory to Tenant.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this _____ day of

_____, ___.

_____(Seal)

## EXHIBIT D

[Work Letter – U.S. Army Corps of Engineers Work Order]



| US ARMY CORPS OF ENGINEERS INTERAGENCY AGREEMENT (ER 1140-1-211) | 1. AGREEMENT NUMBER           WO 3 |
|---|---|
| | 2. ☐ INITIAL AGREEMENT ☐ AMENDMENT NUMBER |

| **3. PROJECT TITLE**  Improvements to the Southwest Waterfront Fish Market and Washington Marina | **4. EFFECTIVE DATE** 25 October 1999 |
|---|---|
| | **5. COMPLETION DATE** 21 April 2000 |

| **6. NAME AND ADDRESS OF USACE ORGANIZATION** Baltimore District, U.S. Army Corps of Engineers P.O. Box 1715 Baltimore, MD 21203-1715 | **7. NAME AND ADDRESS OF CUSTOMER** D.C. Dept of Housing & Community Development 801 North Capitol Street, N.E., 8th Floor Washington, DC 20002 |
|---|---|

**8. SCOPE OF WORK** *(Additional pages may be used as needed)*

In accordance with the FY 1999 Omnibus Appropriations Bill, the Corps of Engineers will prepare all necessary environmental/ cultural/ Section 106 compliance documentation needed to implement the improvements identified in the Southwest Waterfront Development Needs Assessment dated July 1999. The specific tasks and budgets are as follows:

1.  Management – The Corps of Engineers will provide a project manager to provide overall management of the effort. $5,000 budget, $24,000 project contingency.
2.  Environmental Compliance – All necessary environmental compliance documentation will be prepared. $55,000 budget.
3.  Cultural/ Section 106 Compliance – All necessary coordination with the D.C. Historical Preservation Officer will be accomplished and all necessary compliance documentation will be prepared. $14,000 budget.

**9. CUSTOMER EXPECTATIONS** *(Additional pages may be used as needed)*

The Corps will make every effort to complete the environmental and cultural compliance work within 5 months and to limit project expenditures to $74,000. The five months' timeframe begins when CENAB receives a letter from DCDHCD acknowledging deviations from the 1997 Master Plan. DCDHCD will forward CENAB all existing NEPA (if any), NCPC comments on the proposed improvements, and documents that address the ownership of the land.

| **10. USACE PROJECT OFFICER** Name: Mary Y. Dan Voice: (410) 962-3377 FAX: (410) 962-9312 | **12. CUSTOMER PROJECT OFFICER** Name: Joseph J. Wolfe Voice: (202) 442-7255 FAX: (202) 442-8391 |
|---|---|

ENG FORM 4914-R, Jan 88                                                                (Proponent: CECW-RJ)

**12. REPORTS**

A copy of all compliance documentation will be provided.

**13. FUNDS** *(Page(s) with cost breakdown may be attached as necessary)*

| SOURCE | PREVIOUS AMOUNT | AMOUNT THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| a. USACE AMOUNT | | | |
| b. CUSTOMER AMOUNT | $20,000 | $98,000 | $128,000 98,000 |
| c. TOTAL PROJECT COST | $20,000 | $98,000 | $128,000 98,000 |

**14. FUNDING**   Funds will be provided by:

☐  a.  Transfer Appropriation *(SF1151, Non-Expenditure Transfer Authorization)*

☒  Reimbursable Order *(31 USC 1535 - Economy Act)*

☐  Other *(describe)*

b. Appropriation:

| LINE | AGY | YR | INDEX | PCA | AOBJ |
|---|---|---|---|---|---|
| 001 | DB0 | 98 | 84040 | 04012 | 1506 |

**15. BILLING**

a.  Request for payment will be made by:  ☒ SF 1080  ☐ SF 1081  ☐ Other *(describe)*

b.  Frequency:  ☒ Monthly  ☐ Quarterly  ☐ Upon Work Completion  ☐ Other *(describe)*

c.  Request for payment will cite the following accounting information *(describe necessary documentation)*:

d.  Submit to:   D.C. Dept. of Housing & Community Development
Office of the Comptroller
801 North Capitol Street, N.E., 7th Floor
Washington, DC 20002

**16. AUTHORITY**

FY 1999 Omnibus Appropriations Bill, 31 USC 1535 - Economy Act, and Interagency Agreement.

**17. APPROVALS**

| a. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR USACE | SIGNATURE | DATE |
|---|---|---|
| James R. Jones<br>Chief, Programs and Project Management Division | | 10-18-99 |
| b. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR THE CUSTOMER<br><br>Othello Mahone, Interim Director<br>Department of Housing and Community Development | SIGNATURE | 10-15-99 |

ENG FORM 4914-R, Jan 89

(Proponent CECW-RI)

| US ARMY CORPS OF ENGINEERS INTERAGENCY AGREEMENT (ER 1140-1-211) | 1. AGREEMENT NUMBER          WO 4 |
|---|---|
| | 2. ☒ INITIAL AGREEMENT<br>☐ AMENDMENT NUMBER |

| 3. PROJECT TITLE   Improvements to the Southwest Waterfront Fish Market and Washington Marina | 4. EFFECTIVE DATE   13 March 2000 |
|---|---|
| | 5. COMPLETION DATE   30 September 2000 |

| 6. NAME AND ADDRESS OF USACE ORGANIZATION<br>Baltimore District, U.S. Army Corps of Engineers<br>P.O. Box 1715<br>Baltimore, MD 21203-1715 | 7. NAME AND ADDRESS OF CUSTOMER<br>D.C. Dept of Housing & Community Development<br>801 North Capitol Street, N.E., 7th Floor<br>Washington, DC  20002 |
|---|---|

**8. SCOPE OF WORK** *(Additional pages may be used as needed)*

In accordance with the FY 1999 Omnibus and the FY 2000 DC Appropriations Bills, the Corps of Engineers will provide the following:

1. Management – The Corps of Engineers will provide a project manager to provide overall management of the wooden pile investigation and preparation of contract documents for selected improvements to the Washington Marina, Municipal Fish Warf, and adjacent DC Government Properties. $20,000 budget, $10,0000 contingency for investigation and preparation of contract documents.

2. Property Description — Using existing survey information and lease exhibits, a property description will be provided for the Washington Marina and Municipal Fish Warf. The description will precisely identify the property being leased, to include the common area and pier frontage at the Municipal Fish Wharf.  $8,000 budget.

3. Wooden Pile Investigation and Report – A contract for a wooden pile investigation will be issued. Wooden foundation piles under the fish wharf and marina piers and under the seawall/ bulkhead will be inspected by underwater divers and a civil/ structural engineer will characterize the condition of the piles, make a determination as to whether the piles need to be repaired or replaced, and estimate the remaining useful life of the piles. $25,000 budget.

4. Design Plans – The Corps of Engineers will prepare a site plan identifying the improvements to be made to the Washington Marina, Municipal Fish Wharf, and Redevelopment Land Agency premises. The site plan will be coordinated with the Washington Marina, Municipal Fish Wharf, and Capital Yacht Club tenants and DHCD. After an investigation of the wooden piles is conducted, and after NEPA/Sect 106 compliance documentation is completed, design and construction contract documents for the repair or replacement of the wooden piles and/or for the work listed on the attached sheet will be prepared as the budget will allow. Design-build and task order contracts will be used to implement the improvements. The contractors will be responsible for securing all necessary permits. $110,000 budget.

**9. CUSTOMER EXPECTATIONS** *(Additional pages may be used as needed)*

The Corps of Engineers will make every effort to minimize project costs and complete the scope of work within 7 months of signing this work order by both parties. Priorities will be to complete the survey in April 2000 and the underwater investigation by June 2000. After the Corps of Engineers has completed the underwater investigation, the Corps of Engineers and the Department of Housing and Community Development will reevaluate the estimated duration, construction costs, and scope of work to ensure that the total project costs do not exceed funds available.

| 10. USACE PROJECT OFFICER<br><br>Name: Mary Y. Dan     *myd 3/13/00*<br>Voice: (410) 962-3377<br>FAX:   (410) 962-9312 | 11. CUSTOMER PROJECT OFFICER<br><br>Name: Joseph J. Wolfe<br>Voice: (202) 442-6977<br>FAX:   (202) 442-6967 |
|---|---|
| ADDRESS<br>Baltimore District, U.S. Army Corps of Engineers<br>P.O. Box 1715<br>Baltimore, MD 21203-1715 | ADDRESS<br>D.C. Dept of Housing & Community Development<br>801 North Capitol Street, N.E., 7th Floor<br>Washington, DC  20002 |

ENG FORM 4914-R, Jan 88

(Proponent: CECW-FJ)

## 12. REPORTS

A copy of the property descriptions, underwater investigation report, site plan, development concept, and contract documents will be provided.

## 13. FUNDS *[Page(s) with cost breakdown may be attached as necessary]*

| SOURCE | PREVIOUS AMOUNT | AMOUNT THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| a. USACE AMOUNT | | | |
| b. CUSTOMER AMOUNT | $0 | $140,000 $173,000 | $140,000 $173,000 |
| c. TOTAL PROJECT COST | $0 | $140,000 $173,000 | $140,000 $173,000 |

## 14. FUNDING. Funds will be provided by:

☐ Transfer Appropriation *(SF1151, Non-Expenditure Transfer Authorization)*

☒ Reimbursable Order *(31 USC 1535 - Economy Act)*

☐ Other *(describe)*

Appropriation:

## 15. BILLING

a. Request for payment will be made by: ☒ SF 1080  ☐ SF 1081  ☐ Other *(describe)*

b. Frequency: ☒ Monthly  ☐ Quarterly  ☐ Upon Work Completion  ☐ Other *(describe)*

c. Request for payment will cite the following accounting information *(describe necessary documentation):*

d. Submit to:   D.C. Dept of Housing & Community Development
ATTN: Mr. Joseph Wolfe
801 North Capitol Street, N.E., 7th Floor
Washington, DC 20002

## 16. AUTHORITY

FY 1999 Omnibus Appropriations Bill, FY 2000 District of Columbia Appropriations Bill, 31 USC 1535 - Economy Act, and Memorandum of Agreement Between the District of Columbia and the U.S. Army Corps of Engineers regarding Improvements to the Southwest Waterfront.

## 17. APPROVALS

| a. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR USACE | SIGNATURE | DATE |
|---|---|---|
| James R. Jones<br>Chief, Programs and Project Management Division | | 3/13/00 |

| b. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR THE CUSTOMER | SIGNATURE | DATE |
|---|---|---|
| Othello Mahone, Interim Director<br>Department of Housing and Community Development | | 4-3-00 |

ENG FORM 4914-R, Jan 88                                                                 (Proponent: CECW-RJ)

Exhibit D

Page 5 of 9

# Improvements to the Southwest Waterfront Fish Market and Washington Marina

## Attachment to Interagency Agreement WO-4

The following will be removed/ constructed:

- Underground Storage Tanks – Four underground storage tanks (one 4,000 gallon, two 2,000 gallon, and one 30,000 gallon) will be closed and the tanks, associated piping, ancillary equipment, and contaminated soil will be removed and disposed of in accordance with D.C. regulations. (task order contract)
- Fish Market Building – The facility will be demolished and disposed of. (task order contract)
- Concrete Bulkhead – The area of the bulkhead to be repaired is beneath the I-395 bridge. The top 6" of concrete will be removed. The bulkhead will be drilled to tie in new reinforcing steel. A concrete section approximately 50' long, 2' wide, and 2.5' deep will be added to the top of the bulkhead, and the area behind the bulkhead will be backfilled. The existing railing between the marina and Pruitt Seafood will be removed and a new railing will be installed.
- Electrical Utilities – The Contractor will prepare an electrical plan that provides sufficient power for projected activities and operation and will coordinate the electrical plan with PEPCO to define/delineate responsibilities for relocating utilities and implementing/constructing the plan. Utility trenches will be excavated and approximately 5,100 lf of electrical ductbanks will be constructed and overhead electrical distribution lines will be relocated underground.
- Remove Fence – 60 lf of chain link fence between the fish wharf and the Capitol Yacht Club parking areas will be removed.
- Equipment on Site – The existing equipment on Lot 846 that is not being used will be removed.
- Fish Cleaning Building – The central historic portion of the structure will be renovated for the fish cleaning service and vending machines. The remainder of the building will be demolished. A new facility for the public restrooms and dumpsters will be constructed at the eastern edge of Lot 846. The new facility will be a masonry structure similar to the existing.
- Concrete Piers – The existing wooden piles under the marina and fish wharf piers will be repaired and replaced as needed. The fish wharf piers, approximately 16,868 sf, will be repaved with a new concrete surface and made ADA compliant. 1.5" of the existing surface will be removed to level the piers. A new concrete surface will be poured with 6 x 6 inch wire reinforcing. A patterned surface will be provided and color dye will be included. Utilities serving the fish wharf barges will be upgraded to meet current codes.
- Safety Railings and Fences – Existing safety railings along the bulkhead will be removed. Guardrails will be installed for parking areas along the waterfront and bulkhead west of the marina and along the bulkhead between the marina and fish wharf. As much as 2,000 lf of 2 rail, 2" dia. steel pipe, safety railing will be installed along the concrete piers and bulkhead, as needed for pedestrians.
- Piers and Boat Slips – Remove, as necessary, existing piles and piers and install fully-functional floating pier/dock replacements with such accessories (water, electric, etc.) as specified by the Tenant in a configuration shown in the attached site plan. The number of floating piers and docks to be installed by the government government will be the maximum number which can be installed within a $1,150,000 budget. The remaining floating piers will be provided by others. ( design-build contract)
- Site Lighting - Site lighting will be upgraded throughout the site in order to comply with current code requirements. Approximately 5,100 lf of utility trenches will be excavated. 41 lighting fixtures and associated conduit and wiring will be installed.
- Paving – Approximately 50,000 sf of paving, trees and stumps throughout the site, and chainlink fences around the parking lot west of the marina and to the east of the Maine Avenue Seafood building will be removed. The entire site, approximately 100,000 sf, will be cut, filled, and graded to provide larger, more level, parking areas and to improve stormwater management. A concrete walkway along the waterfront between the marina building and the east edge of the fish wharf will be provided.
- Sidewalks – Approximately 7,100 sf of sidewalks will be provided.
- Marina Building – A new membrane roof will be installed, and the electrical service will be upgraded. The electrical upgrades will include demolition and removal of the existing 400 A service and the installation of 1 – 1200 A 208/120V 3 phase electrical service, 3 – 400 A distribution panels, feeders from the new 1200 A service to each (3) 400 A panel, and reconnection of the existing store circuits to a new 400 A panel.
- Landscaping – Landscaping improvements will be provided along Main Avenue and around parking lots in areas that will not reduce parking capacity.



| US ARMY CORPS OF ENGINEERS INTERAGENCY AGREEMENT (ER 1140-1-211) | 1. AGREEMENT NUMBER   WO 5 |
|---|---|
| | 2. ☒ INITIAL AGREEMENT ☐ AMENDMENT NUMBER |

| 3. PROJECT TITLE   Improvements to the Southwest Waterfront Fish Market and Washington Marina | 4. EFFECTIVE DATE  1 July 2000 |
|---|---|
| | 5. COMPLETION DATE   30 June 2001 |

| 6. NAME AND ADDRESS OF USACE ORGANIZATION Baltimore District, U.S. Army Corps of Engineers P.O. Box 1715 Baltimore, MD 21203-1715 | 7. NAME AND ADDRESS OF CUSTOMER D.C. Dept of Housing & Community Development 801 North Capitol Street, N.E., 8th Floor Washington, DC  20002 |
|---|---|

**8. SCOPE OF WORK** *(Additional pages may be used as needed)*

In accordance with Public Law 106-113, the Corps of Engineers agrees to prepare, procure, and oversee contracts for improvements to the Southwest Waterfront in the District of Columbia as follows:

1. Management – The Corps of Engineers will provide a project manager to provide overall management of contract procurement and construction of the improvements noted in item 3.  $11,140 budget, $ 41,210 contingency for entire project.
2. Construction Supervision & Inspection – A project engineer will oversee the construction contractor and verify that improvements are being provided in accordance with the construction contract. $29,700 budget.
3. The following will be removed/ constructed:
- Underground Storage Tanks – Four underground storage tanks (one 4,000 gallon, two 2,000 gallon, and one 30,000 gallon) will be closed and the tanks, associated piping, ancillary equipment, and contaminated soil will be removed and disposed of in accordance with D.C. regulations. $100,000 budget.
- Electrical Utilities – Utility trenches will be excavated and approximately 3,000 lf of overhead electrical distribution lines will be relocated underground. $107,590 budget.
- Fish Market Building – The facility will be demolished and disposed of. $8,470 budget.
- Site Lighting - Site lighting will be upgraded throughout the site in order to comply with current code requirements. Approximately 5,100 lf of utility trenches will be excavated.  41 lighting fixtures and associated conduit and wiring will be installed. $66,890 budget.
- Concrete Bulkhead – The area of the bulkhead to be repaired is beneath the I-395 bridge. The top 6" of concrete will be removed. The bulkhead will be drilled to tie in new reinforcing steel.  A concrete section approximately 50' long, 2' wide, and 2.5' deep will be added to the top of the bulkhead, and the area behind the bulkhead will be backfilled. The existing railing between the marina and Pruitt Seafood will be removed and a new walkway railing will be installed. $24,080 budget.
- Safety Railings and Fences – Existing safety railings along the bulkhead will be removed. Guardrails will be installed for parking areas along the waterfront and bulkhead west of the marina and along the bulkhead between the marina and fish wharf. As much as 2,000 lf of 2 rail, 2" dia, steel pipe, safety railing will be installed along the concrete piers and bulkhead, as needed for pedestrians. $38,260 budget.
- Remove Fence – 60 lf of chain link fence between the fish wharf and the Capitol Yacht Club parking areas will be removed. $330 budget.
- Equipment on Site – The existing equipment on Lot 846 that is not being used will be removed. $1,530 budget.
- Sidewalks – Provide 7,100 sf of sidewalk. $24,070 budget.

**9. CUSTOMER EXPECTATIONS** (Additional pages may be used as needed)

The Corps of Engineers will make every effort to minimize project costs and complete the project within 15 months. After the Corps of Engineers has completed the design work, the Corps of Engineers and the Department of Housing and Community Development will reevaluate the estimated duration, construction costs, and scope of work to ensure that the total project budget amount does not exceed $453,260. The Corps of Engineers will make reasonable efforts to accommodate the tenant's priorities for work preformed. However, the final decisions shall remain with DHCD. The priority of the items in the scope of work will generally be in the order listed. The Corps of Engineers will make reasonable efforts to minimize the disruption to Tenant's business. The majority of construction on the fish wharf property will be scheduled to occur during the winter months. If multiple design-build contracts are awarded, the contracts will require close coordination with the Corps project manager to avoid construction scheduling conflicts.

| 10. USACE PROJECT OFFICER Name: Mary Y. Dan Voice: (410)962-3377 FAX:  (410)962-9312 | 11. CUSTOMER PROJECT OFFICER Name: Joseph J. Wolfe Voice: (202) 442-6977 FAX:  (202) 442-6967 |
|---|---|
| ADDRESS  Baltimore District, U.S. Army Corps of Engineers P.O. Box 1715 Baltimore, MD 21203-1715 | ADDRESS  D.C. Dept of Housing & Community Development 801 North Capitol Street, N.E., 8th Floor Washington, DC  20002 |

(Proponent: CECW-RI)

**12. REPORTS**

A complete set of as-built drawings shall be provided.

**13. FUNDS** *(Page(s) with cost breakdown may be attached as necessary)*

| SOURCE | PREVIOUS AMOUNT | AMOUNT THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| a. USACE AMOUNT | | | |
| b. CUSTOMER AMOUNT | $ | $453,260 | $453,260 |
| c. TOTAL PROJECT COST | $ | $453,260 | $453,260 |

**14. FUNDING**   Funds will be provided by:

- a. ☐ Transfer Appropriation *(SF1151, Non-Expenditure Transfer Authorization)*

  ☒ Reimbursable Order *(31 USC 1535 - Economy Act)*

  ☐ Other *(describe)*

- b. Appropriation:

**15. BILLING**

- a. Request for payment will be made by:   ☒ SF 1080   ☐ SF 1081   ☐ Other *(describe)*

- b. Frequency:   ☒ Monthly  ☐ Quarterly   ☐ Upon Work Completion  ☐ Other *(describe)*

- c. Request for payment will cite the following accounting information *(describe necessary documentation):*

- d. Submit to:  D.C. Dept of Housing & Community Development
  Office of the Comptroller
  801 North Capitol Street, N.E., 7th Floor
  Washington, DC  20002

**16. AUTHORITY**

Public Law 106-113, District of Columbia FY 2000 Appropriations, 31 USC 1535 - Economy Act, and Memorandum of Agreement Between the District of Columbia and the U.S. Army Corps of Engineers regarding Improvements to the Southwest Waterfront.

**17. APPROVALS**

| a. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR USACE | SIGNATURE | DATE |
|---|---|---|
| James R. Jones<br>Chief, Programs and Project Management Division | | |
| b. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR THE CUSTOMER | SIGNATURE | DATE |
| Othello Mahone, Interim Director<br>Department of Housing and Community Development | | |

ENG FORM 4914-R, Jan 88

(Proponent: CECW-RJ)

| US ARMY CORPS OF ENGINEERS INTERAGENCY AGREEMENT (ER 1140-1-211) | 1. AGREEMENT NUMBER | WO 6 |
|---|---|---|
| | 2. ☒ INITIAL AGREEMENT ☐ AMENDMENT NUMBER | |

| 3. PROJECT TITLE   Improvements to the Southwest Waterfront Fish Market and Washington Marina | 4. EFFECTIVE DATE  1 July 2000 |
|---|---|
| | 5. COMPLETION DATE  30 June 2001 |

| 6. NAME AND ADDRESS OF USACE ORGANIZATION Baltimore District, U.S. Army Corps of Engineers P.O. Box 1715 Baltimore, MD 21203-1715 | 7. NAME AND ADDRESS OF CUSTOMER D.C. Dept of Housing & Community Development 801 North Capitol Street, N.E., 8th Floor Washington, DC  20002 |
|---|---|

**8. SCOPE OF WORK** *(Additional pages may be used as needed)*

In accordance with Public Law 106-113, the Corps of Engineers agrees to prepare, procure, and oversee contracts for improvements to the Southwest Waterfront in the District of Columbia as follows:

1. Management – The Corps of Engineers will provide a project manager to provide overall management of contract procurement and construction of the improvements. $73,710 budget, $272,730 contingency for entire project.
2. Construction Supervision & Inspection – A project engineer will oversee the construction contractor and verify that improvements are being provided in accordance with the construction contract. $196,560 budget.
3. The following will be removed/ constructed:
- Marina Building –A new membrane roof will be installed, and the electrical service will be upgraded. The electrical upgrades will include demolition and removal of the existing 400 A service and the installation of 1 – 1200 A 208/120V 3 phase electrical service, 3 – 400 A distribution panels, feeders from the new 1200 A service to each (3) 400 A panel, and reconnection of the existing store circuits to a new 400 A panel. $255,000 budget.
- Piers and Boat Slips - Remove, as necessary, existing piles and piers and install fully-functional floating pier/dock replacements with such accessories (water, electric, etc.) as specified by the Tenant in a configuration shown in the attached site plan. The number of floating piers and docks to be installed by the government will be the maximum number which can be installed within a $1,150,000 budget.
- Fish Cleaning Building – The central historic portion of the structure will be renovated for the fish cleaning service and vending machines. The remainder of the building will be demolished. A new facility for the public restrooms and dumpsters will be constructed at the eastern edge of Lot 846. The new facility will be a masonry structure similar to the existing. $365,390 budget.
- Concrete Piers – The existing wooden piles under the marina and fish wharf piers will be repaired and replaced as needed. The fish wharf piers, approximately 16,868 sf, will be repaved with a new concrete surface and made ADA compliant. 1.5" of the existing surface will be removed to level the piers. A new concrete surface will be poured with 6 x 6 inch wire reinforcing. A patterned surface will be provided and color dye will be included. Utilities serving the fish wharf barges will be upgraded to meet current codes. $225,000 budget excluding pile repairs or replacement.
- Paving – Approximately 50,000 sf of paving, trees and stumps throughout the site, and chainlink fences around the parking lot west of the marina and to the east of the Maine Avenue Seafood building will be removed. The entire site, approximately 100,000 sf, will be cut, filled, and graded to provide larger, more level, parking areas and to improve stormwater management. 6" subbase, 6" base, and 3" wearing courses and striping will be provided. A concrete walkway along the waterfront between the marina building and the east edge of the fish wharf will be provided. $414,370 budget.
- Landscaping – Landscaping improvements will be provided along Main Avenue and around parking lots in areas that will not reduce parking capacity. $47,240 budget.

**9. CUSTOMER EXPECTATIONS** (Additional pages may be used as needed)

The Corps of Engineers will make every effort to minimize project costs and complete the project within 15 months. After the Corps of Engineers has completed the design work, the Corps of Engineers and the Department of Housing and Community Development (DHCD) will reevaluate the estimated duration, construction costs, and scope of work to ensure that the total project budget amount does not exceed $3,000,000. The Corps of Engineers will make reasonable efforts to accommodate the tenant's priorities for work preformed. However, the final decisions shall remain with DHCD. The marina building roof and the marina piers and boat slips will be first and second priority respectively. The priority of the remaining items in the scope of work will generally be in the order listed. The Corps of Engineers will make reasonable efforts to minimize the disruption to Tenant's business. The majority of construction on the fish wharf property will be scheduled to occur during the winter months. If multiple design-build contracts are awarded, the contracts will require close coordination with the Corps project manager to avoid construction scheduling conflicts.

| 10. USACE PROJECT OFFICER | 11. CUSTOMER PROJECT OFFICER |
|---|---|
| Name: Mary Y. Dan Voice: (410)962-3377 FAX:  (410)962-9312 | Name: Joseph J. Wolfe Voice: (202) 442-6977 FAX:  (202) 442-6967 |
| ADDRESS  Baltimore District, U.S. Army Corps of Engineers P.O. Box 1715 Baltimore, MD 21203-1715 | ADDRESS  D.C. Dept of Housing & Community Development 801 North Capitol Street, N.E., 8th Floor Washington, DC  20002 |

ENG FORM 4914-R, Jan 88

(Proponent: CECW-RJ)

**12. REPORTS**

A complete set of as-built drawings shall be provided.

