## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WHARF, INC. t/a THE WHARF, *et al.*,<br>        Plaintiffs/Counter-Defendants,<br><br>        v.<br><br>THE DISTRICT OF COLUMBIA, *et al.*,<br>        Defendants,<br><br>and<br><br>WHARF HORIZONTAL REIT LEASEHOLDER<br>LLC, *et al.*,<br>        Defendants/Counter-Plaintiffs. | Civil Action No. 15-1198 (CKK) |

## MEMORANDUM OPINION
(March 30, 2021)

Plaintiffs BRW, Inc., The Wharf, Inc., and Salt Water Seafood, Inc. (collectively, "Plaintiffs") operate seafood businesses on leased property commonly referred to as the Municipal Fish Market ("Fish Market"), which is located along Maine Avenue between 11th and 12th Streets, S.W. in the Southwest Waterfront ("SW Waterfront") in the District of Columbia. The District of Columbia ("the District") was the original lessor of the property at issue pursuant to three leases ("Fish Market Leases") which were assigned by the District in 2014 to Developer Defendant Wharf Horizontal Reit Leaseholder LLC ("WHRL"), which later transferred its interest to Wharf Fish Market REIT Leaseholder LLC. The validity of the Fish Market Leases is at issue before this Court.

### I. Background

Pending before this Court are Defendant The District of Columbia's [190] Motion for Summary Judgment ("D.C. Mot") and Developer Defendants' ("Developers") [192] Motion for Partial Summary Judgment ("Developers' Mot."), which are opposed by the Plaintiffs in their

[203] Consolidated Brief in Opposition to Defendants' Motions for Partial Summary Judgment ("Pls.' Opp'n").[1]

### A. Procedural Background

Plaintiffs filed their [1] Complaint on July 23, 2015, against Defendants District of Columbia, Hoffman-Madison Waterfront, LLC ("HMW") and WHRL, alleging that HMW and WHRL violated the terms of the parties' lease agreements, and that the District violated the Takings Clause of the Fifth Amendment by impeding access to the property leased to Plaintiffs at the SW Waterfront of the District of Columbia.  Plaintiffs' [1] Complaint was amended

---

[1] The Court notes that sealed complete versions of the motions have been filed, as well as redacted public versions.  The Court references the sealed versions and refers to the page numbers assigned through the Court's Electronic Case Filing ("ECF") system.  The Court has considered the following documents in connection with this Memorandum Opinion and the accompanying Order and Executive Summary: The District of Columbia's Motion for Summary Judgment ("D.C. Mot."), ECF No. 190, the Memorandum of Points and Authorities in Support thereof ("D.C. Mem."), ECF No. 190-1, and exhibits attached thereto; (2) Developers' Motion for Partial Summary Judgment ("Developers' Mot."), ECF No. 192 (redacted version at ECF No. 193), the Brief in Support thereof ("Developers' Brief"), ECF No. 192-1, and affidavits and exhibits attached thereto; (3) Developers' Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment ("Developers' SMF"), ECF No. 189-4, which have been adopted by the District of Columbia; (4) Plaintiffs' Consolidated Brief in Opposition to Defendants' Motions for Partial Summary Judgment ("Pls.' Opp'n"), ECF No. 203 (redacted version at ECF No. 206), and the affidavits and exhibits attached thereto; (4) Plaintiffs' Response to Defendants' Statement of Material Facts ("Pls.' RSMF") and Additional Statement of Undisputed Material Facts in Support of Plaintiffs' Consolidated Opposition ("Pls.' SMF"), ECF No. 203-1; (5) The District of Columbia's Reply in Support of its Motion for Summary Judgment ("D.C. Reply"), ECF No. 209 (unsealed version at ECF No. 215), and the exhibits attached thereto; (6) Developers' Reply in Further Support of Their Motion for Summary Judgment ("Developers' Reply"), ECF No. 214 (redacted version at ECF No. 210), and the affidavits and exhibits attached thereto; (7) Developers' Reply to Plaintiffs' Response to Developers' Statement of Undisputed Material Facts and Response to Plaintiffs' Additional Statement of Undisputed Material Facts ("Developers' RSMF"), ECF No. 214-1, which has also been adopted by the District of Columbia; and the entire record in this case.

In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision. *See* LCvR 7(f).

subsequently, *see* First Amended Complaint, ECF No. 17, and the Defendants filed their [20, 25] motions to dismiss, which were denied by this Court.  *See* Order denying motions to dismiss, ECF No. 44, and the accompanying Memorandum Opinion, ECF No. 45.  Thereafter, HMW and WHRL filed their [54] Answer, and WHRL additionally filed a Counterclaim,[2] which was later amended, *see* ECF No. 56, alleging that Plaintiffs breached their lease agreement and were unjustly enriched as a result of WHRL's improvement of the premises.  This Court denied Plaintiffs' [61] motion to dismiss the Amended Counterclaim.  *See* Order, ECF No. 69, and the accompanying Memorandum Opinion, ECF No. 70.  WHRL filed a subsequent unopposed [74] motion for joinder to add Wharf Fish Market REIT Leaseholder LLC ("WFMRL") as an additional party, which was granted by the Court, with the effect that WFMRL was added as a Defendant and counterclaim Plaintiff.  *See* Order, ECF No. 75.

On April 26, 2017, Plaintiffs filed their [82] Second Amended Complaint against Defendant the District, Developer Defendants HMW, WHRL and WFMRL, as well as Developer Defendants Hoffman-Struever Waterfront LLC, Wharf District GP Joint Venture LLC, Wharf Horizontal REIT LLC, and Wharf District Joint Venture, LP, four entities associated with the redevelopment of the Fish Market and adjacent SW Waterfront property.  These four Developer Defendants made a [114] motion to dismiss Plaintiff's [119 (unsealed)] Third Amended Complaint, which was denied by this Court.  *See* Order, ECF No. 129, and accompanying Memorandum Opinion, ECF No. 130.  Answers were subsequently filed by those four Developer Defendants, and the case proceeded to discovery on a schedule which was extended upon several joint requests of the parties.

---

[2] For ease of reference, the Court refers to the parties as either Plaintiffs or Defendants throughout the majority of this Opinion, dropping the designations of Counterclaim Defendants and Counterclaim Plaintiffs.

On February 19, 2020, this Court held a status conference with the parties and subsequently granted a request for bifurcated dispositive motions' briefing, and the Court set a briefing schedule for dispositive motions pertaining to the validity of the Plaintiffs' Fish Market Leases. *See* Scheduling and Procedures Order, ECF No. 180.  The Court granted several consent motions for extension of that briefing schedule.  Pending before this Court and now ripe for resolution are: (1) The District of Columbia's Motion for Summary Judgment and (2) Developer Defendants' Motion for Partial Summary Judgment, both of which are opposed by the Plaintiffs in a Consolidated Opposition.  Upon consideration of the Defendants' two motions, and for the reasons explained herein, Developer Defendants' [192] Motion for Partial Summary Judgment is **GRANTED** and The District of Columbia's [190] Motion for Summary Judgment is **GRANTED IN PART** - consistent with this Court's ruling on the Developer Defendants' Motion for Partial Summary Judgment - and **DEFERRED IN PART** as to whether the Plaintiffs' three counts against the District of Columbia in their Third Amended Complaint shall be dismissed.  Issues relating to substantive claims in this case (and whether Plaintiffs have standing to assert such claims) will be briefed more fully and considered in connection with the parties' second round of dispositive motions addressing the substantive claims and counterclaims in this case.  A separate Order and Executive Summary accompany this Memorandum Opinion.

### B. Factual Background

As previously noted, this Court granted bifurcation of dispositive motions' briefing to first address the validity of the three Fish Market Leases (sometimes referred to as the "Leases") at issue in this case, where Defendants allege that the Leases were either void *ab initio* or they terminated on their respective third anniversaries, and further, that the 2014 assignment of one of the Fish Market Leases (Pruitt's) to Plaintiff Salt Water should be treated consistently.  In

4

presenting the facts pertinent to resolving the present motions, this Court "assume[s] that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1). In most instances the Court shall cite to [189-4] Developers' Statement of Undisputed Material Facts ("Developers' SMF"), which has been adopted by the District, unless Plaintiffs dispute or controvert relevant aspects of a fact proffered by Defendants.  In such instances, the Court shall also cite to [203-1] Plaintiffs' Response to Statement of Undisputed Material Facts ("Pls.' RSMF") and/or to Plaintiffs' Additional Statement of Undisputed Material Facts ("Pls' SMF"), with cites to  Developers' [214-1] Response to Plaintiffs' Additional Statement of Undisputed Material Facts ("Developers' RSMF"), as needed. The Court shall also cite directly to the record, where appropriate, to provide additional information not covered by the parties' Statements of Material Facts, or to provide applicable references to testimony and exhibits.

Many of the following facts are material to resolution of the lease validity issue, although the Court includes some facts primarily relevant for purposes of explaining the parties' relationships, as well as references to some statutory provisions that are relevant to the Leases. Furthermore, evaluation of the contractual terms governing the length, operation, and termination of the Leases requires a reiteration of several key provisions from the Leases.

In considering the Statements of Undisputed Material Facts proffered by the parties and the responses thereto, this Court notes that several paragraphs of the Plaintiffs' Responses to Developers' Statement of Undisputed Material Facts and several paragraphs in the Plaintiffs' Additional Statement of Undisputed Material Facts contain improper argument, which could have been presented in their brief.  *See, e.g.,* Pls' RSMF ¶¶ 51, 52, 53, 58, 65, 66, 67, 81, 83; Pls.' SMF ¶¶ 163, 171, 180, 181, 182, 214.  *See* LCvR 7(h)(1) (an opposing statement of material facts

consists of a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include reference to the parts of the record relied on to support the statement"); *see also Johnson v. District of Columbia*, Civil Action No. 17-883, 2019 WL 3767103, at *2-3 (D.D.C. Aug. 9, 2019) (Kollar-Kotelly, J.) (citation and internal quotation marks omitted) (noting that "summary judgment briefing – including the affirmative and opposing statements of material facts – is designed to isolate[ ] the facts that the parties assert are material, distinguish[ ] disputed from undisputed facts, and identify[ ] the pertinent parts of the record.")  "Requiring strict compliance with the local rule is justified by the nature of summary judgment and the rule's purposes."  *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner* (D.C. Cir. 1996) (quotation omitted) (examining a prior but materially identical version of the rule and finding the statement of genuine disputed material issues in that case to be "[r]eplete with factual allegations not material to [the] substantive claims and repeatedly blending factual assertions with legal argument").  In the instant case, this Court will disregard legal argument that is contained within Plaintiffs' SMF and RSMF.

Additionally, some of Plaintiffs' SMF and RSMF fail to conform to this Court's [180] Order and Fed. R. Civ. P. 56(c)(1), LCvR 7(h)(1).  Instead of providing "precise citations to the portions of the record on which [Plaintiffs] rely," the evidence cited by Plaintiffs is voluminous, and the Court is required to weed through it in an effort to locate supporting facts.  *See Robertson v. American Airlines*, 239 F. Supp. 2d 5, 8 (D.D.C. 2002) ("Merely incorporating entire affidavits and other materials without reference to the particular facts cited therein is not sufficient.")  Accordingly, where the allegations in Plaintiffs' SMF are disputed by Defendants, and Plaintiffs have not supported their allegations with precise citations, this Court will consider those allegations to be disputed.

**1. Events Setting the Stage for Negotiation of the Fish Market Leases**

In 1986, the District entered into a lease conveying a joint leasehold at the Fish Market to Plaintiff BRW, Inc. t/a Captain White Seafood City, and various individuals who operated businesses at the Fish Market, including Stewart B. Pruitt, d/b/a Pruitt Seafood, and this lease thereafter expired in 1991 or in 1996. Developers' SMF ¶¶ 6-8, 11; see Developers' Ex. 10 (1986 Lease).[3] Under the 1986 Lease, Plaintiff BRW, Inc. paid $303.00 per month in rent to the District of Columbia. Developers' SMF ¶ 9.

Pursuant to the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, (the "1999 Appropriations Act"), Congress appropriated $3,000,000 for fiscal year 1999 to the District Department of Housing and Community Development "for a study in consultation with the United States Army Corps of Engineers of necessary improvements to the Southwest Waterfront in the District of Columbia" and "carrying out the improvements recommended by the study." Pub. L. No. 105-177, 112 Stat. 2681 (1998); Developers' SMF ¶ 12. The 1999 Appropriations Act stated, *inter alia*, that "no portion of such funds shall be available to the District of Columbia unless the District of Columbia executes a 30-year lease with the existing lessees or their successors in interest . . . " *Id.*; Developers' SMF ¶ 13.

The next year, pursuant to the Fiscal Year 2000 District of Columbia Appropriations Act ("2000 Appropriations Act"), Congress amended the condition tied to the $3,000,000 in funding so that receipt of funding required only a signed lease with the then-existing lessee

---

[3] For ease of reference, when citing exhibits that were proffered by both Defendants and Plaintiffs, such as the Fish Market Leases, the Court will cite to Defendants' exhibit numbers (filed first in time). Furthermore, when citing to exhibits filed by Developers and the District, the Court will note which party filed the exhibit ("Developers' Ex. __ " or "D.C. Ex. ___"), and finally, throughout this Memorandum Opinion, the Court will distinguish which Defendant - Developers or the District – proffered a certain argument, when referencing the briefing filed by that Defendant, but the Court will otherwise use the term "Defendants" when referencing a general argument made by all Defendants.

Washington Marina Company.  Pub. L. No. 106-113, 113 Stat. 1529 (1999); Developers' SMF ¶ 14.  Section 164(b)(1)(A)-(B) of the 2000 Appropriations Act provided in part that the 1999 Appropriations Act was amended by "'striking 'existing lessees' the first place it appears and inserting 'existing lessees of the Marina[;]' and . . . by striking 'the existing lessees' the second place it appears and inserting 'such lessees.'"  Developers' SMF ¶ 15.

The following year, pursuant to Section 162 of the District of Columbia Fiscal Year 2001 Appropriations Act (the "2001 Appropriations Act"), Congress granted the Mayor the authority to enter into 30-year leases, as follows:

> Notwithstanding section 451 of the District of Columbia Home Rule Act or any other provision of District of Columbia or Federal law to the contrary, the Mayor of the District of Columbia shall have the exclusive authority to approve and execute leases of the Washington Marina and the Washington municipal fish wharf with the existing lessees thereof for an initial term of 30 years, together with such other terms and conditions (including renewal options) as the Mayor deems appropriate.

District of Columbia Appropriations Act, 2001, Pub. L. No. 106-522 § 162(a), 114 Stat. 2440, 2484-85 (2000).  Developers' SMF ¶ 16; Pls. RSMF ¶ 16 (providing the more complete version of  the text cited above).

### 2. The District's Authority to Enter into the Fish Market Leases in the Absence of the 2001 Appropriations Act

Between 1899 and 2009, the District/Mayor's authority to enter into leases at the Fish Market was statutorily limited to 10 years.  Developers' SMF ¶ 18 (internal citations omitted). The Omnibus Appropriations Act of 2009, Pub. L. 111-8, 123 Stat. 524 (2009), amended D.C. Code § 10-501.02's limit on the Mayor's authority to enter into leases under §10-501-01, by striking the last sentence: " No lease made under the provisions of said § 10-501-01 shall extend beyond the period of 10 years."  Developers' SMF ¶18 (h).  After 2009, the Mayor's authority to enter into leases was still subject to the D.C. Code's general restriction on leasing

of property owned by the District, which required approval of the Council of the District of Columbia to enter into leases exceeding 20 years.  Developers' SMF ¶ 19 a. (internal citations omitted), D.C. Code § 10-801(a)(1); *see* Pls.' RSMF ¶ 19 (noting that the applicable D.C. Code section only addresses real property owned in fee simple, and the District did not own the Fish Market until 2013); *but see* Developers' SMF ¶ 19 (b) (discussing the August 20, 2013 quitclaim deed for the Fish Market) & (c) ("From that day onward, the District of Columbia has owned the Fish Market and its barge space numbers in fee simple, and any sale or lease of any portion of the District's interest in the Fish Market "for a period of greater than 20 years" fell within the scope of D.C. Code § 10-801(a)(1) . . .").

### 3. The Three Fish Market Leases

The parties do not specify exactly when lease negotiations for the Fish Market Leases began, although both sides indicate that negotiations were ongoing for some period of time before the Leases were signed.  *See* Developers' SMF ¶ 21 (referencing negotiations in 1999); Pls.' RSMF ¶ 21 (noting that negotiations preceded 1999); Developers' RSMF ¶ 143 (it is undisputed that Bob Jones spent approximately two years negotiating the Fish Market Leases). Plaintiffs BRW, Inc. and The Wharf, Inc., as well as Billy, Sunny, and Penny White, were represented in the lease negotiations by Richard Aguglia, then of-counsel in the Washington, D.C. office of Hunton & Williams.  Developers' SMF ¶ 45.  Plaintiffs BRW, Inc., which trades as Captain White Seafood City; The Wharf, which trades as The Wharf; and Salt Water Seafood, which trades as Salt Water Seafood (collectively "Plaintiffs") were previously owned, controlled and operated by Penny Rose White, Sunny White, and Billy Ray White (collectively "the Whites"), but they are now owned by Penny and Sunny White, as Billy White passed away sometime after Defendants' motions were filed.  Developers' SMF ¶¶ 2-

5; Pls.' RSMF ¶5 (noting Billy White's death). The District of Columbia delegated responsibility for negotiating the Fish Market Leases to Robert (Bob) Jones, who was not then an employee of the District of Columbia, and to Desmond Connall and Kenneth Logwood, two lawyers from the Washington, D.C. office of Womble Carlyle Sandridge & Rice, who represented the District of Columbia on a *pro bono* basis.  Developers' SMF ¶ 46.

During the course of the negotiations, on August 13, 1999, Mr. Jones wrote an email to Mr. Aguglia and others indicating that he had received a telephone call from a newspaper reporter inquiring about negotiation of leases at the SW Waterfront.  Mr. Jones wrote that:

> I am very flexible on most issues.  I want the area to look good and to be an asset to the city.  I do feel pressure to use the $3,000,000 for that purposes.  However, the city must get fair market rent and a percentage of the gross over that rent.  The fair market rent and overage are the only non-negotiable terms; we can negotiate amounts, breakpoints, etc., but it will be at market.  I assure you I will walk, give back [the] $3,000,000 and look for other tenants before I do a 30 year, below market, fixed rent deal.