**13. FUNDS** *[Page(s) with cost breakdown may be attached as necessary]*

| SOURCE | PREVIOUS AMOUNT | AMOUNT THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| a. USACE AMOUNT | | | |
| b. CUSTOMER AMOUNT | $ | $3,000,000 | $3,000,000 |
| c. TOTAL PROJECT COST | $ | $3,000,000 | $3,000,000 |

**14. FUNDING**   Funds will be provided by:

☐ a.   Transfer Appropriation *(SF1151), Non-Expenditure Transfer Authorization)*

☒   Reimbursable Order *(31 USC 1535 - Economy Act)*

☐   Other *(describe)*

b. Appropriation:

**15. BILLING**

a. Request for payment will be made by:   ☒ SF 1080   ☐ SF 1081   ☐ Other *(describe)*

b. Frequency:   ☒ Monthly ☐ Quarterly   ☐ Upon Work Completion ☐ Other *(describe)*

c. Request for payment will cite the following accounting information *(describe necessary documentation)*:

d. Submit to:   D.C. Dept of Housing & Community Development
Office of the Comptroller
801 North Capitol Street, N.E., 7th Floor
Washington, DC  20002

**16. AUTHORITY**

Public Law 106-113 – District of Columbia FY 2000 Appropriation, 31 USC 1535 - Economy Act, and Memorandum of Agreement Between the District of Columbia and the U.S. Army Corps of Engineers regarding Improvements to the Southwest Waterfront.

**17. APPROVALS**

| | SIGNATURE | DATE |
|---|---|---|
| a. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR USACE<br>James R. Jones<br>Chief, Programs and Project Management Division | | |
| b. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR THE CUSTOMER<br>Othello Mahone, Interim Director<br>Department of Housing and Community Development | | |

ENG FORM 4914-R, Jan 88

(Proponent: CECW-RI)

## EXHIBIT E

[Rules and Regulations]

4/24/00 6:12 PM

## EXHIBIT E

## RULES AND REGULATIONS

### Purpose

The purpose of these Rules and Regulations is to summarize Tenant's responsibilities with respect to the day-to-day operation and maintenance of the Project.

### Common Area Use

To ensure a pleasing and safe environment in the common areas (parking lots and sidewalks) of the Project, each Tenant shall:

1. Keep the sidewalk in front of its Premises clear and free from ice and snow. (Use only sodium based ice melters that do not damage the pavement.)

2. Not place any objects in the common areas of the Project, except in areas, if any, designated for tables by the Tenant Committee.

3. Not solicit business in the common areas; i.e., no signs or displays, except as approved by the Tenant Committee.

4. Not use the common areas for the sale of merchandise without the prior written consent of Landlord.

### Storefronts and Signs

To ensure a consistent appearance throughout the Project:

1. Tenant shall keep the storefront of its Premises in good repair and clean condition.

2. Any temporary sign used by Tenant in its door or window must be professionally made and must comply with District of Columbia sign regulations.



## Tenant Advertising

1. Tenant shall not utilize any advertising medium within the Project that can be seen, heard, or experienced outside of the Premises, including, but not limited to, flashing lights, searchlights, loudspeakers, phonographs, radios or televisions, except as may be approved by the Tenant Committee, as, for example, seasonal displays of lighting and music.

2. Tenant shall not display, paint, place or cause to be displayed, painted, or placed, any handbills, bumper stickers, sandwich boards or other advertising devices in any portion Common Area.

3. Tenant shall not distribute, or cause to be distributed, in the Project, any handbills or other advertising devices; and will not conduct or permit any activities that might constitute a nuisance.

## Loading and Unloading

All shipping, receiving, loading or unloading of Tenant's merchandise, supplies or other property shall take place only in the areas, and at times, designated therefor by the Tenant Committee. Tenant shall not permit any trucks, trailers, or other vehicles or equipment engaged in such activities to interfere with the use of any Common Area or any pedestrian or vehicular use.

## Noise

Tenant shall not permit any noise to be made inside of its Premises which can be heard outside of the Premises. Tenant shall not use any loudspeaker or other communications equipment that may be heard or seen outside of its Premises.

## Odors

Tenant shall prevent the emission of odors from its Premises that are objectionable to its neighbors.

## Refuse

To ensure a clean and equitable refuse handling system:

1. The Management Agent for the Project shall provide refuse containers and disposal service and will allocate the costs thereof to each tenant as provided in its lease.

2. Tenant shall keep its refuse in proper containers in its Premises and shall place it in the refuse container when taken outside the Premises.

## Pest Exterminator Services

Tenant shall contract with a professional exterminator for monthly inspections and treatments as necessary, to ensure that infestations by insects and rodents do not occur on the Premises.

## Store Plans and Permits

The plans and contractors for doing any work in the Premises that requires a permit must be submitted to the Landlord for approval. This includes but is not limited to work that requires a building, mechanical, electrical, or plumbing permit.

## Parking

To ensure that adequate and convenient parking is available to customers of the Project, no part of the Common Area may be used for parking by employees of Tenant or other Tenants of the Project.

## Emergencies

Tenant must notify the Landlord, as soon as possible, of any emergency situation, injury, fire or disorder that occurs in the Tenant's Premises or any common area of the Project.

## Outside Promotional Activities

To avoid undesired disturbances of Tenants and customers of the Project, outside promotional activities will only be permitted with approval of the Tenant Committee.

## Video Games

Tenant shall not permit the installation or use in any portion of its Premises of a pinball, video or other amusement or game machine of any kind.



# EXHIBIT B

for every dollar expended, in cash or in kind, to carry out the activities supported by the grant.

FEDERAL PAYMENT TO HISTORICAL SOCIETY FOR CITY MUSEUM

For a Federal payment to the Historical Society of Washington, D.C., for the establishment and operation of a Museum of the City of Washington, D.C. at the Carnegie Library at Mount Vernon Square, $2,000,000, to remain available until expended, to be deposited in a separate account of the Society used exclusively for the establishment and operation of such Museum: *Provided*, That the Secretary of the Treasury shall make such payment in quarterly installments, and the amount of the installment for a quarter shall be equal to the amount of matching funds that the Society has deposited into such account for the quarter (as certified by the Inspector General of the District of Columbia): *Provided further*, That notwithstanding any other provision of law, not later than January 1, 1999, the District of Columbia shall enter into an agreement with the Society under which the District of Columbia shall lease the Carnegie Library at Mount Vernon Square to the Society beginning on such date for 99 years at a rent of $1 per year for use as a city museum.

FEDERAL PAYMENT FOR A NATIONAL MUSEUM OF AMERICAN MUSIC
AND FOR DOWNTOWN REVITALIZATION

For a Federal contribution to the District of Columbia to establish a National Museum of American Music and for downtown revitalization, $700,000 which shall be deposited into an escrow account held by the District of Columbia Financial Responsibility and Management Assistance Authority, to remain available until expended: *Provided,* That $300,000 shall be available from this appropriation for the Federal City Council to conduct a needs and design study for a National Museum of American Music: *Provided further,* That $300,000 shall be available from this appropriation for the Washington Center Alliance to further and promote the objectives of the Interactive Downtown Task Force: *Provided further,* That $100,000 shall be paid to Save New York Avenue, Inc., for the further improvement of that portion of New York Avenue designated as the Capital Gateway Corridor.

UNITED STATES PARK POLICE

For a Federal payment to the United States Park Police, $8,500,000, to acquire, modify and operate a helicopter and to make necessary capital expenditures to the Park Police aviation unit base: *Provided,* That the Chief of the United States Park Police shall provide quarterly financial reports during fiscal year 1999 on the expenditure of said funds to the Committees on Appropriations of the Senate and House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committee on Government Reform and Oversight of the House of Representatives.

FEDERAL PAYMENT FOR WATERFRONT IMPROVEMENTS

For a Federal payment to the District of Columbia Department of Housing and Community Development for a study in consultation

112 STAT. 2681–125      PUBLIC LAW 105–277—OCT. 21, 1998

with the United States Army Corps of Engineers of necessary improvements to the Southwest Waterfront in the District of Columbia (including upgrading marina dock pilings and paving and restoring walkways in the marina and fish market areas) for the portions of Federal property in the Southwest quadrant of the District of Columbia within Lots 847 and 848, a portion of Lot 846, and the unassessed Federal real property adjacent to Lot 848 in Square 473, and for carrying out the improvements recommended by the study, $3,000,000: *Provided,* That no portion of such funds shall be available to the District of Columbia unless the District of Columbia executes a 30-year lease with the existing lessees, or with their successors in interest, of such portions of property not later than 30 days after the existing lessees or their successors in interest have submitted to the District of Columbia acceptable plans for improvements and private financing: *Provided further,* That the District of Columbia shall report its progress on this project on a quarterly basis to the Committees on Appropriations of the House of Representatives and the Senate.

### FEDERAL PAYMENT FOR MENTORING SERVICES

For a Federal payment to the International Youth Service and Development Corps, Inc. for a mentoring program for at-risk children in the District of Columbia, $200,000: *Provided,* That the International Youth Service and Development Corps, Inc. shall submit to the Committees on Appropriations of the House of Representatives and the Senate an annual report due November 30, 1999, on the activities carried out with such funds.

### FEDERAL PAYMENT FOR HOTLINE SERVICES

For a Federal payment to the International Youth Service and Development Corps, Inc. for the operation of a resource hotline for low-income individuals in the District of Columbia, $50,000: *Provided,* That the International Youth Service and Development Corps, Inc. shall submit to the Committees on Appropriations of the House of Representatives and the Senate an annual report due November 30, 1999, on the activities carried out with such funds.

### FEDERAL PAYMENT FOR PUBLIC EDUCATION

For a Federal contribution to the public education system for public charter schools, $15,622,000.

### FEDERAL PAYMENT FOR MEDICARE COORDINATED CARE DEMONSTRATION PROJECT IN THE DISTRICT OF COLUMBIA

For payment to the District of Columbia Financial Responsibility and Management Assistance Authority, $3,000,000 for the continued funding of a Medicare Coordinated Care Demonstration Project in the District of Columbia as specified in section 4016(b)(2)(C) of the Balanced Budget Act of 1997.

### FEDERAL PAYMENT FOR CHILDREN'S NATIONAL MEDICAL CENTER

For a Federal contribution to the Children's National Medical Center in the District of Columbia, $1,000,000 for construction,

| 105TH CONGRESS<br>2d Session | HOUSE OF REPRESENTATIVES | REPORT<br>105–670 |
|---|---|---|

## DISTRICT OF COLUMBIA APPROPRIATIONS BILL, 1999

AUGUST 3, 1998.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. TAYLOR of North Carolina, from the Committee on Appropriations, submitted the following

## REPORT

[To accompany H.R. 4380]

The Committee on Appropriations submit the following report in explanation of the accompanying bill making appropriations for the District of Columbia for the fiscal year ending September 30, 1999, and for other purposes.

INDEX TO BILL AND REPORT

| | Page Bill | Page Report |
|---|---|---|
| Summary of estimates and recommendations | --- | 2 |
| Federal Funds | 2 | 2 |
| District of Columbia Funds | 8 | 3 |
| Comparative Summary of Bills | --- | 3 |
| General Statement | --- | 6 |
| Operating Expenses: | | |
| Governmental Direction and Support | 8 | 34 |
| Economic Development and Regulation | 9 | 39 |
| Public Safety and Justice | 10 | 43 |
| Public Education System | 13 | 47 |
| Human Support Services | 18 | 56 |
| Public Works | 19 | 60 |
| Washington Convention Center Transfer Payment | 19 | 65 |
| Repayment of Loans and Interest | 19 | 65 |
| Repayment of General Fund Recovery Debt | 20 | 65 |
| Interest on Short-Term Borrowing | 21 | 66 |
| Certificates of Participation | 21 | 66 |
| Human Resources Development | 21 | 67 |
| Productivity Savings | 21 | 67 |
| Receivership Programs | 21 | 67 |
| D.C. Financial Responsibility and Management Assistance Authority | 21 | 69 |
| Water and Sewer Authority | 23 | 73 |

22

99 years at a rent of $1 per year, for use of the building as a city museum.

## UNITED STATES PARK POLICE

A Federal payment of $8,500,000 is recommended in the bill to acquire, modify and operate a Bell 206L3 aircraft or its equivalent and to make necessary capital expenditures to the Park Police aviation unit base. The Metropolitan Police Department eliminated its aviation wing as a result of the city's financial crisis. As a result, the United States Park Police aviation unit was called on to assume aerial law enforcement activities in the National Capital. With concurrent jurisdiction over the entire District of Columbia, the Park Police provide local residents and visitors with the only aviation law enforcement resource available in the city. In addition, the Park Police aviation unit provides executive and dignitary protection as well as assistance to the U.S. Capitol Police. The Park Police helicopter was used to airlift the two U.S. Capitol Police officers who were fatally wounded in the tragic incident at the Capitol on July 24, 1998.

In recommending this appropriation, the Committee does not expect these funds to be offset by other funds or reprogrammed for other purposes. The Committee urges the National Park Service and the Department of the Interior to undertake a thorough review of funding for the Park Police in light of their unique status in the Nation's Capital, and to make recommendations on structural or programmatic changes to ensure sufficient funding in the future.

The Committee is concerned that tourist and commercial helicopter flights over the District may endanger the ability of the USPP aviation unit to respond to law enforcement, Secret Service and military needs in a timely manner. The Committee requests the Park Police to provide an analysis no later than January 1, 1999, of whether such private aviation activities inhibit law enforcement and should be curtailed.

## FEDERAL PAYMENT FOR WATERFRONT IMPROVEMENTS

The Committee recommends a Federal payment of $3,000,000 to the District of Columbia Department of Housing and Community Development for the U.S. Army Corps of Engineers to provide a cost analysis and make the improvements recommended by the analysis for that portion of the Southwest Waterfront at the historic Fish Market and Washington Marina. The property is Federal property that is managed by the District's Department of Housing and Community Development.

Several factors have combined to leave this portion of the Southwest Waterfront in a dilapidated condition. In the case of the Washington Marina, built during the Franklin Roosevelt Administration, its month-to-month lease status of over 40 years has made it impossible for the lessee to obtain financing for maintenance and upgrades that are long overdue. Nor has the city invested in improvements to the property for which it is responsible. The result is that the building is dilapidated, its electrical system is hazardous and needs replacement, and the piers and docks are collapsing into the Potomac. In the case of the Fish Market, a unique and

popular working fish and crab market consisting of several barges attached to the land and to a pier, years of neglect and disagreements between lessees and the city have left the area looking shabby. The contrast with the remainder of the Southwest Waterfront, which is in an acceptable and safe condition, is notable in that the other Southwest Waterfront lessees were long ago awarded very long term leases by the city, permitting those lessees to finance attractive buildings and improvements.

The city is attempting to develop a long-term redevelopment plan for the Southwest Waterfront, to make it the showplace that it ought to be—along a beautiful river, and in sight of the Washington Monument and the Tidal Basin. However, in pursuing these plans, the city has continued the short-term, month-to-month lease policy that makes beautification and improvements of the Fish Market and the Marina by its lessees nearly impossible to finance and to accomplish. This situation further delays effective development and improvements, and precipitates the lessees' untenable business position, promoting an unacceptable further decay of the Southwest Waterfront.

The bill includes language directing the District's Department of Housing and Community Development to use a portion of this grant to secure the U.S. Army Corps of Engineers' expertise for an analysis of the costs for performing needed repairs on these Southwest Waterfront properties. Such repairs would include replacement of the pilings, piers and decks at the Washington Marina, and improvements to the Washington Marina building, and pavement, walkway and pier improvements at the Fish Market. The bill also includes language making the remaining funds available to help execute these repairs and improvements in conjunction with financing privately raised by the lessees as the result of negotiating long-term leases with the city. The availability of these remaining funds is contingent upon the city's Department of Housing and Community Development negotiating 30-year leases with the existing lessees, or their successors in interest, within 90 days of the enactment of this Act, so that the lessees would be able to successfully obtain private financing to fulfill their responsibility in this partnership.

Years of broken promises have contributed to mistrust and miscommunication between the Washington Marina and Fish Market lessees and the District government, resulting in the Southwest Waterfront's tragic deterioration. A good-faith partnership between the Federal government, the city, and the lessees can help renew the Southwest Waterfront, to the benefit of all concerned. Numerous issues remain to be negotiated between the city and the lessees, including the status of corporate successors to the original individual Fish Market lessees, and the clarification as to who is responsible for particular improvements. The Committee expects progress to be made promptly to the satisfaction of the lessees, the city, and the Committee, and requests that the District's Department of Housing and Community Development report to the Committee on a quarterly basis on this project in particular with respect to the issuance of long-term leases which the Committee deems crucial to the successful improvement of the Southwest Waterfront. The Committee further expects to review progress on the

24

Southwest Waterfront improvement as part of its budget process for fiscal year 2000. Through this grant, Congress is committed to secure the responsible renovation of this long-neglected Federal property.

### HARBOR POLICE

The Committee notes the importance of maintaining safety for boaters, fishermen and residents along the District's Potomac and Anacostia waterfronts as a part of the city's economic development and community restoration strategy, through providing a sufficient number of harbor police on the beat.

### FEDERAL PAYMENT FOR MENTORING SERVICES

The Committee recommends a Federal contribution of $200,000 for a mentoring program for at-risk children in the District of Columbia. The bill includes language requiring the contractor to provide an annual report to the Congress on the activities of the program.

### FEDERAL PAYMENT FOR HOTLINE SERVICES

The bill includes a Federal payment of $50,000 for the operation of a resource hotline for low-income individuals in the District of Columbia. Language is included in the bill requiring the contractor to provide an annual report to the Congress on the activities of the program.

### FEDERAL PAYMENT FOR PUBLIC EDUCATION

A Federal payment of $20,391,000 is recommended for public charter schools, in the District. These funds combined with local funds of $12,235,000 will provide a total of $32,626,000 for fiscal year 1999. This funding level is based on a per pupil formula determined by the City Council as required by the School Reform Act of 1996 and will allow 4,400 District students to attend charter schools in the District.

### FEDERAL GRANTS

The District of Columbia participates as a State, county and city in the various Federal grant programs. At the time the fiscal year 1999 budget was submitted the city estimated that it would receive a total of $2,300,772,780 which included $1,982,904,780 in Federal grants for the six years of capital outlay included in the appropriation request. The Committee recommends $27,258,000 in additional Federal funds to bring the total to $2,328,030,780 in Federal grants during the coming fiscal year.

The following table shows the amount of Federal grants the city expects to receive and the office or agency that expects to receive them:

*Summary of Federal grant assistance to the District of Columbia*

| Agency | 1999 Estimate |
|---|---|
| Governmental Direction and Support: | |
| Office of Contracts and Procurement ............................................. | $2,285,000 |

# EXHIBIT C

# LEASE AGREEMENT

THE DISTRICT OF COLUMBIA,
acting on behalf of THE UNITED STATES OF AMERICA,

LANDLORD

and

BRW, INC.,
T/A CAPT. WHITE SEAFOOD CITY,

TENANT

for

Premises Nos. 7, 8, and 9
Municipal Fish Wharf



## TABLE OF CONTENTS

Section Number and Caption      Page

1. Definitions ................................................................................................ 1
2. Lease of the Premises; Termination of Prior Lease; Tenant's Acceptance of Premises ............ 4
3. Landlord's Work ......................................................................................... 5
4. [Intentionally Omitted] ............................................................................... 5
5. Minimum Rent ........................................................................................... 6
6. Late Charges ............................................................................................. 7
7. Additional Rent: CPI Adjustment; Percentage Rent ............................................ 7
8. Utilities .................................................................................................... 8
9. Common Areas; Employee Parking ................................................................. 8
10. Common Area Operating Cost ....................................................................... 8
11. Use of Premises ......................................................................................... 10
12. Signs ....................................................................................................... 10
13. Alterations ............................................................................................... 10
14. Fixtures and Equipment .............................................................................. 10
15. Tenant's Maintenance; Condition of the Premises .............................................. 11
16. Landlord's Right of Entry ............................................................................ 11
17. Tenant's Indemnity; Insurance ..................................................................... 11
18. [Intentionally Omitted] ............................................................................... 12
19. Assignment and Subletting .......................................................................... 12
20. [Intentionally Omitted] ............................................................................... 13
21. Tenant's Defaults ...................................................................................... 13
22. Landlord's Remedies in Case of Tenant's Default ............................................. 14
23. Landlord's Right to Cure Tenant's Default ...................................................... 15
24. [Intentionally Omitted] ............................................................................... 15
25. Holding Over ............................................................................................ 15
26. Surrender of Premises ................................................................................ 15
27. Limitation on Landlord's Liability ................................................................ 16
28. Notices .................................................................................................... 16
29. Quiet Enjoyment ....................................................................................... 17
30. Security Deposit ........................................................................................ 17
31. [Intentionally Omitted] ............................................................................... 18
32. Rules and Regulations ................................................................................ 18
33. Waiver of Jury Trial ................................................................................... 18
34. Covenant Against Contingent Fees ................................................................ 18
35. Facilities Nondiscrimination ........................................................................ 18
36. Nondiscrimination in Employment ................................................................ 19
37. Environment Protection .............................................................................. 20
38. Miscellaneous .......................................................................................... 20

Exhibit A - Outline of the Premises
Exhibit B - Site Plan of the Project
Exhibit C – Certificate of Acceptance
Exhibit D – Work Orders 4 & 5
Exhibit E – Rules and Regulations



# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made this 12th day of July, 2000, by and between THE DISTRICT OF COLUMBIA, acting on behalf of THE UNITED STATES OF AMERICA, whose notice address is Director, District of Columbia Department of Housing and Community Development, 801 North Capitol Street, N.E., 8th Floor, Washington, D.C. 20002 ("Landlord"), and BRW, INC., a District of Columbia corporation, t/a Capt. White Seafood City, whose notice address is 1100 Maine Avenue, S.W., Washington, D.C. 20024 ("Tenant").

In consideration of the promises in the Lease, Landlord and Tenant agree as follows:

## 1.    *Definitions.*

Certain terms in this Lease are defined below:

A.    **Barges:**  The barges owned by Tenant on which Tenant operates its business. The Barges are located on the Premises.

B.    **Commencement Date:**  The date of this Lease.

C.    **Common Areas:**  "Common Areas" mean all areas within the Project that Landlord makes available to tenants and their customers for their general use, convenience and benefit, including restrooms, parking areas, driveways, walkways, landscaped or planted areas, lighting facilities, service areas and loading and unloading areas, as depicted on Exhibit B hereto.

D.    **Consumer Price Index:**  The "Consumer Price Index" means the index for the Washington - Baltimore, DC – MD - VA – WV area, now known as the United States Bureau of Labor Statistics, consumer Price Index, for All Urban Consumers, all items (1996=100).

E.    **Lease Year:**  The first "Lease Year" shall begin on the New Rent Commencement Date and shall end on December 31 of the year following the year in which the New Rent Commencement Date shall occur, in order that each subsequent Lease Year hereunder shall coincide with the calendar year. Each subsequent Lease Year shall commence on the day immediately following the last day of the preceding Lease Year, and shall continue for a period of twelve (12) full calendar months.

F.    **Minimum Rent:**  The minimum rent payable during the Term, as follows: from the Commencement Date to the New Rent Commencement Date, equal monthly installments in the amount of THREE HUNDRED THREE AND 03/100 DOLLARS ($303.03), as provided herein. Commencing on the New Rent Commencement Date and for the first Lease Year, equal monthly installments in the amount of TWO THOUSAND TWO HUNDRED FIFTY AND 00/100 DOLLARS ($2,250.00). Thereafter, on the first day of the second (2nd) and each succeeding Lease Year, the Minimum Rent shall be adjusted for the following Lease Year by the CPI adjustment described in Section 7 below until the date on which the "Base Amount," as defined in Section 1.H below, shall have been reached, at which point the Minimum Rent then prevailing shall be fixed as the Minimum Rent applicable for the succeeding five (5) Lease Years,

and thereafter, upon the expiration of such five (5) Lease Year period, and for each succeeding five (5) Lease Year period during the Term, the Minimum Rent shall be increased by three percent (3.0%) over the Minimum Rent applicable during the preceding five (5) Lease Year period. [As an example, see the following chart, which assumes CPI increases during 2001 and 2002 of 3% each year, and a "Base Amount" of $15,000,000.]

| LEASE YEAR | MINIMUM RENT | GROSS NON-TAXABLE SALES | PERCENTAGE RENT | TOTAL RENT |
|---|---|---|---|---|
| 2001 | 27,000 | $10mm | 0 | $27,000 |
| 2002 | 27,810 | $11mm | 0 | $27,810 |
| 2003 | 28,644 | $16mm | $5,000 | $33,644 |
| 2004 | 28,644 | $17mm | $10,000 | $38,644 |
| 2005 | 28,644 | $14mm | 0 | $28,644 |
| 2006 | 28,644 | $18mm | $15,000 | $43,644 |
| 2007 | 28,644 | $19mm | $20,000 | $48,644 |

G.    **New Rent Commencement Date:**  The date upon which "Landlord's Work" (as defined in Section 3) is substantially completed; i.e., upon receipt of a Certificate of Substantial Completion from the Corps of Engineers, and provided that all utilities to be delivered to the Premises are then in working order.

H.    **Percentage Rent:**  For each Lease Year, an amount equal to 1/2 of one percent (0.5%)] of the excess of (A) Tenant's "Gross Non-Taxable Sales" (as defined in Section 7) made during the Lease Year, over (B) the "Base Amount" (defined below).  The term "Base Amount," for purposes of this definition, means one hundred fifty-five and one-half percent (155.5%) of the amount of actual Gross Non-Taxable Sales for the Premises for calendar year 1999.

I.    **Permitted Uses:**  The retail sale of seafood (fresh and prepared) and of fresh produce, including accessory items such as cole slaw, french fries, and the like, or any other use consistent with and permitted by the 1913 Federal legislation creating the Project and appointing the District of Columbia as manager of the Project. Notwithstanding the foregoing, (i) the proportion of the total area leased by Tenant and any person or entity related to Tenant (a "Tenant Affiliate") within the Project, exclusive of any area leased by THE WHARF, INC., a District of Columbia corporation t/a The Wharf, that is devoted to the preparation and sale of prepared food by Tenant or such Affiliate shall not be increased significantly above the proportion devoted to such use as of the date hereof; (ii) prepared food shall be sold only on a "takeout" basis; and (iii) there shall be no serviced tables situated within the Premises or in the Common Area unless plans for same shall

have been approved by Landlord and unless Landlord and Tenant shall have executed an amendment hereto providing for a change to restaurant use and, among other things, revising the Percentage Rent payable hereunder in respect of the portion of the Premises to be devoted to such restaurant use. As to clauses (i), (ii), and (iii) above, Landlord shall enforce parallel restrictions on all other tenants within the Project.