Developers' SMF ¶ 49; Developers' Ex. 14 [Bob Jones August 13, 1999 email].

On February 21, 2001, the District, as agent for the United States of America, signed a lease dated July 12, 2000, with Plaintiff BRW, Inc., for barge space numbers 7 through 9.[4] Developers' SMF ¶ 22; Developers' Ex. 11 [BRW Lease Agreement] ("BRW Lease") (indicating that the Lease Agreement is "made this day 12th day of July 2000" and defining the Premises in 1.J.).  On October 2, 2001, the District, as agent for the United States of America, signed a lease dated April 1, 2001, with Pruitt's Seafood, Inc., for barge space

---

[4] As previously noted herein, in 2013, the United States of America issued a quitclaim deed for the Fish Market.  That quitclaim deed "released federal claims on the property and transferred ownership of the Fish Market to the District of Columbia," and the District owned the Fish Market and its barge space numbers in "fee simple" thereafter.  Developers' SMF ¶ 19(b) & (c). "Prior to the quitclaim deed, Congress had delegated control of the Fish Market to the District." Developers' SMF ¶ 20 (*see* D.C. Code Section 37-205.01 (2002 ed.)).

numbers 1 through 4.  Developers' SMF ¶ 27; Developers' Ex. 12 [Pruitt's Seafood, Inc. Lease

Agreement] ("Pruitt's Lease") (indicating that the Lease Agreement is "made this day 1st day

of April 2001" and defining the Premises in 1.J.).  On February 21, 2001, the District, as agent

for the United States of America, signed a lease dated July 12, 2000, with Plaintiff The Wharf,

Inc., for barge space numbers 16 through 19.  Developers' SMF ¶ 23;  Developers' Ex. 13

[The Wharf Lease Agreement] ("Wharf Lease") (indicating that the Lease Agreement is

"made this day 12th day of July 2000" and defining the Premises in 1.J.). The Wharf did not

exist as a company until December 30, 1999, and as a corporate entity, it never held a lease at

the Fish Market prior to July 12, 2000.  Developers' SMF ¶ 26.

Mr. Logwood used a form lease that Mr. Desmond Connall had developed as the model

for the Fish Market Leases.  Developers' SMF ¶ 47; Developers' Ex. 6 [D. Connall Dep.], at

29:16-30:22.  The BRW Lease (Developers' Ex. 11), Pruitt's Lease (Developers' Ex. 12), and

the Wharf Lease (Developers' Ex. 13), contain the following identically worded (except as

noted below) provisions:

- The "Commencement Date" is defined as "[t]he date of this Lease." (1.B.)

- The "Lease Year" is defined as follows: "The first "Lease Year" shall begin
  on the New Rent Commencement Date and shall end on December 31 of the
  year following the year in which the New Rent Commencement Date shall
  occur, in order that each subsequent Lease Year hereunder shall coincide with
  the calendar year.  Each subsequent Lease Year shall commence on the day
  immediately following the last day of the preceding Lease Year, and shall
  continue for a period of twelve (12) full calendar months." (1.E. in the BRW
  and Pruitt's Leases) (1.D. in the Wharf Lease)

- The "New Rent Commencement Date" is defined as "[t]he date upon which
  "Landlord's Work" (as defined in Section 3) is substantially completed (i.e.,
  upon receipt of a "Certificate of Substantial Completion" from the Corps of
  Engineers, and provided that all utilities to be delivered to the Premises are
  then in working order." (1.G. in the BRW and Pruitt's Leases) ((1.F. in the
  Wharf Lease)

- "Term" is defined as "[t]he period that begins on the Commencement Date and ends (30) Lease Years after the New Rent Commencement Date, unless sooner terminated pursuant to this Lease. Tenant acknowledges that it has no right hereunder to renew or extend the Term hereof, or to negotiate for a renewal of the Term hereof. However, Landlord acknowledges that nothing contained herein shall prevent Tenant from seeking to obtain such rights." (1.O.)

- "Minimum Rent" starts at $303.03, and the Minimum Rent runs "from the Commencement Date to the New Rent Commencement Date" in the BRW Lease (1.F.) and "[f]rom the Commencement Date to the date that is four (4) months after the New Rent Commencement Date" in the Pruitt's Lease (1.F.), and in the Wharf Lease, it "[c]ommenc[es] on [the] earlier of (1) date on which Tenant opens for business on any portion of the Premises, or (2) availability of utilities to the Premises, and continuing until the New Rent Commencement Date[.]" (1.E.)

- Section 3, titled "Landlord's Work," states, *inter alia*, that the "Landlord has been allocated $3,000,000 from the federal government (the "Federal Appropriations") to make improvements to the Project and to the marina located next to the Project at 1300 Maine Avenue." Furthermore, "Landlord and Tenant have heretofore agreed upon the nature of the improvements to be made to the Project with the Federal Appropriation and such other sources of funding as may be available to the landlord, all as embodied in the Work Orders issued by the Corps of Engineers and reviewed and approved by the Landlord and Tenant, and attached hereto as Exhibit D." Additionally, "Landlord shall have no obligation to spend any funds to complete Landlord's Work in excess of the Federal Appropriation and such other sources of funding as may be available to the Landlord." (3.A.) "After the Landlord's Work has been determined in accordance with subsection A, above, Landlord will complete construction of Landlord's Work in a good and workmanlike manner and in accordance with the requirements of governmental authorities." (3.B.) "Landlord shall use reasonable commercial efforts to complete Landlord's Work by June 30, 2001, but shall have no liability to Tenant if it is unable to complete Landlord's Work by that date or any other date." (3.C.)

- Section 27, titled "Limitation on Landlord's Liability" includes a sentence that "Landlord shall have no liability to Tenant for any delay in completing Landlord's Work." (27.B.)

- Section 38 titled "Miscellaneous" states in subsection A that "[t]his Lease constitutes the entire agreement between the parties concerning the matters set forth herein." In subsection E titled "Rule Against Perpetuities," it states that "[n]otwithstanding any provision in this Lease to the contrary, if the Lease Term has not commenced within three (3) years after the date of this Lease, this Lease shall automatically terminate on the third (3rd) anniversary of the date hereof. The sole purpose of this provision is to avoid any possible

interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation." (38.E.)

At the time that the Leases were signed, the final scope of the Landlord's Work and final budget had not been decided, although the Leases state that the Landlord and Tenant had agreed on the "nature of the improvements to be made to the Project with the Federal Appropriation and such other sources of funds as may be available to the landlord, all as embodied in the Work Orders . . ." and the Landlord was required to consult with the Tenants about certain construction details.  Developers' SMF ¶ 70; Developers' Ex. 2 [P. White 30(b)(6) Dep.], at 62:9-63:18 (acknowledging that the final scope and final budget had not been decided when the leases were signed); Developers' Exs. 11-13 (Sections 3.A., 3.B.).  Furthermore, the occurrence of the New Rent Commencement Date was uncertain.  Developers' SMF 55; Developers' Ex. 5 [R. Aguglia Dep.], at 279:7-9 ("[t]he new rent commencement date was a condition which we didn't know would happen.").  Pursuant to the Lease, the Landlord's Work had to be substantially completed (as defined above) to trigger the New Rent Commencement Date. Developers' SMF ¶ 38. Mr. Aguglia testified that, if the New Rent Commencement Date did not occur, the Lease could continue "into perpetuity."  Developers' SMF ¶56; Developers' Ex. 5 [R. Aguglia Dep.], at 274:10-14.  In contrast, when asked about language in the Leases that avoids the Rule Against Perpetuities, Mr. Connall noted that "the 30-year term [of the Lease] is conditioned on an event that may never happen, namely the completion of work by the landlord," but his lease form "had a Savings clause in it, . . ., and in this particular lease it appears [ ] in Section 38.[E]." Developers' Ex. 6 [D. Connall Dep.], at 32:11-33:5; Developers' Exs. 11-13 (Section 38.E. titled "Rule Against Perpetuities").  In this case, both Mr. Aguglia and Mr. Connall were deposed as fact witnesses regarding their personal knowledge of events in question.  *See Queen v. Schultz*,

310 F.R.D. 10, 26 (D.D.C. 2015) (attorneys may testify as fact witnesses with regard to their personal knowledge of the dispute).

The sum of the budgeted amount for individual work items listed in the Corps of Engineers work orders in Exhibit D to the Leases exceeded $3 million.  Developers' SMF ¶ 69; Developers' Exs. 11-13, at Ex. D [Work Orders].  The Landlord's Work contemplated for the Fish Market was not substantially completed by the third anniversary of the stated effective dates of the Leases. Developers' SMF ¶ 81; Developers' Ex. 1 [Penny White Deposition], at 202:1-14 (indicating that by around 2005 when the Wharf was opened, the District still had not accomplished "all of [the Landlord's Work"), nor has the Landlord's Work been substantially completed to date. Accordingly, neither the New Rent Commencement date (with its increased rent obligations), Developers' SMF ¶88; nor the first Lease Year has yet occurred.  Developers' SMF ¶94.

### 4. Assignment of Pruitt's Fish Market Lease

In 2005, Pruitt's assigned its lease to DNM Seafood, Inc.  Developers' SMF ¶ 112; Pls.' Ex. 77 [2005 Assignment and Assumption of Lease Agreement] ("Pruitt's Assignment").  DNM Seafood entered into a subsequent March 20, 2014 Assignment and Assumption of its Lease Agreement with W.D. Inc. (Salt Water's predecessor) as the assignee, and this Assignment and Assumption was "consented and agreed to" on March 31, 2014, by Victor Hoskins, the Deputy Mayor for Planning and Economic Development, on behalf of the Landlord District of Columbia, as agent for the United States of America, and it was "approved for legal sufficiency" by Susan C. Longstreet, Deputy Attorney General, Commercial Division.  Developers' SMF ¶¶ 113-114; Developers' Ex. 21 [March 20, 2014 Assignment and Assumption of Lease Agreement] ("DNM Assignment"). The "Recitals" section of the DNM Assignment states, *inter alia*, that the underlying Lease is "for a term of thirty (30) years commencing on the New Rent Commencement

Date as defined in the Lease Agreement."  Developers' Ex. 21.  Paragraph 10 of the DNM Assignment states however that the "Landlord and the Assignee acknowledge and confirm that the expiration date of the Lease is March 15, 2044."  *Id.*  On April 3, 2014, Salt Water (then doing business as W.D. Inc.) executed a Bill of Sale to acquire the assets of DNM.  Developers' SMF ¶ 116.

### 5. Assignment of Three Fish Market Leases by the District

On June 19, 2013, the District entered into a Cover Agreement to the Fish Market Ground Lease with WHRL whereby they agreed, *inter alia*, "[f]rom and after the Cover Agreement Effective Date, and for so long as this Agreement is in full force and effect, [the] District shall not enter into any new leases, or extend, modify or amend any Existing Fish Market Lease or any other lease of any part of the Fish Market or the barges attached to the Fish Market without requesting in writing and obtaining Developer's prior written approval, which approval may not be unreasonably withheld, conditioned or delayed."  Developers' SMF ¶ 105; Developers' Ex. 18 [Cover Agreement], at ¶ 2(a).  On April 23, 2014, the District and WHRL entered into an Assignment and Assumption of Leases, whereby the District assigned to WHRL all of its "right, title, and interest in and to the leases listed on [the attached] Exhibit A," which includes the "Lease Agreement dated July 12, 2000 between District and BRW, Inc." and the "Lease Agreement dated March 20, 2014 between District and W.D. Inc., a Virginia Corporation, as successor by assignments to Pruitt's Seafood, Inc." and the "Lease Agreement dated July 20, 2000 between District and The Wharf, Inc."  Developers' SMF ¶¶ 107-108; Developers' Ex. 19 [April 23, 2014 Assignment and Assumption of Leases] ("Assignment and Assumption of Leases"). That Assignment and Assumption of Leases states that "Assignor hereby transfers, assigns, conveys and sets over unto Assignee all of Assignor's right, title and interest as landlord in and under the

Leases.  Assignee hereby accepts the foregoing assignment and assumes all obligations of the "Landlord" under the Leases."  Developers' Ex. 19 (Section 2).

It is the Defendants' legal position that the three Fish Market Leases are invalid, and the lease validity issue is currently before this Court on summary judgment.  The Court will now address the applicable legal standard for a motion for summary judgment involving a contractual dispute.

## II. Legal Standard
### A. Summary Judgment

Granting a motion for summary judgment is appropriate if the movant carries the burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the pleadings, depositions, and affidavits, and other factual materials in the record.  Fed. R. Civ. P. 56(a); *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir. 2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  Fed. R. Civ. P. 56(a).  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant fact; the dispute must be "genuine," meaning the nonmoving party must establish more than "[t]he mere scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252, "must do more than simply show that there is some metaphysical doubt as to the material facts," *Scott v. Harris*, 550 U.S. 373, 380 (2007), and cannot rely on "mere allegations" or conclusory statements, *see Estate of Parsons v. Palestinian Authority*, 651 F. 3d 118, 123 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150 (D.C. Cir. 1993).

The nonmoving party must present specific facts "'such that a reasonable jury could return

a verdict for the nonmoving party.'" *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013) (quoting *Anderson*, 477 U.S. at 248); s*ee also* Fed. R. Civ. P. 56(c)(1). If the evidence proffered "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010). Furthermore, "[if] opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). The Court is only required to consider the materials explicitly cited by the parties, but may, on its own accord, consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009); *see also Sibert-Dean v. Wash. Metro. Transit Auth.*, 751 F. Supp. 2d 87, 90 (D.D.C. 2010) (requiring the non-moving party's factual representations in a sworn affidavit to be supported by facts in the record). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. When, at the summary judgment stage, the parties present a genuine dispute about the facts, the Court must draw all justifiable inferences in favor of the nonmoving party and accept the nonmoving party's evidence as true. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Evans v. Sebelius*, 716 F.3d 617, 619 (D.C. Cir. 2013). If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

### B. Contract Interpretation

Under District of Columbia law, leases of real property are to be analyzed under contract law. *Abdelrhman v. Ackerman*, 76 A.3d 883, 887 (D.C. 2013). In interpreting contractual terms, the court must adhere to the objective law of contracts "whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake." *Marra v. Papandreou*, 59 F. Supp. 2d 65, 76 (D.D.C. 1999) (citation omitted), *aff'd* 216 F. 3d 1119 (D.C. Cir. 2000); *see also Patterson v. District of Columbia*, 795 A. 2d 681, 683 (D.C. 2002).

In contract cases, generally, courts will not grant summary judgment where a contract is ambiguous because its interpretation inevitably would "depend[ ] on the credibility of extrinsic

evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *Holland v. Hannon*, 456 A.2d 807, 815 (D.C. 1983). In contrast, summary judgment is appropriate where "a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence," and the contract is deemed to be unambiguous. *Id.*

It is a question of law to be determined by the court whether a contract is ambiguous; a contract is not ambiguous merely because the parties dispute its meaning or could have drafted more clear terms. *Dist. No. 1 - Pac Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A. 2d 269, 274 (D.C. 2001); *Holland*, 456 A.2d at 815. Rather, a contract is ambiguous when it or its provisions are reasonably or fairly susceptible of different constructions or interpretations, or two or more meanings that are different. *Id.* In contrast, a contract is unambiguous when a court can ascertain the contract's meaning by merely looking at the contract or it is susceptible of only one clear meaning. *Id.*

The first step in deciding whether contract language is susceptible of clear meaning is "to look at the contract language and ask 'what a reasonable person in the position of the parties would have thought the disputed language meant.'" *Patterson v. District of Columbia*, 795 A.2d 681, 683 (D.C. 2002) (citing *Adler*, 728 A.2d 88) (quotation omitted). Under this approach, the "objective reasonable person assessing the contract's language is 'presumed to know all the circumstances before and contemporaneous with the making of the agreement.'" *Patterson*, *id.* (citations omitted); *see 1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984) (citation omitted) (meaning should be ascertained "in light of all the circumstances surrounding the parties at the time the contract was made") "The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *Id.* (citing *Vicki*

*Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, at 366 (D.C. 1984)) (additional citations omitted).

This reasonableness determination regarding an evaluation of surrounding circumstances is applied in all cases - whether or not the contract's language appears ambiguous. *Patterson v. District of Columbia*, 795 A. 2d at 683; *Fairfax Village Condo. VIII Unit Owners' Ass'n v. Fairfax Vill. Cnty. Ass'n, Inc.*, 726 A.2d 675, 677 n.4 (D.C. 1999). "Therefore, although [e]xtrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous, extrinsic evidence may however be considered [in all cases] to determine the circumstances surrounding the making of the contract so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." *Christacos v. Blackie's House of Beef, Inc.*, 583 A.2d 191, 194 (D.C. 1990) (citations and internal quotation marks omitted). Extrinsic evidence may include circumstances before and contemporaneous with the making of the contract, the habitual and customary practices either party knows or has reason to know, the circumstances surrounding the transaction, and the course of conduct of the parties to the contract. *Waverly Taylor, Inc. v. Polinger*, 583 A.2d 179, 182 (D.C. 1990).

In the instant case, the Court begins its analysis of the parties' arguments by conducting a reasonableness inquiry relating to the Fish Market Leases.