J.    **Premises:**  The spaces in the Project identified on Exhibit A as Nos. 7, 8, and 9. The Premises consist of an area on the surface of the water sufficient to moor three Barges to the concrete pier [one in No. 7 ("Barge 7"), one in No. 8 ("Barge 8"), and one in No. 9 ("Barge 9")]. Barge 7 shall have no more than 20 linear feet, Barge 8 shall have no more than 65 linear feet, and Barge 9 shall have no more than 56 linear feet.  Tenant shall have the right to connect the Barges that comprise the Premises under this Lease as well as the Barges that comprise the "Premises" under the Lease between Landlord and The Wharf, Inc. t/a The Wharf by a floating walkway that shall not exceed six feet (6') in width, as shown on Exhibit B-1 hereto.

T

K.    **Project:**  The Municipal Fish Wharf located between 11th and 12th Streets, south of Maine Avenue, S.W., Washington, D.C. The Project includes the portion of the Potomac River in which the tenants' barges are moored.  A site plan of the Project is attached as Exhibit B. A certified survey of the Project, to include references to all Lots and Squares, or portions thereof, included within the Project, has been commissioned and will be delivered to the parties upon completion, at which time a legal description of the Project shall be initialed and attached hereto as a substitute and replacement for the existing Exhibit B.

L.    **Security Deposit:**  $2,250.00, which shall be due and payable within thirty (30) days after the effective date of this Lease.

M.    **Tenant Committee:**  A committee representing the tenants of the Project and composed of one representative to be named by each such tenant. The Tenant Committee shall cooperate with the Management Agent to be retained for the Project, as provided herein, to carry out the operation, maintenance, and repair of the Common Areas of the Project. The Tenant Committee may, at its option, elect to operate by means of a limited liability company or other legal entity. All matters requiring decisions by the Tenant Committee shall be decided on the basis of a simple majority.  Voting on all such matters by Tenant and the other tenants of the Project shall be based upon the "Proportionate Share" (hereinafter defined) of each.

N.    **Tenant's Proportionate Share:**  16.97%, which equals the percentage that the number of linear feet of frontage in the Premises bears to the number of linear feet of frontage in the Project.  If the number of linear feet of frontage in the Project changes, Tenant's Proportionate Share will be adjusted accordingly.

O.    **Term:**  The period that begins on the Commencement Date and ends thirty (30) Lease Years after the New Rent Commencement Date, unless sooner terminated pursuant to this Lease. Tenant acknowledges that it has no right hereunder to renew or extend the Term hereof,

or to negotiate for a renewal of the Term hereof. However, Landlord acknowledges that nothing contained herein shall prevent Tenant hereafter from seeking to obtain any such rights.

P.    **Prohibited Use:**  Anything herein to the contrary notwithstanding, Tenant covenants that during the term of this Lease, (1) it shall not engage in the business of fish cutting or oyster shucking, nor shall it offer non-alcoholic beverages from vending machines; provided, that the provisions of this Section 1.P shall be enforceable only during such times as Virgo Fish House, its successors or permitted assigns, shall engage in the activities described herein at other premises within the Project; and (2) it shall not engage in the sale of liquor for consumption off the Premises. It is understood and agreed that the foregoing prohibition on oyster shucking is intended to apply only to the shucking of oysters conducted as an independent business, and shall not apply to the shucking by Tenant of oysters sold by Tenant.

Q.  **Restrictions on Sales.**  The following restrictions shall appear in all Leases of Barge Spaces within the Project. In the particular Lease or Leases to which any such restriction pertains, such provision shall act as a restriction imposed and enforceable by Landlord for its benefit, and imposed and enforceable by the other tenants of the Project for their benefit, and accepted by the tenant or tenants occupying the area to which such restriction directly pertains.

(i)   For a period of ten (10) years, expiring on the tenth (10) anniversary of this Lease, the sale of seafood of any type shall be prohibited throughout the rectangular area comprising the southernmost twenty-four feet (24') of Barge 6.

(ii)   For the entire Term of this Lease, the sale of crabs anywhere on Barge 6 or 16 shall be prohibited.

2.    *Lease of the Premises; Termination of Prior Lease; Tenant's Acceptance of Premises; Termination Right.*

A.    Landlord leases to Tenant and Tenant leases from Landlord the Premises for the Term.

B.    Landlord is presently leasing the Premises to Tenant pursuant to an existing lease agreement dated February 20, 1986 (the "Prior Lease"). Effective as of the Commencement Date, the Prior Lease shall terminate, and Tenant's use and occupancy of the Premises will be governed by this Lease.

C.    Tenant has accepted delivery of the Premises under the Prior Lease, and at the commencement of the Term hereunder, Tenant shall continue to occupy the Premises in their "as is" condition, subject to Section 3. Effective as of the Commencement Date, Tenant does hereby release, remise, discharge, and forever waive any and all claims, actions, or causes of action, whether known or unknown, arising from or relating to the Prior Lease that Tenant has or may have against landlord, or its affiliated entities, predecessors, successors, assigns, legal representatives, agents, employees, servants, attorneys, officers, or other representatives.

D.    Anything herein to the contrary notwithstanding, Tenant shall have the right, exercisable by written notice given to Landlord not later than ninety (90) days after submission of the Annual Statement (as defined in Section 7 below), to terminate this Lease if the total of the Minimum Rent and the Percentage Rent (as defined in Sections 1.F and 1.H above) for the Lease Year to which such Annual Statement pertains exceeds ONE HUNDRED TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($125,000.00). This termination right is specifically limited to the first Lease Year in which Minimum Rent and Percentage Rent hereunder exceed such sum. Such termination shall be effective for all purposes one (1) calendar year following the date of such notice.  Upon the expiration of such one (1) year period, and upon the surrender of the Premises in the manner required hereby upon the expiration or termination of this Lease, the parties shall be released and relieved of any obligations accruing in respect of the Premises after the expiration of such one (1) year period.

### 3.    *Landlord's Work.*

A.    Landlord has been allocated $3,000,000 from the federal government (the "Federal Appropriation") to make improvements to the Project and to the marina located next to the Project at 1300 Maine Avenue.  Landlord and Tenant have heretofore agreed upon the nature of the improvements to be made to the Project with the Federal Appropriation and such other sources of funding as may be available to landlord, all as embodied in the Work Orders issued by the Corps of Engineers and reviewed and approved by Landlord and Tenant, and attached hereto as Exhibit D. (The improvements to be made to the Project with the Federal Appropriation and such other sources of funding as may be available to Landlord are referred to hereafter as "Landlord's Work.") Landlord shall have no obligation to spend any funds to complete Landlord's Work in excess of the Federal Appropriation and such other sources of funding as may be available to Landlord.

B.    After Landlord's Work has been determined in accordance with subsection A above, Landlord will complete construction of Landlord's Work in a good and workmanlike manner and in accordance with requirements of governmental authorities.  Tenant shall be consulted with regard to materials and structural details of Landlord's Work, but the final choice thereof shall be in Landlord's sole discretion.  Except for Landlord's Work and except as provided in Section 9, Landlord shall not be required to make any repairs or improvements to the Project.

C.    Landlord shall use reasonable commercial efforts to complete Landlord's Work by June 30, 2001, but shall have no liability to Tenant if it is unable to complete Landlord's Work by that date or by any other date.  Within five (5) days after the New Rent Commencement Date, Tenant shall execute and deliver to Landlord a Certificate of Acceptance, in the form attached hereto as Exhibit C.

D.    Landlord's Work shall comply with ADA requirements, as well as all other applicable Federal and local governmental requirements.

### 4.    *[Intentionally Omitted]*



## 5. *Minimum Rent.*

A.    During the Term, Tenant shall pay all rent, without demand and without setoff, counterclaim, recoupment or other reduction, to the "Management Agent" (defined below) for the Project, including Minimum Rent in monthly installments as set forth in Section 1.F. All monthly installments of Minimum Rent shall be payable in advance on the first day of each month, except that the first payment shall be due on the New Rent Commencement Date.    If the Commencement Date or the New Rent Commencement Date is not the first day of a month, the rent for the months in which those dates fall shall be prorated.

B.    On or before the New Rent Commencement Date, the Tenant Committee shall select, following consultation with, and with the approval of, the Landlord, a "Management Agent" that shall be charged with responsibility for the operation, maintenance, repair, and replacement of all elements of the Common Areas and the orderly operation of the Project. The Management Agent, throughout the term of its employment as such with respect to the Project: (1) shall maintain insurance that includes employee dishonesty or fidelity coverage in an amount at least as great as the amount of funds the Management Agent has access to at any time; and (2) shall covenant not to, and shall not, discriminate against any employee or applicant for employment because of race, creed, color, sexual orientation, physical disability, marital status, or national origin.    Landlord, subject to the review and approval, not to be unreasonably conditioned, delayed, or withheld, of the Tenant Committee, shall negotiate and enter into a Management Agreement with the Management Agent.    The Management Agreement shall provide that, before payment to Landlord of any amounts due Landlord hereunder: (i) twenty-five percent (25%) of the Minimum Rent and all other Rent from this Lease and all other leases of premises within the Project shall be placed in an interest-bearing escrow account with the Management Agent as a reserve for future capital expenditures in respect of the Common Areas, of which as much as one-fifth (1/5) (or five percent (5%) of the Minimum Rent) may be used for advertising the Fish Wharf in local media and signage in Common Areas, although it is acknowledged by the parties that establishing reasonable reserves for capital needs shall have priority; (ii) all "Common Area Operating Costs" shall be paid to, and applied by, Management Agent, as provided in Section 10 below; and (iii) Management Agent shall deduct the sum of TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($25,000.00) (the "Accounting Reserve") from the Rent payable hereunder and shall deposit the same in a reserve account to remain available for purposes paying any accounting or auditing charges incurred by Landlord under Section 7.D below from time to time.    As and when funds in the Accounting Reserve are expended, Management Agent shall again deduct sufficient monies from the Rent payable hereunder to replenish the Accounting Reserve to the level established above..

C.    No payment by Tenant of a lesser amount than the monthly installment of rent or other charges herein stipulated shall be deemed to be other than on account of the earliest stipulated rent or other charges, nor shall any endorsement or statement on any check or letter accompanying any payment be deemed an accord and satisfaction. Landlord may accept any check for payment without prejudice to Landlord's right to recover the balance of the rent due or to pursue any other remedy available to Landlord.

## 6.    *Late Charges.*

Any rental or other payment due from Tenant hereunder which is not received when due shall be payable by Tenant to Landlord, without demand, with interest from the due date until paid at the rate of fifteen percent (15%) per annum (1-1/4% per month), but no less than One Hundred Dollars ($100.00), and Tenant shall reimburse Landlord for reasonable attorneys' fees, if any, incurred by Landlord by reason of Tenant's failure to make timely payment. In addition, Tenant shall pay Landlord a $100.00 fee for each check received by Landlord which is returned by Tenant's bank unpaid.

## 7.    *Additional Rent: CPI Adjustment; Percentage Rent.*

A.    Upon the first (1st) day of the second (2nd) Lease Year, and upon each anniversary thereof occurring during the term of this Lease until such time as Tenant shall have reached the Base Amount (as defined in Section 1.H below) (each, an "Adjustment Date"), the Minimum Rent herein provided shall be adjusted to reflect increases in the Consumer Price Index (as defined in Section 1.D above). Such adjustment shall be accomplished by multiplying the Minimum Rent by a fraction, the numerator of which shall be the Consumer Price Index as of the most recent date prior to such Adjustment Date, and the denominator of which shall be the Consumer Price Index as of the most recent date prior to the New Rent Commencement Date; provided, however, that in no event shall the Minimum Rent be reduced as a result of such adjustment below the Minimum Rent for the immediately preceding year. The increased Minimum Rent established pursuant to this Section 7 shall continue in effect as, and for all purposes of this Lease be defined as, the Minimum Rent until again increased as herein provided.

B.    From and after such time as Tenant shall reach the Base Amount (as defined in Section 1.H above), Tenant shall pay to Landlord, as additional rent, within seventy-five (75) days after the end of each Lease Year, Percentage Rent calculated in accordance with Section 1.H. Tenant's annual payment of Percentage Rent shall be accompanied by a financial statement (the "Annual Statement"), signed by Tenant and reviewed by an independent certified public accountant, showing "Gross Sales" and "Gross Non-Taxable Sales" (as such terms are defined below) and the Percentage Rent for the Lease Year.

C.    "Gross Sales" means the gross amount charged for all sales or services made upon or from the Premises, including any rent or other sum received by Tenant from licensees or concessionaires. "Gross Non-Taxable Sales" means the amount of Gross Sales, minus the amount of all sales and services that shall be subject to, and with respect to which Tenant shall pay, District of Columbia Sales and Use Tax. Each sale shall be valued at the actual sales price charged the customer, even if the sale is a credit or installment sale, and reported in full in the month in which the sale occurs, even if full payment is not received at the time of the sale.

D.    Tenant shall furnish to Management Agent, simultaneously with the filing thereof with the District of Columbia, copies of the Sales and Use Tax Returns currently required to be filed by Tenant in respect of prepared foods and other taxable goods sold by Tenant within the Premises. In addition, Tenant shall prepare, file with the District of Columbia, and make simultaneously available to Landlord informational returns in respect of all raw foods and other

non-taxable goods sold by Tenant within the Premises. Such records shall be open to inspection and audit by Landlord or its accountants. If any audit discloses a deficiency in payment of Percentage Rent, Tenant shall immediately pay Landlord the deficient amount, together with interest thereon at the rate of fifteen percent (15%) per annum from the date such Percentage Rent should have been paid. If a discrepancy of three percent (3%) or more in the reported amount of Gross Non-Taxable Sales is uncovered as a result of any audit, Tenant shall reimburse Landlord for the cost of the audit (including the cost of Landlord's accountant). Landlord shall bear the cost of any audit in which no discrepancy or a discrepancy of less than three percent (3%) shall be found (including the cost of Tenant's accountant). Except to the extent required by law or required to exercise its rights hereunder, Landlord shall maintain the confidentiality of all information furnished by Tenant pursuant to this Section 7.D or otherwise made available to Landlord in connection with the exercise of its rights under Section 7.B above.

8.    **Utilities.**

During the Term, Tenant shall pay directly to the supplier all charges for water, sewer, gas, electricity, telephone and other utilities used upon the Premises. Expenses for maintenance of utility meters shall be borne by Tenant, and if Landlord pays any such expenses, Tenant shall reimburse Landlord promptly upon demand. Landlord shall not be liable for any failure to furnish or for any interruption of utility services, unless caused by the gross negligence of Landlord or Landlord's agents. Upon Tenant's request, Landlord shall furnish a copy of the surety bond or indemnity agreement from any contractor performing work in the Project.

9.    **Common Areas; Employee Parking.**

A.    Landlord grants to Tenant the right, in common with other tenants in the Project, to use the Common Areas during the Term. Such right of use shall be deemed a license coupled with an interest, and shall subsist until the expiration or the earlier termination of the Term. After completion of Landlord's Work, and with the approval of the Tenant Committee, Landlord may change the size, location or nature of the Common Areas, and may locate on the Common Areas structures of any type; provided no such structures would materially interfere with access to the Premises across the Common Areas and to and from Maine Avenue.. Subject to the terms of the Management Agreement, Landlord shall have exclusive control and management of the Common Areas and Landlord may establish and enforce rules therefor.

B.    Parking, including, without limitation, employee parking, within the Project shall be regulated by the Tenant Committee, which shall promulgate parking regulations to be enforced by the Management Agent; provided, that no area within the Project shall be dedicated to parking for employees of Tenant or any other tenant of the Project; and provided, further, that no parking shall be permitted in any area designated for table space in the plans for Landlord's Work.

10.    **Common Area Operating Costs.**

A.    Commencing with the New Rent Commencement Date, Tenant shall pay to Management Agent (as agent for Landlord), as additional rent, Tenant's Proportionate Share of all "Common Area Operating Costs" (as hereafter defined). Common Area Operating Costs means the

sum of the following costs and charges incurred by Landlord for each calendar year or part thereof during the Term: (i) "Common Area Costs" (as hereafter defined); (ii) repair and maintenance costs for the structure and exterior of the buildings in the Project, exclusive of improvements located on barges within the Project and exclusive of expenditures that under "generally accepted accounting principles," as that term is defined by the financial Accounting Standards Board, would be capitalized ("Capital Expenditures"); (iii) "Insurance Costs" (as hereafter defined); and (iv) the monthly fee due Management Agent under the Management Agreement.  Common Area Costs mean all costs incurred by Landlord, excluding Capital Expenditures, to operate, maintain, replace and repair the Common Areas, including costs for the following:  security services; gardening and landscaping; repairs; painting; striping and sweeping; lighting (including the cost of electricity and maintenance and replacement of exterior fixtures and bulbs); and other utility costs for the public restrooms and other facilities located within the Common Area; refuse removal, including dumpsters; ice and snow removal; equipment and supplies related to Common Area maintenance; water and maintenance charges for sprinklers and hydrants; any dues, fees or assessments paid by Landlord with respect to storm water management facilities that benefit the Project; and personnel of Management Agent to operate, maintain and repair the Common Areas (including salaries, employment taxes and workmen's compensation insurance for such personnel). "Insurance Costs" mean all insurance premiums and other costs incurred by Landlord in connection with fire and extended coverage, public liability, business interruption, sign, and any other insurance maintained by Landlord relating to the Project.

      B.      Landlord shall annually notify Tenant of Tenant's Proportionate Share of Common Area Operating Costs for each calendar year, and Tenant shall pay to Management Agent (as agent for Landlord) such amount in equal monthly installments in advance on the first day of each of the twelve (12) months after the date of such notice, the first such monthly installment to be due on the New Rent Commencement Date.  If the New Rent Commencement Date is a date other than the first day of a month, Tenant's Proportionate Share of Common Area Operating Costs for that month shall be prorated.  Landlord shall annually submit to Tenant a statement showing the actual Tenant's Proportionate Share of Common Area Operating Costs for the prior calendar year, the amount paid by Tenant, and the balance due or overpayment.  The balance due shall be paid by Tenant to Management Agent (as agent for Landlord), or the overpayment shall be paid by Landlord to Tenant, without interest, within thirty (30) days after the date of the statement.  Tenant may, upon reasonable notice, examine Project records at the office of the Management Agent during ordinary business hours to verify the statement for the immediately preceding year, but such examination shall not excuse the timely payment of Tenant's Proportionate Share of Common Area Operating Costs.

      C.      The Tenant Committee, in conjunction with the Management Agent, shall prepare an annual budget for operation of, and any contemplated repairs and replacements of, the Common Areas, which shall be made available for the review and reasonable approval of Landlord.  As and when capital expenditures are required, the Tenant Committee, in conjunction with the Management Agent, shall prepare a scope of work and budget therefor, and shall submit same to Landlord for approval, which shall not be unreasonably withheld. Until the New Rent Commencement Date, Tenant, in conjunction with the other tenants of the Project, shall continue to be responsible for and pay operating costs of the Project in the same manner as has been the case

before the date of this Lease, subject to adjustment for any changes being implemented currently in tenants' respective Proportionate Shares.

### 11.   Use of Premises.

A.    Tenant shall use the Premises exclusively for conduct of the business set forth in Section 1.I.

B.    Tenant shall keep the Premises open for business at least forty-five (45) hours per week, excluding any closures caused by fire, natural disasters, or other casualties, required by the Landlord's Work or by repair or renovation work by Tenant, or by dredging activity required by the terms of this Lease.

C.    Tenant shall comply with all laws, ordinances, rules and regulations pertaining to the use and occupancy of the Premises, including the Americans with Disabilities Act and other laws relating to the use of the public areas of the Premises by individuals with disabilities. Tenant shall not permit any act upon the Premises which (i) disturbs tenants of the Project or injures the reputation of the Project, (ii) subjects Landlord to liability for injury or damage to persons or property, or (iii) invalidates any insurance policy pertaining to the Project.

### 12.   Signs.

A.    Landlord consents to Tenant's existing exterior signage ("Tenant's Signage") which is in place on the date hereof on Barges 7, 8 and 9. Any changes to Tenant's Signage shall be subject to Landlord's approval, which shall not be unreasonably withheld.

B.    Tenant shall maintain Tenant's Signage in good repair, and shall replace it when needed so that Tenant's Signage is in good condition at all times.  If Tenant fails promptly to perform its obligations under this Section, Landlord may perform the repairs, replacements or removal, at Tenant's expense, and Tenant shall reimburse Landlord for the cost thereof promptly upon demand.

### 13.   Alterations.

Tenant may alter the Barges provided such alterations shall not harm the Project and must comply with all applicable Federal and local building codes, regulations and laws, and provided that any alteration that includes an expansion of the horizontal space covered by such Barges, or the amount or location of the frontage currently occupied by such Barges for purposes of effecting sales to the public, shall require the written consent of Landlord. Provisions identical to the foregoing provisions of this Section 13 shall appear in all Leases of Barge Space within the Project.

### 14.   Fixtures and Equipment.

All of Tenant's equipment, furniture, and moveable trade fixtures shall remain Tenant's property, and Tenant shall have sole responsibility therefor.  Tenant may remove them at

any time prior to expiration of the Term, provided that Tenant is not then in default under this Lease and provided further that Tenant repairs any damage to the Premises occasioned by removal.

### 15.   *Tenant's Maintenance; Condition of the Premises.*

A.    Tenant shall, at all times throughout the Term, at its cost, put, keep and maintain the Barges and Premises and every improvement located thereon in good order, condition and repair, except for reasonable wear and tear, condemnation and casualty loss. As used herein, "repairs" shall include replacements, restorations and/or renewals, when necessary or appropriate to keep the Barges and Premises in good order, condition and repair at all times throughout the Term. All repairs shall be made in a first class workmanlike manner. In addition, Tenant shall keep and maintain the Barges and Premises in a clean and orderly condition, free of dirt, rubbish, snow and ice. The necessity for and adequacy of repairs to the Barges and Premises shall be measured by the standard that is appropriate for a first class wharf and fish market.

B.    Tenant shall deposit its refuse in the compactor, dumpster or other trash receptacle supplied by Landlord for Tenant's use as of the Commencement Date. Throughout the Term, the Tenant Committee shall provide compactors or dumpsters and/or trash collection service, the cost of which shall be included among the Common Area Costs. Tenant shall not use the compactors, dumpsters or trash collection service for discarding "Hazardous Materials" (as such term is defined below). Tenant, at its expense, shall dispose of its Hazardous Materials in accordance with applicable federal, state and local laws and regulations. "Hazardous Materials" means all substances declared to be hazardous, toxic or infectious under any applicable law or regulation.

C.    Tenant shall cooperate with the other tenants of the Project, if given reasonable notice, in arranging for movement of the Barges as necessary to accommodate maintenance, repair, and replacement of Barges and dredging of submerged areas within the Project. All dredging activities shall be carried out and concluded as quickly as is commercially reasonable in the circumstances. Provisions identical to the foregoing provisions of this Section 15.C shall appear in all leases of Barge Space within the Project. It is the intent of the parties that all tenants of the Project shall have the rights of third-party beneficiaries with respect to the provisions of this Section 15.C.

### 16.   *Landlord's Right of Entry.*

Landlord and its agents may enter the Premises at reasonable hours to inspect or exhibit them; to place and maintain a "FOR RENT" sign thereon at any time within six (6) months prior to termination of the Term; or to enter them after Tenant defaults hereunder, and alter, repair or otherwise prepare the Premises for reoccupancy.

### 17.   *Tenant's Indemnity; Insurance.*

A.    Landlord shall not be liable for, and Tenant shall protect, defend, indemnify and hold Landlord harmless from and against, any liability or claim (including attorneys' fees) in connection with any injury or loss to any person or property (i) arising within the Premises, unless

caused by the gross negligence or willful misconduct of Landlord, or (ii) arising out of any act or omission of Tenant or its agents or contractors.

B.    Throughout the Term, Tenant shall maintain, with a company licensed to sell insurance in the District of Columbia, (i) commercial general liability insurance (the "Liability Policy") with limits of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate combined for all locations in which Tenant operates its business (Nos. 7, 8, 9, 16, 17, 18, and 19), in a form providing occurrence basis coverage; and (ii) an all-risk policy of insurance covering the Barges and all trade fixtures, equipment and personal property kept at the Premises, in an amount not less than the full replacement value of said items. All such insurance policies shall (i) be written as primary coverage and not contributing with or in excess of any coverage that Landlord may carry; (ii) contain an express waiver of any right of subrogation by the insurer against Landlord; and (iii) provide that the insurance policy may not be cancelled unless Landlord has been given thirty (30) days' prior written notice. Notwithstanding the foregoing, the Liability Policy shall be increased at the end of each period of five (5) Lease Years during the Term by an amount equal to the increase in the Consumer Price Index during such period. In addition, Tenant's Liability Policy shall (i) list as additional insured Landlord and any other parties with an insurable interest in the Premises designated by Landlord, and (ii) be endorsed to require the insurance carrier to notify Landlord in writing of any losses charged against the policy. Before the Term commences, and before any such insurance policy expires, Tenant shall deliver to Landlord a certificate of insurance for each policy or renewal thereof that Tenant is required to maintain under this Section. If Tenant fails to maintain any insurance required by this Section, Landlord may obtain such insurance, and any premium paid by Landlord shall be immediately payable by Tenant to Landlord as additional rent.

C.    Neither party shall be liable to the other or to any insurer (by way of subrogation or otherwise) for any loss or damage, even though such loss or damage may have been occasioned by the negligence of such party, if such loss was covered by an insurance policy containing an endorsement to the effect that any such release by the insured shall not adversely affect the insured's right to recover for such loss, and that the insurer waives its right of subrogation.

## 18.    *[Intentionally Omitted].*

## 19.    *Assignment and Subletting.*

A.    Tenant shall not assign, transfer, mortgage or otherwise encumber this Lease or sublet or otherwise permit others to use all or any part of the Premises, whether voluntarily, by operation of law or otherwise (collectively, an "Assignment"), without the prior written consent of Landlord, which Landlord may withhold in its absolute discretion. However, Landlord shall not withhold its consent if such assignee, transferee, subtenant or occupant (collectively, the "Assignee") is financially capable of satisfying its obligations under this Lease, and shall have previously and successfully sold seafood at retail. Any attempted Assignment shall be void and confer no rights upon any third party. If an Assignment is effected in violation of the terms of this Lease, Landlord may collect rent from the Assignee and apply the net amount collected to the rent herein reserved, but no such Assignment or collection shall be deemed a waiver of this covenant, acceptance of the Assignee as tenant, or release of Tenant hereunder. In addition, if Landlord

consents to an Assignment, Tenant shall pay Landlord One Thousand and No/100 Dollars ($1,000.00) (the "Assignment Fee") as payment for legal fees and costs incurred in connection with the preparation of the documents to effectuate the Assignment. The Assignment Fee shall be paid to Landlord prior to the preparation of the Assignment documents. The following events shall also constitute an Assignment: (a) if Tenant is a corporation, the transfer of more than fifty percent (50%) of the voting stock of Tenant, or (b) if Tenant is a partnership, the transfer of more than fifty percent (50%) of the partnership interests of Tenant or the transfer of any general partnership interest of Tenant. This clause shall not be interpreted to preclude an Assignment to siblings and direct descendants of individuals owning, as of the Commencement Date, a majority of the voting stock of Tenant, or a transfer to a new entity as a result of a reorganization that does not result in a change in beneficial ownership.