### III. Analysis

As a preliminary matter, Defendants' arguments may be summarized as follows: (1) the Fish Market Leases were void *ab initio* because they (a) would have lasted longer than the 30-year lease period for which Congress authorized the Mayor to contract, (b) The Wharf was not one of the existing tenants of the Fish Market with whom Congress authorized the Mayor to negotiate 30-year leases, (c) any lease obligating the District to complete the Landlord's Work violates the Anti-

Deficiency Act because the scope of the work is undefined (District argument only), (d) the assignment of Pruitt's Fish Market Lease should be similarly treated as exceeding the Mayor's authority; and/or (2) if the Fish Water Leases were ever valid, they terminated on their respective third anniversaries pursuant to Section 38.E. of the Leases because (a) extrinsic evidence regarding the drafting and negotiation of the Leases requires the Court to adopt the Defendants' interpretation of Section 38.E. and (b) the rules of construction also favor Defendants' interpretation of section 38.E., and if the Fish Market Leases do not terminate pursuant to Section 38.E., (c) the Leases violate the Rule Against Perpetuities.  Defendants argue additionally that Plaintiffs cannot create a leasehold interest by estoppel nor is Plaintiffs' new "mistake" argument supported by law or facts.  These arguments set forth above will be addressed by this Court in turn, except the assignment of Pruitt's Fish Market Lease ("DNM Assignment") will be addressed in connection with the Plaintiffs' claims of mistake and estoppel.[5]

### A. Defendants Argue that the Fish Market Leases are Void *ab Initio*

"[I]t is a basic principle of District law that a contracting official cannot obligate the District to a contract in excess of his or her *actual authority*."  *District of Columbia v. Brookstowne Cmty. Dev. Co.*, 987 A.2d 443, 447 (D.C. 2010) (emphasis in original) (quoting *District of Columbia v. Greene*, 806 A.2d 216, 222 (D.C. 2002)).  Where the government is a party to a contract, the capacity to enter into a contract is determined by the statutory grant of authority given to the contracting official.  *Brookstowne*, 987 A.2d at 447*; see also District Intown Props., Ltd. v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 680 A.2d 1373, 1379 (D.C. 1996) (citations omitted) (explaining that a governmental entity is "a creature of statute and may not act in excess

---

[5] This Court will first address the argument that the Fish Market Leases were void *ab initio* (the primary argument asserted by the District) and then address the argument that the Fish Market Leases terminated automatically on their respective third anniversaries (the primary argument asserted by Developers).  Plaintiffs contest both arguments.

of its statutory authority," and "exercise of jurisdiction beyond that conferred upon the agency by the legislature is *ultra vires* and a nullity.")   "[A]ny attempt" by District officials "to contract beyond their conferred powers would be an *ultra vires* act that would be unlawful[.]" *Brookstowne*, 987 A. 2d at 446-47 (citation omitted).

In this case, the Mayor was granted authority in the 2001 Appropriations Act to enter into leases "of the Washington Marina and the Washington municipal fish wharf with the existing lessees thereof *for an initial term of 30 years*, together with such other terms and conditions (including renewal options) as the Mayor deems appropriate."  Pls.' RSMF ¶ 16 (citing District of Columbia Appropriations Act, 2001, Pub. L. No. 106-522 § 162(a), 114 Stat. 2440, 2484-85 (2000)) (emphasis added by the Court); *see* D.C. Ex. 31 [R. Aguglia Dep.], at 58:6-58:19 (recognizing a congressional mandate for 30 years).

The then-existing lessees at the Fish Market included those businesses at the Fish Market occupying their premises as month-to-month tenants after the expiration of the 1986 Lease. Developers' SMF ¶ 11.  Prior to the 2001 Appropriations Act, by statute, the Mayor could not enter into leases at the Fish Market beyond a period of ten (10) years.  Developers' SMF ¶ 18(a)-(g); *see also* D.C. Code §§ 10-501.01, 10-501.02 (2001 ed.).

### 1. The Duration of the Fish Market Leases Exceeds 30 Years

Defendants argue that the Fish Market Leases exceeded the authority of the Mayor because, under the terms of the Leases as written, the "initial term" [duration] of the Leases is for a period exceeding thirty years.[6]  Pursuant to the Fish Market Leases, the Lease "Term" is defined as "[t]he period that begins on the Commencement Date and ends thirty (30) Lease Years after the New Rent Commencement Date, unless sooner terminated pursuant to this Lease."  Developers' Exs.

---

[6] "Initial Term" is not defined or used in the Leases.

11-13 (Section 1.O.).   The "Commencement Date" is defined as the "date of this Lease," Developers' Exs. 11-13 (Section 1.B.), and first "Lease Year" shall begin on the New Rent Commencement Date and end of December 31 of the year following the year in which the New Rent Commencement Date shall occur . . . "  Developers' Exs. 11-13 (Section 1.E./1.D. in Wharf Lease).  Pursuant to the Fish Market Leases, the end date of the "Term" (the period starting on the Commencement Date) is contingent on the occurrence of the New Rent Commencement Date, which triggers the start of the 30 Lease Years. *See* Developers' Exs. 11-13 (section 1.O.).

Reading the Fish Market Leases, it is clear that the "Commencement Date" and the "New Rent Commencement Date" refer to different points in time – first, there is an initial period during which the lessee would pay lower rent, and next, there is a period of 30 Lease Years, with payments of higher rent.  These two terms cannot refer to the same thing without rendering one term or the other surplusage, and legal agreements are presumed not to contain surplusage.  *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1302 (D.C. Cir. 1998) (citing *Farnsworth on Contracts* § 7.11 (1990)) ("We assume that the parties intended for every part of the agreement to have meaning; interpretations that would render a portion of the agreement ineffective or mere surplusage are traditionally disfavored by the courts."); *see also United States ex rel. Schneider v. J.P. Morgan Chase Bank, N.A.*, 224 F. Supp. 3d 48, 57 (D.D.C. 2016) ("Agreements, like statutes, should be read to avoid surplusage where possible."); *Nest & Totah Venture, LLC v. Deutsch*, 31 A. 3d 1211, 1219 (D.C. 2011) (quotations omitted) ("The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all of its terms. . . ").

It is during the period between the Commencement Date and the New Rent Commencement Date, when monthly rent payments are $303.03, that the scope of the Landlord's Work is to be determined and completed as the substantial completion of the Landlord's Work

triggers the start of the New Rent Commencement Date.  *See* Developers' Exs. 11-13, Section 3 (Landlord's Work), Section 1.G/1.F. in Wharf Lease (New Rent Commencement Date).  The New Rent Commencement Date is inextricably linked to an increase in rent (*see* sections 1.H [Percentage Rent], 5 [Minimum Rent]), and it triggers the definition of Lease Year (which is defined in section 1.E., mentioned in section 2.D. [termination provision], and tied to Additional Rent in section 7).  Plaintiffs have acknowledged that there is a distinction between the two periods of time.  *See* Developers' Ex. 1 [P. White Dep.], at 203:18-204:14 ("I wanted to have the [Landlord's] [W]ork done[,]" but acknowledging that if the work was finished, the tenants would have to pay "higher rent.")

If this period between the Commencement Date and the New Rent Commencement Date is considered the "initial term" of the Leases, and Section 38.E. is not applied to terminate the Leases at the three year mark because the New Rent Commencement Date has not commenced (as Defendants assert it should be in Section III.C.4.b., *infra.*), then this "initial term" of the Fish Market Leases runs in perpetuity.  *See* D.C. Ex. 31 [R. Aguglia Dep.], at 289:16-290:18 (noting that it was a "minimum 30-year lease," and "there's no specific language that it ends at 30 years and, therefore, it would be a lease without term at the minimum rent and expenses paid by the client.")

Alternatively, if the period running from the Commencement Date through the 30 Lease Years (triggered by the New Rent Commencement Date) is looked at as a single "initial term," there is no dispute that the Fish Market Leases granted leaseholds with leases that would have lasted in excess of thirty years.  The Defendants read the "initial term" of the Fish Market Leases, as written, as running for a potential 33-34 years, which assumes that Landlord's Work was to have been completed within three years.  *See* Developers' Exs. 11-13 (Section 1.E./1.D. in the

24

Wharf Lease, setting out 30-Lease Years, and Section 38.E., discussing 3 years). Plaintiffs' interpretation of the Fish Market Leases has them running for a period of 45 to 60 years.  *See* D.C. Ex. 30 [B. White Dep.], at 162:6-11 ("I was under the influence that if we went 15 years and we got the landlord's work done, that we would have another 30 years, yes.  From the date - - from the date the landlord['s] work was done, and the committee was satisf[ied] with the work, and another - - another 30 years would commence."); D.C. Ex. 31 [R. Aguglia Dep.], at 122:13-123:12 ("Well, for sure at the meeting where we discussed the minimum 30-year lease at the old rent - -" . . .  and "then there was another term in the lease for 30 years that began when the rent commencement date kicked in when the work was done.").  This Court notes that Plaintiffs' characterization of the Leases as involving [two] terms of either 15 years and 30 years or [two] terms of 30 years is unsupported and contradicted by the actual language of the Fish Market Leases, which discusses one Term that ends "thirty (30) Lease Years after the New Rent Commencement Date, unless sooner terminated . . ." and provides further that "Tenant acknowledges that it has no right hereunder to renew or extend the Term [30 Lease Years] hereof, or to negotiate for a renewal of the Term hereof."  Developers' Exs. 11-13 (section 1.O.).

Moreover, even assuming *arguendo* that the period of time prior to the New Rent Commencement Date can somehow be ignored, the manner in which the first Lease Year is defined would cover a period of at lease 366 days and as many as 731 days.  *See* Developers' Exs. 11-13 (section 1.E./1.D. in the Wharf Lease).  "When combined with the 29 additional [L]ease [Y]ears that would also be calendar years, the period after the New Rent Commencement Date would exceed the 30-year maximum authorized by Congress."  D.C. Mem., ECF No. 190-1, at 20. Because the "initial term" of the Fish Market Leases exceeds 30 years under any of these possible interpretations, the authority granted to the Mayor under the 2001 Appropriations Act has been

exceeded, which makes the Leases void *ab initio*.

### 2. Plaintiffs Argue that the Statutory Authority Should be Read to Authorize Leases Longer Than Thirty Years

Plaintiffs do not argue that the Fish Market Leases as written last for a period of only 30 years; rather, they assert that the Mayor had broad authority under the 2001 Appropriations Act to grant leases with a total duration longer than 30 years.  "Indeed that is exactly how the District must have interpreted the FY01 Act when the Mayor approved and executed the Fish Market Leases in 2001, because the "Term" was obviously going to be longer than 30 years because of (1) the lead-in period until the Landlord's Work is completed, and then (2) approximately 30-year period after the New Rent Commencement Date."  Pls.' Opp'n, ECF No. 203, at 45.

Plaintiffs assert that "[o]ne of the main things a District attorney approving a lease for legal sufficiency would consider is whether the duration of the lease exceeds the authority of the District official signing it."  Pls' SMF at ¶ 155.  Plaintiffs suggest that this undisputed fact lends credence to their argument that the Mayor's authority was broader than that granted pursuant to the 2001 Appropriations Act.  Pls. Opp'n, ECF No. 203, at 45.  More specifically, Plaintiffs contend that the approvals for legal sufficiency of the 2001 Leases, the 2005 Pruitt's Assignment, and the 2014 DNM Assignment – which Plaintiffs characterize as the District's "prior interpretations [of the 2001 Appropriations Act] – "are entitled to deference" over the litigation position taken by Defendants here.  *Id.* at 22; citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) ("We have never applied the principle of those cases [giving deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.  To the contrary, we have declined to give deference to any agency counsel's interpretation of a statute where the agency itself has articulated no position on the question . . .").[7]  But Plaintiffs fail to

---

[7] Plaintiffs cite only the first line of the *Bowen* quotation cited by the Court.

explain how the position taken by the District — that it is bound by the language of the 2001 Appropriations Act — is unsupported by "regulations, rulings or administrative practice." Furthermore, the District notes that the Supreme Court in *Bowen* clearly stated that it declined to give deference to the agency counsel's position when the agency took no position, which is exactly the situation here.  D.C. Reply, No. 209, at 11.  It was "Assistant Attorney General Andrew Ridley who signed the Lease for legal sufficiency, not the District." *Id.*; *see* Developers' Exs. 11-13 (signature pages).  Accordingly, *Bowen* does not support the Plaintiffs' contention that any approval for legal sufficiency should override the language of the 2001 Appropriations Act, which binds the District (the Mayor).

Plaintiffs assert that instead of focusing on the statutory authority as written, this Court should consider legislative history and other purported indicia of intent and construe that 2001 Appropriations Act as permitting leases with an initial term in excess of 30 years.  Plaintiffs proffer that because it is "clear that the statute would have permitted [the] Mayor to give one period at the initial rent for up to 30 years, and a renewal period at higher rent for another 30 years, there is not an *ultra vires* problem but simply a drafting error, " Pls.' Opp'n, ECF No. 203, at 49 (emphasis added), which "can and should be correct[ed] through [this Court's] reformation of the leases." Pls.' Opp'n, ECF No. 203, at 52.  As noted below, there are two major problems with the Plaintiffs' argument: (1) the language of the 2001 Appropriations Act is clear in stating "an initial term of 30 years," as opposed to "up to 30 years," and (2) any proposed "reformation" of the Fish Market Leases would not simply involve adding a termination date but would instead require this Court to rewrite the entire Fish Market Leases.

### 3. The Language of the 2001 Appropriations Act is Clear

Despite the fact that there is no qualifying language in the phrase used in the 2001

Appropriations Act  - <u>an initial term of 30 years</u> - Plaintiffs contend that this Court should view "an initial term of 30 years" as a "floor and not a ceiling" by focusing on the language about renewal options.  Pls.' Opp'n, ECF No. 203, at 50; *see* D.C.'s Ex. 53 [P. White Dep.], at 179:17-180:5 ("whether it's three years, five years, seven, 15, or 29" years to complete the Landlord's Work, that's when the 30-year [New Rent Commencement] term starts).  The District, in turn, suggests that Plaintiffs have it "backwards" as "the phrase "initial term of 30 years" explicitly limits the initial term to that period, not more or less."  D.C. Reply, ECF No. 209, at 10 (noting that the FY01 appropriations law did not say "initial term of *at least* 30 years" and the Leases do not include an "automatic renewal period.")   The District argues further that "Plaintiffs' interpretation of the lease would allow an *initial* term of *less* than 30 years, which also violates the statutory authority.  *Id.* at 12.  This Court notes that the 2001 Appropriations Act *clearly* grants the Mayor authority to execute leases "with the existing lessees" for "an initial term of 30 years[.]"  Pub. L. No. 106-522, November 22, 2000, 114 Stat. 2440 (2001).  Accordingly, this Court finds that Plaintiffs' attempt to manufacture a disputed issue of material fact regarding the plain language of the 2001 Appropriations Act fails.

 Nor does Plaintiffs' focus on the phrase "for an initial term of 30 years, *together with such other terms and conditions (including renewal options) as the Mayor deems appropriate*" alter this Court's understanding of the "initial term of 30 years" to mean a 30-year initial term.  The only reasonable construction of the term "renewal option" is that there may be a "renewal" after the "initial term" of 30 years, but in this case, as previously noted, the Fish Market Leases do not include a renewal term and in fact, indicate that Tenant has no right to renew or extend the term.  *See* Developers' Exs. 11-13 (section 1.O.).

 Where the language of a statute is clear, "Supreme Court precedent emphatically

establishes that courts must take statutory language at its word." *Allegheny Def. Project v. Fed. Reg. Comm'n,* 964 F.3d 1, 18 (D.C. Cir. 2020) (citing *Intel Corp. Investment Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020) (discussing the phrase "actual knowledge" and finding its meaning plain and unambiguous)) (other citations omitted).   Where the statutory text in unambiguous, the Court's consideration excludes any legislative history.  *Janko v. Gates*, 741 F. 3d 136, 142 n.5 (D.C. Cir. 2014); *see Untied States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command there is no reason to resort to legislative history.") Accordingly, in this case, the Court need not consider legislative history because the statutory language is clear.

### 4. Lease Reformation

Plaintiffs suggest that "problem is not that the Mayor lacked authority to go beyond 30 years" but instead, it is that "the "Term" imperfectly expresses the parties' intent," such that "if there was never a "New Rent Commencement Date," the lease expires 30 years after the Commencement Date." Pls.' Opp'n, ECF No. 203, at 49.  Plaintiffs assert that because the statute permits the Mayor to give "one period at the initial rent for up to 30 years, and a renewal period at higher rent for another 30 years," there is no *ultra vires* problem; rather, it is just a "drafting error" that can be corrected.  *Id.*  The District asserts however that inserting expiration dates into the Leases to correct any confusion about the "initial term" means that "the Leases are void *ab initio*" for vagueness.  D.C. Reply, ECF No. 209, at 12.  If "the parties fail to agree to all material terms, no contract is formed, even if the parties intended to be bound. . ." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1239 (D.C. 1995) (quotations omitted); *Robinson v. Gardiner*, 76 A.2d 354, 356 (Md. 1950) ("[N]o action will lie upon a contract, whether written or verbal, where such contract is vague or uncertain in its essential terms.")

The District explains further that "the traditional standard for reformation of contracts is the so-called "blue pencil doctrine" under which courts can remove overbroad terms rather than invalidating an entire agreement."  D.C. Reply, ECF No. 209, at 12; *see Turnell v. Centimark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015) (discussing "blue penciling" under Pennsylvania law). While this doctrine "may limit an area, thus making it reasonable, [ ] it may not rewrite a contract void for vagueness, making it definite by designating a new, clearly demarcated area." *Hamrick v. Kelley,* 392 S.E. 2d 518, 519 (Ga. 1990).  Even in jurisdictions where the less strict doctrine of "equitable reformation" is applied, there may be less willingness to "reform agreements that are not reasonable on their face." *Steiner v. Am. Friends of Lubavitch (Chabad)*, 177 A.3d 1246, 1257-58 (D.C. 2018) (quotation omitted); *see Meyer Grp., Ltd. v. Rayborn*, Civil Action No. 19-1945 (ABJ), 2000 U.S. Dist. Lexis 177249, at *29-30 (D.D.C. Sept. 28, 2020) (analyzing *Steiner* and refusing to reform a contract "to include . . . a time limit," among other things, because "it would require the Court to add a number of essential terms").  This Court rejects Plaintiffs' suggestion that the Leases could be easily corrected through the insertion of expiration dates, as Plaintiffs' interpretation of the Leases (a 30-year initial term and 30-year renewal term) would effectively require this Court to rewrite the Leases to add essential terms including time limits, renewals and rental rates.