       B.     If Landlord approves an assignment or subletting, Tenant shall pay to Landlord, as and when received by Tenant, an amount equal to 50% of the difference between (i) all sums paid to Tenant by or on behalf of such assignee or subtenant under the assignment or sublease, and (ii) the Rent paid by Tenant under this Lease and attributable to the portion of the Premises assigned or sublet.

       C.     In addition to the foregoing, if Tenant notifies Landlord that Tenant desires to assign a portion of this Lease or sublet a portion of the Premises (the "Proposed Sublet Space"), Landlord shall have the option to regain possession of the Proposed Sublet Space and amend this Lease to exclude the Proposed Sublet Space and effect a proportionate reduction in Minimum Rent and Tenant's Proportionate Share based upon the relative size of the Premises as so reduced. All other terms and conditions of this Lease shall remain in effect and applicable to the Premises as reduced, and Tenant shall execute documents to effect such amendment at Landlord's request. If Landlord does not exercise its right to regain possession of the Proposed Sublet Space, Tenant may seek an acceptable assignee or subtenant for a sublease term no longer than that set forth in Tenant's notice. If Tenant does not find an assignee or subtenant acceptable to Landlord within 120 days from the date of Tenant's most recent notice, Tenant may not enter into any assignment or sublease without first submitting a new notice to Landlord and affording Landlord an opportunity to amend or terminate this Lease as set forth above.

## 20.    *[Intentionally Omitted]*.

## 21.    *Tenant's Defaults.*

      Tenant shall be in default under this Lease if Tenant (a) fails to pay any rent or other sum required hereunder within twelve (12) days after its due date; or (b) fails to maintain any insurance required hereunder; or (c) abandons the Premises or fails to conduct business therein for a period of fifteen (15) or more consecutive days, absent a casualty and then only after allowing a period of as much as six (6) months in which to replace the affected Barge; or (d) assigns this Lease or sublets all or any portion of the Premises in violation of Section 19; or (e) fails to continue to operate its existing businesses on Barges 7, 8, and 9; or (f) files for relief under the United States Bankruptcy Code (the "Bankruptcy Code") or under any other state or federal bankruptcy or insolvency law, or Tenant files an assignment for the benefit of creditors, or if an involuntary proceeding under the Bankruptcy Code or under any other federal or state bankruptcy or insolvency

law is commenced against Tenant; or (g) defaults in any other obligation herein and such default is not remedied within thirty (30) days after written notice of the default from Landlord; provided, however, that Tenant's failure to perform any non-monetary obligation set forth in this Lease on its part to be performed three (3) or more times in any twelve (12) month period shall effect an immediate default, and Landlord thereupon may exercise any remedy set forth in Section 22 below without affording Tenant any opportunity to cure such default.

22. *Landlord's Remedies in Case of Tenant's Default.*

A. At any time after Tenant's default under this Lease, Landlord may (i) terminate this Lease upon notice to Tenant or by any available judicial process; and/or (ii) re-enter the Premises (with or without terminating the Lease), remove all property, which may include towing the Barge or Barges and storing same, at Tenant's expense without being deemed guilty of trespass and without liability for any loss or damage, and/or relet or otherwise deal with the Premises in any manner which Landlord determines in its sole discretion.

B. Should Landlord terminate this Lease after Tenant's default, Landlord may recover from Tenant all costs (including attorneys' fees) and other damages incurred by Landlord as a result of such default, and, without limiting the generality of the foregoing, (i) all rent to the time of such termination shall be paid by Tenant immediately, together with all expenses (including attorneys' fees) of retaking possession of the Premises, as shall the cost of preparing the Premises for reletting and the costs (including brokerage fees and advertising) of actually reletting same; (ii) Landlord may take all steps, including repair or alteration of the Premises, to prepare the Premises for reletting; (iii) Landlord may relet all or any part of the Premises for such term, at such rental, and upon such conditions as Landlord deems advisable; and (iv) Tenant shall pay to Landlord, as liquidated damages, for each month during the balance of the Term (but for termination of the Lease by Landlord), any deficiency between (a) all rent and additional rent herein reserved for each such month, and (b) the net rent for each such month collected upon any reletting. Alternatively, if Landlord terminates this Lease at any time after Tenant's default, Landlord may elect, in addition to the damages described in clauses (i) - (iii) of the preceding sentence, and the damages due under clause (iv) up to the time of said election, to recover from Tenant the value at the time of said election of the excess, if any, of all rent and additional rent due under this Lease for the remainder of the Term (but for termination of the Lease by Landlord) over the then reasonable rental value of the Premises for that period.

C. If Landlord elects not to terminate this Lease after Tenant's default, Tenant shall continue to be liable for all rent and additional rent due hereunder, in addition to all costs (including attorneys' fees) and other damages arising from Tenant's default.

D. If Tenant abandons the Premises, Landlord may re-enter the Premises without judicial process and relet them, and such re-entry or reletting shall not terminate this Lease, and Tenant shall continue to be liable for all rent and additional rent due under the Lease, in addition to all costs (including attorneys' fees) and other damages arising from Tenant's default.

23. *Landlord's Right to Cure Tenant's Default.*

A.    If Tenant shall default in the keeping, observance or performance of any provision or obligation of this Lease, Landlord, without thereby waiving such default, may perform the same for the account and at the expense of Tenant, without notice in a case of emergency and in any other case if such default continues after thirty (30) days from the date of the giving by Landlord to Tenant a notice of intention so to do. Bills for any reasonable expense incurred by Landlord in connection with any such performance by Landlord for the account of Tenant, and bills for all reasonable costs, expenses and disbursements of every kind and nature whatsoever, including attorneys' fees, involved in collecting or endeavoring to collect any sums due hereunder or enforcing or endeavoring to enforce any rights against Tenant, under or in connection with this Lease, or pursuant to law, including any such reasonable cost, expense and disbursement involved in instituting and prosecuting any action or proceeding (including any summary dispossess proceeding), may be sent by Landlord to be due and payable in accordance with the terms of said bills, and if not paid when due, the amounts thereof shall immediately become due and payable as Additional Rent under this Lease.

B.    No entry in accordance with this Lease by Landlord or its employees, agents or representatives, or by any other party at the direction of Landlord, shall ever be construed or interpreted as an ouster of Tenant from possession or as a constructive eviction or to alter, diminish or abate Landlord's rights under this Lease.

24. *[Intentionally Omitted].*

25. *Holding Over.*

If Tenant lawfully remains in possession of the Premises after the expiration of the Term, Tenant shall be a tenant from month to month, upon all the terms hereof which are not inconsistent with such tenancy; provided, however, that Tenant covenants to pay to Landlord as Minimum Rent during such tenancy one hundred fifty percent (150%) of the Minimum Rent in effect immediately before expiration of the Term, in addition to all other rent and other charges due hereunder. Such tenancy may be terminated by Landlord or Tenant upon thirty (30) days notice.

26. *Surrender of Premises.*

Upon termination of the Term for any reason, Tenant shall remove the Barges and any other property of Tenant, and surrender the Premises to Landlord in the same condition as they were in on the Commencement Date. If Tenant fails to remove the Barges or other property, it shall become Landlord's property or, at Landlord's option, shall be removed and stored at Tenant's expense, without Landlord being liable for trespass, conversion or negligence in respect of such property. If Tenant fails to surrender the Premises in the condition required by this Section, Landlord may restore the Premises to their condition as of the Commencement Date and Tenant shall reimburse Landlord for the cost of the restoration.

## 27.  Limitation on Landlord's Liability.

A.  Notwithstanding anything to the contrary in this Lease, (i) Landlord shall not be liable to Tenant for any loss or damage to property which is either covered by insurance or which Tenant is required to insure under this Lease, and (ii) any liability of Landlord to Tenant under this Lease shall be limited to direct damages and shall not include indirect, consequential, incidental, or punitive damages, including any liability to Tenant for lost profits or interruption of business. Tenant shall look to its property damage or business interruption insurance policies, and not to Landlord, its agents or employees for any loss incurred as a result of damage to its property or interruption of its business.

B.  Except for damages resulting from the gross negligence or willful misconduct of Landlord, Landlord shall not be liable to Tenant, its employees, agents or other invitees for any damage, compensation, claim or expense arising from (i) damage or loss to the property of Tenant or others located anywhere in the Project), or (ii) death, accident or injury to persons occurring anywhere in the Project). Landlord shall have no liability to Tenant for any delay in completing Landlord's Work.

## 28.  Notices.

All notices and other communications hereunder shall be in writing, and shall be hand delivered, delivered by a recognized overnight delivery service (e.g., Federal Express), or sent by certified or registered U.S. mail, postage prepaid, to Landlord or Tenant, as the case may be, at the address set forth below. All notices hereunder shall also be delivered to counsel for the party to receive such notice, at the address set forth below, in order to effectuate good and valid notice hereunder.

If to Landlord:

Director, District of Columbia Department of Housing
 and Community Development
801 North Capitol Street, N.E.
8th Floor
Washington, D.C. 20002



With a required copy to:

Andrew Ridley, Esquire
Assistant Corporation Counsel
801 North Capitol Street, N.E.
Room 734
Washington, D.C. 20002

If to Tenant:

BRW, Inc.
t/a Capt. White Seafood City
1100 Maine Avenue, S.W.
Washington, D.C. 20024
Attn: Billy White

With a required copy to:

Richard L. Aguglia, Esquire
Hunton & Williams
1900 K Street, N.W., Suite 1200
Suite 1200
Washington, D.C. 20006

Either party may designate in writing a change in its notice address, which shall be effective ten (10) days following receipt of such writing by the other party. Notices which are delivered in person shall be deemed given when received. Notices which are mailed shall be deemed given on the date they are mailed. Notices which are sent by overnight delivery service shall be deemed given on the date they are deposited with the delivery service.

## 29.    *Quiet Enjoyment.*

As long as it is not in default under this Lease, Tenant may peaceably and quietly enjoy the Premises for the Term without hindrance, ejection or molestation by Landlord or anyone claiming or acting by or through Landlord.

## 30.    *Security Deposit.*

Tenant has deposited with Landlord the sum set forth in Section 1.L (the "Security Deposit") as security for performance of Tenant's obligations hereunder. The Security Deposit shall be returned to Tenant, with interest, within forty-five (45) days after the expiration of the Term, provided that Tenant has discharged all such obligations. Landlord may apply the Security Deposit to cure any default of Tenant, and Tenant shall deposit with Landlord the amount applied within thirty (30) days after written demand.

### 31.    *[Intentionally Omitted].*

### 32.    *Rules and Regulations.*

Tenant will comply with the Rules and Regulations set forth on <u>Exhibit E</u>, and with any other reasonable rules and regulations as Landlord adopts for the Premises. Such rules and regulations shall not unreasonably interfere with the conduct of Tenant's business. In particular instances, where in Landlord's reasonable judgment such rules and regulations may be infeasible, Landlord shall have the right to modify or waive such rules and regulations as they apply to particular other tenants. Any failure by Tenant to comply with any rule or regulation established pursuant to this Lease shall be a default under this Lease subject to Section 21. Landlord shall exercise its rights in respect of the promulgation, revision, and enforcement of Rules and Regulations in a non-discriminatory manner.

### 33.    *Waiver of Jury Trial.*

Landlord and Tenant hereby waive all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other pertaining to any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises.

### 34.    *Covenant Against Contingent Fees*

Tenant warrants that its has not employed any person to solicit or secure this Lease upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give Landlord the right to terminate this Lease, or, in its discretion, to add to the rental or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by Tenant upon contracts or sales secured or made through <u>bona fide</u> established commercial or selling agencies maintained by Tenant for the purposes of securing business, or to Tenant's attorneys' fees. Landlord shall pay any and all commissions and other compensation due to any broker, finder or other person with whom Landlord has dealt with regard to this Lease.

### 35.    *Facilities Nondiscrimination.*

A.    As used in this section, the term "facility" means the entire Premises.

B.    Tenant agrees that it will not discriminate by segregation or otherwise against any person or persons because of race, creed, color, sexual orientation, physical disability, marital status or national origin, in furnishing, or by refusing to furnish, to any person or persons the use of any facility, including any and all service, privileges, accommodations and activities provided thereby.

C.    It is agreed that Tenant's noncompliance with the provisions of this Article, as determined by a final, unappealable judgement by a court of competent jurisdiction,

shall constitute material breach of this lease Agreement. In the event of such a determination of noncompliance, and Tenant's failure to cure such non-compliance within ten (10) days after such determination becomes final, Landlord may take appropriate action to enforce compliance, and may pursue remedies as may be provided by law or in equity.

D.    Tenant agrees to include, or to require the inclusion of, the foregoing provisions of this section (with terms "The District" and "Tenant" appropriately modified) in every agreement or concession pursuant to which any person other than Tenant operates or has the right to operate the facility. Tenant also agrees that it will also comply with any final, unappealable court order directing Tenant to take any action with respect to any such agreement in order to enforce the processions of this section, including but not limited to termination of the agreement or concession in question; provided, however, that in the event the Tenant becomes involved in or is threatened with litigation with a person as a result thereof, Tenant may request Landlord to enter into such litigation to protect the interest of Landlord.

## 36.    *Nondiscrimination in Employment.*

A.    In connection with the conduct of business on the Premises, Tenant agrees not to discriminate against any employee or applicant for employment because of race, creed, color, sexual orientation, physical disability, marital status, or national origin. Tenant will take affirmative action to ensure that applicants are employed and that employees are treated during employment without regard to their race, creed, color, sex orientation, physical disability, marital status or national origin. Such action shall include, but not limited to the following: employment, upgrading demotion or transfer, recruitment or recruitment advertising, layoff of termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship, as required by applicable law. Tenant agrees to post in conspicuous places available to employees and applicants for employment, notices to be provided by Landlord setting forth the provisions of this nondiscrimination clause.

B.    Tenant will, in all solicitations for advertisements for employees placed by or on behalf of the Tenant, state that qualified applicants will receive consideration for employment without regard to race, creed, color, sexual orientation, physical disability, marital status or national origin.

C.    Tenant will send to each union or representative of workers with which it has collective bargaining agreement(s) or other contracts of understandings a notice to be provided by Landlord in advising the said labor union or worker's representative of Tenant's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

D.    Tenant will permit Landlord access to their books, records, and accounts, or their agents, for purposes of investigation to ascertain compliance with such rules, regulations and orders, as provided by applicable law.

E.    In the event of any final, unappealable determination by any court or administrative body, of noncompliance of Tenant with the nondiscrimination clauses of this

Lease Agreement, and Tenant's failure to cure such discrimination within ten (10) days after such determination becomes final, this Lease Agreement may be canceled in whole or in part and Tenant may be declared ineligible for further leases with the District of Columbia.

F.    Tenant further agrees to insert the foregoing provisions of nondiscrimination in employment in all subcontracts hereunder, unless exempted by rules and regulations or orders of Landlord so that such provisions will be binding and regulations or orders of Landlord so that such provisions will be binding upon each subcontractor or vendor. Tenant will take such action with respect to any subcontract as required by any final, unappealable order of a court or governmental agency of competent jurisdiction in order to enforce such provisions, including sanctions for noncompliance; provided, however, that in the event the Tenant becomes involved in or is threatened with litigation with a subcontractor or vendor as a result thereof, Tenant may request Landlord to enter into such litigation to protect the interest of Landlord.

### 37.  *Environment Protection.*

Tenant shall not pollute the air, ground or water in, on or under the premises. Tenant shall comply promptly with any laws, regulations, conditions or instructions applicable to the Tenant's business(es) at the Premises, if and when issued by the Environmental Protection Agency, or any Federal, state, or local governmental agency having jurisdiction to abate or prevent pollution. The disposal of any toxic or hazardous material within the Premises in violation or applicable laws or codes is specifically prohibited. Tenant shall require the owners/operators of boats moored at the Premises, including rental boats, to seal all sanitation facilities or such boats against any discharge into the Washington Channel. Services for waste disposal, including sewage pump-out of watercraft, shall be provided by the Tenant as reasonably appropriate. Tenant shall not discharge waste or effluent from the Premises, including Barges, in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

A.    If damage to the environment or natural resources is proximately caused by Tenant's activities at the premises, Tenant shall be liable to restore the damaged resources.

### 38.  *Miscellaneous.*

A.    **Entire Agreement; Joint and Several Liability; Successors and Assigns**. This Lease constitutes the entire agreement between the parties concerning the matters set forth herein. If Tenant shall include more than one person, the obligations hereunder of all such persons shall be joint and several. This Lease shall be binding upon and inure to the benefit of the parties and their respective successors, permitted assigns, heirs and legal representatives.

B.    **Interpretation**. The named Exhibits are part of this Lease. Section and subsection headings are for convenience only, and not for use in interpreting this Lease. If a court finds any provision of this Lease unenforceable, all other provisions remain enforceable.

C.    **Costs; Include; Shall; May.** Except as expressly provided otherwise in this Lease, the party obligated or permitted to perform an obligation is also obligated, as between Landlord and Tenant, to pay the cost of performance. "Include," "includes," and "including" mean considered as part of a larger group, and not limited to the items recited. "Shall" means is obligated to. "May" means "is permitted to."

D.    **Waiver.** No provision of this Lease is waived by Landlord or Tenant unless waived by them in writing. Landlord's acceptance of rent is not a waiver of any default of Tenant, regardless of Landlord's knowledge of a default when it accepts the rent. No waiver by Landlord or Tenant of any default is a waiver of any other default of the same or any other provision of this Lease.

E.    **Rule Against Perpetuities.** Notwithstanding any provision in this Lease to the contrary, if the Lease Term has not commenced within three (3) years after the date of this Lease, this Lease shall automatically terminate on the third (3rd) anniversary of the date hereof. The sole purpose of this provision is to avoid any possible interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation.

F.    **Remedies.** The rights and remedies mentioned in this Lease are in addition to, and do not deprive a party of any other rights at law or in equity.

G.    **No Option.** The submission of this Lease for examination does not constitute a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery of it by Landlord.

H.    **Additional Rent.** All sums owed by Tenant to Landlord in connection with this Lease which are not otherwise designated as rent shall be deemed to be additional rent.

I.    **Governing Law.** This Lease shall be governed by and construed in accordance with the laws of the District of Columbia.

J.    **Waiver and Release of Claims.** In consideration of the execution and delivery of this Lease by the parties hereto, each of such parties hereto (each, a "Releasing Party") hereby unconditionally releases, remises, acquits, and forever discharges the other party hereto (at such time as such other party shall have executed and delivered this Lease), as well as each of the other tenants of the Project (at such time as each such tenant shall have executed and delivered a Lease containing waiver and release provisions identical to the provisions of this Section 38.J, and provided such tenant shall not have instituted litigation against such Releasing Party after the date hereof and before the date of such Lease) (collectively, the "Released Parties"), from any and all claims, demands, liabilities, damages, losses, costs, expenses, causes of action, covenants, contracts, torts, controversies, agreements, promises, representations, breaches of contract or of obligations to perform, and any other type of conduct or misconduct, whether negligent, intentional or otherwise, whether at law or in equity, whether matured or unmatured, and whether known or unknown, that the Releasing Party, or any person or entity claiming by, through or under the Releasing Party, ever had, now has, or hereafter may have, against any of the Released Parties at any time from the beginning of the world to the date hereof related to, arising out of, or in any manner connected with

(1) the Project, the operations of the businesses within the Project, or the conduct of any of the Released Parties that relates in any manner to the Project; or (2) this Lease or other lease agreements entered into at any time before the date hereof or simultaneously herewith relating to the Project (collectively, the "Project Leases"), the procurement or negotiation of any of the Project Leases or the terms thereof, or the performance or non-performance by any party under any of such Project Leases.

IN WITNESS WHEREOF, the District of Columbia has caused this Lease to be executed in its corporate name by **Anthony Williams**, its **Mayor**, and attested by **Beverly Rivers**, its **Secretary of D.C.**, and its seal to be hereunto affixed and does hereby constitute and appoint **Anthony Williams** its true and lawful Attorney-in Fact for it and in its name to acknowledge and deliver this Lease as its act and deed.

LANDLORD:

WITNESS:

THE DISTRICT OF COLUMBIA, as agent for
THE UNITED STATES OF AMERICA

By
Name: **Anthony A. Williams**
Title: **Mayor of the District of Columbia**

Approved for Legal Sufficiency:

Date: 2-21-01

Name: Andrew Earl Ridley
Title: Assistant Corporation Counsel

IN WITNESS WHEREOF, BRW, Inc., has caused this Lease to be executed in its corporate name by Billy R. White, its President, and attested by Penny R. White, its Secretary, and its seal to be hereunto affixed and does hereby constitute and appoint Billy R. White its true and lawful Attorney-in Fact for it and in its name to acknowledge and deliver this Lease as its act and deed.

TENANT:

ATTEST:

BRW, INC., a District of Columbia corporation

By: _Billy Ray White_ (Seal)
Name: _BILLY RAY WHITE_
Title: _PRES._

DISTRICT OF COLUMBIA, SS.

I, _Gladys Herring_, a Notary Public in and for the District of Columbia, do hereby certify that _Anthony A. Williams_ who is personally well known (or satisfactorily proven) to me to be the person named as _Mayor_ of the District of Columbia, a municipal corporation, in the foregoing Lease, bearing date as of _July 12, 2000_ 2000, and hereto annexed, personally appeared before me in the said District of Columbia and acknowledged the same to be the act and deed of the District of Columbia, for the purposes therein contained.

WITNESS my hand and seal this _21st_ day of _February_, ~~2000~~ _2001_.

_Gladys W. Herring_
Notary Public

My commission expires: _June 30, 2004_

DISTRICT OF COLUMBIA, SS.

I, _____, a Notary Public in and for the District of Columbia, do hereby certify that _Billy R. White_, who is personally well known (or satisfactorily proven) to me to be the person named as _PRESIDENT_ of BRW, Inc., a District of Columbia corporation, in the foregoing Lease, bearing date as of _July 12_, 2000, and hereto annexed, personally appeared before me in the said District of Columbia and acknowledged the same to be the act and deed of BRW, Inc., for the purposes therein contained.

WITNESS my hand and seal this _12th_ day of _July_, 2000.

Notary Public

MY COMMISSION EXPIRES
SEPTEMBER 14, 2000

My commission expires: _____

## EXHIBIT A

[Outline of Premises -- to be initialed by the parties and attached upon completion of design and engineering for Landlord's Work.]



#11636 v12 - CAPT WHITE LEASE I





## EXHIBIT B

[Site Plan of the Project]







# EXHIBIT D

# DISTRICT OF COLUMBIA

## ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT ("Assignment"), made and entered into as of the 20th day of March, 2014 by and between

**DNM SEAFOOD, INC.** (the "Assignor"), a District of Columbia corporation; and

**W.D. INC.** (the "Assignee"), a Virginia corporation.

## RECITALS

**WHEREAS**, Pruitt's Seafood (the "Original Tenant") entered into a certain lease agreement (the "Lease Agreement or "Lease") dated April 1, 2001, with the District of Columbia, a municipal corporation, acting as an agent for the United States of America, (the "Landlord"), demising the premises located at 1100 Maine Avenue, SW, Washington, DC commonly known as Premises Nos. 1, 2, 3 and 4 of Municipal Fish Wharf (the "Premises"), for a term of thirty (30) years commencing on the New Rent Commencement Date as defined in the Lease Agreement, a copy of which Lease Agreement is attached hereto and made a part hereof; and

**WHEREAS**, the Original Tenant assigned its leasehold interests in the Premises and the Lease Agreement to Assignor, and Assignor accepted such assignment and assumed all of the rights, obligations and duties of the Original Tenant therein described in the said Lease Agreement; and

**WHEREAS**, the Assignor is currently referred to as "Tenant" in the said Lease Agreement; and

**WHEREAS**, the Assignor desires to assign and convey, insofar as its title enables it to legally so do, its leasehold interests in the Premises and the Lease Agreement to the Assignee, and the Assignee does agree to accept such assignment and conveyance and assume all of the rights, obligations and duties of the Assignor therein described in the said Lease Agreement; and

**WHEREAS**, the Landlord desires to grant its consent to this Assignment and Assumption of Lease Agreement, but expressly subject to the conditions set forth herein and in the Lease Agreement, with no intent on the part of the Landlord or the Assignor/Tenant to further modify any other terms and conditions of the Lease Agreement; and

**WHEREAS**, the Assignor and Assignee, with the consent of the Landlord, desire to modify certain terms of the Lease only in the manner contained in this Assignment.

## WITNESSETH: THAT

**NOW, THEREFORE**, for and in consideration of One Dollar ($1.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows: to wit,

1.  The above Recitals are incorporated herein and made a part of the terms and conditions of this Assignment.

2.  The Assignor does hereby assign, transfer, and convey to the Assignee all the right, title and interest that Assignor has or may have under the Lease Agreement to have and to hold the same unto the Assignee, its successors, and assigns, for and during the remainder of the term of the Lease Agreement, and any renewals or extensions therein provided, subject to the terms, covenants, conditions, and agreements contained herein and in the Lease Agreement.

3.  The Assignee does hereby accept the foregoing assignment and agrees to assume all of the duties which the Assignor is/was obligated to perform under the Lease Agreement including, but not limited to, the payment of rent and other charges, for the balance of the term thereof and any renewals or extensions of the term(s) of the Lease, maintenance of the premises, and operation the fish selling business and other limited business operations for the demised premises in the described manner.

4.  The Assignee warrants and represents to the Landlord and the Assignor that the Assignee is a corporation validly existing in the Commonwealth of Virginia and in good standing in the District of Columbia, has demonstrated the financial capacity, and has the legal capacity, as such, to fully perform the obligations required under the said Lease Agreement.

5.  The Assignor hereby represents and warrants to the Assignee that the Lease Agreement is in full force and effect and no breaches or defaults exist as of the date of execution of this Assignment and with further warranty that the Assignor shall pay or cause to be paid to the Landlord a sum of One Thousand Dollars ($1000.00) as consideration in connection with Landlord's consent to an assignment of the Lease Agreement, as prescribed under Article 19(A) of the said Lease Agreement.