### 5. The Fish Market Leases are Void *Ab Initio*

Leases entered into without valid authority are invalid.  *Brown v. M St. Five, LLC*, 56 A. 3d 765, 771 (D.C. 2012) (a contract entered into by a party without authority to act is *void ab initio*).  "It is a long-standing principle of District of Columbia law that when parties have entered into an illegal contract, such contract is unenforceable and, typically, we leave the parties where we find them." *McMahon v. Anderson, Hibey and Blair*, 728 A.2d 656, 658 (D.C. 1999) (string

citing cases confirming that unenforceable means void).  As the District of Columbia Court of Appeals has repeatedly reaffirmed, "[i]n the District of Columbia it is a principle of long standing that an illegal contract made in violation of a statutory prohibition designed for police or regulatory purposes, is void and confers no rights . . ." *Cevern v. Ferbish*,  666 A.2d 17, 19-20 (D.C. 1995) (quoting *Capital Constr. Co. v. Plaza West Coop. Ass'n*, 604 A.2d 428 (D.C. 1992)); *see also Brown v. Southall Realty Co.*, 237 A.2d 834 (D.C. 1968) (finding a lease void as an illegal contract because of violation of Housing Code regulations).  Exceptions to this rule are not made even when there is a generally positive result of the illicit contract and there is no evidence in the record of fraud.  *See Weil v. Neary*, 278 U.S. 160, 173-74 (1929) (Taft, C.J.) ("Even if the ultimate results . . . were good, that could be no excuse for a contract plainly illegal.")  Based on the clear language in the 2001 Appropriations Act, and the fact that it is undisputed that the duration of the Fish Market Leases, as written, exceeds 30 years, this Court finds that the Fish Market Leases are void *ab initio* for exceeding the Mayor's authority to enter into leases "for an initial term of 30 years."[8] Plaintiffs' claim of estoppel and assertion of mistake will be considered in section III.D.

### 6. The Wharf was not an Existing Lessee

Defendants assert that there is an additional statutory prohibition with regard to The Wharf's Fish Market Lease insofar as the statute limits the Mayor's authority to enter leases with initial terms of 30 years to "existing lessees," and The Wharf was not a party to the 1986 Lease. Developers' Brief, ECF No. 192-1, at 36; D.C. Mem., ECF No. 190-1, at 20.  The Wharf was incorporated on December 30, 1999, under the ownership of Billy, Sunny, and Penny White, Developers' SMF ¶26.  The Wharf was accordingly not one of "the existing lessees" of the Fish

---

[8] Defendants argue that the only scenario where the Leases would not exceed 30 years is if application of Section 38.E. terminated the Leases on their third anniversaries because the Landlord's Work was not completed, and the New Rent Commencement Date was not triggered. This argument will be discussed in Section III.C., *infra.*

Market on October 21, 1998, when the 1999 Appropriations Act made the $3,000,000 appropriation.  Prior to signing the Lease dated July 12, 2000 for barge numbers 16-19, The Wharf never held a lease at the Fish Market nor did the Whites lease or occupy barge numbers 16, 17, or 18 at the Fish Market, although Captain White had a boat in slip 18.  Developers' SMF ¶¶ 24-25; Pls.' RSMF ¶¶ 24-25 (noting the omission of barge space number 19 in ¶ 25, as the Wharf Fish Market Lease covers barges 16-19).

Plaintiffs argue that the Court should ignore the actual statutory language in favor of a broader interpretation of "existing lessees."  *But see Allegheny Def. Project v. Fed. Energy Reg. Comm'n*, 964 F.3d 1, 18 (D.C. Cir. 2020) (courts must take statutory language at its word);  *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020) (courts "do not resort to legislative history to cloud a statutory text that is clear.") (quotation omitted);  *Janko v. Gates*, 741 F 3d 136, 142 n. 5 (D.C. Cir. 2014) (excluding consideration of legislative history where statutory language is clear).  Plaintiffs contend that "[n]othing in the acts or legislative history of Congress demonstrates that it intended to exclude new leases being held by tenants based on their corporate form, or prevent the new leases being held by new corporations,' and furthermore, "Congress's use of the general words "existing lessees" was merely intended to identify the class of people whom Congress intended to benefit, not more narrowly define it."  Pls.' Opp'n, ECF No. 203, at 55.  Plaintiffs proffer no authority, however, to support this assertion.  The District notes that there is "no contention that Congress sought to "prevent . . . new leases being held by new corporations", [Pls.] Opp'n, at 55, . . . only that the authority granted in the FY01 appropriations law to lease without Council approval was limited to existing lessees."  D.C. Reply, ECF No. 209, at 15.  "This Court is not free to re-write the unambiguous language chosen by Congress merely on the basis that policy considerations might counsel in favor of a different result[.]" *New Life Evangelistic*

*Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 124 (D.D.C. 2010) (Kollar-Kotelly, J.); *see also United States v. Hite*, 896 F. Supp. 2d 17, 24 (D.D.C. 2012) (courts give unambiguous words "their plain and ordinary meanings").

Plaintiffs proffer generally that "the District's prior statement through Bob Jones that The Wharf lease was awarded to Billy White, "one of the month to month tenants at the Wharf," creates a disputed issue of material fact with Defendants' assertions that The Wharf was not an "existing lessee" eligible to receive a lease[.]" Pls.' Opp'n, ECF No. 203, at 57-58.[9]  Developers assert that Plaintiffs "want that language [existing lessees] interpreted to mean corporate entities later created by natural persons who previously owned other corporations who were lessees," and they note that Plaintiffs erroneously cite the legislative history for the 1999 Appropriations Act, while it was the 2001 Appropriations Act that granted the Mayor authority to enter into the [Fish Market] Leases. Developers' Reply, ECF No. 214, at 27-28 (noting that the 2001 Act only authorized leases with "existing lessees" and not their successors in interest, as previously provided); *see In re Federal-Mogul Glob., Inc.*, 684 F.3d 355, 373-74 (3d Cir. 2012) (citing *2B Sutherland Statutes and Statutory Construction* §51.2) ("where two statutes deal with the same subject matter, the more recent enactment prevails as the latest expression of legislative will").

The District asserts further that, in any case, The Wharf was not even a corporate successor to BRW, and "[P]laintiffs point to no language in which Congress authorized the [M]ayor to effect a 30-year lease with a company that merely happened to be owned, in part, by an officer of an

_____

[9] Statements by Bob Jones are inadmissible hearsay.  *See* section III.C.2.b., *infra*.  Even in the event that these statements by Bob Jones were considered by the Court, they would not override the terms of the Leases.  Section 38.A. in the Leases contains an integration clause indicating that there are no side agreements between the parties.  *See* Developers Exs. 11-13 (Section 38.A stating that "[t]his Lease constitutes the entire agreement between the parties concerting the matters set forth herein.")  This integration clause is addressed more fully in section III.D.3.d., *infra.*

"'existing lessee.'"  D.C. Reply, ECF No. 209, at 16; *see United States v. Oakland Cannabis Buyers Corp.,* 532 U.S. 483, 497 (2001) ("a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation," even if doing so would seem to support "the public interest or the conveniences of the parties.") (quotation omitted).  Accordingly, the District proffers that the Mayor could not have negotiated a 30-year lease with The Wharf, and the lease is void *ab* initio, or alternatively, "[a]ny lease would, therefor, have been subject to the District's regular leasing provisions under which the mayor could make Fish Market leases of only 10 years or less," and it would have expired.  D.C. Mem., ECF No. 190-1, at 21; *see* D.C. Code § 10-501.01. The Court finds the language in the 2001 Appropriations Act restricting leases to "existing lessees" is clear, and accordingly concludes that the Wharf Lease exceeds the Mayor's authority because The Wharf was not an existing lessee, and such Lease shall be treated as *void ab initio* on that grounds as well.

### B.  Application of the Anti-Deficiency Act does not Void the Leases

District contracts are governed by the federal Anti-Deficiency Act, 31 U.S.C. § 1341 ("Federal ADA"), and the District Anti-Deficiency Act of 2002, D.C. Law 14-285, § 2 (Apr. 4, 2003), *as amended*, codified at D.C. Code § 47-355.01 *et seq.* (2007 Supp.) ("District ADA").[10] The ADA provides that "[a]n officer or employee of the . . . District of Columbia may not make or authorize an expenditure or obligation exceeding an amount available in an appropriation or

---

[10] The District notes that the District ADA did not become law until after the Fish Market Leases were signed, but the Home Rule Act included a similar provision prohibiting such financial obligations and expenditures that were not approved by Act of Congress.  D.C. Mem., ECF No. 190-1, at 22.  "Thus, both federal and District law prohibited the mayor from committing to expend an amount of money not explicitly appropriated or authorized by statute."  *Id.*; *but see Ins. Co. of N. Am. v. District of Columbia*, 948 A.2d 1181, 1184 n.1. (D.C. 2008) (finding the Federal ADA controlled because the contract in question implicated only a federal appropriation).  In this case, the District asserts that the Home Rule Act ADA <u>may</u> be implicated because the Leases implicated federal and District money.  *Id.* at 22 (emphasis added).

fund for the expenditure or obligation exceeding an amount available in an appropriation or fund

for the expenditure or obligation," 31 U.S.C. § 1341(A), or "involve [the] government in a contract

or obligation for the payment of money before an appropriation is made unless authorized by law."

31 U.S.C. § 1341(B).  An "obligation" is a "definite commitment that creates a legal liability of

the government for the payment of goods and services ordered or received[.]"  *Maine Cmty. Health*

*Options v. United States*, 140 S. Ct. 1308, 1319 (2020)(quotation omitted).

Plaintiffs have acknowledged that at the time the Leases were signed, the final scope of the

Landlord's Work had not been finalized, Developers' SMF ¶ 70, and they do not contest that the

District was obligated to perform the Landlord's Work.  *See* Developers' Exs. 11-13 (Section 3),

*see also* Work Orders attached as Exhibit D to the Fish Market Leases (describing projects to

improve the Fish Market or Marina).  Section 3.A. of the Fish Market Leases recites that the parties

agreed to the "nature" of the Landlord's Work" as embodied in work orders, and it notes that the

District "has been allocated $3,000,000 from the federal government [ ] to make improvements to

the [Fish Market] and to the marina located next to [it]."  Developers' Exs. 11-13 (Section 3.A.).

The sum of the individual work items listed in the work orders exceeded $3,000,000.  Developers'

SMF ¶ 69 (providing a breakdown of the work contemplated by each work order and the budgeted

amount); Pls.' RSMF ¶ 69 (Plaintiffs acknowledge that the total budgeted amount exceeds $3

million, but dispute that the final budget had been decided).

The District notes that over $3 million was spent in making repairs to the Marina.  *See*

D.C. Ex. 29 [chart of cost of Marina repairs]; *see also* D.C. Ex. 56 [B. White Dep.], at 117:6-19

("[T]hey started [at the Marina], and they ran out of money.  So we never got any improvements

at the fish market with the 3 million.")  Plaintiffs note that, in addition to the $3 million federal

appropriation, approximately $800,000 had been "reprogrammed" by the District to "fund

improvements to the Southwest waterfront."  *See* Developers' Ex. 16 ["Marina Lease"] §3.A. (stating that "Landlord [District] has reprogrammed an additional sum) (the "Additional Funds") of approximately $800,000 to fund improvements to the Southwest Waterfront").  There is no mirror provision in the Fish Market Leases, and whether any of that money was used for improvements at the Fish Market is unclear.

The District's argument regarding an Anti-Deficiency Act violation hinges on the phrase "such other sources of funding as may be available to the Landlord[,]" D. C. Mem., ECF No. 190-1, at 24, which allegedly "presumes that [the] [L]andlord can get the money elsewhere and that is not necessarily the case."  D.C. Ex. 28 [S. Longstreet Rule 30(b)(6) Dep.], at 141:11-19.  The District concludes that because the Fish Market Leases do not point to authorization or appropriation outside of the $3,000,000, "they improperly <u>commit</u> the District to expending funds beyond the Federal Appropriations in violation of either or both ADAs and are, therefore, void *ab initio*."  D.C. Mem., ECF No. 190-1, at 25 (emphasis added).  The Court finds that the District's argument flies in the face of the language of the Fish Market Leases which does not *commit* the District to expend any *specific* amount of money to complete the Landlord's Work, as the scope of that work was not fully defined.  Furthermore, the term "such other sources of funding as may be available to the landlord" in the Fish Market Leases does not specify where or when those other sources of funding may originate nor were such funds earmarked for any particular part of the Landlord's Work.  Plaintiffs note that "[e]ven if the District made a commitment to spend other funds, it only committed to spend those funds that were "available" for the Landlord's Work, which necessarily means that the funds would have to be specifically appropriated or dedicated for that purpose . . ."  Pls.' Opp'n, ECF 190-1, at 60.[11]

---

[11] *See* Pls.' SMF ¶ 139; Developers' RSMF ¶ 139 (acknowledging that Congress appropriated an additional $2.781 million in the 2003 Appropriations Act "to continue improvements on the

Section 3.A. of the Fish Market Leases states that "Landlord shall have no obligation to spend any funds to complete Landlord's Work in excess of the Federal Appropriation and such other sources of funding as may be available to Landlord."  Developers' Exs. 11-13 (Section 3.A.); Pls. SMF ¶ 136.   Accordingly, the District's obligation to pay for the Landlord's Work is "contingent on the availability of funds."  Pls. Opp'n, ECF No. 203, at 59; *see Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 328 F. Supp. 3d 1133, 1142 (E.D. Wash. 2018) ("Merely because HHS approved the project in its entirety, does not mean it committed itself to appropriate money for future years beyond the first year.  The Funding Announcement also states that the Award is "contingent upon the availability of funds" which ensures compliance with the ADA.")  In this case, if the District had no available funds, or funding had been exhausted, it had no obligation to spend any additional funds to complete the Landlord's Work, and accordingly, there is no deficiency.  Furthermore, the District had "no liability to Tenant if it [was] unable to complete Landlord's Work by [June 30, 2001] or by any other date," Developers' Exs. 11-13 (Section 3.C.); Pls.' SMF ¶ 137, and accordingly, there was no enforceable legal liability against the Landlord (District).  On the record before this Court, the  Court is unable to conclude that the District's obligation to perform the Landlord's Work – subject to the availability of funding and without any legal liability for failure to complete it – is inconsistent

---

historic Potomac Southwest Waterfront" with the condition that the DHCD was to submit a report by April 30, 2003 regarding the activities to be carried out with such funds) (but noting that "the historic Potomac Southwest Waterfront extends beyond the Fish Market; *see also* Pls' SMF ¶ 140, Developers' RSMF ¶ 140, Pls.' Ex. 60 [April 30, 2003 Report by DHCD Director Stanley Jackson] (stating that "[c]urrently, improvements are well underway at the Marina but improvements on the Wharf site [the Fish Market] have been substantially delayed due to pending Federal and District of Columbia court litigation" and noting further that "[t]he District of Columbia continues to work diligently with the U.S. Army Corps of Engineers to implement the improvements in accordance with the terms of the legislation and budget limitations") (also distinguishing the initial $3 million appropriation which was expended on the Washington Marina from the $2.781 million appropriation).

with the ADA, which would warrant summary judgment on these grounds.

    \*                \*                \*

Having concluded above that the Fish Market Leases are void *ab initio* for exceeding the Mayor's authority does not however conclude this Court's inquiry, as Plaintiffs argue that because it is undisputed that the intention was for the parties to enter into 30-year leases, the Court could insert an end date into the Fish Market Leases consistent with that intention, and such reformation "would only require striking a few words from the definition of 'Term,'" so that the Leases run for a period of 30 years that started on the Commencement Date and ends 30 years thereafter, and "[t]he rest of the lease[s] would stay the same." Pls.' Opp'n, ECF No. 203, at 77. Plaintiffs' argument for this type of reformation gives effect to the intent of the parties to enter into 30-year Leases, but it requires that this Court ignore (any intent and operation of) Section 38.E. of the Fish Market Leases. While Plaintiffs deem Section 38.E. meaningless, Defendants contend that Section 38.E. operates to terminate the Leases on their third anniversaries since the Landlord's Work under the Leases had not been completed and the New Rent Commencement Date was not triggered. Accordingly, the Court will next analyze Section 38.E. to determine if it is susceptible to one clear meaning and therefore, unambiguous.

### C. Section 38.E.

Section 38.E. of the Fish Market Leases (Developers Exs. 11-13) provides:

> Rule Against Perpetuities. Notwithstanding any provision in this Lease to the contrary, if the Lease Term has not commenced within three (3) years after the date of this Lease, this Lease shall automatically terminate on the third (3rd) anniversary of the date hereof. The sole purpose of this provision is to avoid any possible interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation.

The Fish Market Leases do not define "Lease Term." In connection with a prior motion to dismiss filed by the Defendants, they argued that "Lease Term" in Section 38.E. has to be read as the

beginning of the 30-Lease Year period after the Landlord's Work is certified as complete (the "New Rent Commencement Date" in the Leases), and accordingly, the Leases terminated on their respective third anniversaries.  September 28, 2015 Memorandum Opinion, ECF No 45, at 19. Plaintiffs argued however that "Lease Term" is identical to "Term," which is defined as commencing on the date of the Leases, and accordingly, Section 38.E. has no bearing in this case. *Id.*  The Court concluded that Section 38.E. was facially ambiguous because "Lease Term" was undefined.  The Court declined however to employ rules of contract construction or to consider extrinsic evidence on a Rule 12(b)(6) motion, preferring instead to revisit this issue on summary judgment.  *Id.* at 19-21; *see Pernice v. Bovim*, 183 F. Supp. 3d 84, 87-88 (D.D.C. 2016) ("[I]f contractual terms are ambiguous, courts must resolve the ambiguity by examining extrinsic evidence, requiring a deeper factual analysis than is permissible at the motion-to-dismiss stage.)

Defendants assert that discovery has resolved any facial ambiguity of Section 38.E., and during its reasonableness inquiry, this Court may rely on extrinsic evidence.  Extrinsic evidence includes "the parties' negotiations prior to and contemporaneous with the formation of the agreement, as well as their course of conduct under the contract."  *Aziken v. District of Columbia*, 70 A.3d 213, 222 (D.C. 2013) (quoting *International Bhd. of Painters & Allied Trades v. Hartford Accident & Indem. Co.*, 388 A.2d 36, 43 (D.C. 1978)).  "[I]f extrinsic evidence supports more than one reasonable interpretation of the contract [District of Columbia] law calls for the trier of fact to resolve the dispute[,]" *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990), but "if that evidence demonstrates that only one view is reasonable — notwithstanding the facial ambiguity — the court must decide the contract interpretation question as a matter of law." *Id.* (citations omitted).  Developers assert that the latter applies in this case and notes that courts may look to extrinsic evidence demonstrating the parties' intent at the time of contracting.

Developers' Brief, ECF No. 192-1, at 16 & n.3. (citing *PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*, 750 F. Supp. 2d 125, 145-46 (D.D.C. 2010) (Kollar-Kotelly, J.)).