6.  The Assignor hereby covenants to remove that certain No. 3 boat and the tank attached to it and remove that certain 20x40 wooden boar (collectively, the "Removal Obligations"), each being located on, under or about the Premises, within twenty-one (21) days following the Effective Date of this Assignment and in compliance with all applicable laws. The Assignor shall indemnify and hold the Landlord and the Assignee harmless from and against any claims asserted by any party in connection with the Removal Obligations and any actual losses, damages or liabilities of the Landlord or the Assignee arising as a result of the Assignor's performance of or failure to perform the Removal

Obligations. If the Assignor fails to complete the Removal Obligations within thirty (30) days following the Effective Date of this Assignment and in compliance with all applicable laws, the Assignee may complete the Removal Obligations, provided that the Assignor's indemnity obligations shall not be modified as a result of the performance of the Removal Obligations by the Assignee.

7.    The parties hereto agree that the security deposit under the Lease Agreement in the amount of $2,666.66 shall be held for the account of the Assignee from the Effective Date of this Assignment. The Effective Date of this Assignment shall be the date when the Landlord indicates Landlord's consent to this Assignment, evidenced by Landlord's execution in the appropriate space on this Assignment, as described in Article 8 of this Assignment. By its execution of this Assignment, Landlord also retroactively consents to the  assignment by Original Tenant to Assignor of the Lease Agreement and Original Tenant's leasehold interests in the Premises.

8.    The Assignor and the Assignee shall, jointly or separately, notify or cause the Landlord to be notified that, as of the Effective Date of this Assignment, all notices prescribed under the said Lease Agreement shall be sent to the Assignee at the following address:

> W.D. Inc
> 1100 Maine Avenue, S.W.
> Washington, DC 20024
> Attn: Mr. Billy White

9.    The Assignor and Assignee understand and agree that this Assignment shall not become effective unless and until the Landlord shall indicate its consent and agreement to this Assignment, evidenced by the signature of the Mayor of the District of Columbia to this Assignment. By its execution of this Assignment, the Landlord hereby affirms that it previously consented to the assignment of the Lease Agreement from the Original Tenant to the Tenant prior to the Tenant taking occupancy of the Premises.

10.    The Landlord and the Assignee acknowledge and confirm that the expiration date of the Lease is March 15, 2044.

[Signature Pages Follow.]

IN WITNESS WHEREOF, DNM Seafood, Inc. has caused this Assignment and Assumption of Lease Agreement to be executed in its corporate name by Sung J. Kim, its President, and attested by Yong W. Kim, its Secretary, and its seal to hereunto affixed and does hereby constitute and appoint Sung J. Kim its true and lawful Attorney-in-Fact for it and in its name to acknowledge and deliver this Assignment as its act and deed as of the 20th day of March, 2014.

**ASSIGNOR:**

ATTEST:                                      **DNM SEAFOOD, INC.**

_____                      By: _____(Seal)
Yong W. Kim, Secretary                       Name: Sung J. Kim
                                             Title:  President


**ACKNOWLEDGMENT**

DISTRICT OF COLUMBIA:

On this 20th day of March, 2014, before me Lorraine White, the undersigned notary, personally appeared Sung J. Kim, who acknowledged himself to be the President of DNM Seafood, Inc., a District of Columbia corporation, and that he, as such President, being authorized so to do, executed the foregoing instrument for the purposes therein contained on behalf of DNM Seafood, Inc.

In witness whereof I hereunto set my hand.

_____
Notary Public

My commission expires:                       LORRAINE V. WHITE
                                             NOTARY PUBLIC DISTRICT OF COLUMBIA
_____                    My Commission Expires November 14, 2017

IN WITNESS WHEREOF, W.D., Inc. has caused this Assignment and Assumption of Lease Agreement to be executed in its corporate name by Billy White, its President, and attested by Penny R. White, its Secretary, and its seal to hereunto affixed and does hereby constitute and appoint Billy White its true and lawful Attorney-in-Fact for it and in its name to acknowledge and deliver this Assignment as its act and deed as of the 20th day of March, 2014.

**ATTEST:**

_____
Penny R. White, Secretary

**ASSIGNEE:**

**W.D., INC.**

By: _____ (Seal)
Name: Billy White
Title:  President

**ACKNOWLEDGMENT**

DISTRICT OF COLUMBIA:

On this 20th day of March, 2014, before me _Lorraine White_ the undersigned notary, personally appeared Billy White, who acknowledged himself to be the President of W.D., Inc., a Virginia corporation, and that he, as such President, being authorized so to do, executed the foregoing instrument for the purposes therein contained on behalf of W.D., Inc.

In witness whereof I hereunto set my hand.

_____
Notary Public

My commission expires:

_____

LORRAINE V. WHITE
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires November 14, 2017

CONSENTED AND AGREED TO as of the ⟨31⟩ day of ⟨March⟩, 2014.

**LANDLORD:**

WITNESS:

**THE DISTRICT OF COLUMBIA, a municipal corporation, by The Deputy Mayor for Planning and Economic Development, acting as agent for THE UNITED STATES OF AMERICA**

By: _____ (Seal)

Name:  Victor L. Hoskins

Title:  Deputy Mayor for Planning and Economic Development

**Approved for Legal Sufficiency**

Susan C. Longstreet
Deputy Attorney General
Commercial Division

## ACKNOWLEDGMENT

DISTRICT OF COLUMBIA

I, ⟨Ingrid D. Rios⟩, a Notary Public in and for the said District of Columbia, do hereby certify that Victor L. Hoskins, Deputy Mayor for Planning and Economic Development, who is named as Attorney-in-Fact for the District of Columbia, acting as agent for the United States of America, in the foregoing and annexed Assignment and Assumption of Lease Agreement, bearing date the 20th day of March, 2014, personally appeared before me in the said District of Columbia, and the said Victor L. Hoskins is personally well known to me as the person named as the Attorney-in-Fact in the said Assignment and Assumption of Lease Agreement for the District of Columbia and acknowledged said Assignment and Assumption of Lease Agreement to be the act and deed of the said District of Columbia, and that he delivered the same as such.

GIVEN under my hand and seal this ⟨31⟩ day of ⟨March⟩, 2014.

_____
Notary Public

My commission expires:

⟨June 14 2017⟩

## BILL OF SALE

**DNM SEAFOOD, INC.**, a District of Columbia corporation d/b/a Pruitt's Seafood, having a place of business at 1100 Maine Avenue, SW, Washington, District of Columbia 20024 ("Seller"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, hereby sells and delivers to **W.D., Inc.**, a District of Columbia corporation, having a place of business at 1100 Maine Avenue, SW, Washington, District of Columbia 20024 ("Purchaser") the personal property, equipment and fixtures described on Schedule 1 attached hereto (the "Personal Property"), which Personal Property is located in the City of Washington, District of Columbia, on the premises situated at 1100 Maine Avenue, SW, Washington, District of Columbia 20024 (the "Leased Property"), without representation or warranty except as provided in that certain Purchase and Sale Agreement between Seller and Purchaser dated as of March 13, 2014.

IN WITNESS WHEREOF, Seller and Purchaser have caused this Bill of Sale to be executed and effective as of this 3rd day of April, 2014.

WITNESS:

_____

DNM Seafood, Inc.

BY: _____
NAME: Sung J. Kim
TITLE: President

WITNESS:

_____

W.D., Inc.

BY: _____
NAME: Billy R. White
TITLE: President

Schedule 1 to Bill of Sale

Two boats located on Leased Property having the following identifying DC Numbers:
   DC 2587 N (Sticker 0262)
   DC 2588 N (Sticker 0263)

Inventory listed on following page

# Equipment List
## Of DNM Seafood, Inc. d/b/a Pruitt Seafood

1. Office Refrigerator & Table
2. Digital Video Recorder – 16 Camera & Monitor
3. Canon Fax Copy Machine Super G3
4. Telephone 2-Line Telephone
5. Hot Water Heater – 2
6. House hold Refrigerator – 1
7. Kitchen – Microwave
8. Kitchen – 2 Story Stainless Shelves – 1
9. Kitchen Shelves – 2
10. Electric 2 Round Range
11. Electric Square Grill
12. 2 Door Small Freezer
13. 2 Door Small Refrigerator
14. 1 Door Tall Freezer
15. 10'x20' Walk in Freezer with 2 Compression
16. 5hp Columbia Boiler Diesel
17. 10hp Columbia Boiler Diesel
18. Stainless Water Return Tank
19. 50 or Up Gallons of Diesel Tank
20. Small Hot Water Heater
21. 20x20 Walk in Cooler with 2 Compression
22. 10,000 lb Ice Machine
23. 5,000 lb Ice Machine with Water Tower & Water Return Barrel
24. Hoshizaki Ice Machine with Cooling Fan
25. 10'x30' Walk in Fish Cooler with Compression
26. 8'x8' Walk in with Compression
27. 1 Door Freezer – Storage Room
28. Sandwich Refrigerator – 2
29. 3 Well Sink – L-2 , S-1
30. Stainless Table 4x8 – 2EA
31. Pallet Jack – 1
32. 24x30 Stainless Table – Cook & Oyster – 2
33. Picnic Table – 1
34. 30"x8' – 3 Well Steamer
35. 2 Bu Steamer – 2
36. 1 Bu Steamer – 3
37. 2 Story Steamer – 2
38. 3'x12' Stainless Hoods – Fan
39. Hand Sink
40. 1'x4' Shelve
41. 30"x4' Stainless Table – 2 Ice Machine
42. Square Steamer – 4 – Roof
43. Quick Freezing Machine 2 Door – 1
44. Long Ladder – 2 , M-1
45. Freezer Shelves 4 Story – 3



46. Crab Table – 2
47. Claim Table – 1
48. 3 Story Stainless Shelves -1 Front
49. 1'x6' Shell Front
50. Ex Shelves – 4
51. Stainless Shelve Table – Fish Boat
52. Ice Box – 10
53. Trash Can - 8

Additional Items:
5 scales

# LEASE AGREEMENT

THE DISTRICT OF COLUMBIA,
acting on behalf of THE UNITED STATES OF AMERICA,

LANDLORD

and

PRUITT'S SEAFOOD, INC.,
a Virginia corporation,

TENANT

for

Premises Nos.1, 2, 3, and 4
Municipal Fish Wharf

## TABLE OF CONTENTS

Section Number and Caption                                                                     Page

1.  *Definitions* .......................................................................................................1
2.  *Lease of the Premises; Termination of Prior Lease; Tenant's Acceptance of Premises* ...........4
3.  *Landlord's Work* ..............................................................................................4
4.  *[Intentionally Omitted]* .....................................................................................5
5.  *Minimum Rent* ..................................................................................................5
6.  *Late Charges* ...................................................................................................6
7.  *Additional Rent:  CPI Adjustment; Percentage Rent* ....................................................6
8.  *Utilities* ...........................................................................................................8
9.  *Common Areas; Employee Parking* ........................................................................8
10. *Common Area Operating Cost* ..............................................................................8
11. *Use of Premises* ................................................................................................9
12. *Signs* ..............................................................................................................10
13. *Alterations* ......................................................................................................10
14. *Fixtures and Equipment* ....................................................................................10
15. *Tenant's Maintenance; Condition of the Premises* ....................................................11
16. *Landlord's Right of Entry* .................................................................................11
17. *Tenant's Indemnity; Insurance* ...........................................................................11
18. *[Intentionally Omitted]* .....................................................................................12
19. *Assignment and Subletting* ................................................................................12
20. *[Intentionally Omitted]* .....................................................................................13
21. *Tenant's Defaults* ............................................................................................13
22. *Landlord's Remedies in Case of Tenant's Default* ...................................................14
23. *Landlord's Right to Cure Tenant's Default* ............................................................15
24. *[Intentionally Omitted]* .....................................................................................15
25. *Holding Over* ..................................................................................................15
26. *Surrender of Premises* ......................................................................................15
27. *Limitation on Landlord's Liability* .......................................................................16
28. *Notices* ...........................................................................................................16
29. *Quiet Enjoyment* ..............................................................................................17
30. *Security Deposit* ..............................................................................................17
31. *[Intentionally Omitted]* .....................................................................................17
32. *Rules and Regulations* ......................................................................................18
33. *Waiver of Jury Trial* ........................................................................................18
34. *Covenant Against Contingent Fees* ......................................................................18
35. *Facilities Nondiscrimination* ..............................................................................18
36. *Nondiscrimination in Employment* .......................................................................19
37. *Environment Protection* .....................................................................................20
38. *Miscellaneous* .................................................................................................20

Exhibit A - Outline of the Premises
Exhibit B - Site Plan of the Project
Exhibit C – Certificate of Acceptance
Exhibit D – Work Letter
Exhibit E – Rules and Regulations

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made this 1st day of April xxxx 2001 *S.B.1*
by and between THE DISTRICT OF COLUMBIA, acting on behalf of THE UNITED STATES OF
AMERICA, whose notice address is Director, District of Columbia Department of Housing and
Community Development, 801 North Capitol Street, N.E., 8th Floor, Washington, D.C. 20002
("Landlord"), and PRUITT'S SEAFOOD, INC., a Virginia corporation, whose notice address is
1100 Maine Avenue, S.W., Washington, D.C. 20024 ("Tenant").

In consideration of the promises in the Lease, Landlord and Tenant agree as follows:

## 1.    Definitions.

Certain terms in this Lease are defined below:

A.    **Barges:**  The barges owned by Tenant on which Tenant operates its
business.  The Barges are located on the Premises.

B.    **Commencement Date:** The date of this Lease.

C.    **Common Areas:**  "Common Areas" mean all areas within the Project that
Landlord makes available to tenants and their customers for their general use, convenience and
benefit, including restrooms, parking areas, driveways, walkways, landscaped or planted areas,
lighting facilities, service areas and loading and unloading areas, as depicted on Exhibit B hereto.

D.    **Consumer Price Index:** The "Consumer Price Index" means the index for
the Washington - Baltimore, DC – MD - VA – WV area, now known as the United States Bureau of
Labor Statistics, consumer Price Index, for All Urban Consumers, all items (1996=100).

E.    **Lease Year:**  The first "Lease Year" shall begin on the New Rent
Commencement Date and shall end on December 31 of the year following the year in which the
New Rent Commencement Date shall occur, in order that each subsequent Lease Year hereunder
shall coincide with the calendar year.  Each subsequent Lease Year shall commence on the day
immediately following the last day of the preceding Lease Year, and shall continue for a period of
twelve (12) full calendar months.

F.    **Minimum Rent:** The minimum rent payable during the Term, as follows:

(1)    From the Commencement Date to the date that is four (4) months
after the New Rent Commencement Date, equal monthly installments in the amount
of THREE HUNDRED THREE AND 03/100 DOLLARS ($303.03).

(2)    Commencing on the date that is four (4) months after the New
Rent Commencement Date and for the first Lease Year, equal monthly
installments in the amount of TWO THOUSAND SIX HUNDRED SIXTY-SIX
AND 66/100 DOLLARS ($2,666.66).  Thereafter, on the first day of the second

$(2^{nd})$, third $(3^{rd})$, fourth $(4^{th})$ and fifth $(5^{th})$ Lease Years, the Minimum Rent shall be adjusted for the following Lease Year by the CPI adjustment described in Section 7 below.

(3)    On the first day of the sixth $(6^{th})$ Lease Year, and upon the expiration of each period of five (5) consecutive Lease Years thereafter during the Term, the Minimum Rent shall be increased by three percent (3%) for the succeeding period of five (5) Lease Years.

G.    **New Rent Commencement Date:**  The date upon which "Landlord's Work" (as defined in Section 3) is substantially completed; i.e., upon receipt of a Certificate of Substantial Completion from the Corps of Engineers, and provided that all utilities to be delivered to the Premises are then in working order.

H.    **Percentage Rent:** For each Lease Year commencing with the sixth $(6^{th})$ Lease Year:

(i)    with respect to all "Gross Non-Taxable Sales" (as defined in Section 7), an amount equal to 6/10 of one percent (0.6%) of the excess of (A) Tenant's Gross Non-Taxable Sales for the Premises during the Lease Year, over (B) the "Non-Taxable Base Amount," which means the average of actual Gross Non-Taxable Sales for the Premises for the first five (5) Lease Years; and

(ii)    with respect to all "Gross Taxable Sales" (as defined in Section 7), an amount equal to 6/10 of one percent (0.6%) of the excess of (A) Tenant's Gross Taxable Sales for the Premises during the Lease Year, over (B) the "Taxable Base Amount," which means the average of actual Gross Taxable Sales for the Premises for the first five (5) Lease Years.

I.    **Permitted Uses:**  The retail sale of seafood (fresh and prepared) and of fresh produce, including accessory items such as cole slaw, french fries, and the like, or any other use consistent with and permitted by the 1913 Federal legislation creating the Project and appointing the District of Columbia as manager of the Project. Notwithstanding the foregoing, (i) prepared food shall be sold only on a "takeout" basis; and (ii) there shall be no serviced tables situated within the Premises or in the Common Area unless plans for same shall have been approved by Landlord and unless Landlord and Tenant shall have executed an amendment hereto providing for a change to restaurant use and, among other things, revising the Percentage Rent payable hereunder in respect of the portion of the Premises to be devoted to such restaurant use. As to clauses (i) and (ii) above, Landlord shall enforce parallel restrictions on all other tenants within the Project.

J.    **Premises:** The spaces in the Project identified on <u>Exhibit A</u> as Nos. 1, 2, 3, and 4. The Premises consist of an area on the surface of the water sufficient to moor three Barges to the concrete pier [one in No. 2 ("Barge 2"), one in No. 3 ("Barge 3"), and one in No. 4 ("Barge 4")]. Barge 2 shall have no more than 39 linear feet, Barge 3 shall have no more than 65 linear feet, and,

subject to the immediately succeeding sentence, Barge 4 shall have no more than 71 linear feet. Landlord and Tenant acknowledge and agree that Landlord has determined that the space identified on Exhibit B as Space No. 1, as presently configured, is not suitable or available for retail sales. Accordingly, although Tenant shall have the right, at any time during the Term, to expand its existing Barge 2, or to install a new barge, in the area comprising Space No.1, Tenant shall not have the right hereunder to utilize any of the sea wall frontage abutting Space No. 1 for the sale of goods or services, unless Landlord later determines that Space No. 1 has become suitable or available for retail sales. In the event that Landlord makes such a determination regarding Space No. 1, Tenant shall have the option to expand its existing Barge 2, or to install a new barge, in the area comprising Space No. 1, provided such alterations satisfy the requirements of Section 13 below, and provided Tenant executes and delivers an amendment to this Lease acknowledging the resulting increase in frontage created by such alterations, and agreeing to increase the Minimum Rent and Tenant's Proportionate Share of Common Area Operating Costs proportionate to the increased linear feet of frontage.

K.    **Project:** The Municipal Fish Wharf located between 11th and 12th Streets, south of Maine Avenue, S.W., Washington, D.C. The Project includes the portion of the Potomac River in which the tenants' barges are moored. A site plan of the Project is attached as Exhibit B. A certified survey of the Project, to include references to all Lots and Squares, or portions thereof, included within the Project, has been commissioned and will be delivered to the parties upon completion, at which time a legal description of the Project shall be initialed and attached hereto as a substitute and replacement for the existing Exhibit B.

L.    **Security Deposit:** $2,666.66, which shall be due and payable within thirty (30) days after the effective date of this Lease.

M.    **Tenant Committee:** A committee representing the tenants of the Project and composed of one representative to be named by each such tenant. The Tenant Committee shall cooperate with the Management Agent to be retained for the Project, as provided herein, to carry out the operation, maintenance, and repair of the Common Areas of the Project. The Tenant Committee may, at its option, elect to operate by means of a limited liability company or other legal entity. All matters requiring decisions by the Tenant Committee shall be decided on the basis of a simple majority. Voting on all such matters by Tenant and the other tenants of the Project shall be based upon the "Proportionate Share" (hereinafter defined) of each.

N.    **Tenant's Proportionate Share:** 21.03%, which equals the percentage that the number of linear feet of frontage in the Premises bears to the number of linear feet of frontage in the Project. If the number of linear feet of frontage in the Project changes, Tenant's Proportionate Share will be adjusted accordingly.

O.    **Term:** The period that begins on the Commencement Date and ends thirty (30) Lease Years after the New Rent Commencement Date, unless sooner terminated pursuant to this Lease. Tenant acknowledges that it has no right hereunder to renew or extend the Term hereof, or to negotiate for a renewal of the Term hereof. However, Landlord acknowledges that nothing contained herein shall prevent Tenant hereafter from seeking to obtain any such rights.

P.    **Prohibited Use:**  Anything herein to the contrary notwithstanding, Tenant covenants that during the term of this Lease, (1) it shall not engage in the business of fish cutting or oyster shucking, nor shall it offer non-alcoholic beverages from vending machines; provided, that the provisions of this Section 1.P shall be enforceable only during such times as Virgo Fish House, its successors or permitted assigns, shall engage in the activities described herein at other premises within the Project; and (2) it shall not engage in the sale of liquor for consumption off the Premises. It is understood and agreed that the foregoing prohibition on oyster shucking is intended to apply only to the shucking of oysters conducted as an independent business, and shall not apply to the shucking by Tenant of oysters sold by Tenant.

Q.  **Restrictions on Sales.**  The following restrictions shall appear in all Leases of Barge Spaces within the Project.  In the particular Lease or Leases to which any such restriction pertains, such provision shall act as a restriction imposed and enforceable by Landlord for its benefit, and imposed and enforceable by the other tenants of the Project for their benefit, and accepted by the tenant or tenants occupying the area to which such restriction directly pertains.

(i)  For a period of ten (10) years, expiring on the tenth (10) anniversary of this Lease, the sale of seafood of any type shall be prohibited throughout the rectangular area comprising the southernmost twenty-four feet (24') of Barge 6.

(ii)  For the entire Term of this Lease, the sale of crabs anywhere on Barge 6 or 16 shall be prohibited.

## 2.    *Lease of the Premises;  Termination of Prior Lease;  Tenant's Acceptance of Premises; .*

A.    Landlord leases to Tenant and Tenant leases from Landlord the Premises for the Term.

B.    Landlord is presently leasing the Premises to Tenant pursuant to an existing lease agreement dated February 20, 1986 (the "Prior Lease").  Effective as of the Commencement Date, the Prior Lease shall terminate, and Tenant's use and occupancy of the Premises will be governed by this Lease.

C.    Tenant has accepted delivery of the Premises under the Prior Lease, and at the commencement of the Term hereunder, Tenant shall continue to occupy the Premises in their "as is" condition, subject to Section 3.  Effective as of the Commencement Date, Tenant does hereby release, remise, discharge, and forever waive any and all claims, actions, or causes of action, whether known or unknown, arising from or relating to the Prior Lease that Tenant has or may have against landlord, or its affiliated entities, predecessors, successors, assigns, legal representatives, agents, employees, servants, attorneys, officers, or other representatives.

## 3.    *Landlord's Work.*

A.    Landlord has been allocated $3,000,000 from the federal government (the "Federal Appropriation") to make improvements to the Project and to the marina located next to the Project at 1300 Maine Avenue. Landlord and Tenant have heretofore agreed upon the nature of the improvements to be made to the Project with the Federal Appropriation and such other sources of funding as may be available to landlord, all as embodied in the Work Orders issued by the Corps of Engineers and reviewed and approved by Landlord and Tenant, and attached hereto as Exhibit D. (The improvements to be made to the Project with the Federal Appropriation and such other sources of funding as may be available to Landlord are referred to hereafter as "Landlord's Work.") Landlord shall have no obligation to spend any funds to complete Landlord's Work in excess of the Federal Appropriation and such other sources of funding as may be available to Landlord.

B.    After Landlord's Work has been determined in accordance with subsection A above, Landlord will complete construction of Landlord's Work in a good and workmanlike manner and in accordance with requirements of governmental authorities. Tenant shall be consulted with regard to materials and structural details of Landlord's Work, but the final choice thereof shall be in Landlord's sole discretion. Except for Landlord's Work and except as provided in Section 9, Landlord shall not be required to make any repairs or improvements to the Project.

C.    Landlord shall use reasonable commercial efforts to complete Landlord's Work by June 30, 2001, but shall have no liability to Tenant if it is unable to complete Landlord's Work by that date or by any other date. Within five (5) days after the New Rent Commencement Date, Tenant shall execute and deliver to Landlord a Certificate of Acceptance, in the form attached hereto as Exhibit C.

D.    Landlord's Work shall comply with ADA requirements, as well as all other applicable Federal and local governmental requirements.

## 4.    *[Intentionally Omitted]*

## 5.    *Minimum Rent.*

A.    During the Term, Tenant shall pay all rent, without demand and without setoff, counterclaim, recoupment or other reduction, to the "Management Agent" (defined below) for the Project, including Minimum Rent in monthly installments as set forth in Section 1.F. All monthly installments of Minimum Rent shall be payable in advance on the first day of each month, except that the first payment shall be due on the New Rent Commencement Date. If the Commencement Date or the New Rent Commencement Date is not the first day of a month, the rent for the months in which those dates fall shall be prorated.

B.    On or before the New Rent Commencement Date, the Tenant Committee shall select, following consultation with, and with the approval of, the Landlord, a "Management Agent" that shall be charged with responsibility for the operation, maintenance, repair, and replacement of all elements of the Common Areas and the orderly operation of the Project. The Management Agent, throughout the term of its employment as such with respect to the Project: (1) shall maintain insurance that includes employee dishonesty or fidelity coverage in an amount at least as great as the amount of funds the Management Agent has access to at any time; and (2) shall

covenant not to, and shall not, discriminate against any employee or applicant for employment because of race, creed, color, sexual orientation, physical disability, marital status, or national origin. Landlord, subject to the review and approval, not to be unreasonably conditioned, delayed, or withheld, of the Tenant Committee, shall negotiate and enter into a Management Agreement with the Management Agent. The Management Agreement shall provide that, before payment to Landlord of any amounts due Landlord hereunder: (i) twenty-five percent (25%) of the Minimum Rent and all other Rent from this Lease and all other leases of premises within the Project shall be placed in an interest-bearing escrow account with the Management Agent as a reserve for future capital expenditures in respect of the Common Areas, of which as much as one-fifth (1/5) (or five percent (5%) of the Minimum Rent) may be used for advertising the Fish Wharf in local media and signage in Common Areas, although it is acknowledged by the parties that establishing reasonable reserves for capital needs shall have priority; (ii) all "Common Area Operating Costs" shall be paid to, and applied by, Management Agent, as provided in Section 10 below; and (iii) Management Agent shall deduct the sum of TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($25,000.00) (the "Accounting Reserve") from the Rent payable hereunder and shall deposit the same in a reserve account to remain available for purposes paying any accounting or auditing charges incurred by Landlord under Section 7.D below from time to time. As and when funds in the Accounting Reserve are expended, Management Agent shall again deduct sufficient monies from the Rent payable hereunder to replenish the Accounting Reserve to the level established above.