### 1. Parties' Positions on Section 38.E.

None of the written correspondence exchanged between the parties regarding the drafting of the Leases makes specific reference to Section 38.E., Developers' SMF ¶ 62, Developers' Ex. 2 [P. White Rule 30(b)(6) Dep.] at 328:15-330:18, and Plaintiffs were unaware of any negotiations between themselves or their counsel with the District regarding the language of Section 38.E. Developers' SMF ¶63, Developers' Ex. 2, at 322:17-324:16, 328:18-329:6, 334:9-20 ("Plaintiffs understand that Paragraph 38E was a provision from the model lease that counsel for the District of Columbia supplied as a form to be adapted into the lease that the District of Columbia entered into with the plaintiffs" [and] Plaintiffs "have no knowledge of any negotiation that occurred regarding Paragraph 38E."). *See* Pls. Ex. 6 [P. White Rule 30(b)(6) Dep.] at 299:8-12 (the language "other rules of law against restraints on alienation" was "the District's language[, and,][y]ou'd have to ask the District [what it meant].").

Defendants' position is that Section 38.E. was designed to avoid a possible interpretation that the Fish Market Leases violated the RAP or other rules of law against restraints on alienation. *See* Developers' Exs. 11-13 (Section 38.E.); *see also* Developers' Ex. 6 [D. Connall Dep.] at 53:22-54:11 ("The Savings clause [Section 38.E.] is designed to avoid the unanticipated application of the Rule Against Perpetuities, . . ., by imposing a specific agreed-upon time period for the condition to either be satisfied or not.")

Plaintiffs' position is that Section 38.E. would never apply and is therefore meaningless. *See* Developers' Ex. 2 [P. White Rule 30(b)(6) Dep.] at 335:4-8 ("Plaintiffs believe that the terms of the leases make it so that there is no situation where a Paragraph 38E would ever apply, because

the term for the leases begins on the commencement date so our interests had vested."); *see* Pls.'

Ex. 6 [R. Aguglia Dep.] at 298:12-299:1 ("since we took possession under the old rent with respect

to BRW, immediately then we were vested and therefore, the [RAP] didn't apply").  According to

the Plaintiffs' Rule 30(b)(6) deponent, Penny White, "Paragraph 38E was a provision from the

model lease that counsel for the District of Columbia supplied as a form to be adapted into the

lease."  Developers' Ex. 2 [P. White Rule 30(b)(6) Dep.]  at 334:9-16.  Ms. White understood that

"it was a standard form" and "it had to stay."  *Id.* at 322:17-323:2.

This Court will begin its inquiry into Section 38.E. by looking to extrinsic evidence and

the rules of contract construction to determine whether this section is susceptible of clear meaning;

*i.e.*, there is only one reasonable interpretation.

### 2. Extrinsic Evidence of Intent to Determine Reasonableness

This Court notes that Plaintiffs' *expectations* of having *long-term* leases were shared by

Defendants, and this is consistent with the authorizing language of the 2001 Appropriations Act

(noting "an initial term of 30 years") and supported by the very definition of "Term" that is found

in the Fish Market Leases (defined as ending "(30) Lease Years after the New Rent

Commencement Date, unless sooner terminated pursuant to this Lease.")  *See* Developers' Exs.

11-13 (Section 1.O.).  The reality of a situation may however differ from parties' expectations.

The parties recognize that contingencies were built into the Fish Market Leases before the 30-

Lease Years commenced; *i.e.*, the New Rent Commencement Date had to be triggered, and that

was contingent on the Landlord's Work being done. The parties agree that the New Rent

Commencement date was not triggered in this case because there was no completion of the

Landlord's Work.  Defendants argue therefore that Section 38.E. provided an end to the Leases if,

at the 3-year point, these contingencies had not become realities, but Plaintiffs assert that Section

38.E. is inapplicable, and accordingly the Leases run for at least 30 years, if not in perpetuity.

### a. Defendants' Extrinsic Evidence

As previously indicated, Desmond Connall, Esq. and Kenneth Logwood assisted the District with the Washington Marina and Fish Market Leases on a *pro bono* basis.[12]  Developers' SMF ¶ 46.  Mr. Logwood used a form lease that Mr. Connall had developed as the model for the Fish Market Leases.  Developers' SMF ¶ 47.  Developers rely on testimony by Mr. Connall regarding his understanding and interpretation of  Section 38.E.  This Court notes that it is undisputed that the Fish Market Leases were negotiated starting with a lease form prepared by Mr. Connall, which included the provision that is found at Section 38.E.  Plaintiffs challenge much of Mr. Connall's testimony on grounds that Mr. Connall proffers legal opinions when he is acting as a fact witness.  *See* Pls.' RSMF ¶¶ 51-53, 58-61, 66 (challenging Mr. Connall's testimony as inadmissible expert opinion/legal conclusions), *see also* Pls.' Ex. 7 (D. Connall Dep.), at 47:19-49:18 (noting that he was "not consulted or involved in the application of this clause [38.E.] or any aspect, really, of the negotiation of this [Fish Market] lease" and he did not share his opinions on the clause with Mr. Jones or Mr. Logwood), 45:3-7 (indicating that Mr. Connall did not interact with Plaintiffs).  This Court notes however that "[i]t is well-established that attorneys may testify as fact witnesses regarding their personal knowledge of the events in question."  *See Queen v. Schultz*, 310 F.R.D. 10, 26 (D.D.C. 2015) (string citing cases) *see, e.g., Tardiff v. Geico Indem. Co.,* 481 Fed. App'x 584, 587 (11th Cir. 2012) (affirming the trial court's ruling permitting an attorney to "testify as [a] fact witness[ ] [where he] confined [his] testimony to statements based on [his] own experiences and personal knowledge").  Accordingly, this Court finds Mr. Connall's testimony regarding Section 38.E. —the lease provision that was derived from his form lease —

---

[12] Developers note that they were unable to depose Mr. Logwood because of ongoing medical issues.  Developers' Brief, ECF No. 192-1, at 17 n.4.

may be considered by this Court.

Mr. Connall testified that he is a lawyer at a "real estate boutique" firm, and "[l]easing is one of [his] main areas of specialty." Developers' Ex. 6 [D. Connall Dep.], at 9:19-10:11. With reference to the Fish Market Leases, Mr. Connall testified that "[b]ecause the 30-year term [which begins on the "New Rent Commencement Date"] is conditioned on an event that may never happen, namely the completion of work by the landlord," the Rule Against Perpetuities ('RAP") is implicated. *Id.* at 32:11-20. Mr. Connall testified that in the Fish Market Lease, there are "two terms here. . . the initial term until the 30-year term starts [and] [i]t's the 30-year term that's problematic here [because] . . . that one had not . . . vested [upon signing of the lease]." *Id.*, at 33:21-34:12. To avoid RAP issues, Mr. Connall's lease "form had a Savings clause in it" which he "usually put[s] in the Miscellaneous section," and which was in "Section 38 [E]" in the Fish Market Leases. *Id.* at 32:21-33:5. Mr. Connall testified that Section 38.E. "say[s] if [the new rent commencement date] doesn't – if this doesn't happen by a certain date, the deal is over," and the three years [noted in Section 38.E.] was from his lease, but "it didn't have to be three [years], [although] it had to be something specific [and under 21 years to avoid issues with restraints on alienation]." *Id.*, at 34:16-35:14. Mr. Connall testified additionally that in the Marina Lease that he worked on, there is no clause like that in Section 38.E. "[b]ecause there is no issue [t]here about the term . . . [which] starts when the lease is signed [and] goes on for a specific determined period . . . [without] conditions [or] contingents . . . [as] to that term . . . [so] . . . the lease interest [ ] is fully vested." *Id.*, at 35:19-36:18. Accordingly, Mr. Connall distinguished between lease situations where Section 38.E. was necessary and unnecessary, depending on the contingencies in the lease terms.

Developers rely further on an excerpt from the deposition testimony of Mr. Aguglia, who

represented the Plaintiffs during the Fish Market Lease negotiations.  Mr. Aguglia indicated that:

Q.      But in terms of the – the term where [Section 38.E.] says "if the lease term has not commenced," that could mean two different things.  It could either mean the commencement date of the entire lease or it could mean the commencement date that starts upon the new rent commencement date?

A.      That's where I –

MR. RANGE:  Object to the form of the question.

A.      That's where I disagree with you.  It was intended only for the new rent commencement date, not to  - my clients' 30 year minimum lease with a minimum rent – 30 years – 30-year lease with a minimum rent, it would not apply to that, and it was vested.

Q.      So the intent of when it said in Section 38(e) "lease term," it should have said – what – what that means, what your interpretation of that is, is if the new rent commencement date has not – has not commenced?

MR. RANGE: Object to the form.

Q.      Is that correct?

A.      Correct

Developers' Ex. 5 [R. Aguglia Dep.], at 310:8-311:8.

Developers contend that this excerpt from Mr. Aguglia's testimony of his understanding of Section 38.E. is consistent with Mr. Connall's testimony about the need for a "Savings Clause," Developers' Brief, ECF No. 192, at 18, but Plaintiffs assert that "[t]he questions posed to Mr. Aguglia sought his legal opinion regarding construction of the lease at the time he sat for his deposition, not what he knew or remembered the parties had discussed in negotiations 20 years prior."[13]  Pls.' Opp'n, ECF No. 203, at 30-31.  Furthermore, counsel objected to the form of the questions asked.  The Court notes that Defendants' focus on the excerpt cited above ignores Mr. Aguglia's other testimony about  Section 38.E., whereby he stated that "[I]f a lease is not in effect

---

[13] In reading the deposition excerpts proffered by the parties, the Court finds that much of Mr. Aguglia's testimony focuses on what happened during lease negotiations and his understanding of the operation of lease terms in light of the circumstances at that time.

within three years of February 21, 2001, then the lease shall automatically terminate. However, because we had two terms under the lease, one was the old rent, which we paid, it commenced immediately [on February 21, 2001]." Pls.' Ex. 6 at 306:4-16. That statement and other testimony by Mr. Aguglia is consistent with Plaintiffs' position that Section 38.E. was inapplicable to the Fish Market Leases, but that would leave the Leases without a termination date. Indeed, Mr. Aguglia acknowledged that "there [was] no specific language [in the Lease] that says it ends at 30 years, [ ] therefore, it would be a lease without term at the minimum rent and expenses paid by the client." D.C. Ex. 31 [R. Aguglia Dep.], at 290:9-18. The question before this Court is whether or not the position asserted by Plaintiffs and their counsel is a reasonable one in light of the language of Section 38.E., which clearly states that its intent is to avoid the RAP and other restraints on alienation.

### b. Plaintiffs' Extrinsic Evidence

In an attempt to rebut Mr. Connall's testimony, Plaintiffs proffer that Penny and Billy White testified that Bob Jones - the non-lawyer who negotiated the business terms of the Fish Market Lease for the District (and who is deceased and therefore cannot be cross-examined) - told them that the Leases would last 30 years even if the Landlord's Work was not completed. Pls.' SMF ¶¶ 152-153 (citations omitted); Developers' RSMF ¶¶ 152-153 (disputing Plaintiffs' testimony as inadmissible hearsay that is contrary to the August 13, 1999 email by Bob Jones). Such "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007). In this case, Plaintiffs point to no corroborating evidence that Section 38.E. was designed to operate as a meaningless provision that is to be ignored and as such, if the Landlord's Work was never completed, the Leases had no

45

termination point and they continued at minimum rent for at least 30 years and perhaps in perpetuity.  In fact, this proposition runs contrary to what Bob Jones specifically stated in his email that the District would not enter into a "30 year, below market, fixed rent deal."  Developers' Ex. 14 (August 13, 1999 email).

Furthermore, Developers challenge the credibility and admissibility of what Bob Jones allegedly told Plaintiffs on two grounds: (1) this information was allegedly conveyed during a meeting with the Whites and their lawyer, but without the presence of the District's counsel, before the Leases were executed in 2001; and (2) it is inadmissible hearsay.  Developers' Reply, ECF No. 214, at 21-22.  In a footnote in their Opposition, Plaintiffs assert that "[o]ut of court statements by Mr. Jones are not hearsay under Fed. R. Evid. 801(d)(2) because he was an agent with authority to negotiate the leases."  Pls.' Opp'n, ECF No. 203, at 26 n. 24.  But Developers argue that "even if Mr. Jones qualified as the District's agent, his statements are not admissible against the Developers [because] Rule 801(d)(2) requires that the statement be "offered against" the party who made it" and "one party's statements may not be admitted under this rule against another party on the same side of the litigation."  Developers' Reply, ECF No. 214, at 21; *see Dyer v. McCormick & Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 240 (D.D.C. 2017) (citing 5 Mark S. Bordin, *et al., Weinstein's Federal Evidence* § 801.30 [1]  & n.5 (2d ed. 2017)).  Nor can this limitation be evaded by Plaintiffs arguing that the Developers are assignees of the Fish Market Leases or a successor in interest to the District as Landlord.  *See In re Patterson,* No. 04-32201-DWS, 2007 WL 987306, at *2-3 (Bankr. E.D. Pa. Apr. 2, 2007) (noting that while "an assignee takes the rights of the assignor, no more and no less, this is a principle of substantive law, not one of evidence" and such privity of interest "does not render his statements admissions"); *see also Three Rivers Confections, LLC v. Warman*, 660 F. App'x 103, 109 (3d Cir. 2016) (finding statements not

admissible against a successor in interest) (discussing *Calhoun v. Baylor*, 646 F.2d 1158, 1162-63 (6th Cir. 1981) (same)).   Accordingly, statements allegedly made by Bob Jones to the Whites, which are contradicted by Bob Jones' written email, are inadmissible hearsay which will not be considered by this Court.

**(i). Additional Extrinsic Evidence**

Plaintiffs rely further on statements in affidavits by Joe Wolfe ("Wolfe"), who was alleged to have acted as the "District project manager for the Fish Market," Pls.' SMF ¶ 145; Developers' RSMF ¶ 145 (contesting this as a non-material fact and challenging the admissibility of the supporting evidence), and who allegedly "worked closely with Bob Jones in negotiating the Fish Market Leases."  Pls.' SMF ¶ 144; Developers' RSMF ¶ 144 (same challenges as above); Pls' Ex. 55 [Wolfe Affidavit] prepared in connection with *Barton v. District of Columbia*, Civil Action No. 00-0174 (RMU) (D.D.C. 2000).[14]

In *Barton v. District of Columbia*, Civil Action No. 00-0174 (RMU) (D.D.C. 2000), plaintiff Barton, a former lessee at the Fish Market, sought a preliminary injunction barring the District from entering into leases with other prospective lessees while Barton's denial of a lease was in litigation.  *See Barton v. District of Columbia*, 131 F. Supp. 2d 236 (D.D.C. 2001) (denying the motion for preliminary injunction).  Developers note that:

> The dispute in the *Barton* case had nothing to do with the Lease interpretation issue here. Even the District, which was a party in the *Barton* lawsuit, had no motive to address the matters at issue here. Developers were not a party to the *Barton* lawsuit and had no

---

[14] There are several problems with the evidence cited in support of Pls.' SMF ¶¶ 144-145: (1) the citation to Mr. Aguglia's deposition testimony by Plaintiffs in Pls.' SMF ¶ 144 does not reference Wolfe; (2) Pls.' Ex. 55, cited in Pls.' SMF ¶¶ 144-145, states that Wolfe "worked closely with Mr. Jones during the <u>Barton</u> lease negotiation process [as opposed to the Fish Market Lease negotiation];" and (3) Wolfe is not identified as project manager for the "Landlord's Work" (as stated in Pls.' SMF ¶ 145); instead he was project manager "for the Municipal Fish Wharf properties and for the Congressionally-mandated improvement project for that area" and "responsible for implementing the Congressional directive contained in the FY99 and FY00 Acts."

opportunity to cross[-]examine or otherwise challenge the witnesses regarding their statements.

Developers' Reply, ECF No. 214, at 23.  *See Amobi v. Brown*, 317 F. Supp. 3d 29, 34-35 (D.D.C. 2018) (excluding testimony from another litigation where party in current litigation had no similar motive and opportunity to cross-examine witness); *Stanley Martin Cos., Inc. v. Universal Forest Products Shoffner LLC*, 396 F. Supp. 2d 606, 613 (D. Md. 2005) (depositions and interrogatory answers from prior litigation inadmissible hearsay and cannot support summary judgment).

While this Court previously took judicial notice of a list of pleadings from the *Barton* lawsuit, pursuant to a request by Plaintiffs, *see* September 28, 2015 Memorandum Opinion, ECF No. 45 at 2 n.2, facts asserted in those pleadings are not automatically admissible for their truth here.  *See Crumpacker v. Ciraolo-Klepper*, 715 Fed. App'x 18, 19 (D.C. Cir. 2018) ("The court takes judicial notice of the existence of the filings, not the accuracy of any legal or factual assertions made therein.") (citation omitted); *see also* 29 Am. Jur. 2d Evidence § 140 (2020) ("Judicial notice cannot be used to circumvent the rule against hearsay and thereby deprive a party of the right of cross-examination on a contested material issue of fact.")

This Court notes that whether or not Mr. Wolfe assisted with the Barton "lease" has no ascertainable connection to the issues pending before this Court.[15]  This Court finds that Plaintiffs' proffer of several affidavits (Wolfe, Jones, Edwards) filed in connection with the *Barton* case has no bearing on the Fish Market Leases at issue in this case and the issue of how Section 38.E. operates if the Landlord's Work is never completed.[16]  Accordingly, affidavits and testimony

---

[15] *See* Developers' RSMF ¶ 144 (stating that "Mr. Barton never executed a lease.")

[16] For example, Plaintiffs contend that "discovery revealed that all of the parties expressed a belief that the leases they negotiated were long-term," Pls' Opp'n, ECF No. 203, at 37.  In support thereof, Plaintiffs ask this Court to consider statements by Bob Jones and Joe Wolfe, found in their affidavits in connection with the *Barton* case and in an email by Mr. Wolfe. Notably Plaintiffs do not provide specific citations regarding the quotes from affidavits which are cited in their Opposition, see below, nor are the quotes put into context; instead, Plaintiffs

related to the *Barton* case are of no probative value to the dispute at hand, and they will not be considered.