C.    No payment by Tenant of a lesser amount than the monthly installment of rent or other charges herein stipulated shall be deemed to be other than on account of the earliest stipulated rent or other charges, nor shall any endorsement or statement on any check or letter accompanying any payment be deemed an accord and satisfaction. Landlord may accept any check for payment without prejudice to Landlord's right to recover the balance of the rent due or to pursue any other remedy available to Landlord.

## 6.    Late Charges.

Any rental or other payment due from Tenant hereunder which is not received when due shall be payable by Tenant to Landlord, without demand, with interest from the due date until paid at the rate of fifteen percent (15%) per annum (1-1/4% per month), but no less than One Hundred Dollars ($100.00), and Tenant shall reimburse Landlord for reasonable attorneys' fees, if any, incurred by Landlord by reason of Tenant's failure to make timely payment. In addition, Tenant shall pay Landlord a $100.00 fee for each check received by Landlord which is returned by Tenant's bank unpaid.

## 7.    Additional Rent: CPI Adjustment; Percentage Rent.

A.    Upon the first (1st) day of the second (2nd) Lease Year, and upon each anniversary thereof through the first day of the sixth (6th) Lease Year (each, an "Adjustment Date"), the Minimum Rent herein provided shall be adjusted to reflect increases in the Consumer Price Index (as defined in Section 1.D above). Such adjustment shall be accomplished by multiplying the Minimum Rent by a fraction, the numerator of which shall be the Consumer Price Index as of the most recent date prior to such Adjustment Date, and the denominator of which shall be the Consumer Price Index as of the most recent date prior to the New Rent Commencement Date;

provided, however, that in no event shall the Minimum Rent be reduced as a result of such adjustment below the Minimum Rent for the immediately preceding year. The increased Minimum Rent established pursuant to this Section 7 shall continue in effect as, and for all purposes of this Lease be defined as, the Minimum Rent until again increased as herein provided. [As an example, to calculate the adjustment in Minimum Rent on the first day of the second (2nd) Lease Year, assuming that (x) the annual Minimum Rent is $30,000.00; (y) the CPI Index is at 175 at the time of the New Rent Commencement Date; and (z) the CPI Index is at 185 at the time of the first day of the second (2nd) Lease Year, then the adjustment to Minimum Rent would be calculated as follows: ($30,000.00)x(185/175) = ($30,000)x(1.057) = $31,710. ]

B.    Within seventy-five (75) days after the end of each Lease Year beginning with the sixth (6th) Lease Year, Tenant shall pay to Landlord, as additional rent, within seventy-five (75) days after the end of each Lease Year, Percentage Rent calculated in accordance with Section 1.H. Tenant's annual payment of Percentage Rent shall be accompanied by a financial statement (the "Annual Statement"), signed by Tenant and reviewed by an independent certified public accountant, showing the "Gross Sales," "Gross Taxable Sales," and "Gross Non-Taxable Sales" (as such terms are defined in Section 6.B) and the Percentage Rent for the Lease Year.

C.    "Gross Sales" means the gross amount charged for all sales or services made upon or from the Premises, including any rent or other sum received by Tenant from licensees or concessionaires. "Gross Non-Taxable Sales" means the amount of Gross Sales, minus the amount of all sales and services that shall be subject to, and with respect to which Tenant shall pay, District of Columbia Sales and Use Tax. "Gross Taxable Sales" means the amount of Gross Sales minus the amount of Gross Non-Taxable Sales. Each sale shall be valued at the actual sales price charged the customer, even if the sale is a credit or installment sale, and reported in full in the month in which the sale occurs, even if full payment is not received at the time of the sale.

D.    Tenant shall furnish to Management Agent, simultaneously with the filing thereof with the District of Columbia, copies of the Sales and Use Tax Returns currently required to be filed by Tenant in respect of prepared foods and other taxable goods sold by Tenant within the Premises. In addition, Tenant shall prepare, file with the District of Columbia, and make simultaneously available to Landlord informational returns in respect of all raw foods and other goods sold by Tenant within the Premises. Such records shall be open to inspection and audit by Landlord or its accountants. If any audit discloses a deficiency in payment of Percentage Rent, Tenant shall immediately pay Landlord the deficient amount, together with interest thereon at the rate of fifteen percent (15%) per annum from the date such Percentage Rent should have been paid. If a discrepancy of three percent (3%) or more in the reported amount of Gross Sales is uncovered as a result of any audit, Tenant shall reimburse Landlord for the cost of the audit (including the cost of Landlord's accountant). Landlord shall bear the cost of any audit in which no discrepancy or a discrepancy of less than three percent (3%) shall be found (including the cost of Tenant's accountant). Except to the extent required by law or required to exercise its rights hereunder, Landlord shall maintain the confidentiality of all information furnished by Tenant pursuant to this Section 7.D or otherwise made available to Landlord in connection with the exercise of its rights under Section 7.B above.

## 8. *Utilities.*

During the Term, Tenant shall pay directly to the supplier all charges for water, sewer, gas, electricity, telephone and other utilities used upon the Premises. Expenses for maintenance of utility meters shall be borne by Tenant, and if Landlord pays any such expenses, Tenant shall reimburse Landlord promptly upon demand. Landlord shall not be liable for any failure to furnish or for any interruption of utility services, unless caused by the gross negligence of Landlord or Landlord's agents. Upon Tenant's request, Landlord shall furnish a copy of the surety bond or indemnity agreement from any contractor performing work in the Project.

## 9. *Common Areas; Employee Parking.*

A.     Landlord grants to Tenant the right, in common with other tenants in the Project, to use the Common Areas during the Term. Such right of use shall be deemed a license coupled with an interest, and shall subsist until the expiration or the earlier termination of the Term. After completion of Landlord's Work, and with the approval of the Tenant Committee, Landlord may change the size, location or nature of the Common Areas, and may locate on the Common Areas structures of any type; provided no such structures would materially interfere with access to the Premises across the Common Areas and to and from Maine Avenue. Subject to the terms of the Management Agreement, Landlord shall have exclusive control and management of the Common Areas and Landlord may establish and enforce rules therefor.

B.     Parking, including, without limitation, employee parking, within the Project shall be regulated by the Tenant Committee, which shall promulgate parking regulations to be enforced by the Management Agent; provided, that no area within the Project shall be dedicated to parking for employees of Tenant or any other tenant of the Project; and provided, further, that no parking shall be permitted in any area designated for table space in the plans for Landlord's Work.

## 10. *Common Area Operating Costs.*

A.     Commencing with the New Rent Commencement Date, Tenant shall pay to Management Agent (as agent for Landlord), as additional rent, Tenant's Proportionate Share of all "Common Area Operating Costs" (as hereafter defined). Common Area Operating Costs means the sum of the following costs and charges incurred by Landlord for each calendar year or part thereof during the Term: (i) "Common Area Costs" (as hereafter defined); (ii) repair and maintenance costs for the structure and exterior of the buildings in the Project, exclusive of improvements located on barges within the Project and exclusive of expenditures that under "generally accepted accounting principles," as that term is defined by the financial Accounting Standards Board, would be capitalized ("Capital Expenditures"); (iii) "Insurance Costs" (as hereafter defined); and (iv) the monthly fee due Management Agent under the Management Agreement. Common Area Costs mean'all costs incurred by Landlord, excluding Capital Expenditures, to operate, maintain, replace and repair the Common Areas, including costs for the following: security services; gardening and landscaping; repairs; painting; striping and sweeping; lighting (including the cost of electricity and maintenance and replacement of exterior fixtures and bulbs); and other utility costs for the public restrooms and other facilities located within the Common Area; refuse removal, including dumpsters; ice and snow removal; equipment and supplies related to Common Area maintenance;

water and maintenance charges for sprinklers and hydrants; any dues, fees or assessments paid by Landlord with respect to storm water management facilities that benefit the Project; and personnel of Management Agent to operate, maintain and repair the Common Areas (including salaries, employment taxes and workmen's compensation insurance for such personnel). "Insurance Costs" mean all insurance premiums and other costs incurred by Landlord in connection with fire and extended coverage, public liability, business interruption, sign, and any other insurance maintained by Landlord relating to the Project.

B.      Landlord shall annually notify Tenant of Tenant's Proportionate Share of Common Area Operating Costs for each calendar year, and Tenant shall pay to Management Agent (as agent for Landlord) such amount in equal monthly installments in advance on the first day of each of the twelve (12) months after the date of such notice, the first such monthly installment to be due on the New Rent Commencement Date. If the New Rent Commencement Date is a date other than the first day of a month, Tenant's Proportionate Share of Common Area Operating Costs for that month shall be prorated. Landlord shall annually submit to Tenant a statement showing the actual Tenant's Proportionate Share of Common Area Operating Costs for the prior calendar year, the amount paid by Tenant, and the balance due or overpayment. The balance due shall be paid by Tenant to Management Agent (as agent for Landlord), or the overpayment shall be paid by Landlord to Tenant, without interest, within thirty (30) days after the date of the statement. Tenant may, upon reasonable notice, examine Project records at the office of the Management Agent during ordinary business hours to verify the statement for the immediately preceding year, but such examination shall not excuse the timely payment of Tenant's Proportionate Share of Common Area Operating Costs.

C.      The Tenant Committee, in conjunction with the Management Agent, shall prepare an annual budget for operation of, and any contemplated repairs and replacements of, the Common Areas, which shall be made available for the review and reasonable approval of Landlord. As and when capital expenditures are required, the Tenant Committee, in conjunction with the Management Agent, shall prepare a scope of work and budget therefor, and shall submit same to Landlord for approval, which shall not be unreasonably withheld. Until the New Rent Commencement Date, Tenant, in conjunction with the other tenants of the Project, shall continue to be responsible for and pay operating costs of the Project in the same manner as has been the case before the date of this Lease, subject to adjustment for any changes being implemented currently in tenants' respective Proportionate Shares.

## 11.     Use of Premises.

A.      Tenant shall use the Premises exclusively for conduct of the business set forth in Section 1.I.

B.      Tenant shall keep the Premises open for business at least forty-five (45) hours per week, excluding any closures caused by fire, natural disasters, or other casualties, required by the Landlord's Work or by repair or renovation work by Tenant, or by dredging activity required by the terms of this Lease.

C.    Tenant shall comply with all laws, ordinances, rules and regulations pertaining to the use and occupancy of the Premises, including the Americans with Disabilities Act and other laws relating to the use of the public areas of the Premises by individuals with disabilities. Tenant shall not permit any act upon the Premises which (i) disturbs tenants of the Project or injures the reputation of the Project, (ii) subjects Landlord to liability for injury or damage to persons or property, or (iii) invalidates any insurance policy pertaining to the Project.

## 12.    Signs.

A.    Landlord consents to Tenant's existing exterior signage ("Tenant's Signage") which is in place on the date hereof on Barges 2, 3, and 4. Any changes to Tenant's Signage shall be subject to Landlord's approval, which shall not be unreasonably withheld.

B.    Tenant shall maintain Tenant's Signage in good repair, and shall replace it when needed so that Tenant's Signage is in good condition at all times. If Tenant fails promptly to perform its obligations under this Section, Landlord may perform the repairs, replacements or removal, at Tenant's expense, and Tenant shall reimburse Landlord for the cost thereof promptly upon demand.

## 13.    Alterations.

Tenant may alter the Barges, provided such alterations shall not harm the Project and must comply with all applicable Federal and local building codes, regulations and laws, and provided that any alteration that includes an expansion of the horizontal space covered by such Barges, or the amount or location of the frontage currently occupied by such Barges for purposes of effecting sales to the public, shall require the written consent of Landlord. Provisions identical to the foregoing provisions of this Section 13 shall appear in all Leases of Barge Space within the Project.

## 14.    Fixtures and Equipment.

All of Tenant's equipment, furniture, and moveable trade fixtures shall remain Tenant's property, and Tenant shall have sole responsibility therefor. Tenant may remove them at any time prior to expiration of the Term, provided that Tenant is not then in default under this Lease and provided further that Tenant repairs any damage to the Premises occasioned by removal.

## 15.   *Tenant's Maintenance; Condition of the Premises.*

A.     Tenant shall, at all times throughout the Term, at its cost, put, keep and maintain the Barges and Premises and every improvement located thereon in good order, condition and repair, except for reasonable wear and tear, condemnation and casualty loss.  As used herein, "repairs" shall include replacements, restorations and/or renewals, when necessary or appropriate to keep the Barges and Premises in good order, condition and repair at all times throughout the Term.  All repairs shall be made in a first class workmanlike manner.  In addition, Tenant shall keep and maintain the Barges and Premises in a clean and orderly condition, free of dirt, rubbish, snow and ice.  The necessity for and adequacy of repairs to the Barges and Premises shall be measured by the standard that is appropriate for a first class wharf and fish market.

B.     Tenant shall deposit its refuse in the compactor, dumpster or other trash receptacle supplied by Landlord for Tenant's use as of the Commencement Date.  Throughout the Term, the Tenant Committee shall provide compactors or dumpsters and/or trash collection service, the cost of which shall be included among the Common Area Costs.  Tenant shall not use the compactors, dumpsters or trash collection service for discarding "Hazardous Materials" (as such term is defined below).  Tenant, at its expense, shall dispose of its Hazardous Materials in accordance with applicable federal, state and local laws and regulations.  "Hazardous Materials" means all substances declared to be hazardous, toxic or infectious under any applicable law or regulation.

C.     Tenant shall cooperate with the other tenants of the Project, if given reasonable notice, in arranging for movement of the Barges as necessary to accommodate the maintenance, repair, and replacement of Barges and the dredging of submerged areas within the Project.  All dredging activities shall be carried out and concluded as quickly as is commercially reasonable in the circumstances.  Provisions identical to the foregoing provisions of this Section 15.C shall appear in all leases of Barge Space within the Project.  It is the intent of the parties that all tenants of the Project shall have the rights of third-party beneficiaries with respect to the provisions of this Section 15.C.

## 16.   *Landlord's Right of Entry.*

Landlord and its agents may enter the Premises at reasonable hours to inspect or exhibit them; to place and maintain a "FOR RENT" sign thereon at any time within six (6) months prior to termination of the Term; or to enter them after Tenant defaults hereunder, and alter, repair or otherwise prepare the Premises for reoccupancy.

## 17.   *Tenant's Indemnity; Insurance.*

A.     Landlord shall not be liable for, and Tenant shall protect, defend, indemnify and hold Landlord harmless from and against, any liability or claim (including attorneys' fees) in connection with any injury or loss to any person or property (i) arising within the Premises, unless caused by the gross negligence or willful misconduct of Landlord, or (ii) arising out of any act or omission of Tenant or its agents or contractors.

B.    Throughout the Term, Tenant shall maintain, with a company licensed to sell insurance in the District of Columbia, (i) commercial general liability insurance (the "Liability Policy") with limits of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate combined for all locations in which Tenant operates its business in a form providing occurrence basis coverage; and (ii) an all-risk policy of insurance covering the Barges and all trade fixtures, equipment and personal property kept at the Premises, in an amount not less than the full replacement value of said items. All such insurance policies shall (i) be written as primary coverage and not contributing with or in excess of any coverage that Landlord may carry; (ii) contain an express waiver of any right of subrogation by the insurer against Landlord; and (iii) provide that the insurance policy may not be cancelled unless Landlord has been given thirty (30) days' prior written notice. Notwithstanding the foregoing, the Liability Policy shall be increased at the end of each period of five (5) Lease Years during the Term by an amount equal to the increase in the Consumer Price Index during such period. In addition, Tenant's Liability Policy shall (i) list as additional insured Landlord and any other parties with an insurable interest in the Premises designated by Landlord, and (ii) be endorsed to require the insurance carrier to notify Landlord in writing of any losses charged against the policy. Before the Term commences, and before any such insurance policy expires, Tenant shall deliver to Landlord a certificate of insurance for each policy or renewal thereof that Tenant is required to maintain under this Section. If Tenant fails to maintain any insurance required by this Section, Landlord may obtain such insurance, and any premium paid by Landlord shall be immediately payable by Tenant to Landlord as additional rent.

C.    Neither party shall be liable to the other or to any insurer (by way of subrogation or otherwise) for any loss or damage, even though such loss or damage may have been occasioned by the negligence of such party, if such loss was covered by an insurance policy containing an endorsement to the effect that any such release by the insured shall not adversely affect the insured's right to recover for such loss, and that the insurer waives its right of subrogation.

## 18.    [Intentionally Omitted].

## 19.    Assignment and Subletting.

A.    Tenant shall not assign, transfer, mortgage or otherwise encumber this Lease or sublet or otherwise permit others to use all or any part of the Premises, whether voluntarily, by operation of law or otherwise (collectively, an "Assignment"), without the prior written consent of Landlord, which Landlord may withhold in its absolute discretion. However, Landlord shall not withhold its consent if such assignee, transferee, subtenant or occupant (collectively, the "Assignee") is financially capable of satisfying its obligations under this Lease, and shall have previously and successfully sold seafood at retail. Any attempted Assignment shall be void and confer no rights upon any third party. If an Assignment is effected in violation of the terms of this Lease, Landlord may collect rent from the Assignee and apply the net amount collected to the rent herein reserved, but no such Assignment or collection shall be deemed a waiver of this covenant, acceptance of the Assignee as tenant, or release of Tenant hereunder. In addition, if Landlord consents to an Assignment, Tenant shall pay Landlord One Thousand and No/100 Dollars ($1,000.00) (the "Assignment Fee") as payment for legal fees and costs incurred in connection with

the preparation of the documents to effectuate the Assignment. The Assignment Fee shall be paid to Landlord prior to the preparation of the Assignment documents. The following events shall also constitute an Assignment: (a) if Tenant is a corporation, the transfer of more than fifty percent (50%) of the voting stock of Tenant, or (b) if Tenant is a partnership, the transfer of more than fifty percent (50%) of the partnership interests of Tenant or the transfer of any general partnership interest of Tenant. This clause shall not be interpreted to preclude an Assignment to siblings and direct descendants of individuals owning, as of the Commencement Date, a majority of the voting stock of Tenant, or a transfer to a new entity as a result of a reorganization that does not result in a change in beneficial ownership.

B.      If Landlord approves an assignment or subletting, Tenant shall pay to Landlord, as and when received by Tenant, an amount equal to 50% of the difference between (i) all sums paid to Tenant by or on behalf of such assignee or subtenant under the assignment or sublease, and (ii) the Rent paid by Tenant under this Lease and attributable to the portion of the Premises assigned or sublet.

C.      In addition to the foregoing, if Tenant notifies Landlord that Tenant desires to assign a portion of this Lease or sublet a portion of the Premises (the "Proposed Sublet Space"), Landlord shall have the option to regain possession of the Proposed Sublet Space and amend this Lease to exclude the Proposed Sublet Space and effect a proportionate reduction in Minimum Rent and Tenant's Proportionate Share based upon the relative size of the Premises as so reduced. All other terms and conditions of this Lease shall remain in effect and applicable to the Premises as reduced, and Tenant shall execute documents to effect such amendment at Landlord's request. If Landlord does not exercise its right to regain possession of the Proposed Sublet Space, Tenant may seek an acceptable assignee or subtenant for a sublease term no longer than that set forth in Tenant's notice. If Tenant does not find an assignee or subtenant acceptable to Landlord within 120 days from the date of Tenant's most recent notice, Tenant may not enter into any assignment or sublease without first submitting a new notice to Landlord and affording Landlord an opportunity to amend or terminate this Lease as set forth above.

## 20.    *[Intentionally Omitted]* .

## 21.    *Tenant's Defaults.*

Tenant shall be in default under this Lease if Tenant (a) fails to pay any rent or other sum required hereunder within twelve (12) days after its due date; or (b)  fails to maintain any insurance required hereunder; or (c) abandons the Premises or fails to conduct business therein for a period of fifteen (15) or more consecutive days, absent a casualty and then only after allowing a period of as much as six (6) months in which to replace the affected Barge; or (d) assigns this Lease or sublets all or any portion of the Premises in violation of Section 19; or (e) fails to continue to operate its existing businesses on Barges 2, 3, and 4; or (f) files for relief under the United States Bankruptcy Code (the "Bankruptcy Code") or under any other state or federal bankruptcy or insolvency law, or Tenant files an assignment for the benefit of creditors, or if an involuntary proceeding under the Bankruptcy Code or under any other federal or state bankruptcy or insolvency law is commenced against Tenant; or (g) defaults in any other obligation herein and such default is not remedied within thirty (30) days after written notice of the default from Landlord; provided,

however, that Tenant's failure to perform any non-monetary obligation set forth in this Lease on its part to be performed three (3) or more times in any twelve (12) month period shall effect an immediate default, and Landlord thereupon may exercise any remedy set forth in Section 22 below without affording Tenant any opportunity to cure such default.

### 22.  *Landlord's Remedies in Case of Tenant's Default.*

A.    At any time after Tenant's default under this Lease, Landlord may (i) terminate this Lease upon notice to Tenant or by any available judicial process; and/or (ii) re-enter the Premises (with or without terminating the Lease), remove all property, which may include towing the Barge or Barges and storing same, at Tenant's expense without being deemed guilty of trespass and without liability for any loss or damage, and/or relet or otherwise deal with the Premises in any manner which Landlord determines in its sole discretion.

B.    Should Landlord terminate this Lease after Tenant's default, Landlord may recover from Tenant all costs (including attorneys' fees) and other damages incurred by Landlord as a result of such default, and, without limiting the generality of the foregoing, (i) all rent to the time of such termination shall be paid by Tenant immediately, together with all expenses (including attorneys' fees) of retaking possession of the Premises, as shall the cost of preparing the Premises for reletting and the costs (including brokerage fees and advertising) of actually reletting same; (ii) Landlord may take all steps, including repair or alteration of the Premises, to prepare the Premises for reletting; (iii) Landlord may relet all or any part of the Premises for such term, at such rental, and upon such conditions as Landlord deems advisable; and (iv) Tenant shall pay to Landlord, as liquidated damages, for each month during the balance of the Term (but for termination of the Lease by Landlord), any deficiency between (a) all rent and additional rent herein reserved for each such month, and (b) the net rent for each such month collected upon any reletting. Alternatively, if Landlord terminates this Lease at any time after Tenant's default, Landlord may elect, in addition to the damages described in clauses (i) - (iii) of the preceding sentence, and the damages due under clause (iv) up to the time of said election, to recover from Tenant the value at the time of said election of the excess, if any, of all rent and additional rent due under this Lease for the remainder of the Term (but for termination of the Lease by Landlord) over the then reasonable rental value of the Premises for that period.

C.    If Landlord elects not to terminate this Lease after Tenant's default, Tenant shall continue to be liable for all rent and additional rent due hereunder, in addition to all costs (including attorneys' fees) and other damages arising from Tenant's default.

D.    If Tenant abandons the Premises, Landlord may re-enter the Premises without judicial process and relet them, and such re-entry or reletting shall not terminate this Lease, and Tenant shall continue to be liable for all rent and additional rent due under the Lease, in addition to all costs (including attorneys' fees) and other damages arising from Tenant's default.

23.   **Landlord's Right to Cure Tenant's Default.**

A.    If Tenant shall default in the keeping, observance or performance of any provision or obligation of this Lease, Landlord, without thereby waiving such default, may perform the same for the account and at the expense of Tenant, without notice in a case of emergency and in any other case if such default continues after thirty (30) days from the date of the giving by Landlord to Tenant a notice of intention so to do.  Bills for any reasonable expense incurred by Landlord in connection with any such performance by Landlord for the account of Tenant, and bills for all reasonable costs, expenses and disbursements of every kind and nature whatsoever, including attorneys' fees, involved in collecting or endeavoring to collect any sums due hereunder or enforcing or endeavoring to enforce any rights against Tenant, under or in connection with this Lease, or pursuant to law, including any such reasonable cost, expense and disbursement involved in instituting and prosecuting any action or proceeding (including any summary dispossess proceeding), may be sent by Landlord to be due and payable in accordance with the terms of said bills, and if not paid when due, the amounts thereof shall immediately become due and payable as Additional Rent under this Lease.

B.    No entry in accordance with this Lease by Landlord or its employees, agents or representatives, or by any other party at the direction of Landlord, shall ever be construed or interpreted as an ouster of Tenant from possession or as a constructive eviction or to alter, diminish or abate Landlord's rights under this Lease.

24.   **[Intentionally Omitted].**

25.   **Holding Over.**

If Tenant lawfully remains in possession of the Premises after the expiration of the Term, Tenant shall be a tenant from month to month, upon all the terms hereof which are not inconsistent with such tenancy; provided, however, that Tenant covenants to pay to Landlord as Minimum Rent during such tenancy one hundred fifty percent (150%) of the Minimum Rent in effect immediately before expiration of the Term, in addition to all other rent and other charges due hereunder.  Such tenancy may be terminated by Landlord or Tenant upon thirty (30) days notice.

26.   **Surrender of Premises.**

Upon termination of the Term for any reason, Tenant shall remove the Barges and any other property of Tenant, and surrender the Premises to Landlord in the same condition as they were in on the Commencement Date.  If Tenant fails to remove the Barges or other property, it shall become Landlord's property or, at Landlord's option, shall be removed and stored at Tenant's expense, without Landlord being liable for trespass, conversion or negligence in respect of such property.  If Tenant fails to surrender the Premises in the condition required by this Section, Landlord may restore the Premises to their condition as of the Commencement Date and Tenant shall reimburse Landlord for the cost of the restoration.

## 27.  *Limitation on Landlord's Liability.*

A.  Notwithstanding anything to the contrary in this Lease, (i) Landlord shall not be liable to Tenant for any loss or damage to property which is either covered by insurance or which Tenant is required to insure under this Lease, and (ii) any liability of Landlord to Tenant under this Lease shall be limited to direct damages and shall not include indirect, consequential, incidental, or punitive damages, including any liability to Tenant for lost profits or interruption of business. Tenant shall look to its property damage or business interruption insurance policies, and not to Landlord, its agents or employees for any loss incurred as a result of damage to its property or interruption of its business.

B.  Except for damages resulting from the gross negligence or willful misconduct of Landlord, Landlord shall not be liable to Tenant, its employees, agents or other invitees for any damage, compensation, claim or expense arising from (i) damage or loss to the property of Tenant or others located anywhere in the Project), or (ii) death, accident or injury to persons occurring anywhere in the Project). Landlord shall have no liability to Tenant for any delay in completing Landlord's Work.