Developers assert that because the extrinsic evidence from Mr. Connall demonstrates that Defendants' view of Section 38.E. is the only reasonable view, "[t]his case is accordingly like *Farmland*, 904 F.2d at 736, where this Circuit adopted the interpretation of a facially ambiguous contract provision that was supported by the testimony of individuals involved in the negotiation of the contracts. In *Farmland*, the contracts had a blank that was not filled in, and the parties argued over what was intended to be in the blank. *Id.* at 734. The United States Court of Appeals for the District of Columbia Circuit affirmed the district court's summary judgment ruling in favor of defendant, noting its agreement that "all of the direct evidence — the testimony of individuals involved in the negotiation and implementation of the contracts and the contemporaneous correspondence between the parties — supports the [defendant's ] interpretation of the clause." *Id.* at 736. Furthermore, the plaintiff in that case "offer[ed] no direct evidence to rebut the [defendant's] powerful showing." *Id.* at 737.

In the instant case, the extrinsic evidence of the parties' intent - per Mr. Connall's testimony - indicates that Section 38.E. was designed to protect against the RAP and other restraints on

refer this Court generally to Pls.' Ex. 55 (which includes a 6-page affidavit by Joseph Wolfe as well as an affidavit by Carl Johnson) and Pls.' Ex. 56 (which is 56 pages long and includes a lengthy pleading from the *Barton* case, an affidavit by Bob Jones, and various statutory excerpts).

The quotes provided by Plaintiffs in their Opposition are: "All of the existing tenants at the Municipal Fish Wharf have signed new long-term leases . . . ," *see* Pls.' Ex. 56 [B. Jones Affidavit], at ¶ 26 (in context, contrasting that with Mr. Barton's situation), and a "long-term lease for spaces 16 and 17 [was granted to the Wharf]." *See* Pls' Ex. 55 [J. Wolfe Affidavit], at ¶ 18 (stating in full that "Mr. Barton's failure today to have a long-term lease for spaces 16 and 17 is entirely his doing"). *See also* Pls.' Ex. 79 [3/6/2003 email from J. Wolfe to Andrew Ridley and Leopold Clarke] (stating that "No one at the wharf has a 3-year lease.") The statements quoted by Plaintiffs add nothing of value in this case, as the parties have acknowledged already their expectations of having 30-year Fish Market Leases, when the Leases were signed.

alienation by providing a cut-off date for the completion of the Landlord's Work.  Unlike the

Marina Lease, the Fish Market Leases involved contingencies (completion of the Landlord's Work

and certification thereof) before the 30-Lease Years commenced.  Plaintiffs' position is that

Section 38.E. is meaningless.  But, Plaintiffs proffer no extrinsic evidence supporting that position,

with the exception of self-serving statements that it was their understanding that the Fish Market

Leases would continue for a period of 30-years at the minimum rent, even if the Landlord's Work

was never completed.  As such, the extrinsic evidence proffered by the parties leads this Court to

conclude that only Defendants' reading of Section 38.E. is reasonable; however, the Court

continues its inquiry by looking at the intersection between Section 38.E. and the rules of

construction.

### 3. Rules of Construction

Courts interpreting a contract shall "strive to give reasonable effect to all its parts and

eschew an interpretation that would render part of it meaningless or incompatible with the contract

as a whole."  *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012) (citation and internal

quotation marks omitted); *see also Doe v. George Washington Univ.*, 321 F. Supp. 3d 118, 127

(D.D.C. 2018) ("To ignore [an article of a contract] as [defendant] does, would render it

surplusage, a result that is contrary to the rules of contract interpretation.").  It is well-established

that "when interpreting statutes or contractual provisions, a court should 'absent a clear indication

to the contrary . . . read the statute [or provision] so that no word, clause, sentence, or phrase is

rendered surplusage, superfluous, meaningless or nugatory.'"  *Air Line Pilots Ass'n, Int'l v.

Pension Benefit Guar. Corp.*, 193 F. Supp. 2d 209, 218 n.4 (D.D.C. 2002) (quoting Norman J.

Singer, *Sutherland Stat. Const.* § 46.03); *see also United States ex rel. Schneider v. J.P. Morgan

Chase Bank, N.A.*, 224 F. Supp. 3d 48, 57 (D.D.C. 2016) (explaining that agreements, like statutes,

should be read to avoid surplusage where possible); *Tax Analysts v. I.R.S.*, 217 F. Supp. 2d 23, 28 (D.D.C. 2002).

Developers contend that the rules of construction support their interpretation of Section 38.E. by: (1) providing "a date certain for the end date of the Interim Period [pre-New Rent Commencement Date] and the overall length of the Leases in the event that the Landlord's Work is never finished;" (2) saving the Leases "from a possible interpretation that they violate the Limiting Rules;" and (3) giving effect "to the intention stated in writing by [Bob Jones] that the District would never agree to 'a 30 year, below market, fixed rent deal.'" Developers' Brief, ECF No. 192-1, at 20; *see also* Developers' SMF ¶ 49 (quoting the Bob Jones August 13, 1999 email).

Rather than deal with the rule requiring the Court to interpret Section 38.E. to give meaning to all Lease provisions, Plaintiffs argue that the Court should just ignore that section, which would violate the rules of statutory construction. Plaintiffs assert that "read literally, there is no scenario where 38.E. would ever terminate the Fish Market Leases because the Term begins on the date of each lease," and accordingly, it "should not be a significant concern to the Court[.]" Pls.' Opp'n, ECF No. 203, at 34; *see also Wilson v. Wagner*, 211 S.W.2d 241 (Tex. App. 1948) ("It is better to construe a single clause in an elaborate and extensive contract as an inoperative but harmless provision than to give the clause a construction which renders the whole contract voidable at the option of either party, thus depriving the entire instrument of all finality and legal force."). Developers distinguish the *Wilson* case, which "dealt with a different issue and stands for nothing more than the principle that a writing containing the essential terms of a contract may be enforced even if that writing contemplates a more formal contract containing additional terms." Developers' Reply, ECF No. 214, at 13; *see Wilson*, 211 S.W. 2d at 243-44.

Accordingly, Developers argue that Plaintiffs, in effect, "concede" Defendants'

interpretation of Section 38.E. because they "do not address the[se] rule of construction" arguments made by Developers nor do they "distinguish . . . the authorities cited by Developers" or rebut the contention "that the Leases were expressly written to end after the initial three years if the Landlord's Work [was] not complete."  Developers' Reply, ECF No. 214, at 12.  This Court notes that Plaintiffs assert only that Section 38.E. is a boilerplate provision, which does not apply under the circumstances at issue, and as such, it should be ignored by the Court.  Furthermore, Plaintiffs cite only a few cases in support of their position, mostly contained in footnotes in their Opposition. Plaintiffs do not proffer any alternative interpretation of Section 38.E. whereby it would address issues regarding the potential violation of the RAP or restraints on alienation. Accordingly, this Court finds that the arguments presented by Developers in regard to the rules of construction stand largely unrebutted by Plaintiffs.

### a. Boilerplate Clauses are Enforceable

Developers assert that "parties to a contract are entitled to enforce 'boilerplate' [terms] under the same conditions as terms which are less common or more actively contested in negotiations."  Developers' Reply, ECF No. 214, at 13, citing *Dematic Corp. v. Int'l Union, United Auto. Aerospace, and Agricultural Implement Workers of America (UAW) and UAW Local 1485*, 635 F. Supp. 2d 662, 678 n.7 (W.D. Mich. 2009).  "It is not the law that one must bargain for each and every written term of a contract." *Id.* (citing *Silva v. Encyclopedia Britannica, Inc.*, 239 F.3d 385, 389 (1st Cir. 2001)); *see also Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020) (where Chief Justice Roberts noted that "boilerplate is boilerplate for a reason – because it offers tried-and-true language to ensure a precise and predictable result.")

This Court finds that Plaintiffs' argument that "boilerplate" Section 38.E. should be deemed inoperative by this Court flies in the face of the clearly stated purpose of the clause, which

is "avoid[ing] any possible interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation." *See* Developers' Exs. 11-13 (Section 38.E.). Accordingly, Plaintiffs' view that Section 38.E. is surplusage which is meaningless cannot be accepted by this Court as reasonable. The Court turns now to the other arguments proffered by Developers to bolster their interpretation of Section 38.E., specifically that Plaintiffs' reading of the Leases would violate the limiting rules. The Court notes again that Defendants' arguments regarding the rules of construction are largely conceded by Plaintiffs, who failed to address this issue in their Opposition.

### b. Plaintiffs' Interpretation of Section 38.E. Violates the RAP

District of Columbia law disfavors restraints against alienation under the Rule Against Perpetuities ("RAP"), whereby contracts (including leases) that do not ensure a vested property interest by a sufficiently certain end date may be rendered void. See *Jones v. Habersham*, 107 U.S. 174, 176 (1982) (describing the "rule against perpetuities, by which every devise or bequest is void which may by possibility not take effect within a life or lives in being and twenty-one years afterwards."); see also *Restatement 2d of Prop.: Landlord & Tenant*, § 1.8, Comment (b)("If the tenant's interest is not vested and is not certain to vest, if it ever vests, within the period of the governing rule against perpetuities, the lease is void.") The RAP, which often applies to property transferred in a will, trust or estate, also applies to commercial transactions. *Winslow v. Balt. & Ohio RR. Co.*, 188 U.S. 646, 654-55 (1903) (applying the rule to a commercial lease); *Cont'l Cablevision, Inc. v. United Broadcasting Co.*, 873 F.2d 717, 730 (4th Cir. 1989) (discussing the "law of the Rule Against Perpetuities for commercial transactions").

Under the RAP, no property "interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of its interest" and "[t]he effect of the rule

is to invalidate ab initio . . . " interests that do not. *Am. Sec. & Trust Co. v. Cramer*, 175 F. Supp. 367, 370-71 (D.D.C. 1959) (applying District law).  Vested and contingent interests in property are thereby distinguished. *Jason Oil Co. v. Littler*, 446 P.3d 1058, 1064 (Kan. 2019) (With regard to application of the RAP, "a true *vested* interest is never obnoxious to the rule, while a *contingent* interest not only may be, but often is." ) (citation omitted) (emphasis in original).  Accordingly, to avoid violating the RAP, a contingent interest must either vest or terminate within the requisite 21-year period. *Selig v. State Highway Admin.*, 861 A.2d 710, 718 (Md. 2004) (citation omitted). Furthermore, for property interests established without reference to any measuring life, such as the commercial leases at issue in this case, "the common law [RAP] voids any interest not certain to terminate or vest within 21 years." *New Bar P'ship v. Martin*, 729 S.E. 2d 675, 683 (N.C. Ct. App. 2012) (citation omitted).[17] Where contingent property interests violate the RAP, they are voided to prevent such interests from tying up real property indefinitely. *See Barton v. Thaw*, 92 A. 312, 313 (Pa. 1914) (an option to purchase land in fee simple that could be triggered "at any future time whatsoever" breached the RAP and took the "property out of commerce" where the RAP was designed "for the express purpose of destroying such hindrances to material and social prosperity and progress").

---

[17] In the District of Columbia, the RAP is statutory as of March 3, 1901, see 31 Stat. 1269, ch 854, § 512 (now codified at D.C. § 42-301).  See *In re Estate of Burrough*, 521 F.2d 277, 279 n.2 (D.C. Cir. 1975) (holding that "[The] statute embodies the rule against suspension of the power of alienation, but it is not exclusive, and the common law Rule against Perpetuities is also in force in the District of Columbia.").  Furthermore, on April 27, 2001, the Omnibus Trusts and Estates Amendment Act of 2000 took effect, which adopted the Uniform Intestacy, Wills and Donative Transfers Act into Title 19 of the D.C. Code.  D.C. Law 13-292.  Part of this law was codified at D.C. Code Section 19-901, *et seq.*, and it confirms that the common law known as the rule against perpetuities applied in the District before it took effect.  Accordingly, at the time the Fish Market Leases were signed, "both the statute and the common law rule [we]re in effect in the District of Columbia." *Cennamo v. AM. Sec. & Trust Co*., 360 F. Supp. 1354, 1357 n.3 (D.D.C. 1973) (citation omitted).  Therefore, the Leases in this case are subject to the RAP.

The language of Section 38.E. states that "if the <u>Lease Term</u> [undefined] has not commenced within three (3) years after the date of this Lease, the Lease shall automatically terminate on the third (3rd) anniversary of the date hereof."  Developers' Exs. 11-13 (Section 38.E.) (emphasis added).  Plaintiffs in the instant case deny that there is a concern about the RAP, because, as previously noted, they argue that the "Term" of the leases both commenced and vested immediately.   Pls' Opp'n, ECF No. 203, at 34-35; *see Fisher v. Parsons*, 213 Cal. App. 2d 829, 838 (Ct. App. 1963) ("A lease which becomes immediately effective vests in all respects at that time, and the rights under it, through exercisable in the future, do not have the characteristics of a contingency or future estate.").  Developers distinguish *Fisher* where the court found that the RAP was not implicated because the tenant's right to vary the amount of its occupied space vested when the lease was executed versus the situation in this case where the 30-Lease Year term is contingent on an event that may never occur.

The District argues that Plaintiffs misstate the concept of vesting.  Pursuant to District of Columbia law:

> A future estate is vested when there is a person in being who would have an immediate right to the possession of the land upon the expiration of the intermediate or precedent estate, or upon the arrival of a certain period or event when it is to commence in possession. It is contingent when the person to whom or the event upon which it is limited to take effect in possession or become a vested estate is uncertain.

D.C. Code § 42-512, 31 Stat. 1351, ch. 854, § 1022 (Mar. 3, 1901); see also *Safe Deposit & Trust Co. v. Sheehan*, 179 A. 536, 543 (Md. 1935) ("The word 'vest' as used in the law of property, signifies the fixation of a present right to the immediate or future enjoyment of property.") (citations omitted).  The District notes that "[e]ven by plaintiffs' descriptions, BRW, The Wharf and Pruitt's Seafood each had an unvested interest in the 30-year lease period after the New Rent Commencement Date [because] [t]hey could not "take possession of" that 30-year leasehold unless

and until the Landlord's Work was completed."  D.C. Mem., ECF No. 190-1, at 28; Developers'

Ex. 2 [P. White  Rule 30(b)(6) Dep.], at 111:2-4 ("once [the Landlord's Work] was completed . .

. and only then, would a new 30-year lease begin."); Developers' Ex. 5 [R. Aguglia Dep.], at 277:2-

13 ("The 30-year lease [30-Lease Years] applies to the new rent commencement date."), at 278:14-

279:9 ("[T]he old rent, under 30 years was a given. The new rent commencement date was a

condition which we didn't know would happen.")

The Fish Market Leases at issue before this Court are replete with contingencies which

delayed vesting.  While the Fish Market Leases indicate that Landlord and Tenant had agreed on

the nature of the improvements to be made to the Project, Developers' Exs. 11-13 (Section 3.A.),

and further that the Landlord was to use reasonable commercial efforts to complete the

improvements by June 30, 2001, Developers' Exs. 11-13 (Section 3.C.),[18] Plaintiffs acknowledge

that "the final details of the work had not been finalized [at the time the Leases were signed], and

that Landlord was required by the leases to consult with Tenants about certain construction

details."  Pls.' RSMF ¶ 70; Developers' Exs. 11-13 (Section 3.B.).  It is undisputed also that "[t]he

Landlord's Work contemplated for the Fish Market was not completed by the third anniversary of

the stated effective dates of the Leases."  Developers' SMF ¶ 81; Developers' Ex. 1 [P. White

Dep.], at 202:1-14 (Q: Okay. And the District had still not accomplished the landlord's work [by

around 2005]?  A: Not all of it, that's correct.")  Nor has the  Landlord's Work been completed to

date.  Pls.' RSMF ¶ 83.  Moreover, the occurrence of the New Rent Commencement Date (which

was contingent on the completion of the Landlord's Work) was uncertain.  Developers' SMF ¶ 55;

Developers' Ex. 5 [R. Aguglia Dep.], at 279:7-9 ("The new rent commencement date was a

condition which we didn't know would happen.").  Accordingly, neither the New Rent

---

[18] The June 30, 2001 date was stated in each of the three Leases, even though Pruitt's Lease was
not signed on behalf of the District until October 2, 2001.

Commencement Date nor the 30-Lease Year term was certain to vest within 21 years after the interest was created, or at any time.  *See* Developers' Ex. 6 [D. Connall Dep.], at 34:9-17 (testifying that "[the 30-year term] had not vested [upon signing of the lease] and "[i]t would have vested when the work was done and the [new rent] commencement date occurred").   Mr. Connall testified further that:

Q:  And so what was to stop – or how could it be assured that the new rent commencement date would not violate the Rule Against Perpetuities?

A: By saying it if it doesn't – if this doesn't happen by a certain date, the deal is over.

Q: Okay

A: It could have been another – it could have been five years, it could have been seven years, it could have been two years, it could have been 21 years . . . it didn't have to be three [years], but it had to be something specific.

Ex. 6 at 34:18-35:10.  Thus, Section 38.E. was to make it clear that the 30-Lease Years that begin with the New Rent Commencement Date had to either vest or terminate by the third anniversary of the Lease, even though the language of Section 38.E. states that "if the <u>Lease Term</u> [undefined] has not commenced within three (3) years after the date of this Lease, the Lease shall automatically terminate on the third (3rd) anniversary of the date hereof."   Developers' Exs. 11-13 (Section 38.E.) (emphasis added).

The District notes another RAP problem with the language of the Fish Market Leases insofar as the Leases provide that the tenant "shall execute and deliver to the Landlord a Certificate of Acceptance" of the Landlord's Work, and so, even completion of the Landlord's Work might not even be sufficient to trigger the New Rent Commencement Date.  D.C. Mem., ECF No 190-1, at 30-31; *see* Developers' Exs. 11-13 (Section 3.C., 1.G.)  Assuming that such consent "would not be *unreasonably* withheld," *Aronoff v. Lenkin Co.*, 618 A.2d 669, 678 (D.C. 1992) (emphasis in original), nothing in the Fish Market Lease explicitly constrains the tenant to reasonableness as to

the issue of whether the Landlord's Work has been completed.  D.C. Mem., ECF No. 190-1, at 30-31; *see* D.C. Ex. 28 [S. Longstreet Rule 30(b)(6) Dep.], at 141:11-19 ("I'm not sure that you would get a certification that landlord's work was done if [the District stopped working once it had expended the $3 million federal appropriation]").  Because the Landlord's Work was left undefined, "an implied requirement of "reasonableness" or that the tenant "will act in good faith and deal fairly" is not sufficient."  D.C. Mem., ECF No. 190-1, at 31; *see Julian v. Christopher*, 575 A.2d 735, 739 (Md. 1990) (rejecting a "common law interpretation" of reasonableness and recognizing the need for a case-specific analysis of what would constitute reasonableness).