## 28.  *Notices.*

All notices and other communications hereunder shall be in writing, and shall be hand delivered, delivered by a recognized overnight delivery service (e.g., Federal Express), or sent by certified or registered U.S. mail, postage prepaid, to Landlord or Tenant, as the case may be, at the address set forth below. All notices hereunder shall also be delivered to counsel for the party to receive such notice, at the address set forth below, in order to effectuate good and valid notice hereunder.

If to Landlord:

Director, District of Columbia Department of Housing
  and Community Development
801 North Capitol Street, N.E.
8th Floor
Washington, D.C. 20002

With a required copy to:

Andrew Ridley, Esquire
Assistant Corporation Counsel
801 North Capitol Street, N.E.
7th Floor
Washington, D.C. 20002

If to Tenant:

Pruitt's Seafood, Inc.

C/o Stewart B. Pruitt, President
8344 Seaside Road
P.O. Box 921
Nassawadox, Virginia 23413

With a required copy to:

Gordon S. Vincent, Esquire
Vincent, Northam & Lewis
23391 Front Street
P.O. Box 90
Accomac, Virginia 23301

Either party may designate in writing a change in its notice address, which shall be effective ten (10) days following receipt of such writing by the other party. Notices which are delivered in person shall be deemed given when received. Notices which are mailed shall be deemed given on the date they are mailed. Notices which are sent by overnight delivery service shall be deemed given on the date they are deposited with the delivery service.

### 29.    *Quiet Enjoyment.*

As long as it is not in default under this Lease, Tenant may peaceably and quietly enjoy the Premises for the Term without hindrance, ejection or molestation by Landlord or anyone claiming or acting by or through Landlord.

### 30.    *Security Deposit.*

Tenant has deposited with Landlord the sum set forth in Section 1.L (the "Security Deposit") as security for performance of Tenant's obligations hereunder. Upon appointment of the Management Agent, the Security Deposit shall be transferred to an interest-bearing escrow account to be maintained by the Management Agent hereunder. Upon the request of Tenant, the Management Agent shall distribute to Tenant, on an annual basis, all interest accrued on the Security Deposit from the time of its deposit or the time of the immediately preceding distribution, as the case may be. The Security Deposit shall be returned to Tenant, with interest, within forty-five (45) days after the expiration of the Term, provided that Tenant has discharged all such obligations. Landlord may apply the Security Deposit to cure any default of Tenant, and Tenant shall deposit with Landlord the amount applied within thirty (30) days after written demand.

### 31.    *[Intentionally Omitted].*

32.    **Rules and Regulations.**

Tenant will comply with the Rules and Regulations set forth on Exhibit E, and with any other reasonable rules and regulations as Landlord adopts for the Premises. Such rules and regulations shall not unreasonably interfere with the conduct of Tenant's business. In particular instances, where in Landlord's reasonable judgment such rules and regulations may be infeasible, Landlord shall have the right to modify or waive such rules and regulations as they apply to particular other tenants. Any failure by Tenant to comply with any rule or regulation established pursuant to this Lease shall be a default under this Lease subject to Section 21. Landlord shall exercise its rights in respect of the promulgation, revision, and enforcement of Rules and Regulations in a non-discriminatory manner.

33.    **Waiver of Jury Trial.**

Landlord and Tenant hereby waive all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other pertaining to any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises.

34.    **Covenant Against Contingent Fees**

Tenant warrants that its has not employed any person to solicit or secure this Lease upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give Landlord the right to terminate this Lease, or, in its discretion, to add to the rental or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by Tenant upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by Tenant for the purposes of securing business, or to Tenant's attorneys' fees. Landlord shall pay any and all commissions and other compensation due to any broker, finder or other person with whom Landlord has dealt with regard to this Lease.

35.    **Facilities Nondiscrimination.**

A.    As used in this section, the term "facility" means the entire Premises.

B.    Tenant agrees that it will not discriminate by segregation or otherwise against any person or persons because of race, creed, color, sexual orientation, physical disability, marital status or national origin, in furnishing, or by refusing to furnish, to any person or persons the use of any facility, including any and all service, privileges, accommodations and activities provided thereby.

C.    It is agreed that Tenant's noncompliance with the provisions of this Article, as determined by a final, unappealable judgement by a court of competent jurisdiction, shall constitute material breach of this lease Agreement. In the event of such a determination of noncompliance, and Tenant's failure to cure such non-compliance within ten (10) days after such

determination becomes final, Landlord may take appropriate action to enforce compliance, and may pursue remedies as may be provided by law or in equity.

      D.    Tenant agrees to include, or to require the inclusion of, the foregoing provisions of this section (with terms "The District" and "Tenant" appropriately modified) in every agreement or concession pursuant to which any person other than Tenant operates or has the right to operate the facility. Tenant also agrees that it will also comply with any final, unappealable court order directing Tenant to take any action with respect to any such agreement in order to enforce the processions of this section, including but not limited to termination of the agreement or concession in question; provided, however, that in the event the Tenant becomes involved in or is threatened with litigation with a person as a result thereof, Tenant may request Landlord to enter into such litigation to protect the interest of Landlord.

## 36.   *Nondiscrimination in Employment.*

      A.    In connection with the conduct of business on the Premises, Tenant agrees not to discriminate against any employee or applicant for employment because of race, creed, color, sexual orientation, physical disability, marital status, or national origin. Tenant will take affirmative action to ensure that applicants are employed and that employees are treated during employment without regard to their race, creed, color, sex orientation, physical disability, marital status or national origin. Such action shall include, but not limited to the following: employment, upgrading demotion or transfer, recruitment or recruitment advertising, layoff of termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship, as required by applicable law. Tenant agrees to post in conspicuous places available to employees and applicants for employment, notices to be provided by Landlord setting forth the provisions of this nondiscrimination clause.

      B.    Tenant will, in all solicitations for advertisements for employees placed by or on behalf of the Tenant, state that qualified applicants will receive consideration for employment without regard to race, creed, color, sexual orientation, physical disability, marital status or national origin.

      C.    Tenant will send to each union or representative of workers with which it has collective bargaining agreement(s) or other contracts of understandings a notice to be provided by Landlord in advising the said labor union or worker's representative of Tenant's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

      D.    Tenant will permit Landlord access to their books, records, and accounts, or their agents, for purposes of investigation to ascertain compliance with such rules, regulations and orders, as provided by applicable law.

      E.    In the event of any final, unappealable determination by any court or administrative body, of noncompliance of Tenant with the nondiscrimination clauses of this Lease Agreement, and Tenant's failure to cure such discrimination within ten (10) days after

such determination becomes final, this Lease Agreement may be canceled in whole or in part and Tenant may be declared ineligible for further leases with the District of Columbia.

F.    Tenant further agrees to insert the foregoing provisions of nondiscrimination in employment in all subcontracts hereunder, unless exempted by rules and regulations or orders of Landlord so that such provisions will be binding and regulations or orders of Landlord so that such provisions will be binding upon each subcontractor or vendor. Tenant will take such action with respect to any subcontract as required by any final, unappealable order of a court or governmental agency of competent jurisdiction in order to enforce such provisions, including sanctions for noncompliance; provided, however, that in the event the Tenant becomes involved in or is threatened with litigation with a subcontractor or vendor as a result thereof, Tenant may request Landlord to enter into such litigation to protect the interest of Landlord.

### 37.    *Environment Protection.*

A.    Tenant shall not pollute the air, ground or water in, on or under the premises. Tenant shall comply promptly with any laws, regulations, conditions or instructions applicable to the Tenant's business(es) at the Premises, if and when issued by the Environmental Protection Agency, or any Federal, state, or local governmental agency having jurisdiction to abate or prevent pollution. The disposal of any toxic or hazardous material within the Premises in violation or applicable laws or codes is specifically prohibited. Tenant shall require the owners/operators of boats moored at the Premises, including rental boats, to seal all sanitation facilities or such boats against any discharge into the Washington Channel. Services for waste disposal, including sewage pump-out of watercraft, shall be provided by the Tenant as reasonably appropriate. Tenant shall not discharge waste or effluent from the Premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

B.    If damage to the environment or natural resources is proximately caused by Tenant's activities at the premises, Tenant shall be liable to restore the damaged resources.

### 38.    *Miscellaneous.*

A.    **Entire Agreement; Joint and Several Liability; Successors and Assigns.** This Lease constitutes the entire agreement between the parties concerning the matters set forth herein. If Tenant shall include more than one person, the obligations hereunder of all such persons shall be joint and several. This Lease shall be binding upon and inure to the benefit of the parties and their respective successors, permitted assigns, heirs and legal representatives.

B.    **Interpretation.** The named Exhibits are part of this Lease. Section and subsection headings are for convenience only, and not for use in interpreting this Lease. If a court finds any provision of this Lease unenforceable, all other provisions remain enforceable.

C.    **Costs; Include; Shall; May.** Except as expressly provided otherwise in this Lease, the party obligated or permitted to perform an obligation is also obligated, as between

Landlord and Tenant, to pay the cost of performance. "Include," "includes," and "including" mean considered as part of a larger group, and not limited to the items recited. "Shall" means is obligated to. "May" means "is permitted to."

D.    **Waiver**. No provision of this Lease is waived by Landlord or Tenant unless waived by them in writing. Landlord's acceptance of rent is not a waiver of any default of Tenant, regardless of Landlord's knowledge of a default when it accepts the rent. No waiver by Landlord or Tenant of any default is a waiver of any other default of the same or any other provision of this Lease.

E.    **Rule Against Perpetuities**. Notwithstanding any provision in this Lease to the contrary, if the Lease Term has not commenced within three (3) years after the date of this Lease, this Lease shall automatically terminate on the third (3rd) anniversary of the date hereof. The sole purpose of this provision is to avoid any possible interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation.

F.    **Remedies**. The rights and remedies mentioned in this Lease are in addition to, and do not deprive a party of any other rights at law or in equity.

G.    **No Option**. The submission of this Lease for examination does not constitute a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery of it by Landlord.

H.    **Additional Rent**. All sums owed by Tenant to Landlord in connection with this Lease which are not otherwise designated as rent shall be deemed to be additional rent.

I.    **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the District of Columbia.

J.    **Waiver and Release of Claims**. In consideration of the execution and delivery of this Lease by the parties hereto, each of such parties hereto (each, a "Releasing Party") hereby unconditionally releases, remises, acquits, and forever discharges the other party hereto (at such time as such other party shall have executed and delivered this Lease), as well as each of the other tenants of the Project (at such time as each such tenant shall have executed and delivered a Lease containing waiver and release provisions identical to the provisions of this Section 38.J, and provided such tenant shall not have instituted litigation against such Releasing Party after the date hereof and before the date of such Lease) (collectively, the "Released Parties"), from any and all claims, demands, liabilities, damages, losses, costs, expenses, causes of action, covenants, contracts, torts, controversies, agreements, promises, representations, breaches of contract or of obligations to perform, and any other type of conduct or misconduct, whether negligent, intentional or otherwise, whether at law or in equity, whether matured or unmatured, and whether known or unknown, that the Releasing Party, or any person or entity claiming by, through or under the Releasing Party, ever had, now has, or hereafter may have, against any of the Released Parties at any time from the beginning of the world to the date hereof related to, arising out of, or in any manner connected with: (1) the Project, the operations of the businesses within the Project, or the conduct of any of the Released Parties that relates in any manner to the Project; or (2) this Lease or other lease agreements

entered into at any time before the date hereof or simultaneously herewith relating to the Project (collectively, the "Project Leases"), the procurement or negotiation of any of the Project Leases or the terms thereof, or the performance or non-performance by any party under any of such Project Leases.

IN WITNESS WHEREOF, the District of Columbia has caused this Lease to be executed in its corporate name by _Anthony A. Williams_ its _Mayor_____, and attested by _Joseph Wolfe_____, its _Project Manager___, and its seal to be hereunto affixed and does hereby constitute and appoint _Anthony A. Williams_ its true and lawful Attorney-in Fact for it and in its name to acknowledge and deliver this Lease as its act and deed.

LANDLORD:

WITNESS:                              THE DISTRICT OF COLUMBIA, as agent for
                                      THE UNITED STATES OF AMERICA

By: _Anthony A. Williams_____(Seal)
Name: _Anthony A. Williams_____
Title: _Mayor of the District of_ Columbia

Approved for Legal Sufficiency:

                                      Date: _10 / 2 / 01_____
Name: _Andrew Osel Ridley____
Title: _Senior Counsel_____


IN WITNESS WHEREOF, Pruitt's Seafood, Inc., has caused this Lease to be executed in its corporate name by _Stewart B. Pruitt_, its _President_____, and attested by _JEFF PRUITT____, its _____, and its seal to be hereunto affixed and does hereby constitute and appoint _STEWART B. PRUITT___ its true and lawful Attorney-in Fact for it and in its name to acknowledge and deliver this Lease as its act and deed.

TENANT:

ATTEST:                               PRUITT'S SEAFOOD, INC., a Virginia corporation

By: _Stewart Pruitt_____(Seal)
Name: _Stewart Pruitt_____
Title: _President_____

DISTRICT OF COLUMBIA, SS.

I, _Gladys Herring_, a Notary Public in and for the District of Columbia, do hereby certify that _Anthony A.Williams_, who is personally well known (or satisfactorily proven) to me to be the person named as _the Mayor_ of the District of Columbia, a municipal corporation, in the foregoing Lease, bearing date as of _Oct 2, 2001_, gh 2000, and hereto annexed, personally appeared before me in the said District of Columbia and acknowledged the same to be the act and deed of the District of Columbia, for the purposes therein contained.

WITNESS my hand and seal this _2nd_ day of _October_, 2000. gh

_Gladys W. Herring_
Notary Public

My commission expires: _June 30, 2004_

DISTRICT OF COLUMBIA, SS.

I, _____, a Notary Public in and for the District of Columbia, do hereby certify that _____, who is personally well known (or satisfactorily proven) to me to be the person named as _____ of _____., a District of Columbia corporation, in the foregoing Lease, bearing date as of _____, 2000, and hereto annexed, personally appeared before me in the said District of Columbia and acknowledged the same to be the act and deed of _____ for the purposes therein contained.

WITNESS my hand and seal this ____ day of _____, 2000.

_____
Notary Public

My commission expires: _____

STATE OF VIRGINIA, SS.

     I, _Gordon S. Vincent_, a Notary Public in and for the State of Virginia, do hereby certify that Stewart B. Pruitt, who is personally well known (or satisfactorily proven) to me to be the person named as President of Pruitt's Seafood, Inc., a Virginia corporation, in the foregoing Lease, bearing date of April 1, 2001, and hereto annexed, personally appeared before me in the said State of Virginia and acknowledged the same to be the act and deed of Pruitt's Seafood, Inc., for the purposes therein contained.

    WITNESS my hand and seal this 14th day of _March_, 2001.

                                   _Gordon S. Vincent_
                                   Notary Public

My Commission Expires: _Jan. 31, 2003_

## EXHIBIT A

[Outline of Premises -- to be initialed by the parties and attached upon completion of design and engineering for Landlord's Work.]





## EXHIBIT B

[Site Plan of the Project]





## EXHIBIT C

[Certificate of Acceptance – establishing New Rent Commencement Date]

## EXHIBIT C

## CERTIFICATE OF ACCEPTANCE

The undersigned, having entered into a certain Lease Agreement dated _____

_____, 2000, by and between the undersigned, as Tenant, and THE DISTRICT OF

COLUMBIA, acting on behalf of THE UNITED STATES OF AMERICA, as Landlord,

DOES HEREBY CERTIFY to Landlord that:

    (1)    The Lease is in full force and effect without offset or defense;

    (2)    Tenant has taken possession of the Premises described in said Lease,

namely, _____, 1100 Maine Avenue, S. W., Washington, D.C. 20024;

    (3)    The Commencement Date is _____, 2000;

    (4)    The New Rent Commencement Date is _____, ____; and

    (5)    The condition of the Premises is satisfactory to Tenant.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this ____ day of

_____, ____.

_____(Seal)

# **EXHIBIT D**

[Work Letter – U.S. Army Corps of Engineers Work Order]

| | WO 3 |
|---|---|
| **US ARMY CORPS OF ENGINEERS INTERAGENCY AGREEMENT (ER 1140-1-211)** | **1. AGREEMENT NUMBER** <br> 2. ☐ INITIAL AGREEMENT <br>☐ X <br>☐ AMENDMENT NUMBER |
| **3. PROJECT TITLE** Improvements to the Southwest Waterfront Fish Market and Washington Marina | **4. EFFECTIVE DATE** 25 October 1999 <br> **5. COMPLETION DATE** 21 April 2000 |
| **6. NAME AND ADDRESS OF USACE ORGANIZATION** <br> Baltimore District, U.S. Army Corps of Engineers <br> P.O. Box 1715 <br> Baltimore, MD 21203-1715 | **7. NAME AND ADDRESS OF CUSTOMER** <br> D.C. Dept of Housing & Community Development <br> 801 North Capitol Street, N.E., 8th Floor <br> Washington, DC 20002 |

**8. SCOPE OF WORK** *(Additional pages may be used as needed)*

In accordance with the FY 1999 Omnibus Appropriations Bill, the Corps of Engineers will prepare all necessary environmental and cultural/ Section 106 compliance documentation needed to implement the improvements identified in the Southwest Waterfront Development Needs Assessment dated July 1999. The specific tasks and budgets are as follows:

1. Management – The Corps of Engineers will provide a project manager to provide overall management of the effort. $5,000 budget, $24,000 project contingency.
2. Environmental Compliance – All necessary environmental compliance documentation will be prepared. $55,000 budget.
3. Cultural/ Section 106 Compliance – All necessary coordination with the D.C. Historical Preservation Officer will be accomplished and all necessary compliance documentation will be prepared. $14,000 budget.

**9. CUSTOMER EXPECTATIONS** *(Additional pages may be used as needed)*

The Corps will make every effort to complete the environmental and cultural compliance work within 5 months and to limit project expenditures to $74,000. The five months' timeframe begins when CENAB received a letter from DCDHCD acknowledging deviations from the 1997 Master Plan. DCDHCD will forward CENAB all existing NEPA (if any), NCPC comments on the proposed improvements, and documents that address the ownership of the land.

| **11. USACE PROJECT OFFICER** | **12. CUSTOMER PROJECT OFFICER** |
|---|---|
| Name: Mary Y. Dan <br> Voice: (410) 962-3377 <br> FAX: (410) 962-9512 | Name: Joseph A. Wolfe <br> Voice: (202) 442-7255 <br> FAX: (202) 442-8391 |

ENG FORM 4914-R, Jan 88                                    (Proponent: CECW-RJ)

**12. REPORTS**

A copy of all compliance documentation will be provided.

**13. FUNDS** *(Page(s) with cost breakdown may be attached as necessary).*

| SOURCE | PREVIOUS AMOUNT | AMOUNT THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| a. USACE AMOUNT | | | |
| b. CUSTOMER AMOUNT | $80,000 | $98,000 | $178,000  98,000 |
| c. TOTAL PROJECT COST | $80,000 | $98,000 | $178,000  98,000 |

**14. FUNDING**  Funds will be provided by:

- a. ☐ Transfer Appropriation (SF1151, Non-Expenditure Transfer Authorization)
- ☒ Reimbursable Order (31 USC 1535 – Economy Act)
- ☐ Other (describe)

b. Appropriation:

| LINE | AGY | YR | INDEX | PCA | AOBJ |
|---|---|---|---|---|---|
| 001 | DB0 | 98 | 84040 | 04012 | 1506 |

**15. BILLING**

- a. Request for payment will be made by: ☒ SF 1080  ☐ SF 1081  ☐ Other (describe)
- b. Frequency: ☒ Monthly  ☐ Quarterly  ☐ Upon Work Completion  ☐ Other (describe)
- c. Request for payment will cite the following accounting information (describe necessary documentation):
- d. Submit to: D.C. Dept. of Housing & Community Development
  Office of the Comptroller
  801 North Capitol Street, N.E., 7th Floor
  Washington, DC 20002

**16. AUTHORITY**

FY 1999 Omnibus Appropriations Bill, 31 USC 1535 – Economy Act, and Interagency Agreement.

**17. APPROVALS**

| a. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR USACE | SIGNATURE | DATE |
|---|---|---|
| James R. Jones<br>Chief, Programs and Project Management Division | | 10-18-99 |
| b. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR THE CUSTOMER | SIGNATURE | DATE |
| Othello Mahone, Interim Director<br>Department of Housing and Community Development | | 10-15-99 |

ENG FORM 4914-R, Jan 88                                (Proponent: CECW-RI)

| US ARMY CORPS OF ENGINEERS<br>INTERAGENCY AGREEMENT<br>(ER 1140-1-211) | 1. AGREEMENT NUMBER    WO 4 |
|---|---|
| | 2. ☒ INITIAL AGREEMENT<br>☐ AMENDMENT NUMBER |

| 3. PROJECT TITLE    Improvements to the Southwest Waterfront Fish Market and Washington Marina | 4. EFFECTIVE DATE    13 March 2000 |
|---|---|
| | 5. COMPLETION DATE    30 September 2000 |

| 6. NAME AND ADDRESS OF USACE ORGANIZATION<br>Baltimore District, U.S. Army Corps of Engineers<br>P.O. Box 1715<br>Baltimore, MD 21203-1715 | 7. NAME AND ADDRESS OF CUSTOMER<br>D.C. Dept of Housing & Community Development<br>801 North Capitol Street, N.E., 7th Floor<br>Washington, DC 20002 |
|---|---|

**8. SCOPE OF WORK** *(Additional pages may be used as needed)*

In accordance with the FY 1999 Omnibus and the FY 2000 DC Appropriations Bills, the Corps of Engineers will provide the following:

1. Management – The Corps of Engineers will provide a project manager to provide overall management of the wooden pile investigation and preparation of contract documents for selected improvements to the Washington Marina, Municipal Fish Warf, and adjacent DC Government Properties. $20,000 budget, $10,0000 contingency for investigation and preparation of contract documents.

2. Property Description – Using existing survey information and lease exhibits, a property description will be provided for the Washington Marina and Municipal Fish Warf. The description will precisely identify the property being leased, to include the common area and pier frontage at the Municipal Fish Wharf. $8,000 budget.

3. Wooden Pile Investigation and Report – A contract for a wooden pile investigation will be issued. Wooden foundation piles under the fish wharf and marina piers and under the seawall/ bulkhead will be inspected by underwater divers and a civil/ structural engineer will characterize the condition of the piles, make a determination as to whether the piles need to be repaired or replaced, and estimate the remaining useful life of the piles. $25,000 budget.

4. Design Plans – The Corps of Engineers will prepare a site plan identifying the improvements to be made to the Washington Marina, Municipal Fish Wharf, and Redevelopment Land Agency premises. The site plan will be coordinated with the Washington Marina, Municipal Fish Wharf, and Capital Yacht Club tenants and DHCD. After an investigation of the wooden piles is conducted, and after NEPA/Sect 106 compliance documentation is completed, design and construction contract documents for the repair or replacement of the wooden piles and/or for the work listed on the attached sheet will be prepared as the budget will allow. Design-build and task order contracts will be used to implement the improvements. The contractors will be responsible for securing all necessary permits. $110,000 budget.

**9. CUSTOMER EXPECTATIONS** *(Additional pages may be used as needed)*

The Corps of Engineers will make every effort to minimize project costs and complete the scope of work within 7 months of signing this work order by both parties. Priorities will be to complete the survey in April 2000 and the underwater investigation by June 2000. After the Corps of Engineers has completed the underwater investigation, the Department of Housing and Community Development will reevaluate the estimated duration, construction costs, and scope of work to ensure that the total project costs do not exceed funds available.

| 10. USACE PROJECT OFFICER<br><br>Name: Mary Y. Dan    *myd 3/15/00*<br>Voice: (410) 962-3377<br>FAX: (410) 962-9312 | 11. CUSTOMER PROJECT OFFICER<br><br>Name: Joseph J. Wolfe<br>Voice: (202) 442-6977<br>FAX: (202) 442-6967 |
|---|---|
| ADDRESS<br>Baltimore District, U.S. Army Corps of Engineers<br>P.O. Box 1715<br>Baltimore, MD 21203-1715 | ADDRESS<br>D.C. Dept of Housing & Community Development<br>801 North Capitol Street, N.E., 7th Floor<br>Washington, DC 20002 |

ENG FORM 4914-R, Jan 88                                                    (Proponent: CECW-RJ)

**12. REPORTS**

A copy of the property descriptions, underwater investigation report, site plan, development concept, and contract documents will be provided.

**13. FUNDS** *[Page(s) with cost breakdown may be attached as necessary]*

| SOURCE | PREVIOUS AMOUNT | AMOUNT THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| a. USACE AMOUNT | | | |
| b. CUSTOMER AMOUNT | $0 | $140,000 $173,000 | $140,000 $173,000 |
| c. TOTAL PROJECT COST | $0 | $140,000 $173,000 | $140,000 $173,000 |

**14. FUNDING.** Funds will be provided by:

a. ☐ Transfer Appropriation (SF1151, Non-Expenditure Transfer Authorization)

☒ Reimbursable Order (31 USC 1535 - Economy Act)

☐ Other *(describe)*

b. Appropriation:

**15. BILLING**

a. Request for payment will be made by:  ☒ SF 1080  ☐ SF 1081  ☐ Other *(describe)*

b. Frequency:  ☒ Monthly  ☐ Quarterly  ☐ Upon Work Completion  ☐ Other *(describe)*

c. Request for payment will cite the following accounting information *(describe necessary documentation)*:

d. Submit to:  D.C. Dept of Housing & Community Development
ATTN: Mr. Joseph Wolfe
801 North Capitol Street, N.E., 7th Floor
Washington, DC 20002

**16. AUTHORITY**

FY 1999 Omnibus Appropriations Bill, FY 2000 District of Columbia Appropriations Bill, 31 USC 1535 - Economy Act, and Memorandum of Agreement Between the District of Columbia and the U.S. Army Corps of Engineers regarding Improvements to the Southwest Waterfront.