In sum, Developers argue that the rules of construction require this Court to adopt an interpretation of Section 38.E. which results in a valid lease as opposed to an interpretation which makes the leases deficient.  Developers' Brief, ECF No. 192-1, at 23; *see Ottenberg v. Ottenberg*, 194 F. Supp. 98, 104-05 (D.D.C. 1961) (explaining that the "general rule is that a contract will be upheld where it is susceptible of two meanings, one of which will render it valid" and finding the "agreement as a valid contract for support, and upholding it" in accordance with "the weight of authority in the interpretation of contracts"); *see also Questar Builders, Inc v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009) (expressing a preference for construction of contracts that makes them effective as opposed to unenforceable).   Furthermore, reading Section 38.E. to terminate the Fish Market Leases on their respective third anniversaries avoids the possibility of violating the RAP.  A contract "does not violate the rule against perpetuities, if by its terms, all contingent interests must vest *or fail* within the period of the rule.  *Melcher v. Camp*, 435 P.2d 107, 113 (Okla. 1967)  (emphasis in original).  In contrast, reading Section 38.E. as the Plaintiffs do – with Lease Term defined the same as the Term, which begins on the Commencement Date of the Lease – renders it meaningless and poses a violation of the RAP.

### c. Plaintiffs' Interpretation of Section 38.E. does not Avoid Restraints on Alienation

Section 38.E. also references avoidance of an interpretation that violates any "other rule of law against restraints on alienation."  Developers' Exs. 11-13 (Section 38.E.).  To illustrate this principle, Developers rely on *Omath Holding Co. v. City of New York*, 545 N.Y.S.2d 557, 558 (1st Dep't 1989), a case involving a 20-year commercial lease with a start date — contingent on the earliest of completion of construction work on the premises, the date business commenced on the premises, or 42 months after rezoning changes.  In *Omath*, the plaintiff could not commence business until after completion of construction and the construction could not commence until the rezoning.  *Id.*  In that case, defendant terminated the lease as null and void when none of these events had occurred after 18 years.  *Id.* at 559.  The court found that the contingent vesting date violated the rule prohibiting unreasonable restraints on alienation, and because there was no Savings Clause, the court concluded that it was necessary for the contingent leasehold to vest or terminate within a "reasonable" period of time shorter than the 18 years that had passed.  *Id.* at 560-61.

Plaintiffs do not address *Omath* in their Opposition, relying instead on *Conley v. Gaylock*, 108 S.E. 2d 675, 679 for the proposition that "Defendants' argument that 38.E. was intended to prevent the "Term" from continuing indefinitely if the Landlord's Work were never completed is wrong because neither the rule against perpetuities nor rule against restraints on alienation is violated by a lease of indefinite duration."  Pls' Opp'n, ECF No. 203, at 35 n.39.  Developers distinguish *Conley* as a case involving "no dispute . . . about the start of the leasehold interest nor was there a contingent leasehold period that would not start until a particular event had occurred," but instead, the issue was that "the lease was perpetual in nature at the *sole option* of the tenant."

Developers' Reply, ECF No. 214, at 15.

In the instant case, the Court finds that reading Section 38.E. so that the Fish Market Leases terminate on their third anniversaries is consistent with avoiding a violation of a rule of law against restraints on alienation, as in this case, approximately 20 years have passed since the Leases were signed and the 30-Lease Year term has not vested because it is contingent on completion of the Landlord's Work, which has not been done to date.

### 4. Contractual Agreements Should be Interpreted Sensibly

Plaintiffs' interpretation of Section 38.E. (as inapplicable) would allow them to occupy the premises "in perpetuity" if the Landlord's Work was never finished.  *See* Developers' Ex. 5 [R. Aguglia Dep.], at 274:10-14 (Q: "So you – at the time you understood that the leases didn't explicitly talk about what would happen if the new rent commencement date didn't occur?" A: "Well, explicitly it would allow us to go on infinitum, into perpetuity.").  Pursuant to the terms of the Fish Market Leases, monthly rent was set at approximately $303.00, and this was not scheduled to increase until after the New Rent Commencement Date, which has never occurred, and therefore, monthly rent has been frozen at this rate.  Moreover, the Fish Market Leases provide no end date as the Term and 30-Lease Years are both linked to the New Rent Commencement Date.

Contractual agreements should be interpreted in a sensible manner.  *See District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012) (emphasis added, and internal quotation marks omitted) (a court should "strive to give *reasonable* effect" in its interpretation); *Catalina Enters. Inc. Pension Tr. v. Hartford Fire Ins. Co.*, 67 F. 3d 63, 66 (4th Cir. 1995) (citations omitted) ("[i]t is axiomatic under Maryland law that a court should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available."); *Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (citation omitted) (in

interpreting contracts, "[f]orm should not prevail over substance and a sensible meaning of words should be sought"). *Holden v. Alice Mfg., Inc.*, 452 S.E. 2d 628, 631 (S.C. Ct. App. 1994) (citation omitted). ("A contract should receive sensible and reasonable construction and not such construction as will lead to absurd consequences or unjust results.")

Plaintiffs interpret Section 38.E. as meaningless and suggest that the Court ignore it.  If this interpretation of Section 38.E. is given credence by this Court and the aftermath is that the Fish Market Leases continue for an indefinite period of time because the New Rent Commencement Date never occurred, or until an end date determined by the Court, this changes the relationship of the parties under the Leases because it invalidates interrelated provisions relating to a New Rent Commencement Date.  In this case, the New Rent Commencement Date not only triggers the 30-Lease Years but higher monthly rent obligations (minimum and percentage rent calculations in the Leases).  *See* Developers' Exs. 11-13 (Sections 1.F. & 1.G. in Pruitt's and BRW Leases; Sections 1.E. & 1.G. in the Wharf Lease).  Furthermore, completion of the Landlord's Work is discussed also with regard to the parties' rights and obligations in the Common Areas and the Tenant's obligation to pay their proportionate share of Common Area operating costs, as well as hiring a Management Agent.  *See* Developers' Exs. 11-13 (Sections 9 and 10). Voiding any impact of Section 38.E. (by reading it as Plaintiffs do) has repercussions elsewhere in the Lease; it is not a stand-alone provision.  Nor would a lease that goes on in perpetuity be a reasonable result.

Moreover, even while Plaintiffs propose that this Court could simply add an end date to the Leases, the rules of construction do not permit the Court to add words to a contract and change the parties' bargain.  *Nat'l Trade Productions v. Info. Dev. Corp.*, 728 A.2d 106, 111 (D.C. 1999) (holding reversible error where the Superior Court "substitute[d] an alternate date from the date

provided in the contract for the payment of . . . $250,000" in purporting to find "the parties' agreement was unambiguous on its face"); *Reliable Const. & Realty Co. v. Waterproofing Serv.*, 34 A.2d 124, 125-26 (D.C. 1943) (citation omitted) ("[C]ourts have no right to disregard terms used by the parties or insert new terms not used by them" because contracts are put in writing "for the purpose of evidencing the agreement of the parties and to prevent misunderstandings and mistakes[.]"); *Hart v. Vermont Inv. Ltd. P'ship*, 667 A.2d 578, 584-85 (D.C. 1995) (citation omitted) (declining to "impose by judicial *fiat* a provision which the parties did not include therein. Accordingly, the law is clear that this Court may not insert language into a contract (lease) where such language would alter the obligations of the parties, as in this case where adding an end date would lock in the current rental rates, invalidate interrelated Lease provisions, and ignore the intent and operation of Section 38.E.[19]

Accordingly, having considered the extrinsic evidence proffered by the parties in the context of the rules of construction, this Court finds that Section 38.E. – even with its inartful wording - is unambiguous– *i.e.*, the Fish Market Leases automatically terminate within three years after the date of the Leases, in the event that the Landlord's Work has not been completed, and the New Rent Commencement Date has not been triggered, and accordingly, the Term (involving 30-Lease Years) does not begin. Therefore, such termination at the end of three years carries out the intent of Section 38.E. (stated clearly therein), which is to avoid violating the Rule Against Perpetuities and other restraints on alienation. The Court now turns to Plaintiffs' claims of mistake and defense of estoppel.

---

[19] In this case, Developers note that the Plaintiffs "interpretation [of a 30-year lease at rent of $303.00/month] would result in something the District's lead negotiator specifically said he would refuse: a 30-year, below market, fixed rent deal." Developers' Brief, ECF No. 192-1, at 31.

### D. Plaintiffs' Allege a "Mistake" in the "Term" of the Leases and Claim Estoppel

Plaintiffs assert that sometime prior to 2006, the District identified an ambiguity in the "Term" of the Fish Market Leases (which they refer to as a "mistake"), whereby "the expiration date of the "Term" was tied to completion of the Landlord's Work," and the Leases "never contemplated what would happen if the landlord's work was never substantially complete."  Pls.' Opp'n, ECF No. 203, at 12.  Plaintiffs  contend now that this was a "mistake," which was acknowledged in connection with the assignment of the Fish Market Lease to Salt Water, as an expiration date was inserted therein.  *See generally id.* at 15-16.  Plaintiffs allege further that Defendants are estopped by their conduct from arguing that the Fish Market Leases are terminated or invalid because they "never contemporaneously asserted that Section 38.E. terminated the leases after three years" nor did they "contemporaneously profess that the leases were *void ab initio* as beyond the Mayor's authority for any reason." *Id.* at 61.

Defendants argue that Plaintiffs' assertion of "mistake" is misplaced as it is unsupported by admissible testimony, law, or the District's conduct post-2004; and furthermore, Plaintiffs have not pled mistake with particularity or sought reformation.  *See generally* Developers' Reply, ECF No. 214, at 17-25; D.C. Reply, ECF No. 209, at 19-22; *see also* Pls.' Third Am. Compl., ECF No. 119.  Defendants argue further that they are not estopped from asserting that the Plaintiffs had no valid leasehold interest because the Fish Market Leases exceeded the Mayor's authority and/or they terminated on their third anniversaries.

### 1. Background Relevant to Claims of Mistake and Equitable Estoppel

Plaintiffs begin by noting that the manner in which the "Term" in the Leases is defined as "the period that begins on the Commencement Date and ends thirty (30) Lease Years after the New Rent Commencement Date, unless sooner terminated pursuant to this Lease" makes it "arguably

indefinite if the Landlord's Work is never completed because the New Rent Commencement Date does not occur."  Pls.' Opp'n, ECF No. 203, at 13.  Plaintiffs cite to testimony by Nina Albert, a District employee of the Anacostia Waterfront Corporation and Office of the Deputy Mayor for Planning and Economic Development, who was the property manager for the Fish Market between 2006 and 2010, Pls.' SMF ¶ 162, in support of their alleged theory that the way in which "Term" was defined is a mistake.  *See* Pls.' SMF 164-166 (discussing the "mistake" and a possible amendment of the Leases to correct the "mistake"); *but see* Developers' RSMF ¶¶ 164-166 (disputing that the facts asserted by Plaintiffs are supported by the evidence cited by Plaintiffs). As noted by Defendants and confirmed by the Court in its review of the deposition excerpts, neither Ms. Albert nor Ms. Longstreet state anywhere anything about a mistake in the definition of the "Term" of the Leases.[20]  By around 2009, however, Ms. Albert recognized that the Landlord's Work had not been completed and was not going to be completed.  Developers' RSMF ¶ 165.  In a February 23, 2009 email, Ms. Albert stated that the "crux of the problem" is that "the work was never complete[d] so the new rent commencement date has never been triggered." Pls. Ex. 85 [2/23/2009 email written by Nina Albert]; *see also* Pls.' Ex. 15 [N. Albert Dep.], at 90:7-92:3 ("it was very clear I believe to the tenants as well as to us, the landlord, that the landlord's work as defined in this lease was never going to be completed because the funds were no longer available, and circumstances had changed" and noting "four or five" discussions regarding this issue).

Plaintiffs argue that despite the District recognizing that there was a problem with the

---

[20] Furthermore, the testimony from these two deponents cited by Plaintiffs in support of their Statement of Material Facts in ¶¶ 164-166 is taken out of context.  *See, e.g.,* Pls.' Ex. 15 [N. Albert Dep.], at 103:16-104:2 (generally discussing expectations that leases involve a definite time period and not go on indefinitely but noting more specifically that "this lease never contemplated what would happen if the landlord's work was never substantially complete"), Pls.' Ex. 5 [S. Longstreet Dep.], at 42:12-19 (recollecting internal discussions with her staff on the position "that the leases were void *ab initio,*" which, to her knowledge, was not conveyed to the Plaintiffs).

"Term" of the Leases, "the District continued to treat the leases as valid by performing its obligations and enforcing its rights under the leases."  Plaintiffs' Opp'n, ECF No. 203, at 14;  Pls.' SMF ¶ 172; *but see* Developers' RSMF ¶ 172 (contesting Pls' Ex. 93 [an alleged notice of Lease violation for selling chicken and ice cream] as unauthenticated hearsay and disputing that the District continued to treat the Leases as "valid").  Ms. Albert testified that, "I think we all recognized that the status of the leases was unclear, and we did not have a legal conclusion as to what the status was and so we honored the relationship that we had with the tenants because the intent was to reach a new agreement that reflected what was actually going on."  Pls.' Ex. 15 [N. Albert Dep.], at 149:6-21

In 2014, the District approved the assignment of Pruitt's Lease to W.D. Inc. (Salt Water's predecessor), which included an added paragraph 10, providing a lease expiration date of March 15, 2044.  *See* Developers' Ex. 21 [Assignment and Assumption of Lease Agreement dated March 20, 2014] ("DNM Assignment") (which was signed on March 31, 2014 by Victor Hoskins, on behalf of the Landlord, the District, acting as agent for the United States of America, and was approved for legal sufficiency by Susan C. Longstreet).  It is undisputed that Ms. Longstreet testified that she made a mistake when she certified the assignment for legal sufficiency. Developers' RSMF ¶ 208; *see* Developers' Ex. 4 [S. Longstreet Rule 30(b)(6) Dep.], at 125:17-19 (testifying that she made a mistake).[21]  Ms. Longstreet testified that "Paragraph ten certainly appears to modify the lease" but "[i]t isn't valid."  Pls.' Ex. 5 [S. Longstreet Rule 30(b)(6) Dep.],

---

[21] Pls.' SMF ¶ 208 states that Ms. Longstreet "had not reviewed a draft version of the assignment with the expiration date added, and therefore was not aware that the assignment modified the lease to add a defined expiration date when she approved it for legal sufficiency, which approval she said was a mistake." The deposition excerpts from Susan Longstreet do not support the factual allegations made, and they misrepresent her testimony.  Accordingly, the Court relies on Developers' RSMF ¶ 208 and the citations in support thereof, which more accurately describe Ms. Longstreet's testimony.

at 123:14-125:19.  Ms. Longstreet testified further that Mr. Troy [the project manager for the Southwest Waterfront redevelopment site] "talked to [her] about this document that he received from Jason Ziegler [an attorney for the Whites] which does not have paragraph ten[.]"  Developers' Ex. 4 at 131:1-12.  The parties dispute whether paragraph ten adding an expiration date was suggested by Mr. Troy, *see* Ziegler Decl., ECF No. 203-3, ¶ 11, or by someone else, *see* Pls.' Ex. 12 [Troy Dep.], at 67:18-23 (testifying that he did not recall having a discussion with the Fish Market tenants or their representative about changing the term of one of the existing leases), Troy Decl., ECF No. 209-2,  ¶ 36 (same).  For purposes of resolution of the pending summary judgment motions, the Court finds that the dispute over who inserted paragraph 10 into the DNM Assignment is not a genuine issue of material fact.

### 2. Plaintiffs did not Plead Mistake Adequately nor is Mistake Supported Factually

Defendants assert that Plaintiffs' Third Amended Complaint does not plead mistake with the particularity required by Federal Rule of Civil Procedure 9(b), and as such, "none of the Developers' discovery efforts were focused upon this theory and Developers are prejudiced by the [Plaintiffs'] effort to avoid summary judgment on that basis now."  Developers' Reply, ECF No. 214, at 18.  More specifically, Developers assert that "[a]t the end of three of 290 numbered factual allegations in their 55-page Third Amended Complaint, the [Plaintiffs] say "to the extent the lease is understood to have a different term, that would reflect a mutual mistake."  *Id.* at 18 n.3., *see* Third Am. Compl., ECF No. 119 at ¶¶ 48, 50, 51.  Plaintiffs do not identify the alleged mistake, how it was made, or who made it, as required by Rule 9(b), nor did they request reformation of the Leases on the theory of mistake.  *See Liberty Mut. Fire Ins. Co. v. Lumber Liquidators, Inc.*, Civil Action No. 4:15-cv-34, 2015 WL 12803126, at *7 (E.D. Va. Sept. 4, 2015).  The Court may reject the Plaintiffs' allegation of mistake on that basis alone.  *See Palmer/Kane LLC v. Rosen Book*

*Works LLC*, 204 F. Supp. 3d 565, 581 (S.D.N.Y. 2016) ("In federal court, a request for reformation, which depends on allegations of mutual mistake, is required to be pleaded in accordance with the heightened pleading requirements of Rule 9(b)[.]")

Furthermore, as set out in section III.D.1., *supra.*, the deposition excerpts cited in support of Plaintiffs' material facts (discussing their theory of "mistake") do not indicate that there was any "mistake" but rather, at some point, Ms. Albert and Ms. Longstreet recognized that the Landlord's Work had not been completed and it was not going to be completed, and as such, there was uncertainty as to the term of the Lease. Ms. Longstreet testified that she and her staff discussed the possibility that the Leases were void *ab initio*. Neither of these witnesses spoke to the intent and operation of Section 38.E. Accordingly, based on Plaintiffs' failure to plead mistake with particularity and the resulting prejudice to the Defendants in proceeding on this theory post-discovery, and because this theory appears unsupported by the record in this case, the Court denies Plaintiffs' allegation of mistake. The Court will next consider Plaintiffs' equitable estoppel argument and Defendants' responses thereto.

### 3. Plaintiffs' Theory of Equitable Estoppel

Plaintiffs argue, under the doctrine of equitable estoppel, that the District's alleged negligence through its failure to notify the Plaintiffs of any problems with the Leases after they were executed either revalidated the Leases, if they were void *ab initio*, or revived and/or extended the Leases, if they terminated on their third anniversaries. Before considering the parties' arguments on estoppel, this Court briefly summarizes the law on equitable estoppel against a defendant which is a municipality.