**17. APPROVALS**

| a. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR USACE | SIGNATURE | DATE |
|---|---|---|
| James R. Jones<br>Chief, Programs and Project Management Division | | 3/13/00 |

| b. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR THE CUSTOMER | SIGNATURE | DATE |
|---|---|---|
| Othello Mahone, Interim Director<br>Department of Housing and Community Development | | 4-3-00 |

ENG FORM 4914-R, Jan 88                                    (Proponent: CECW-RJ)

Exhibit D

Page 5 of 9

## Improvements to the Southwest Waterfront Fish Market and Washington Marina

## Attachment to Interagency Agreement WO-4

The following will be removed/ constructed:

- Underground Storage Tanks – Four underground storage tanks (one 4,000 gallon, two 2,000 gallon, and one 30,000 gallon) will be closed and the tanks, associated piping, ancillary equipment, and contaminated soil will be removed and disposed of in accordance with D.C. regulations. (task order contract)
- Fish Market Building – The facility will be demolished and disposed of. (task order contract)
- Concrete Bulkhead – The area of the bulkhead to be repaired is beneath the I-395 bridge. The top 6" of concrete will be removed. The bulkhead will be drilled to tie in new reinforcing steel. A concrete section approximately 50' long, 2' wide, and 2.5' deep will be added to the top of the bulkhead, and the area behind the bulkhead will be backfilled. The existing railing between the marina and Pruitt Seafood will be removed and a new railing will be installed.
- Electrical Utilities – The Contractor will prepare an electrical plan that provides sufficient power for projected activities and operation and will coordinate the electrical plan with PEPCO to define/delineate responsibilities for relocating utilities and implementing/constructing the plan. Utility trenches will be excavated and approximately 5,100 lf of electrical ductbanks will be constructed and overhead electrical distribution lines will be relocated underground.
- Remove Fence – 60 lf of chain link fence between the fish wharf and the Capitol Yacht Club parking areas will be removed.
- Equipment on Site – The existing equipment on Lot 846 that is not being used will be removed.
- Fish Cleaning Building – The central historic portion of the structure will be renovated for the fish cleaning service and vending machines. The remainder of the building will be demolished. A new facility for the public restrooms and dumpsters will be constructed at the eastern edge of Lot 846. The new facility will be a masonry structure similar to the existing.
- Concrete Piers – The existing wooden piles under the marina and fish wharf piers will be repaired and replaced as needed. The fish wharf piers, approximately 16,868 sf, will be repaved with a new concrete surface and made ADA compliant. 1.5" of the existing surface will be removed to level the piers. A new concrete surface will be poured with 6 x 6 inch wire reinforcing. A patterned surface will be provided and color dye will be included. Utilities serving the fish wharf barges will be upgraded to meet current codes.
- Safety Railings and Fences – Existing safety railings along the bulkhead will be removed. Guardrails will be installed for parking areas along the waterfront and bulkhead west of the marina and along the bulkhead between the marina and fish wharf. As much as 2,000 lf of 2 rail, 2" dia, steel pipe, safety railing will be installed along the concrete piers and bulkhead, as needed for pedestrians.
- Piers and Boat Slips – Remove, as necessary, existing piles and piers and install fully-functional floating pier/dock replacements with such accessories (water, electric, etc.) as specified by the Tenant in a configuration shown in the attached site plan. The number of floating piers and docks to be installed by the government government will be the maximum number which can be installed within a $1,150,000 budget. The remaining floating piers will be provided by others. ( design-build contract)
- Site Lighting - Site lighting will be upgraded throughout the site in order to comply with current code requirements. Approximately 5,100 lf of utility trenches will be excavated. 41 lighting fixtures and associated conduit and wiring will be installed.
- Paving – Approximately 50,000 sf of paving, trees and stumps throughout the site, and chainlink fences around the parking lot west of the marina and to the east of the Maine Avenue Seafood building will be removed. The entire site, approximately 100,000 sf, will be cut, filled, and graded to provide larger, more level, parking areas and to improve stormwater management. A concrete walkway along the waterfront between the marina building and the east edge of the fish wharf will be provided.
- Sidewalks – Approximately 7,100 sf of sidewalks will be provided.
- Marina Building –A new membrane roof will be installed, and the electrical service will be upgraded. The electrical upgrades will include demolition and removal of the existing 400 A service and the installation of 1 – 1200 A 208/120V 3 phase electrical service, 3 – 400 A distribution panels, feeders from the new 1200 A service to each (3) 400 A panel, and reconnection of the existing store circuits to a new 400 A panel.
- Landscaping – Landscaping improvements will be provided along Main Avenue and around parking lots in areas that will not reduce parking capacity.

| US ARMY CORPS OF ENGINEERS INTERAGENCY AGREEMENT (ER 1140-1-211) | 1. AGREEMENT NUMBER **WO 5** |
|---|---|
| | 2. ☒ INITIAL AGREEMENT ☐ AMENDMENT NUMBER |

| 3. PROJECT TITLE   Improvements to the Southwest Waterfront Fish Market and Washington Marina | 4. EFFECTIVE DATE  1 July 2000 |
|---|---|
| | 5. COMPLETION DATE   30 June 2001 |

| 6. NAME AND ADDRESS OF USACE ORGANIZATION | 7. NAME AND ADDRESS OF CUSTOMER |
|---|---|
| Baltimore District, U.S. Army Corps of Engineers P.O. Box 1715 Baltimore, MD 21203-1715 | D.C. Dept of Housing & Community Development 801 North Capitol Street, N.E., 8th Floor Washington, DC  20002 |

**8. SCOPE OF WORK** *(Additional pages may be used as needed)*

In accordance with Public Law 106-113, the Corps of Engineers agrees to prepare, procure, and oversee contracts for improvements to the Southwest Waterfront in the District of Columbia as follows:

1. Management – The Corps of Engineers will provide a project manager to provide overall management of contract procurement and construction of the improvements noted in item 3.  $11,140 budget, $ 41,210 contingency for entire project.
2. Construction Supervision & Inspection – A project engineer will oversee the construction contractor and verify that improvements are being provided in accordance with the construction contract. $29,700 budget.
3. The following will be removed/ constructed:
- Underground Storage Tanks – Four underground storage tanks (one 4,000 gallon, two 2,000 gallon, and one 30,000 gallon) will be closed and the tanks, associated piping, ancillary equipment, and contaminated soil will be removed and disposed of in accordance with D.C. regulations. $100,000 budget.
- Electrical Utilities – Utility trenches will be excavated and approximately 3,000 lf of overhead electrical distribution lines will be relocated underground. $107,590 budget.
- Fish Market Building – The facility will be demolished and disposed of. $8,470 budget.
- Site Lighting - Site lighting will be upgraded throughout the site in order to comply with current code requirements. Approximately 5,100 lf of utility trenches will be excavated.  41 lighting fixtures and associated conduit and wiring will be installed. $66,890 budget.
- Concrete Bulkhead – The area of the bulkhead to be repaired is beneath the I-395 bridge.  The top 6" of concrete will be removed.  The bulkhead will be drilled to tie in new reinforcing steel.  A concrete section approximately 50' long, 2' wide, and 2.5' deep will be added to the top of the bulkhead, and the area behind the bulkhead will be backfilled.  The existing railing between the marina and Pruitt Seafood will be removed and a new walkway railing will be installed. $24,080 budget.
- Safety Railings and Fences – Existing safety railings along the bulkhead will be removed.  Guardrails will be installed for parking areas along the waterfront and bulkhead west of the marina and along the bulkhead between the marina and fish wharf.  As much as 2,000 lf of 2 rail, 2" dia, steel pipe, safety railing will be installed along the concrete piers and bulkhead, as needed for pedestrians. $38,260 budget.
- Remove Fence – 60 lf of chain link fence between the fish wharf and the Capitol Yacht Club parking areas will be removed.  $330 budget.
- Equipment on Site – The existing equipment on Lot 846 that is not being used will be removed.  $1,530 budget.
- Sidewalks – Provide 7,100 sf of sidewalk. $24,070 budget.

**9.  CUSTOMER EXPECTATIONS**  (Additional pages may be used as needed)

The Corps of Engineers will make every effort to minimize project costs and complete the project within 15 months.  After the Corps of Engineers has completed the design work, the Corps of Engineers and the Department of Housing and Community Development will reevaluate the estimated duration, construction costs, and scope of work to ensure that the total project budget amount does not exceed $453,260. The Corps of Engineers will make reasonable efforts to accommodate the tenant's priorities for work preformed. However, the final decisions shall remain with DHCD. The priority of the items in the scope of work will generally be in the order listed. The Corps of Engineers will make reasonable efforts to minimize the disruption to Tenant's business. The majority of construction on the fish wharf property will be scheduled to occur during the winter months. If multiple design-build contracts are awarded, the contracts will require close coordination with the Corps project manager to avoid construction scheduling conflicts.

| 10. USACE PROJECT OFFICER | 11. CUSTOMER PROJECT OFFICER |
|---|---|
| Name:  Mary Y. Dan Voice:  (410)962-3377 FAX:  (410)962-9312 | Name:  Joseph J. Wolfe Voice:  (202) 442-6977 FAX:   (202) 442-6967 |
| ADDRESS  Baltimore District, U.S. Army Corps of Engineers P.O. Box 1715 Baltimore, MD 21203-1715 | ADDRESS  D.C. Dept of Housing & Community Development 801 North Capitol Street, N.E., 8th Floor Washington, DC  20002 |

ENG FORM 4914-R, Jan 88                                                          (Proponent: CECW-RJ)

**12. REPORTS**

A complete set of as-built drawings shall be provided.

**13. FUNDS** *[Page(s) with cost breakdown may be attached as necessary]*

| SOURCE | PREVIOUS AMOUNT | AMOUNT THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| a. USACE AMOUNT | | | |
| b. CUSTOMER AMOUNT | $ | $453,260 | $453,260 |
| c. TOTAL PROJECT COST | $ | $453,260 | $453,260 |

**14. FUNDING**   Funds will be provided by:

    a. ☐  Transfer Appropriation *(SF1151, Non-Expenditure Transfer Authorization)*

      ☒  Reimbursable Order *(31 USC 1535 – Economy Act)*

      ☐  Other *(describe)*

    b. Appropriation:

**15. BILLING**

    a. Request for payment will be made by:   ☒ SF 1080   ☐ SF 1081   ☐ Other *(describe)*

    b. Frequency:   ☒ Monthly ☐ Quarterly   ☐ Upon Work Completion ☐ Other *(describe)*

    c. Request for payment will cite the following accounting information *(describe necessary documentation)*:

    d. Submit to:  D.C. Dept of Housing & Community Development
               Office of the Comptroller
               801 North Capitol Street, N.E., 7th Floor
               Washington, DC  20002

**16. AUTHORITY**

Public Law 106-113, District of Columbia FY 2000 Appropriations, 31 USC 1535 – Economy Act, and Memorandum of Agreement Between the District of Columbia and the U.S. Army Corps of Engineers regarding Improvements to the Southwest Waterfront.

**17. APPROVALS**

| a. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR USACE | SIGNATURE | DATE |
|---|---|---|
| James R. Jones<br>Chief, Programs and Project Management Division | | |
| b. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR THE CUSTOMER | SIGNATURE | DATE |
| Stanley Jackson, Acting Director<br>Department of Housing and Community Development | | |

ENG FORM 4914-R, Jan 88

(Proponent: CECW-RJ)

| US ARMY CORPS OF ENGINEERS<br>INTERAGENCY AGREEMENT<br>(ER 1140-1-211) | 1. AGREEMENT NUMBER    WO 6 |
|---|---|
| | 2. ☒ INITIAL AGREEMENT<br>☐ AMENDMENT NUMBER |
| **3. PROJECT TITLE**    Improvements to the Southwest Waterfront<br>Fish Market and Washington Marina | **4. EFFECTIVE DATE**  1 July 2000 |
| | **5. COMPLETION DATE**  30 June 2001 |
| **6. NAME AND ADDRESS OF USACE ORGANIZATION**<br>Baltimore District, U.S. Army Corps of Engineers<br>P.O. Box 1715<br>Baltimore, MD 21203-1715 | **7. NAME AND ADDRESS OF CUSTOMER**<br>D.C. Dept of Housing & Community Development<br>801 North Capitol Street, N.E., 8th Floor<br>Washington, DC  20002 |

**8. SCOPE OF WORK** *(Additional pages may be used as needed)*
In accordance with Public Law 106-113, the Corps of Engineers agrees to prepare, procure, and oversee contracts for improvements to the Southwest Waterfront in the District of Columbia as follows:

1. Management – The Corps of Engineers will provide a project manager to provide overall management of contract procurement and construction of the improvements. $73,710 budget, $272,730 contingency for entire project.
2. Construction Supervision & Inspection – A project engineer will oversee the construction contractor and verify that improvements are being provided in accordance with the construction contract. $196,560 budget.
3. The following will be removed/ constructed:
- Marina Building –A new membrane roof will be installed, and the electrical service will be upgraded.  The electrical upgrades will include demolition and removal of the existing 400 A service and the installation of 1 – 1200 A 208/120V 3 phase electrical service, 3 – 400 A distribution panels, feeders from the new 1200 A service to each (3) 400 A panel, and reconnection of the existing store circuits to a new 400 A panel.  $255,000 budget.
- Piers and Boat Slips - Remove, as necessary, existing piles and piers and install *fully-functional floating pier/dock* replacements with such accessories (water, electric, etc.) as specified by the Tenant in a configuration shown in the attached site plan. The number of floating piers and docks to be installed by the government will be the maximum number which can be installed within a $1,150,000 budget.
- Fish Cleaning Building – The central historic portion of the structure will be renovated for the fish cleaning service and vending machines.  The remainder of the building will be demolished.  A new facility for the public restrooms and dumpsters will be constructed at the eastern edge of Lot 846.  The new facility will be a masonry structure similar to the existing.  $365,390 budget.
- Concrete Piers – The existing wooden piles under the marina and fish wharf piers will be repaired and replaced as needed.  The fish wharf piers, approximately 16,868 sf, will be repaved with a new concrete surface and made ADA compliant.  1.5" of the existing surface will be removed to level the piers.  A new concrete surface will be poured with 6 x 6 inch wire reinforcing.  A patterned surface will be provided and color dye will be included.  Utilities serving the fish wharf barges will be upgraded to meet current codes. $225,000 budget excluding pile repairs or replacement.
- Paving – Approximately 50,000 sf of paving, trees and stumps throughout the site, and chainlink fences around the parking lot west of the marina and to the east of the Maine Avenue Seafood building will be removed.  The entire site, approximately 100,000 sf, will be cut, filled, and graded to provide larger, more level, parking areas and to improve stormwater management.  6" subbase, 6" base, and 3" wearing courses and striping will be provided.  A concrete walkway along the waterfront between the marina building and the east edge of the fish wharf will be provided. $414,370 budget.
- Landscaping – Landscaping improvements will be provided along Main Avenue and around parking lots in areas that will not reduce parking capacity. $47,240 budget.

**9. CUSTOMER EXPECTATIONS** (Additional pages may be used as needed)
The Corps of Engineers will make every effort to minimize project costs and complete the project within 15 months.  After the Corps of Engineers has completed the design work, the Corps of Engineers and the Department of Housing and Community Development (DHCD) will reevaluate the estimated duration, construction costs, and scope of work to ensure that the total project budget amount does not exceed $3,000,000.  The Corps of Engineers will make reasonable efforts to accommodate the tenant's priorities for work preformed.  However, the final decisions shall remain with DHCD.  The marina building roof and the marina piers and boat slips will be first and second priority respectively.  The priority of the remaining items in the scope of work will generally be in the order listed.  The Corps of Engineers will make reasonable efforts to minimize the disruption to Tenant's business.  The majority of construction on the fish wharf property will be scheduled to occur during the winter months.  If multiple design-build contracts are awarded, the contracts will require close coordination with the Corps project manager to avoid construction scheduling conflicts.

| **10. USACE PROJECT OFFICER**<br>Name:  Mary Y. Dan<br>Voice:  (410)962-3377<br>FAX:   (410)962-9312 | **11. CUSTOMER PROJECT OFFICER**<br>Name:  Joseph J. Wolfe<br>Voice:  (202) 442-6977<br>FAX:   (202) 442-6967 |
|---|---|
| **ADDRESS**  Baltimore District, U.S. Army Corps of Engineers<br>P.O. Box 1715<br>Baltimore, MD 21203-1715 | **ADDRESS**  D.C. Dept of Housing & Community Development<br>801 North Capitol Street, N.E., 8th Floor<br>Washington, DC  20002 |

**ENG FORM 4914-R, Jan 88**                                                                  (Proponent: CECW-RJ)

**12. REPORTS**

A complete set of as-built drawings shall be provided.

**13. FUNDS** *[Page(s) with cost breakdown may be attached as necessary]*

| SOURCE | PREVIOUS AMOUNT | AMOUNT THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| a. USACE AMOUNT | | | |
| b. CUSTOMER AMOUNT | $ | $3,000,000 | $3,000,000 |
| c. TOTAL PROJECT COST | $ | $3,000,000 | $3,000,000 |

**14. FUNDING**    Funds will be provided by:

     a. ☐ Transfer Appropriation *(SF1151, Non-Expenditure Transfer Authorization)*

     ☒ Reimbursable Order *(31 USC 1535 - Economy Act)*

     ☐ Other *(describe)*

     b. Appropriation:

**15. BILLING**

     a. Request for payment will be made by:   ☒ SF 1080   ☐ SF 1081   ☐ Other *(describe)*

     b. Frequency:   ☒ Monthly ☐ Quarterly   ☐ Upon Work Completion ☐ Other *(describe)*

     c. Request for payment will cite the following accounting information *(describe necessary documentation)*:

     d. Submit to:   D.C. Dept of Housing & Community Development
                   Office of the Comptroller
                    801 North Capitol Street, N.E., 7th Floor
                    Washington, DC  20002

**16. AUTHORITY**

Public Law 106-113 – District of Columbia FY 2000 Appropriation, 31 USC 1535 - Economy Act, and Memorandum of Agreement Between the District of Columbia and the U.S. Army Corps of Engineers regarding Improvements to the Southwest Waterfront.

**17. APPROVALS**

| a. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR USACE | SIGNATURE | DATE |
|---|---|---|
| James R. Jones<br>Chief, Programs and Project Management Division | | |
| **b. NAME AND TITLE OF AUTHORIZING OFFICIAL FOR THE CUSTOMER** | SIGNATURE | DATE |
| Stanley Jackson, Acting Director<br>Department of Housing and Community Development | | |

**ENG FORM 4914-R, Jan 88**                                    (Proponent: CECW-RJ)

<u>**EXHIBIT E**</u>

[Rules and Regulations]

# EXHIBIT E

## RULES AND REGULATIONS

### Purpose

The purpose of these Rules and Regulations is to summarize Tenant's responsibilities with respect to the day-to-day operation and maintenance of the Project.

### Common Area Use

To ensure a pleasing and safe environment in the common areas (parking lots and sidewalks) of the Project, each Tenant shall:

1. Keep the sidewalk in front of its Premises clear and free from ice and snow. (Use only sodium based ice melters that do not damage the pavement.)

2. Not place any objects in the common areas of the Project, except in areas, if any, designated for tables by the Tenant Committee.

3. Not solicit business in the common areas; i.e., no signs or displays, except as approved by the Tenant Committee.

4. Not use the common areas for the sale of merchandise without the prior written consent of Landlord.

### Storefronts and Signs

To ensure a consistent appearance throughout the Project:

1. Tenant shall keep the storefront of its Premises in good repair and clean condition.

2. Any temporary sign used by Tenant in its door or window must be professionally made and must comply with District of Columbia sign regulations.

## Tenant Advertising

1. Tenant shall not utilize any advertising medium within the Project that can be seen, heard, or experienced outside of the Premises, including, but not limited to, flashing lights, searchlights, loudspeakers, phonographs, radios or televisions, except as may be approved by the Tenant Committee, as, for example, seasonal displays of lighting and music.

2. Tenant shall not display, paint, place or cause to be displayed, painted, or placed, any handbills, bumper stickers, sandwich boards or other advertising devices in any portion Common Area.

3. Tenant shall not distribute, or cause to be distributed, in the Project, any handbills or other advertising devices; and will not conduct or permit any activities that might constitute a nuisance.

## Loading and Unloading

All shipping, receiving, loading or unloading of Tenant's merchandise, supplies or other property shall take place only in the areas, and at times, designated therefor by the Tenant Committee. Tenant shall not permit any trucks, trailers, or other vehicles or equipment engaged in such activities to interfere with the use of any Common Area or any pedestrian or vehicular use.

## Noise

Tenant shall not permit any noise to be made inside of its Premises which can be heard outside of the Premises. Tenant shall not use any loudspeaker or other communications equipment that may be heard or seen outside of its Premises.

## Odors

Tenant shall prevent the emission of odors from its Premises that are objectionable to its neighbors.

## Refuse

To ensure a clean and equitable refuse handling system:

1. The Management Agent for the Project shall provide refuse containers and disposal service and will allocate the costs thereof to each tenant as provided in its lease.

2. Tenant shall keep its refuse in proper containers in its Premises and shall place it in the refuse container when taken outside the Premises.

## Pest Exterminator Services

Tenant shall contract with a professional exterminator for monthly inspections and treatments as necessary, to ensure that infestations by insects and rodents do not occur on the Premises.

## Store Plans and Permits

The plans and contractors for doing any work in the Premises that requires a permit must be submitted to the Landlord for approval. This includes but is not limited to work that requires a building, mechanical, electrical, or plumbing permit.

## Parking

To ensure that adequate and convenient parking is available to customers of the Project, no part of the Common Area may be used for parking by employees of Tenant or other Tenants of the Project.

## Emergencies

Tenant must notify the Landlord, as soon as possible, of any emergency situation, injury, fire or disorder that occurs in the Tenant's Premises or any common area of the Project.

## Outside Promotional Activities

To avoid undesired disturbances of Tenants and customers of the Project, outside promotional activities will only be permitted with approval of the Tenant Committee.

## Video Games

Tenant shall not permit the installation or use in any portion of its Premises of a pinball, video or other amusement or game machine of any kind.

# EXHIBIT E

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "**Assignment**") is made as of the 23rd day of April,  2014, by and between the **DISTRICT OF COLUMBIA**, a municipal corporation, acting by and through the Deputy Mayor for Planning and Economic Development pursuant to delegation by Mayor's Order 2008-43 ("**Assignor**"), and **WHARF HORIZONTAL REIT LEASEHOLDER LLC**, a Delaware limited liability company ("**Assignee**").  Assignor and Assignee are sometimes referred to herein collectively as the "**Parties**."

## W I T N E S S E T H

In connection with that certain Cover Agreement to Fish Market Ground Lease dated June 10, 2013 (the "**Agreement**") between Assignor and Assignee, Assignor desires to assign and convey to Assignee all of Assignor's right, title and interest in and to the leases listed on Exhibit A attached hereto (the "**Leases**") on and after the date hereof.

NOW, THEREFORE, in consideration of the Agreement, the promises and covenants hereinafter set forth, and other good and valuable hereto consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Incorporation of Recitals; Defined Terms.  The recitals above are hereby incorporated into and made a part of this Assignment as if fully set forth herein.  Each capitalized term used herein that is not defined in this Assignment shall have the meaning ascribed to it in the Agreement.

2. Assignment.  Assignor hereby transfers, assigns, conveys and sets over unto Assignee all of Assignor's right, title and interest as landlord in and under the Leases.  Assignee hereby accepts the foregoing assignment and assumes all obligations of the "Landlord" under the Leases.

3. Successors; Governing Law.  This Assignment shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and assigns.  This Assignment shall be governed by and construed in accordance with the laws of the District of Columbia without regard to the principles of conflicts of laws.

4. JURY TRIAL WAIVER.  EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS ASSIGNMENT AND THE RELATIONSHIP OF ASSIGNOR AND ASSIGNEE HEREUNDER.  THIS JURY TRIAL WAIVER PROVISION SHALL SURVIVE THE CLOSING AND THE TERMINATION OF THIS ASSIGNMENT.

5. Merger.  This Assignment shall not merge with or limit or restrict any provision of the Agreement, and the provisions of the Agreement shall govern and control the rights and obligations of Assignor and Assignee with respect to all matters described therein, including,

without limitation, representations and warranties, the apportionment of payment obligations, and indemnification obligations in addition to those set forth herein.

6. <u>Counterparts</u>.  This Assignment may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute one and the same Assignment.

7. <u>Severability</u>.  If any provision of this Assignment, or the application thereof to any person or circumstances, shall, for any reason and to any extent, be or become invalid or unenforceable, the remainder of this Assignment and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent possible.

*[Signature Page Follows]*

**IN TESTIMONY WHEREOF**, the undersigned caused the foregoing instrument to be executed as of the date first written above.

DISTRICT:

APPROVED AS TO LEGAL
SUFFICIENCY

DISTRICT OF COLUMBIA,
by and through the Office of the Deputy Mayor for
Planning and Economic Development

Office of the Attorney General for the
District of Columbia

By: _Jennifer Carter_

Name: _Jennifer Carter_

Title: _Assistant Attorney General_

By: _____

Name: Victor L. Hoskins

Title: Deputy Mayor for Planning and Economic
Development

DISTRICT OF COLUMBIA) ss:

The foregoing instrument was acknowledged before me on this 23rd day of April, 2014, by Victor L. Hoskins, Deputy Mayor for Planning and Economic Development, whose name is subscribed to the within instrument, being authorized to do so on behalf of the District of Columbia, acting by and through the Office of the Deputy Mayor for Planning and Economic Development, has executed the foregoing and annexed document as his free act and deed, for the purposes therein contained.

_ETMcMc_
Notary Public

[Notarial Seal]

My commission expires: _____

Elizabeth T. McMahon
Notary Public, District of Columbia
My Commission Expires 3/14/2015



[Signatures Continue on Following Page]

[Signature page to Assignment of Existing Fish Market Leases

ASSIGNEE:

WHARF HORIZONTAL REIT
LEASEHOLDER LLC, a Delaware limited
liability company

By:
Name: Lamont Hoffman
Title: Co-President

[Signature Page to Assignment and Assumption of Leases]

## Exhibit A

### Leases

1. Lease Agreement dated January 27, 2000 between District and Benjamin F. Edwards and Daryl V. Jones t/a Virgo Fish House (Premises Fish Cutting House 12 and 13)

2. Lease Agreement dated July 12, 2000 between District and BRW, Inc. t/a Capt. White Seafood City (Premises Nos. 7, 8, and 9)

3. Lease Agreement dated March 20, 2014 between District and W.D. Inc., a Virginia Corporation, as successor by assignments to Pruitt Seafood, Inc. (Premises 1, 2, 3, and 4).

4. Lease Agreement dated February 14, 2001 between District and C. & F. Evans Seafood, Inc., and Stan Evans Seafood, Inc., together trading as Jessie Taylor Seafood (Premises Nos. 5, 6, and 11)

5. Lease Agreement dated February 21, 2001 between District and Evans Brothers Seafood, Inc. t/a Custis & Brown Seafood (Premises Nos. 10 and 15)

6. Lease Agreement dated July 20, 2000 between District and The Wharf, Inc. trading as The Wharf (Premises Nos. 16, 17, 18, and 19) (not executed)