The District of Columbia Court of Appeals has questioned whether "the doctrine of equitable estoppel" is "applicable against the government at all." *District of Columbia v.*

*Brookstowne Cmty. Dev. Co.,* 987 A.2d 442, 450 (D.C. 2010) (quotation marks omitted).   In general, "where a contract is void because it is not within a municipality's power to make, the municipality cannot be estopped to deny the validity of the contract." *Rocky Mt. Nat. Gas, LLC v. Colo Mt. Junior Coll. Dist.*, 385 P.3d 848, 854 (Colo. App. 2014) (*citing* 10 Eugene McQuillen, *The Law of Municipal Corporations* § 29.14 (3d ed., rev. vol. 2009)).   The doctrine of equitable estoppel "should not be invoked [against the government] except in rare and unusual, or exceptional circumstances," and if invoked, it "is limited to circumstances where the equities are strongly in favor of the party seeking to revoke it." *Aziken v. District of Columbia*, 194 A. 3d 31, 36-37 (D.C. 2018).

With regard to claims of estoppel, the government may not be treated the same as other litigants.  *See Bartko v. SEC,* 845 F. 3d 1217, 1227 (D.C. Cir. 2017) (quoting *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984) ("Although the Supreme Court has left open the question of whether there exists a 'flat rule that [unclean hands] may not in any circumstances run against the Government,' it has nonetheless recognized that 'the Government may not be estopped on the same terms as other litigants.'")); *but see District of Columbia v. Cahill*, 54 F.2d 453, 454 (D.C. Cir. 1931) (When dealing with individuals "as a municipal corporation" in the commercial domain, the government "may be estopped by its acts and conduct in a like manner and under similar circumstances as in the case of estoppel against individuals.")[22]   "[T]o successfully raise an estoppel argument against the District, [a party] must show that the District made a promise, that [the party] suffered injury due to reasonable reliance on the promise and that enforcement of the promise would be in the public interest and would prevent injustice." *D.C. v. Brookstowne Cmty.*

---

[22] Developers note that six of the cases which were cited by Plaintiffs rejected estoppel claims, and Plaintiffs "point to [only] a single instance in which the District was estopped, a 90-year-old case," and they "cite no authority where the District was either estopped when it exceeded its authority to contract, or from terminating a contract."  Developers' Reply, ECF No. 214, at 29.

*Dev. Co.*, 987 A.2d 442, 450 (D.C. 2010) (quotation and internal quotation marks omitted).

### a. Plaintiffs Assert Entitlement to Equitable Estoppel

Plaintiffs assert that equitable estoppel against Defendants is appropriate because of:

> Defendants' unconscionable conduct in concealing their knowledge of the mistake in the "Term" provision, or in the case of Salt Water . . . misrepresenting that the mistake could be corrected by adding a definite expiration date, while simultaneously treating the leases as valid and allowing Plaintiffs to make substantial continuing investments to expand their businesses based on the good faith belief that they had long-term rights.

Pls' Opp'n, ECF No. 203, at 62-63.[23]   At the outset, this Court notes that neither Defendants nor this Court accepts Plaintiffs' characterization of the Lease "Term" as a "mistake."  The record in this case indicates that parties attempted to effect valid leases in 2001, and they believed they had entered into 30-year leases consistent with the 2001 Appropriations Act; however, as concluded by this Court herein, the Leases exceeded the Mayor's authority under that Act.

Furthermore, there is no evidence in the record before this Court that the District actively "concealed" any knowledge of a "mistake." The District acknowledges that some of its witnesses – Ms. Albert and Ms. Longstreet –  expressed that they had personal concerns about the Leases' validity over the years (as discussed previously herein), but these "concerns" did not rise to the level of determinations that the Leases were invalid.  *See United States v. Baker Hughes Inc.*, 908 F. 2d 981, 984 (D.C. Cir. 1990) (distinguishing "probabilities" from "certainties or possibilities"). Moreover, the District contends that it was "[o]nly after plaintiffs filed this suit [that it became] necessary for the District to decide whether it believes the Leases were valid."  D.C. Reply, ECF No. 209, at 23.

### b. Estoppel Fails because the District's Employees did not have the Authority to Act

---

[23] Plaintiffs' claim of estoppel based on the Salt Water Lease termination date is addressed in Section III.D.3.g., *infra.*

Developers argue that the District must first have authority to act before the conduct of the District's employees can serve as the basis of an estoppel defense.  Developers' Reply, ECF No. 214, at 30; s*ee District of Columbia v. Stewart*, 278 A.2d 117, 119 (D.C. 1971) (rejecting claim of estoppel); *see also Aziken*, 194 A.3d at 37 (estoppel limited to where the government "has the authority to act.")   "When the agent enters into a contract that does not satisfy statutory or regulatory conditions, . . . the contract does not bind the government." *Molton, Allen & Williams, Inc. v. Harris*, 613 F.2d 1176, 1178 (D.C. Cir. 1980); *see Winder v. Erste*, 60 F. Supp. 3d 43, 51-52 (D.D.C. 2014) (granting summary judgment in favor of the District because the "contract [was] unenforceable [because the District's agent] was not authorized to enter into" it, and [plaintiff's claim of estoppel failed).  In considering the plaintiff's estoppel claim, the *Winder* court found that "a person making or seeking to make a contract with the District is charged with knowledge of the limits of the agency's [or its agent's] actual authority . . . and cannot reasonably rely on representations to the contrary." *Id.* at 52 (citation and internal quotation marks omitted); *see also ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988) ("[T]he government is not bound by the statements or assurances of its officers where the actual authority to make such statements or assurances is lacking.")

In the instant case, this Court has found the Leases void *ab initio* because the District exceeded its statutory authority, and accordingly, Plaintiffs' claim of estoppel – based on the conduct of the District's employees with regard to approving the Leases – fails.  There is no dispute that the terms of both the 2001 Appropriations Act and the Fish Market Leases were available to all parties.  Furthermore, all parties were represented by counsel who had the opportunity to review the Lease terms and statutory authority with due diligence.  Under these circumstances, Plaintiffs had constructive notice of the limits on the District's authority to contract. *Brookstowne*, 987 A.2d

at 450 (citation omitted); *Winder v. Erste*, 60 F. Supp. 3d 43, 51-52 (D.D.C. 2014) (listing cases); *Perkins v. District of Columbia*, 146 A.3d 80, 87-88 (D.C. 2016).

### c. Plaintiffs have not Demonstrated Affirmative Misconduct by the District

An exception [to not estopping the government] exists "where there is a showing of some type of affirmative misconduct by a government agent." *See Brookstowne*, 987 A.2d at 450 (If the doctrine of equitable estoppel is applicable against the government at all, it may be "invoked only where there is a showing of some type of affirmative misconduct by a government agent"). The District contends that "mere delay" in notifying the Plaintiffs' of its concerns that the Leases were void "does not constitute 'affirmative misconduct.'" D.C. Mem., ECF No. 190-1, at 41 (citing *Robinson v. Smith*, 683 A.2d 481, 492 (D.C. 1996) (quoting *Gropp v. D.C. Bd. of Dentistry*, 606 A.2d 1010, 1016 (D.C. 1992)); *see also Perpetual Bldg. Ltd. P'ship v. District of Columbia*, 618 F. Supp. 603, 614-15 (D.D.C. 1985) (rejecting plaintiff's estoppel claim based on the District's delay in repudiating leases while waiting for legal guidance). In sum, Developers note that "certain District employees recognized an issue with the Leases because the 30 Lease Year period could only begin upon completion of the Landlord's Work [and] [e]ach one of these District employees handed off responsibility for the Fish Market to another without wrestling the "problem" to the ground." Developers' Reply, ECF No. 314, at 31. Alleged passive misconduct by the District may not however qualify as "affirmative misconduct." *Brookstowne*, 987 A.2d at 450 (citation omitted) (rejecting an estoppel claim on other grounds where the record showed "credible and persuasive . . . passive misconduct" by the District).[24]

---

[24] Developers contend that Plaintiffs' proffered cases in support of misconduct do not address the legal issue of estoppel. Developers' Reply, ECF No. 214, at 31; *see Resolution Trust Corp. v. District of Columbia*, 78 F. 3d 606, 609-10 (D.C. Cir. 1996) (regarding "innocent misrepresentation[s]" and voidable contracts) and *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101 (D.D.C. 2013) (involving a fraud claim by one commercial entity against another). Developers contend further that plaintiffs were "equally guilty of passive misconduct."

Furthermore, Plaintiffs have not demonstrated that the District had any affirmative duty to inform them of possible problems with their leasehold interest.  While the duty to inform is one thing that defines a fiduciary relationship, *see, e.g., Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750-51 (D.C. Cir. 1990),  D.C. Courts have "reject[ed] the argument presented . . . that a fiduciary relationship exists between landlord and tenant."  *Sekulow v. 11th & F St. Valet, Inc.*, 162 F.2d 19, 22 (D.C. Cir. 1947).   The District notes further that all parties had counsel during the negotiations and thus "stood on an equal footing," which bolsters its claim that no duty was owed.  D.C. Reply, ECF No. 209, at 23.  Plaintiffs have not demonstrated that there was any affirmative misconduct by Defendants which would support their claim of estoppel.[25]

### d. Reliance by Plaintiffs on an Alleged Promise by Bob Jones is Irrelevant and Unreasonable

The District contends further that any suggestion by the Plaintiffs of an understanding with Bob Jones that the Leases would continue for at least 30 years is made irrelevant by the fact that the Leases contain an integration clause (known as an "entire agreement clause"), *see* Developers' Exs. 11-13 (section 38.A.), whereby there are no side agreements between the parties.  *See, e.g., Martinsville Nylon Emps. Council Corp. v. NLRB*, 969 F.2d 1263, 1268 (D.C. Cir. 1992) ("by including the entire agreement clause the parties here made clear beyond doubt their intention not to be bound by any informal arrangement to which they might voluntarily adhere"); *see Sibley v. St. Albans Sch.,* 134 A.3d 789, 811 & n.17 (D.C. 2016) (citation omitted) (holding that "reliance on [an alleged] misrepresentation is precluded as a matter of law" such as when a "complete

---

Developers' Reply, ECF No. 214, at 31.

[25] The Court notes that Plaintiffs argue that Developer "never intended to honor the terms of the Fish Market leases when it became landlord," *see generally* Pls.' Opp'n, ECF No. 203 at 72-74, but these contentions are speculative, and they are not material to resolution of the Leases' validity.

integration clause in [a] contract made reliance on [a] statement made outside of [such] contract legally irrelevant"); *see also Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.,* 467 U.S. 51, 65 (1984) ("The necessity for ensuring that governmental agents stay within the lawful scope of their authority . . . argues strongly for the conclusion that an estoppel cannot be erected on the basis of the oral advice" of a government agent).

Moreover, any reliance by Plaintiffs on statements made by Bob Jones or anyone else that contradicted the District's statutory authority would not be "reasonable reliance" because the Mayor's authority to enter into the Fish Market Leases for more than a 30-year initial term was explicitly limited by the 2001 Appropriations Act.[26] "[W]hen the agent of the government whose representations are relied upon plainly lacks the authority to do whatever he has promised, the promisee's reliance cannot be 'reasonable.'" *Brookstowne Cmty. Dev. Co.*, 987 A.2d at 450. Accordingly, Plaintiffs' may not claim reliance on statements by Bob Jones to support their estoppel defense, as such reliance would not be deemed reasonable, and the  Leases' integration clause prevents any side agreements.

**e. Estoppel Does Not Create a Leasehold Interest nor does it Apply to an Assignee**

Developers contend further that Plaintiffs cite no authority for their proposition that estoppel creates a leasehold interest or that an assignee (Developers) can be estopped based on the assignor's (District's) pre-assignment conduct.  Developers' Reply, ECF No 214, at 31.  Nor do Plaintiffs provide case law authority for using estoppel against an assignee under these or any circumstances; rather, they point to "two authorities that generally refer to the applicability of defenses against the assignee of a contract," one which discusses set-off and the other which makes

---

[26] The Court has found previously herein that statements allegedly made by Bob Jones to the Plaintiffs are inadmissible hearsay that will not be considered.

no reference to any defense in particular.[27]  *Id.*  As such, the Court finds that Plaintiffs have not demonstrated that estoppel creates a leasehold interest or that it is enforceable against Developers based on the circumstances of this case.

### f. Enforcement of the Leases is neither in Public Interest nor does it Prevent Injustice

Finally, as previously noted, the party claiming equitable estoppel needs to show that they "suffered injury due to reasonable reliance on the promise [by the other party] and that enforcement of the promise would be in the public interest and would prevent injustice."  *Brookstowne*, 987 A.2d 442, 450 (D.C. 2010).  Plaintiffs address equities in a cursory manner, asserting that "equities are in [their] favor . . . because all [they] want is to uphold the terms of the leases they agreed to with the District 20 years ago."  Pls.' Opp'n, ECF No. 203, at 79.  The Court notes that Plaintiffs' statement ignores that the terms of the Leases anticipated increases in monthly rent, which have not occurred.

Defendants argue that Plaintiffs have benefitted "knowingly" from the presumed validity of the contracts over the past 20 years, by acquiring a "windfall" of "tens of millions of dollars in profit while paying nominal rent[.]"  D.C. Reply, ECF No. 209, at 25.   As such, Plaintiffs suffer no "egregious injustice" if the Leases are deemed void or terminated,  *L'Enfant Plaza Props., Inc. v. D.C. Redevelopment Land Agency*, 564 F.2d 515, 524 (D.C. Cir. 1977); s*ee Gordon v. Posner*, 790 A.2d 675, 692 n.3 (Md. App. 2002) ("estoppel may not be warranted . . .when the party seeking the estoppel has not been prejudiced . . . and would reap an inappropriate windfall from an estoppel.")   Accordingly, because the District's employees acted beyond the scope of their authority in approving Leases that exceeded the Mayor's statutory authority, and Plaintiffs have not demonstrated any affirmative misconduct by Defendants nor can they claim reasonable

---

[27] Developers note that the "remaining authorities" cited by Plaintiffs are irrelevant, and they effectively distinguish the authority cited by Plaintiffs.  Developers' Reply, ECF No. 214, at 32.

reliance on any statements made by Bob Jones outside of the Lease language, and furthermore, because the equities in this case do not favor Plaintiffs who have reaped the benefit of paying the same monthly rent for the last 20 years, the Court concludes that Plaintiffs' claim of equitable estoppel fails.

### g. Salt Water's Lease is Invalid

Plaintiffs assert that because the District consented to an end date being inserted into the DNM Assignment, Salt Water's Lease should be treated differently than the two other Leases. As a preliminary matter, this Court notes that Plaintiffs were aware of the open-ended nature of the duration of the Fish Market Leases during the assignment of the DNM Lease, as there were obviously discussions regarding this issue, which led to the insertion of an end date in the DNM Assignment. That insertion of an end date does not operate however to cure the underlying invalidity of any of the Fish Market Leases.[28]

Developers explain that because the underlying Pruitt's Lease terminated on its third anniversary pursuant to Section 38.E. or it was void *ab initio* for exceeding the Mayor's authority, in either event, "by 2005, Pruitt's was a month-to-month tenant." Developers' Brief, ECF No. 192-1, at 37. The resulting assignment of Pruitt's Lease to DNM Seafood in 2005, and subsequent assignment from DNM to W.D. Inc. in 2014 (and thereafter to Salt Water), *see* Developers' SMF ¶ 116, "could not transfer any greater interest than Pruitt's possessed in 2005, which was then at most a month-to-month tenancy." Developers' Brief, ECF No. 192-1, at 37. Under District of Columbia law, an attempt to assign a month-to-month tenancy is invalid. *Banks v. E. Sav. Bank*,

---

[28] Plaintiffs argue that there is a dispute about who inserted an end date into the DNM Assignment Agreement, and whether the District realized that it had been inserted, which precludes summary judgment, *see* Plaintiffs' Opp'n, ECF No. 203, at 68-70, but these issues are not material to resolution of the validity of the underlying Leases.

8 A.3d 1239, 1244 (D.C. 2010) (discussing *Comedy v. Vito*, 492 A.2d 276, 279 (D.C. 1985) (noting adoption by the District of the view from the Restatement of Property that "tenancies at will are not freely transferable interests in leased property")).

Developers' argument that the Leases were invalid prior to the DNM Assignment and thus, there could be no transfer of a leasehold that was more than a month-to-month tenancy is not addressed by Plaintiffs in their Opposition.  Plaintiffs assert instead that the District's consent to the DNM Assignment, which included the end date, should "estop[ ] Defendants from claiming that the [DNM] Assignment conveyed no rights or was a new lease that was *ultra vires* because it exceeded the District's 20-year limit of authority."  Pls.' Opp'n, ECF No. 203, at 77.   This theory of estoppel fails for the same reasons as explained above.  Neither Deputy Mayor Hoskins, who signed the DNM Assignment on behalf of the District, nor Ms. Longstreet, who approved the DNM Assignment for legal sufficiency, possessed the authority to bind the District to a new lease term by adding an end date in the DNM Assignment, particularly under the circumstances here, where the underlying Pruitt's Lease was invalid.[29]  As previously noted, there is a dispute regarding who added the end date, and Ms. Longstreet claims that the approval of the end date addition was an oversight/error, but none of these "disputes" change the fact that this Court has deemed the Leases void *ab initio*, or terminated at the three-year mark.  Therefore, Pruitt's was a month-to-month tenant by the time its Lease was assigned, and it could only convey its "own interest" to DNM and eventually to Salt Water.  *Velati v Dante*, 39 App. D.C. 372, 376 (D.C. Cir. 1912).

Accordingly, the Salt Water Lease (DNM Assignment) shall be treated in the same manner as the BRW Lease and The Wharf Lease.  All three Fish Market Leases are found to be void *ab*

---

[29] The District asserts that the 2014 [DNM] Assignment could not create a new lease through 2044 for Salt Water because the Executive Branch of the District of Columbia "cannot make 30-year contracts without legislative approval," and there was no approval.   D.C. Mem., ECF No. 190-1, at 37 (citations omitted).

*initio*, or if they were valid as 30-year leases, they terminated on their third anniversaries by operation of Section 38.E.  And therefore, for the reasons explained in detail herein, Plaintiffs BRW, Inc., The Wharf, Inc., and Salt Water Seafood, Inc. are considered to be month-to-month tenants.

A separate Order and an Executive Summary accompany this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE